## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| **ADIS KOVAC;** ) | |
| **BASHAR ALJAME;** ) | |
| **ABRAHAM SBYTI;** ) | **Case No.** |
| **SUHAIB ALLABABIDI;** and, ) | **Hon.** |
| **FADUMO WARSAME;** ) | |
| ) | |
| Plaintiffs, ) | |
| ) | **COMPLAINT FOR** |
| v. ) | **INJUNCTIVE AND DECLARATORY** |
| ) | **RELIEF AND JURY DEMAND** |
| **CHRISTOPHER WRAY**, Director of the ) | |
| Federal Bureau of Investigation, in his official ) | |
| capacity; ) | |
| ) | |
| **CHARLES H. KABLE,** Director of the ) | |
| Terrorist Screening Center; in his official ) | |
| capacity; ) | |
| ) | |
| **DEBORAH MOORE**, Director, Transportation ) | |
| Security Redress (OTSR), Transportation ) | |
| Security Administration (TSA), United States ) | |
| Department of Homeland Security (DHS), and ) | |
| Director of the DHS Traveler Redress Inquiry ) | |
| Program (DHS TRIP); in his official capacity; ) | |
| ) | |
| **NICHOLAS J. RASMUSSEN**, Director of the ) | |
| National Counterterrorism Center, in ) | |
| his official capacity; ) | |
| ) | |
| **DAVID P. PEKOSKE**, Administrator, ) | |
| Transportation Security Administration ) | |
| (TSA), United States Department of ) | |
| Homeland Security (DHS); in his official ) | |
| capacity; ) | |
| ) | |
| **KEVIN K. MCALEENAN**, Acting Commissioner ) | |
| United States Customs and Border Protection; ) | |
| in his official capacity, and, ) | |
| ) | |
| Defendants. ) | |

_____/

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Plaintiffs, **Adis Kavoc, Bashar Aljame, Abraham Sbyti, Suhaib Allababidi** and

**Fadumo Warsame**, for themselves and on behalf of all other similarly situated, by and

through their attorneys, CAIR Legal Defense Fund, Inc. ("Council on American-Islamic

Relations" or "CAIR") and Council on American-Islamic Relations, Dallas/Fort Worth ("CAIR-

DFW"), state as follows:

## Introduction

1.      Our federal government is imposing an injustice of historic proportions upon

the Americans who have filed this action, as well as thousands of other Americans.  Through

extrajudicial and secret means, the federal government is ensnaring individuals into an

invisible web of consequences that are imposed indefinitely and without recourse as a result

of the shockingly large federal terror watch list that now include hundreds of thousands of

individuals.

2.      Indeed, many Americans, including children, end up on the secret federal

terror watch list – which the Defendants have named the Terrorist Screening Database

("TSDB") – based on mere guesses, hunches, and conjecture and even simply based on

matters of race, ethnicity, national origin, religion or the exercise of their constitutional

rights.

3.      These consequences include the inability to fly on airplanes, to go through

security without having all screeners receive a message for the remainder of a listee's life

that he or she is a "known or suspected terrorist," to obtain licenses, to exercise their Second

Amendment right to own a firearm, to obtain immigration benefits including citizenship, and

to be free from the unimaginable indignity and real-life danger of having their own

government communicate to hundreds of thousands of federal agents, private contractors,

businesses, state and local police, the captains of sea-faring vessels, and foreign governments all across the world that they are a violent menace.

4.     And unfortunately, the federal government has designed its federal terror watch list to be accountability-free.  Persons placed on the federal terror watch list have no means of removing themselves or challenging the basis for their inclusion.  Indeed, people on the federal terror watch list only learn of their placement when they feel the web of consequences burdening their lives and aspirations, and they never learn why.

5.     Media accounts have made clear that the secret federal terror watch list is the product of bigotry and misguided, counterproductive zeal.  Americans are dumped onto the watch list without being charged, convicted, or in some stomach-churning cases, even subject to an ongoing investigation.

6.     Instead, leaked government documents and a governmental report, which include the March 2013 Watchlisting Guidance (Exhibit 1), the Directorate of Terrorist Identities (DTI): Strategic Accomplishments 2013 (Exhibit 2), and the Department of Justice's March 2014 Audit of the Federal Bureau of Investigation's Management of Terrorist Watchlist (Exhibit 3) reveal that the care the federal government takes in creating its federal terror watch list is void of proper processing, which in turn results in life-altering consequences that flow from these illegal actions.

7.     In fact, Dearborn, a city of less than 100,000 and a place Arab Americans and Muslim Americans have called home for generations, contains the second highest concentration of Americans on the federal government's watch list.  Moreover, there have been more than 1.5 million nominations to the federal terror watch list since 2009.  And in

2013 for example, the Terrorist Screening Center converted 98.96 percent of those nominations into watch list placements.

8.      Upon information and belief, evidence also shows that the federal government uses guilt-by-association presumptions to place family members and friends of listed persons on the watch list.

9.      Moreover, travel to Muslim majority countries—travel that American Muslims are very likely to engage in—is also a basis for watch list placement.

10.     In 2009, the federal government made 227,932 nominations to its federal terror watch list.  In 2013, that number more than doubled at an alarming and dangerous rate to 468,749.

11.     A federal court judge observed in *Gulet Mohamed v. Eric R. Holder, Jr., et al.,* (United States District Court, Eastern District of Virginia, Case No. 11-cv-00050 (2011)), that "[a] showing of past or ongoing unlawful conduct does not seem to be required, … But the Court has little, if any, ability to articulate what information is viewed by TSC as sufficiently 'derogatory' beyond the labels it has provided the Court.  In sum, the No Fly List assumes that there are some American citizens who are simply too dangerous to be permitted to fly, no matter the level of pre-flight screening or on-flight surveillance and restraint, even though those citizens cannot be legally arrested, detained, or otherwise restricted in their movements or conduct."  *See* United States District Court, Eastern District of Virginia, Case No. 11-cv-00050 (2011); Dkt. 70 at 19; attached as Memorandum Opinion (Exhibit 4).

12.     Moreover, the Court went on to find that "[i]nclusion on the No Fly List also labels an American citizen a disloyal American who is capable of, and disposed toward committing, war crimes, and one can easily imagine the broad range of consequences that

might be visited upon such a person if that stigmatizing designation were known by the general public... The process of nomination to the No Fly List is based on a suspected level of future dangerousness that is not necessarily related to any unlawful conduct." *See* United States District Court, Eastern District of Virginia, Case No. 11-cv-00050 (2011); Dkt. 70 at 14, 17; attached as Memorandum Opinion (Exhibit 4).

13.     Further, the Court in *Elhady, et al., v. Piehota, et al.*, United States District Court, Eastern District of Virginia, Case No. 1:16-cv-375, recently held that the "'central meaning of procedural due process'" is that "[p]arties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified.'" *See* United States District Court, Eastern District of Virginia, Case No. 1:16-cv-375 (2016); Dkt. 47 at 15; attached as Memorandum Opinion (Exhibit 5).   The Court went on to state that the "Government's 'trust us' approach is inconsistent with the fundamental procedural protections applicable to the deprivation of a protected liberty interest, including the right to be heard." *See* United States District Court, Eastern District of Virginia, Case No. 1:16-cv-375 (2016); Dkt. 47 at 16; attached as Memorandum Opinion (Exhibit 5).

## Parties

14.     Plaintiff Adis Kovac (hereinafter "Mr. Kovac") is a United States citizen and an American Muslim residing in New Jersey.

15.     Plaintiff Bashar Aljame (hereinafter "Mr. Aljame") is a United States citizen and an American Muslim residing in Dallas, Texas.

16.     Plaintiff Abraham Sbyti (hereinafter "Mr. Sbyti") is a United States citizen and an American Muslim residing in Dallas, Texas.

17.     Plaintiff Suhaib Allababidi (hereinafter "Mr. Allababidi") is a United States citizen and an American Muslim residing in Dallas, Texas.

18.     Plaintiff Fadumo Warsame (hereinafter "Ms. Warsame") is a United States citizen and an American Muslim residing in Dallas, Texas.

19.     Defendant Christopher Wray is the Director of the Federal Bureau of Investigation ("FBI").  Defendant Wray is responsible for the nominations of Plaintiffs and other similarly situated American citizens to the federal terror watch list.  Defendant Wray is being sued in his official capacity, only.

20.     Defendant Charles H. Kable is the current Director of the Terrorist Screening Center ("TSC").  Defendant Kable was appointed in April 2013.  Defendant Kable develops and maintains the federal government's consolidated Terrorism Screening Database (the "watch list"), and accepts nominations of Plaintiffs and other similarly situated American citizens made to the federal terror watch list.  Defendant Kable also oversees the dissemination of the stigmatizing label attached to Plaintiffs and other similarly situated American citizens of "known or suspected terrorists" to state and local authorities, foreign governments, private corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, the captains of sea-faring vessels, among other official and private entities and individuals.  Defendant Kable is being sued in his official capacity, only.

21.     Defendant Deborah Moore is the Director of the Office of Transportation Security Redress (OTSR), Transportation Security Administration (TSA), United States Department of Homeland Security (DHS).  Defendant Moore also serves as the Director of the DHS Traveler Inquiry Program (DHS TRIP).  Defendant Moore is responsible for overseeing DHS TRIP, the administrative complaint process to challenge nominations of

Plaintiffs and other similarly situated American citizens made to the federal terror watch list, and coordinating with other government agencies, including the Terrorism Screening Center, to resolve the complaint.  Defendant Moore is being sued in her official capacity, only.

22.     Defendant Nicholas J. Rasmussen is Director of the National Counterterrorism Center ("NCTC").  Defendant Rasmussen is responsible for the nominations that resulted in the placement of Plaintiffs and other similarly situated American citizens on the federal terror watch list.  Defendant Rasmussen is being sued in his official capacity, only.

23.     Defendant David P. Pekoske is Administrator of the Transportation Security Administration ("TSA").  Defendant Pekoske oversees the dissemination of the stigmatizing label attached to Plaintiffs and other similarly situated American citizens of "known or suspected terrorists" to state and local authorities, foreign governments, private corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, the captains of sea-faring vessels, among other official and private entities and individuals. Defendant Pekoske is being sued in his official capacity, only.

24.     Defendant Kevin K. McAleenan is Acting Commissioner of the United States Customs and Border Protection ("CBP").  Defendant McAleenan is responsible for receiving and implementing the federal terror watch list.  Defendant McAleenan is being sued in his official capacity, only.

## Jurisdiction and Venue

25.     Under U.S. Const. Art. III §2, this Court has jurisdiction because the rights sought to be protected herein are secured by the United States Constitution.  Jurisdiction is proper pursuant to 28 U.S.C. § 1331, 403 U.S. 388 (1971), *et seq.*, 5 U.S.C. § 702, 5 U.S.C. § 706, the United States Constitution, and federal common law.

26.     This action seeks declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § § 2201-02, Rules 57 and 65 of the Federal Rules of Civil Procedure, and pursuant to the general, legal, and equitable powers of this Court.

27.     A substantial part of the unlawful acts alleged herein were committed within the jurisdiction of the United States District Court for the Northern District of Texas.

28.     Venue is proper under 42 U.S.C. § 1391(e) as to all Defendants because Defendants are officers or employees of agencies of the United States sued in their official capacities and because this judicial district is where substantial number of Plaintiffs reside or where a substantial part of the events or omissions giving rise to the claims occurred.

## Factual Background

### The Federal Government's Terrorist Watch List

29.     In September 2003, Former Attorney General John Ashcroft established the Terrorist Screening Center ("TSC") to consolidate the government's approach to terrorism screening.  The TSC, which is administered by the FBI, develops and maintains the federal government's consolidated Terrorism Screening Database (the "watch list").  TSC's consolidated watch list is the federal government's master repository for suspected international and domestic terrorist records used for watch list related screening.

30.     The watch list has two primary components: the Selectee List and the No-Fly List.  Persons on the Selectee List, including many of Plaintiffs, are systematically subject to extra screening at airports and land border crossings, and often find "SSSS" on their boarding passes printed by airline employees which is marked to indicate a passenger's watch list status to airline employees and screeners.  Persons on the No-Fly List, including the

remainder of Plaintiffs, are prevented from boarding flights that fly into, out of, or even through United States airspace.

31.     TSC disseminates records from its terrorist watch list to other government agencies that in turn use those records to identify listed persons.  For example, applicable TSC records are provided to TSA for use by airlines in pre-screening passengers and to CBP for use in screening travelers entering the United States by land.

32.     Upon information and belief, Defendants disseminated the records of each of the Plaintiffs from its terrorist watch list to other government agencies, including the TSA for use by airlines in pre-screening Plaintiffs, and CBP for use in screening Plaintiffs upon entering the United States.

33.     Upon information and belief, Defendants disseminated the records pertaining to each of the Plaintiffs from its terrorist watch list to foreign governments with the purpose and hope that those foreign governments will constrain the movement of the Plaintiffs in some manner.

34.     Upon information and belief, Defendants' intention in disseminating watch list records, including those of Plaintiffs and similarly situated American citizens, as widely as possible is to constrain Plaintiffs' movements, not only within the United States, but abroad as well.  For example, some countries detain individuals listed on the federal terror watch list who enter their borders, question those individuals at the behest of United States officials, or altogether prevent those individuals from even entering those countries.

35.     Thus, while the TSC maintains and controls the database of suspected terrorists, it is the front-line agencies like the TSA that carry out the screening function.  In the context of air travel, when individuals make airline reservations and check in at airports,

the front-line screening agency, like TSA and CBP, conducts a name-based search of the individual, including each of the Plaintiffs, to determine whether he or she is on a watch list.

36.     While agencies throughout the federal government utilize the federal terror watch list to conduct screening, listed persons are subject to a comprehensive portfolio of consequences that cover large aspects of their lives.

37.     Indeed, Defendants disseminated the federal terror watch list to both government authorities and private corporations and individuals with the purpose and hope that these entities and/or individuals will impose consequences on those individuals Defendants have listed, including each of the Plaintiffs.

38.     Upon information and belief, the status of Plaintiffs and similarly situated American citizens as known or suspected terrorists on the federal terror watch list diminishes and even imperils their ability to access the financial system.

39.     Defendants have provided access to the federal terror watch list, and banks have closed the bank accounts of individuals listed on the federal terror watch list and financial companies have declined to allow some listed individuals to make wire transfers.

40.     Moreover, upon information and belief, the citizenship and green card applications of Plaintiffs and similarly situated American citizens are delayed indefinitely due to an "FBI name check" and not adjudicated, thereby denying Plaintiffs and similarly situated American citizens of the rights the flow from citizenship, including the ability to travel freely as a United States citizen and to sponsor for lawful permanent residency immediate relatives living abroad.

41.     Among the entities and individuals that the federal government disseminates its federal terror watch list are state and local authorities, foreign governments, private

corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, the captains of sea-faring vessels, among others.

42.     In fact, last year Former Director of the Terrorist Screening Center Christopher M. Piehota gave an exclusive interview to CNN and stated the following, in relevant part:

> It's concerning that our partners don't use all of our data. We provide them with tools. We provide them with support, and I would find it concerning that they don't use these tools to help screen for their own aviation security, maritime security, border screening, visas, things like that for travel.[1]

43.     Former TSC Director Piehota went on to state that the United States shares its federal terror watch list with the European Union, but that European Union countries don't systematically utilize it to identify suspected terrorists or screen migrants coming.

44.     Upon information and belief, because the names of Plaintiffs and similarly situated American citizens and lawful permanent residents are included on the federal terror watch list, their names were disseminated to state and local authorities, foreign governments, private corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, the captains of sea-faring vessels, among other official and private entities and individuals.

45.     Because the federal government disseminates its federal terror watch list to foreign governments, listed persons, including Plaintiffs and similarly situated American citizens and lawful permanent residents, are often not allowed to enter other nations.  This is because the United States is telling other nations, without any modicum of due process,

---

[1] Brown, P. & Mallonee, M.K. (2016, April 7). *First on CNN: Top U.S. intel official: Europe not taking advantage of terror tracking tools.* Retrieved from http://www.cnn.com/2016/04/07/politics/christopher-piehota-us-intel-europe-terror-tracking/index.html

that thousands of its own citizens and lawful permanent residents are "known or suspected terrorists."

46.     The federal government, through Defendants, disseminates its federal terror watch list to state and local police officers, including Plaintiffs, which allows those officers to query the names of persons, if for example, the listed individual is pulled over for routine traffic violations.

47.     Disseminating the federal terror watch list to state and local police officers creates a dangerous situation insofar as the federal terror watch list effectively directs state and local officers to treat thousands of Americans, including Plaintiffs, charged or convicted with no crime yet listed as a "known or suspected terrorist" and as extremely dangerous.

48.     With the advent and deployment of automatic license plate readers by police departments across the country, local and state authorities have relied heavily upon a driver's watch list status as the basis of a traffic stop, including Plaintiffs and similarly situated American citizens and lawful permanent residents.

49.     Being on the federal terror watch list can prevent listed persons, including Plaintiffs and similarly situated American citizens and lawful permanent residents, from purchasing a gun.  For example, New Jersey passed a law in 2013 that banned persons on the federal terror watch list from owning guns.  Additionally, Connecticut is in the process of setting up an institutional mechanism to prevent individuals whose names are included on the federal terror watch list, such as Plaintiffs, from being able to buy a gun in the state of Connecticut.

50.     Accordingly, Plaintiffs and similarly situated American citizens and lawful permanent residents are unable to purchase guns in states that ban persons on the federal terror watch list from owning guns.

51.     Because the federal government conducts a security risk assessment that includes querying the federal terror watch list prior to issuing a license to commercial drivers to transport hazardous materials, being on the federal terror watch list can prevent listed persons, including Plaintiffs and similarly situated American citizens, from obtaining or renewing their Hazmat license.

52.     Being on the federal terror watch list can also prevent listed persons, including Plaintiffs and similarly situated American citizens and lawful permanent residents, from accompanying minors or passengers with disabilities to their gate, from working at an airport, or working for an airline insofar as listed persons are not allowed to enter so-called "sterile areas" of airports.

53.     Being on the federal terror watch list can also result in the listing of the false stigmatizing label of "known or suspected" terrorist on the criminal records of Plaintiffs and similarly situated American citizens and lawful permanent residents, information that is publicly accessible to the general public.

54.     Defendants make the federal terror watch list available to municipal courts, which then make bail determinations based on an individual's status on the watch list.

55.     Being on the federal terror watch list can also result in the denial or revocation of a Federal Aviation Administration (FAA) license of Plaintiffs and similarly situated American citizens and lawful permanent residents.

56.     Although TSA, CBP, and other agencies may use the records provided by the TSC, it is the TSC that maintains and controls the database of suspected terrorists.

57.     Two government entities are primarily responsible for "nominating" individuals for inclusion in the terrorist watch list—Defendants NCTC and FBI.  The NCTC, which is managed by the Office of the Director of National Intelligence, relies on information from other federal departments and agencies when including alleged known or suspected international terrorists in its Terrorist Identities Datamart Environment ("TIDE") database. The NCTC reviews TIDE entries and recommends specific entries to the TSC for inclusion in the watch list.  TIDE is the main source of all international terrorist information included in the watch list.

58.     Defendant FBI, in turn, nominates to the watch list individuals with what it characterizes as suspected ties to domestic terrorism.

59.     Defendant TSC makes the final decision on whether a nominated individual meets the minimum requirements for inclusion into the watch list as a known or suspected terrorist.  TSC also decides which screening systems will receive the information about that individual.

60.     Former Director of the Terrorism Screening Center Healy has testified that in evaluating whether an individual meets the criteria for inclusion on the consolidated watch list, the TSC determines whether the nominated individual is "reasonably suspected" of having possible links to terrorism.  According to the TSC, "reasonable suspicion requires articulable facts which, taken together with rational inferences, reasonably warrant the determination that an individual is known or suspected to be or has been engaged in conduct constituting, in preparation for, in and of or related to terrorism and terrorist activities."

61.     Defendants have not stated publicly the entirety of what standards or criteria are applied to determine whether an American citizen on the consolidated watch list will be placed on the No-Fly List, Selectee List ("SSSS") or other list that is distributed to the TSA, CBP or other screening agencies.

62.     The standards for watch list inclusion do not evince even internal logic. Defendants define a "suspected terrorist" as an "individual who is reasonably suspected to be, or have been, engaged in conduct constituting, in preparation for, in aid of, or related to terrorism and terrorist activities based on articulable and reasonable suspicion."  In other words, Defendants place American citizens on the federal terror watch list based upon a "reasonable suspicion" that they are "reasonably suspected" of nefarious activities.  This "reasonable suspicion" based on a "reasonable suspicion" standard does not even contain internal logic.

63.     The federal government utilizes guilt-by-association as a basis for watch list inclusion.  For example, the immediate relative of listed persons can be listed without any derogatory information—other than the bonds of family.  Nonetheless, such designation suggests that the immediate relative is him or herself engaged in nefarious activities.

64.     Being a known associate—a friend, colleague, fellow community member, etc.—of a listed individual can also provide a basis for watch list inclusion.

65.     Even if an American citizen is acquitted of terrorism charges or those charges are otherwise dismissed, the federal government retains for itself the authority to continue to include them in the watch list.

66.     For reasons unknown, Defendants also place what they call "non-investigatory subjects" on the federal terror watch list, American citizens that they have chosen not to investigate.

67.     Defendants place individuals on the federal terror watch list without any information regarding an individual's intended target.

68.     Defendants place individuals on the Selectee List without any information that they pose a threat to aviation.

69.     Defendants place individuals on the No Fly List without any information that they pose a threat to aviation.

70.     Under these practices and standards, the number of records in the consolidated watch list has swelled.  Over 1.5 million nominations to the watch list have been submitted by federal agencies since fiscal 2009.

71.     In 2013, Defendant TSC accepted 98.96 percent of all nominations made.

72.     Because of these loose standards and practices, the federal terror watch list's rate of growth has increased.  In fiscal 2009, there were 227,932 nominations to the watch list.  In fiscal 2013, there were 468,749 nominations.

73.     Upon information and belief, in 2001, there were 16 people who the federal government systematically prevented from flying.  In 2013, that number increased to 47,000.

74.     Once an American citizen has been placed on the watch list, the individual remains on the list until the agency that supplied the initial information in support of the nomination determines the individual should be removed.

75.    A 2007 GAO report found that TSC rejects only approximately one percent of all nominations to the watch list.   As such, the watch list is growing at a rate of approximately 20,000 entries per year.

76.    At a March 10, 2010 Senate Homeland Security Committee hearing, Russel E. Travers, Deputy Director of the National Counterterrorism Center, stated that "[t]he entire federal government is leaning very far forward on putting people on list," and that the watch list is "getting bigger, and it will get even bigger."

77.    The federal terror watch list also disproportionately targets American Muslims.

78.    Defendants have utilized the watch list, not as a tool to enhance aviation and border security, but as a bludgeon to coerce American Muslims into becoming informants or forgoing the exercise of their rights, such as the right to have an attorney present during law enforcement questioning.

79.    Public examples of this phenomenon abound.  *See Latif v. Holder*, 2014 U.S. Dist. LEXIS 85450, *19 (D. Or. June 24, 2014) (an FBI agent told Steven Washburn that he "would help remove Washburn's name from the No-Fly List if he agreed to speak to the FBI"); *Id.* at *21-22 (FBI agents told Ibraheim Mashal that "his name would be removed from the No-Fly List and he would receive compensation if he helped the FBI by serving as an informant."): *Id* at *22-23 (FBI agents offered Amir Meshal "the opportunity to serve as a government informant in exchange for assistance in removing his name from the No-Fly List."). *See also Fikre v. FBI*, 2014 U.S. Dist. LEXIS 73174 (D. Or. May 29, 2014) (Emirati officials told Yonas Fikre that he "could not travel to the United States by air because he is on the No-Fly List" and an FBI agent told Fikre that "the FBI could take steps to remove [him]

from the No-Fly List if he agreed to be an informant."); *Tanveer v. Holder*, et. al., No. 13-cv-6951, Dkt. 15 (April 22, 2014) (Naveed Shinwari "declined to act as an informant for the Federal Bureau of Investigation and to spy on [his] own American Muslim communities and other innocent people.").

80.     Almost all publicly known instances of Americans being placed on the watch list regard Muslims or persons who could be mistaken for Muslims.

81.     Additionally, government records show that Dearborn, Michigan—which is 40 percent Arab—is disproportionately represented on the federal terror watch list.  In fact, Dearborn is among the top five cities in the country, alongside Chicago, Houston, New York, and San Diego, represented on the federal terror watch list.

82.     Due to Dearborn's significant population of Muslims, it has earned a reputation as the "Muslim Capital of America."  In fact, almost all publicly known instances of Americans being placed on the watch list regard Muslims or persons who could be mistaken for Muslims.

83.     Defendants' 2013 Watchlisting Guidance also indicates that "[t]ravel for no known lawful or legitimate purpose to a locus of terrorist activity" can be a basis for being listed.  While a "locus of Terrorist Activity" is not defined by the document, upon information and belief, it likely includes any place where many Muslims reside.

84.     The federal terror watch list's inclusion standards are so permissive and pliable and the selectee list's efficacy is at best fleetingly marginal that the inclusion standards themselves violate Plaintiffs procedural and substantive due process.

85.     The federal terror watch list diminishes, rather than enhances, our national security because the number of innocent Americans on the list is becoming so voluminous

that the purpose of having a list is significantly undermined as all are being treated as the same.

86.     The consequences of being on the federal terror watch list are meted out publicly.  Members of the public can witness the extra screening to which individuals on the federal terror watch list are subject, including being pulled out of their car at gunpoint, being ordered to leave one's vehicle with one's hands held above his/her head, among other stigmatizing measures.

87.     Because travel is regularly done with family, friends, and community and professional contacts, a person's watch list status is revealed to travel companions.  Travel companions come to learn of a person's watch list status based on how screeners treat a listee.

88.     In practice, frontline screeners disclose the status of individuals on the federal terror watch list to state and local authorities, as well as airline employees, and they do so in a manner that other members of the traveling public can hear.

89.     The operation of the federal terror watch list enlists air carriers to assist the federal government in tracking the passenger on the federal terror watch list.

90.     Defendants apply the federal terror watch list against Muslim Americans in a manner that is different from how it uses its list against people of other faith backgrounds.

91.     Defendants use impermissible and inaccurate religious profiles in compiling the federal terror watch list.

92.     Defendants who contributed to the placement of Plaintiffs and similarly situated American citizens on the federal terror watch list knew that their actions violated clearly established federal law.

93.     Defendants knew at the time they acted unlawfully that Supreme Court precedent required that, whenever a citizen is deprived of a liberty interest, the federal government must at least provide the deprived with some form of notice that a deprivation occurred.

### The Federal Government's Terrorist Watch List
### Is No More Effective Than a List of Randomly Selected Individuals

94.     Defendants' ability to watch list persons, including Plaintiffs, who pose a threat of terrorism can be measured and described using a quantitative analysis based on factual allegations made in this Complaint as well as publicly available information describing the current operation of the federal terror watch list.

95.     Upon information and belief, the federal government has placed approximately one million persons on the federal terror watch list over the last ten years.

96.     Moreover, based on the University of Maryland's Global Terrorism Database, a project funded in part by the Department of Homeland Security, there have been less than 250 terrorist acts inside the United States over the last decade.  These terrorist acts were perpetrated by less than 250 persons.

97.     Only one of these perpetrators was designated on the federal terror watch list by the federal government prior to their criminal conduct.  This single person designated on the federal terror watch list, however, was removed from the federal terror watch list prior to perpetrating the terrorist attack.

98.     Upon information and belief, in order to designate a person on the federal terror watch list, the federal government must first have information about that person. Because the federal government does not possess information on every person in the world, existing law enforcement and intelligence practices produce a subset of persons who the

federal government can then screen against the federal terror watch list's inclusion standards.

99.     The precise size of this subset is unknown; however, a survey of law enforcement and intelligence practices indicates that the size of this subset is greater than 50 million people.

100.    Upon information and belief, the practices that produce this subset exclude some persons who do pose a threat of terrorism and include some persons who do not pose a threat of terrorism.

101.    Upon further information and belief, the federal government does not screen the entire subset of people known to it.   Moreover, Defendants do not make individual determinations as to whether each person about whom they know should be placed on the federal terror watch list.

102.    In order to designate a person on the federal terror watch list, a federal government official must make a nomination and a TSC official must accept the nomination.

103.    Upon information and belief, TSC officials accept nominations at a rate above 95 percent.

104.    Based on the facts alleged in this Complaint and the publicly known processes of the federal terror watch list, a quantitative analysis can be constructed to measure and describe the performance of the federal terror watch list.

105.    A quantitative analysis demonstrates that, in order to accomplish the federal terror watch list's stated objectives, Defendants must have at least some greater-than-random ability to identify future terrorists.   This is due to the nature of the processes Defendants utilize to place persons on the federal terror watch list and the size of the

population Defendants can—if they so choose—screen against the federal terror watch list's inclusion standards.

106.    A quantitative analysis also demonstrates that Defendants' watch listing system would perform similarly if inclusion on the watch list was done via random selection instead of the existing inclusion standards Defendants utilize.

107.    A quantitative analysis therefore indicates that Defendants have no ability to watch list persons whose placement on the watch list would further Defendants' stated objectives.

### Inadequacy of the DHS Traveler Redress Inquiry Program Process

108.    The government entities and individuals involved in the creation, maintenance, support, modification and enforcement of the federal terror watch list, including Defendants, have not provided travelers, including Plaintiffs and similarly situated American citizens, with a fair and effective mechanism through which they can challenge the TSC's decision to place them on the terrorist watch list.

109.    An individual, including Plaintiffs and similarly situated American citizens, who has been prevented or hindered from travel by being placed on the federal terror watch list has no clear avenue for redress, because no single government entity is responsible for removing an individual from the list.  The TSC, which is administered by the FBI, does not accept redress inquiries from the public, nor does it directly provide final disposition letters to individuals on the selectee list, including Plaintiffs on the selectee list and similarly situated American citizens, who have submitted redress inquiries.  The NCTC which manages the TIDE list also does not accept redress inquiries from the general public.

110.    Individuals who seek redress after having been included in the terrorist watch list must submit an inquiry through the DHS Traveler Redress Inquiry Program ("DHS TRIP").  DHS TRIP provides individuals with a "Redress Control Number."

111.    DHS TRIP is the only redress "process" available to individuals included on the terrorist watch list.

112.    DHS TRIP submits traveler complaints to the TSC, which determines whether any action should be taken.  The TSC has not provided any publicly available information about how it makes that decision.  The TSC is the final arbiter of whether an individual's name is retained on or removed from the watch list, including those of Plaintiffs and similarly situated American citizens and lawful permanent residents.

113.    The TSC makes a determination regarding a particular individual's status on the watch list, including Plaintiffs and similarly situated American citizens, and DHS in turn responds to the individual with a standard form letter that neither confirms nor denies the existence of any terrorist watch list records relating to the individual.  The letters do not set forth any basis for inclusion in a terrorist watch list, do not state whether the government has resolved the complaint at issue.

114.    The government does not provide an American citizen with any opportunity to confront, or to rebut, the grounds for his or her possible inclusion on the watch list.  As such, DHS TRIP offers no meaningful review of the watch list designation and in effect shields the TSC's actions with respect to the individual nominations or classes of nominations from meaningful review by any independent authority.

115.    With regards to the No Fly List, DHS TRIP does disclose to US persons on the No Fly List their status, though DHS TRIP does not disclose to US persons on the Selectee List their status on this list.

116.    Moreover, the government's own internal audits of the system point to serious flaws.  For example, a March 2008 DOJ Office of the Inspector General report entitled Audit of the U.S. Department of Justice Terrorism Watchlist Nomination Processes found significant problems with the nomination and removal process.

117.    Thus, the only "process" available to such individuals is to submit their names and other identifying information to a government entity that has no authority to provide redress and to hope that an unspecified government agency corrects an error or changes its mind.

118.    All Plaintiffs are United States Citizens.

119.    None have been charged, arrested or convicted of a terrorism-related offense.

120.    As alleged below, each of the Plaintiffs and similarly situated American citizens are designated on the watch list.

**Plaintiff Adis Kovac**

121.    On or about October 17, 2014, Mr. Kovac appeared at the O'Hare International Airport in Chicago, Illinois to board his international flight to Turkey.

122.    Mr. Kovac printed his boarding pass and was thoroughly searched and cleared by TSA security.

123.    However, once boarding for his flight commenced, unknown agents stopped Mr. Kovac at the gate entrance and prevented him from boarding.  Upon information and belief, the unknown agents were TSA agents.

124.    The TSA agents interrogated Mr. Kovac at the gate publicly in front of the other passengers and airline personnel.

125.    The TSA agents then escorted Mr. Kovac to the baggage claim area and searched his luggage.

126.    The TSA agents then informed Mr. Kovac that he was cleared to fly.

127.    However, by that time, Mr. Kovac had already missed his flight.  As a result, he had to reschedule his flight for the following day and pay the fees associated with the flight change.

128.    The following day, Mr. Kovac again appeared at the O'Hare International Airport to board his rescheduled flight.

129.    However, once again, at the gate entrance, TSA agents stopped and interrogated Mr. Kovac at the gate publicly in front of other passengers and airline personnel.

130.    Moreover, the TSA agents once again escorted him to the baggage claim area and searched his luggage.

131.    This time, however, the TSA agents confiscated Mr. Kovac's cell phone, and upon information and belief, downloaded the data from his cell phone.

132.    Afterwards, two FBI agents – one male and one female – interrogated Mr. Kovac for approximately one hour about his travel plans in Turkey and Syria, his views and opinions on Sharia law (Islamic law), his life, family, friends and employment.

133.    Following the interrogation, the FBI agents informed Mr. Kovac that he would not be allowed to board his flight and that he should return home.

134.    As a result, Mr. Kovac was unable to board his flight and lost the money he paid for the flight.

135.    The FBI agents then drove Mr. Kovac to Zak's Pizza Pasta & Wings, in Lombard, Illinois, where they further interrogated him for approximately one hour.

136.    Afterwards, the FBI agents drove Mr. Kovac to his home, which was surrounded by multiple law enforcement vehicles with flashing lights.

137.    Moreover, FBI agents were interrogating Mr. Kavoc's parents about him and searching his home and electronics.  The FBI downloaded the data from Mr. Kovac's parents' laptops and took Mr. Kovac's cell phone offsite for days until it was returned.

138.    The following week, Mr. Kovac was interrogated by FBI agents, including FBI Agent Aaron Render, about his Islamic beliefs and political opinions at a Starbucks near his home.

139.    On or about the end of 2015, Mr. Kovac was again interrogated about his Islamic beliefs and political opinions by FBI agent Trevor Stotts at the FBI Chicago field office. During the interrogation, FBI agent Stotts asked Mr. Kovac to take a lie detector test.

140.    On or about the summer of 2016, Mr. Kovac was again interrogated by FBI Agent Stotts at a Dunkin' Donuts in Chicago.  FBI Agent Stotts informed Mr. Kovac that he needed to take a lie detector test if he wanted to be removed from the No Fly List.  Otherwise, FBI Agent Stotts, explained that Mr. Kovac would have to wait several years before his name would be removed from the No Fly List.

141.    On or about the end of 2016, two female FBI agents interrogated Mr. Kovac's wife while he was at work.

142.    The FBI has also separately interrogated his older brother and younger sister.

143.    In June 2017, Mr. Kovac appeared at the O'Hare International Airport to board his flight to Newark, New Jersey.

144.     However, this time, he was unable to check in to his flight or print his boarding pass.  Moreover, he was prevented from boarding his flight.

145.     At no time was Mr. Kovac given notice of the factual basis for his placement on the federal terror watch list, and at no time was he offered a meaningful opportunity to contest his designation.

146.     Moreover, at no time was Mr. Kovac given notice of the deprivation of his liberty interests or violation of his constitutional rights.

147.     Mr. Kovac filed a redress request through DHS TRIP.

148.     As of this date, Mr. Kovac has not yet received a response to his redress request.

149.     Upon information and belief, Mr. Kovac remains on the federal terror watch list.

150.     Upon information and belief, Mr. Kovac's nomination to and designation on the federal terror watch list was made based solely upon a hunch (based upon his race, ethnicity, national origin, religious affiliation, guilt-by-association, or First Amendment protected activities).

151.     Upon information and belief, because Mr. Kovac is included on the federal terror watch list, and specifically the No Fly List, Defendants disseminated and are continuing to disseminate his designation as a "known or suspected terrorist" to state and local authorities, foreign governments, corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, among other official and private entities and individuals.

152.    Mr. Kovac has never been charged, arrested or convicted of a terrorism-related offense.

### Plaintiff Bashar Aljame

153.    Mr. Aljame is routinely referred to secondary inspection by CBP when he attempts to re-enter the United States.

154.    In April 2013, Mr. Aljame arrived at the Queen Alia International Airport to board his flight to San Diego, California.  He was planning to resettle his family in the United States.

155.    Mr. Aljame was prevented from boarding his flight and did not receive an explanation for being denied boarding.

156.    Moreover, he lost the money that he paid for his flight, hotel, and car rental.

157.    In an attempt to seek answers, Mr. Aljame went to the United States Embassy in Amman, Jordan on two separate occasions.

158.    However, instead of receiving assistance, both times, Mr. Aljame was subjected to a lengthy interrogation by FBI Agent Kevin.

159.    FBI Agent Kevin asked Mr. Aljame if he would be willing to take a lie detector test in exchange for the United States government arranging a flight for him to fly to Chicago, Illinois, as opposed to San Diego, California.

160.    Mr. Aljame continued to contact the United States Embassy in Amman, Jordan; however, he never received a response.

161.    As a direct result of being prevented from flying to the United States, Mr. Aljame and his family were forced to remain in Jordan for approximately two years.

162.    In April 2015, Mr. Aljame appeared at the Queen Alia International Airport in Amman, Jordan to attempt to return to the United States again.  His flight itinerary had a connection at the Frankfurt Airport in Frankfurt, Germany.

163.    Once again, Mr. Aljame was pulled aside for secondary screening and searched extensively.

164.    As soon as Mr. Aljame deplaned, he heard his name being called by two CBP officers.

165.    The CBP officers escorted Mr. Aljame to the baggage claim area, confiscated his passports and documents, and searched his personal belongings and luggage.

166.    Meanwhile, Mr. Aljame was interrogated by one of the CBP Officers, CBP Officer Hristov.

167.    He was eventually cleared to board his flight to the United States.

168.    Since April 2015, every time Mr. Aljame travels by air, he is unable to check in to his flights online or at the kiosks stationed at the airports.

169.    Rather, he is directed to check in manually with an airline representative to print his boarding pass.

170.    The airline representative, after pulling up his name on the computer system, then contacts the Department of Homeland Security to obtain clearance to board his flight.

171.    Once clearance from the Department of Homeland Security is obtained, the airline representative prints his boarding pass, which is always stamped with the "SSSS" designation, indicating that he has been designated as a "known or suspected terrorist."

172.    As a result, every time Mr. Aljame travels by air, he is subjected to extensive secondary inspections, prolonged searches and interrogations.

173.    Mr. Aljame filed a redress request through DHS TRIP in July 2014 and in May 2015.

174.    On July 23, 2014, Mr. Aljame received a letter, similar to the letter described in paragraph 113 above, and was assigned a Redress Control Number.  While that letter contained many words, it provided no information—not notice of his placement nor some means by which to challenge his designation—about Mr. Aljame's status as a listee.

175.    Mr. Aljame received a similar letter in response to his second redress request in May 2015.

176.    On or around the beginning of June 2015, Mr. Aljame returned to Jordan to again try to resettle his family in the United States, this time in Dallas, Texas.

177.    Mr. Aljame was delayed and subjected to special screening prior to boarding his flight.

178.    Several days later, on June 10, 2015, Mr. Aljame, his wife, daughter, and ten-year-old son appeared at the Queen Alia International Airport to board their flight from Amman, Jordan to Dallas, Texas.  Their flight itinerary had a connection in the Dubai International Airport in Dubai, United Emirates.

179.    Although Mr. Aljame and his family were eventually allowed to board their flight, Mr. Aljame and his ten-year-old son were told that he and his son will be denied from boarding their flight from Dubai, United Emirates to the United States.  His wife and daughter boarded without issues.

180.    At the Dubai International Airport, Mr. Aljame was required to wait three hours before the Department of Homeland Security finally cleared him to fly to the United States.  An hour later, the Department of Homeland Security cleared his son to fly.

181.    Because of the delay, Mr. Aljame and his family missed their flight and were forced to sleep at the airport for approximately eight to ten hours before they were able to board their flight that was rescheduled for the following day.

182.    Upon arriving to the Dallas/Fort Worth International Airport, CBP Officers Portales and Brock called for Mr. Aljame and escorted him to the baggage claim area to pick up his luggage and interrogate him.  One of the CBP officers interrogated him while the other searched his belongings and inspected his passports, identification documents, credit cards and other documents.

183.    Mr. Aljame asked the CBP officers why he was being interrogated but received no answer.

184.    Mr. Aljame's family had to wait a couple of hours not knowing what was happening to him.  Mr. Aljame was not able to take his wife's calls during this time.

185.    Mr. Aljame had a similar experience upon his return from Amman, Jordan in September 2015.

186.    In May 2016, Mr. Aljame flew to Amman, Jordan.  Once he arrived at the Queen Alia International Airport, he was held for almost two hours.  The Jordanian officials denied him entry and deported Mr. Aljame back to Dallas.

187.    At no time was Mr. Aljame given notice of the factual basis for his placement on the federal terror watch list, and at no time was he offered a meaningful opportunity to contest his designation.

188.    Moreover, at no time was Mr. Aljame given notice of the deprivation of his liberty interests or violation of his constitutional rights.

189.    Upon information and belief, Mr. Aljame's nomination to and designation on the federal terror watch list was made based solely upon a hunch (based upon his race, ethnicity, national origin, religious affiliation, guilt-by-association, or First Amendment protected activities).

190.    Upon information and belief, because Mr. Aljame is included on the federal terror watch list, and specifically the Selectee List, Defendants disseminated and are continuing to disseminate his designation as a "known or suspected terrorist" to state and local authorities, foreign governments, corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, among other official and private entities and individuals.

**Plaintiff Abraham Sbyti**

191.    Every time Mr. Abraham Sbyti travels by air, since 2014, his boarding pass is stamped with the "SSSS" designation, indicating that he has been designated as a "known or suspected terrorist."

192.    Moreover, Mr. Sbyti is frequently unable to board his flights until he is "cleared" by DHS to board the flight, a process that oftentimes takes hours.

193.    Since October 2014, Mr. Sbyti has been subjected to prolonged searches and interrogations on numerous flights he has taken.  Each time he attempts to reenter the country, his phone is confiscated and, upon information and belief, the CBP officers download the data from his phone.

194.    On or about October 2014, upon deplaning at the O'Hare International in Chicago from Lebanon, two CBP officers called for him at the gate.  The CBP Officers escorted Mr. Sybti to an empty area in the airport to interrogate him.

195.    The CBP Officers confiscated Mr. Sbyti's credit cards, driver's license, passport and other documents for inspection.  Meanwhile, Mr. Sbyti was interrogated by the second CBP Officer.

196.    During this interrogation, Mr. Sybti was asked "do you go to a mosque?"

197.    Mr. Sybti filed a redress request through DHS TRIP in March 2015.

198.    He received a letter, similar to the letter described in paragraph 113 above, and was assigned a Redress Control Number.  While that letter contained many words, it provided no information—not notice of his placement nor some means by which to challenge his designation—about Mr. Sbyti's status as a listee.

199.    On or about May 2016, Mr. Sybti received a called from someone identifying themselves as a DHS agent, asking to meet him at a Starbucks in Allen, Texas, to discuss the DHS TRIP complaint he filed.

200.    On or about June 1, 2016, Mr. Sybti met with two agents in plain clothes at a Starbucks in Allen, Texas.

201.    One DHS agent showed Mr. Sybti his DHS badge.  The other agent refused to identify himself and show his badge however identified himself as "Eric."

202.    The meeting lasted three-and-a-half hours.  The DHS agents had all of Mr. Sybti's travel history and personal information.

203.    The DHS agents attempted to recruit Mr. Sybti into becoming an informant in Lebanon.

204.    They tried to entice Mr. Sybti into becoming an informant by offering to solve his travel problems if Mr. Sybti cooperated with them by acting as an informant in Lebanon.

205.    Mr. Sybti refused to become an informant.

206.    In June 2016, while Mr. Sybti waited to board his flight to Lebanon at the Dallas/Fort Worth International Airport, Agent Eric remained with Mr. Sybti for almost an hour until he boarded his flight.

207.    Two months later, Mr. Sybti went to the Richardson Police Department regarding an issue unrelated to his travel experiences.  Once again, when Mr. Sybti arrived at the police station, Agent Eric was there.

208.    Agent Eric, who was dressed in plain clothes, remained with Mr. Sybti for the entire forty-five minutes that Mr. Sybti was at the police station.  Agent Eric continued his attempts to "befriend" Mr. Sybti.

209.    At no time was Mr. Sybti given notice of the factual basis for his placement on the federal terror watch list, and at no time was he offered a meaningful opportunity to contest his designation.

210.    Moreover, at no time was Mr. Sybti given notice of the deprivation of his liberty interests or violation of his constitutional rights.

211.    Mr. Sybti's boarding passes are stamped with the "SSSS" designation every time he travels by air.

212.    Additionally, every time Mr. Sybti travels by air, he is referred to secondary inspection and subjected to prolonged searches and questioning.

213.    Upon information and belief, Mr. Sybti remains on the federal terror watch list.

214.    Upon information and belief, Mr. Sybti's nomination to and designation on the federal terror watch list was made based solely upon a hunch (based upon his race, ethnicity, national origin, religious affiliation, guilt-by-association, or First Amendment protected activities).

215.    Upon information and belief, because Mr. Sybti is included on the federal terror watch list, and specifically the Selectee List, Defendants disseminated and are continuing to disseminate his designation as a "known or suspected terrorist" to state and local authorities, foreign governments, corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, among other official and private entities and individuals.

### Plaintiff Suhaib Allababidi

216.    On January 24, 2017, Mr. Suhaib Allababidi arrived at the Dallas/Fort Worth International Airport.  Mr. Allababidi was returning to the United States after a four-week business trip in Turkey, Kuwait and Dubai.

217.    Prior to this trip, Mr. Allababidi was pre-approved for the Global Entry program.  Global Entry is a federal government program that allows for expedited clearance for pre-approved, low-risk travelers upon arrival in the United States.  All applicants for Global Entry undergo rigorous background check(s) and in-person interview before enrollment in the program.   Global Entry members enter the United States through automatic kiosks.

218.    When Mr. Allababidi attempted to enter the country using the Global Entry kiosk, the kiosk instructed Mr. Allababidi that his Global Entry card had been cancelled.

219.    Thereafter, Mr. Allababidi was escorted for secondary questioning.

220.    After waiting approximately one hour, Mr. Allababidi was interrogated by CBP Officer Allen.  Another CBP officer confiscated and searched Mr. Allababidi's documents, including business receipts, and all his belongings.

221.    Meanwhile, a second CBP officer asked Mr. Allababidi to unlock his two cell phones that he had with him.   Mr. Allababidi unlocked one of his cell phones.   Upon information and belief, the CBP officers downloaded the data on that phone.   Mr. Allababidi refused to provide his password to his second phone.

222.    Afterwards, CBP Special Agent Charles Plasket arrived and instructed Mr. Allababidi that CBP is going to confiscate both of his phones even though one of the phones was searched and had already been cleared and returned to him.

223.    After being informed that his business phone would be confiscated, Mr. Allababidi unlocked his second phone and asked CBP Special Agent Plasket to search it and return it back to him.   CBP Special Agent Plasket replied that it was too late and he would need to confiscate it now.

224.    As of this date, CBP has returned one of Mr. Allababidi's phones that was confiscated.   However, Mr. Allababidi still has not been able to obtain his second phone, despite repeated attempts.

225.    In August 2017, Mr. Allababidi filed a complaint through DHS TRIP.

226.    He received a letter, similar to the letter described in paragraph 113 above, and was assigned a Redress Control Number.   While that letter contained many words, it provided no information—not notice of his placement nor some means by which to challenge his designation—about Mr. Allababidi's status as a listee.

227.    Each time Mr. Allababidi travels by air, since January 2017, his boarding pass is stamped with the "SSSS" designation, indicating that he has been designated as a "known or suspected terrorist."

228.    Mr. Allababidi is frequently unable to board his flights until he is "cleared" by DHS to board the flight.  He is not able to print his boarding pass online or at an airport kiosk.

229.    In July 2017, Mr. Allababidi went on vacation with his wife and kids.  They arrived three hours early.  Because of the above described treatment, Mr. Allababidi and his family missed their flight to Cancun.  They had to rebook another flight and went through the entire process again.  Mr. Allababidi and his entire family, including two infants, had "SSSS" labeled on their boarding passes.

230.    During this time, Mr. Allababidi asked the airline representative why he was not able to print out his boarding pass.  The airline representative informed him that he was on the watch list.

231.    Moreover, Mr. Allababidi has been severely discouraged from flying to the point that in October 2017, he engaged in business travel to China because he did not want to suffer the humiliation, frustration, and hassle he experiences when he flies.

232.    Upon information and belief, Mr. Allababidi remains on the federal terror watch list.

233.    Upon information and belief, Mr. Allababidi's nomination to and designation on the federal terror watch list was made based solely upon a hunch (based upon his race, ethnicity, national origin, religious affiliation, guilt-by-association, or First Amendment protected activities).

234.    Upon information and belief, because Mr. Allababidi is included on the federal terror watch list, and specifically the Selectee List, Defendants disseminated and are continuing to disseminate his designation as a "known or suspected terrorist" to state and local authorities, foreign governments, corporations, private contractors, airlines, gun

sellers, car dealerships, financial institutions, among other official and private entities and individuals.

### Plaintiff Fadumo Warsame

235.    Every time Ms. Warsame travels by air since March 2015, her boarding pass is stamped with the "SSSS" designation, indicating that she has been designated as a "known or suspected terrorist."

236.    Ms. Warsame is unable to check-in and print her boarding passes from a kiosk or online.   Instead, Ms. Warsame is frequently unable to board her flights until she is "cleared" by DHS to board the flight.

237.    Ms. Warsame has been subjected to prolonged searches and interrogations.

238.    Moreover, upon information and belief, the adjudication of her application for citizenship has been delayed due to Ms. Warsame's status on the watch list, which has been pending since 2014.

239.    Additionally, upon information and belief, due to Ms. Warsame's status on the watch list, Ms. Warsame has not been able to get a credit card or receive a bank loan.

240.    Ms. Warsame has filed a redress request through DHS TRIP.

241.    Ms. Warsame received a letter, similar to the letter described in paragraph 113 above, and was assigned a Redress Control Number.   While that letter contained many words, it provided no information—not notice of his placement nor some means by which to challenge his designation—about Ms. Warsame's status as a listee.

242.    At no time was Ms. Warsame given notice of the factual basis for her placement on the federal terror watch list, and at no time was she offered a meaningful opportunity to contest her designation.

243.     Moreover, at no time was Ms. Warsame given notice of the deprivation of her liberty interests or violation of her constitutional rights.

244.     Ms. Warsame's boarding passes continue to be stamped with the "SSSS" designation every time she travels by air.

245.     Upon information and belief, Ms. Warsame remains on the federal terror watch list.

246.     Upon information and belief, Ms. Warsame's nomination to and designation on the federal terror watch list was made based solely upon a hunch (based upon his race, ethnicity, national origin, religious affiliation, guilt-by-association, or First Amendment protected activities).

247.     Upon information and belief, because Ms. Warsame is included on the federal terror watch list, and specifically the Selectee List, Defendants disseminated and are continuing to disseminate his designation as a "known or suspected terrorist" to state and local authorities, foreign governments, corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, among other official and private entities and individuals.

## COUNT I
## FAILURE TO PROVIDE POST-DEPRIVATION NOTICE AND HEARING IN VIOLATION OF THE FIFTH AMENDMENT RIGHT TO PROCEDURAL DUE PROCESS
## (Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)

248.     The foregoing allegations are realleged and incorporated herein.

249.     Each of the Plaintiffs and other similarly situated American citizens learned that he or she was placed on the federal terror watch list subsequent to being added on the federal terror watch list and sought to challenge such placement.

250.   Defendants' actions as described above in refusing to provide Plaintiffs and other similarly situated American citizens with any notice at all of their placement which deprived Plaintiffs and other similarly situated American citizens of constitutionally protected liberty interests.

251.   Defendants' actions in nominating Plaintiffs and other similarly situated American citizens to the federal terror watch list blatantly violate the requirement that "'nominations' must not be solely based on race, ethnicity, national origin, religious affiliation, or First Amendment protected activities."  49 U.S.C. § 114(h)(3).

252.   Plaintiffs and other similarly situated American citizens have a liberty interest in traveling free from unreasonable burdens that are not reasonably tailored within, to, and from the United States, through land border crossings and over U.S. air space.

253.   Plaintiffs and other similarly situated American citizens have a right to be free from false government stigmatization as individuals who are "known or suspected to be" terrorists, or who are otherwise associated with terrorist activity, when such harm arises in conjunction with the additional consequences that follow from being listed as well as the deprivation of their right to travel on the same terms as other travelers and/or the deprivation of their liberty interest under the Fifth Amendment in travel free from unreasonable burdens.

254.   Plaintiffs and other similarly situated American citizens have a liberty interest in nonattainder (ie:  the interest against being singled out for punishment without trial). Defendants' actions have singled out Plaintiffs and others similarly situated for punishments that include, but are not limited to, inability to travel by air and unreasonable burdens placed

upon traveling by air to and from the United States, over U.S. air space and at land border crossings, and false association with a list of individuals suspected of terrorism.

255.   Plaintiffs and other similarly situated American citizens, having been burdened or prevented from boarding on commercial flights or entering the United States at land border crossings, having had their bank accounts closed, having been prevented from making wire transfers at financial institutions, having had their citizenship applications delayed indefinitely due to an "FBI name check," having lost lucrative economic opportunities and suffering from other forms of financial harm, having been prevented from test driving or purchasing vehicles at a car dealership, and having sought to challenge their placement on the federal terror watch list, are entitled to a constitutionally adequate legal mechanism that affords them notice of the reasons and bases for their placement on the federal terror watch list and a meaningful opportunity to contest their continued inclusion on the federal terror watch list.   Defendants have even failed to provide the most basic ingredient of due process, which is notice that the government has deprived a person of their protected rights.

256.   Moreover, Defendants have officially imposed on Plaintiffs and other similarly situated American citizens the stigmatizing label of "known or suspected terrorists" without a constitutionally adequate legal mechanism.

257.   Further, Defendants disseminated the stigmatizing label attached to Plaintiffs and other similarly situated American citizens of "known or suspected terrorists" to state and local authorities, foreign governments, private corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, the captains of sea-faring vessels, among other official and private entities and individuals.

258.    By imposing on Plaintiffs and other similarly situated American citizens the stigmatizing label of "known or suspected terrorists" and by failing to provide Plaintiffs and others similarly situated with a constitutionally adequate legal mechanism, Defendants have deprived Plaintiffs and other similarly situated American citizens of their protected liberty interests, including but not limited to their liberty interests in traveling, freedom from false stigmatization, and nonattainder, and thus violated the constitutional rights of Plaintiffs and other similarly situated American citizens without affording them due process of law and will continue to do so into the future if Plaintiffs and other similarly situated American citizens are not afforded the relief demanded below.

WHEREFORE, Plaintiffs request this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

## COUNT II

### DEPRIVATION OF PROTECTED LIBERTIES IN VIOLATION OF FIFTH AMENDMENT RIGHT TO SUBSTANTIVE DUE PROCESS
### (Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)

259.    The foregoing allegations are realleged and incorporated herein.

260.    Because Plaintiffs and other similarly situated American citizens were listed by Defendants in a manner not narrowly tailored to a compelling interest, Defendants' actions as described above in including Plaintiffs and other similarly situated American citizens on a watch list that unreasonably burdens or prevents them from boarding commercial flights or entering the United States at land border crossings, are arbitrary and capricious, lack even a rational relationship to any legitimate government interest, and have

unduly deprived Plaintiffs of constitutionally protected rights, including their liberty interests in travel, freedom from false stigmatization, and nonattainder.

261.    Defendants' actions in nominating Plaintiffs and other similarly situated American citizens to the federal terror watch list blatantly violate the requirement that "'nominations' must not be solely based on race, ethnicity, national origin, religious affiliation, or First Amendment protected activities."  49 U.S.C. § 114(h)(3).

262.    By placing Plaintiffs and other similarly situated American citizens on the federal terror watch list, Defendants have placed an undue burden on their fundamental right of movement.

263.    By placing Plaintiffs and other similarly situated American citizens on the federal terror watch list, Defendants have treated Plaintiffs like second-class citizens.

264.    Defendants' watch list lacks a compelling interest insofar as their true purpose is to provide law enforcement with a tool to coerce American Muslims into becoming informants.

265.    Defendants' watch lists are also not narrowly tailored insofar as the federal terror watch lists are entirely and demonstrably ineffectual and obvious alternatives exist.

266.    Defendants' actions in placing Plaintiffs and other similarly situated American citizens on the federal terror watch list, officially imposing on Plaintiffs and other similarly situated American citizens the stigmatizing label of "known or suspected terrorists," and disseminating the stigmatizing label to state and local authorities, foreign governments, private corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, the captains of sea-faring vessels, among other official and private entities and individuals, without a constitutionally adequate legal mechanism, are arbitrary and

capricious, shock the conscience, violate the decencies of civilized conduct and are so brutal and offensive that they do not comport with the traditional ideas of fair play and decency.

267.   Plaintiffs and other similarly situated American citizens, having been burdened or prevented from boarding on commercial flights or entering the United States at land border crossings, having had their bank accounts closed, having been prevented from making wire transfers at financial institutions, having had their citizenship applications delayed indefinitely due to an "FBI name check," having lost lucrative economic opportunities and suffering from other forms of financial harm, having been prevented from test driving or purchasing vehicles at a car dealership, and having sought to challenge their placement on the federal terror watch list, are entitled to a constitutionally adequate legal mechanism that affords them notice of the reasons and bases for their placement on the federal terror watch list and a meaningful opportunity to contest their continued inclusion on the federal terror watch list.  Defendants have even failed to provide the most basic ingredient of due process, which is notice that the government has deprived a person of their protected rights.

268.   Because Plaintiffs and other similarly situated American citizens have not been charged with any crimes and are United States Citizens, Plaintiffs challenge their placement and the placement of others similarly situated American citizens on the federal terror watch list on a broad, as-applied basis.

269.   Plaintiffs' substantive due process challenge is also facial, as there are no circumstances where their placement or the placement of others similarly situated on the federal terror watch list is narrowly tailored to achieve any compelling government interest.

270.    Defendants have thus violated Plaintiffs' constitutional rights and the constitutional rights of other similarly situated American citizens without affording them due process of law and will continue to do so into the future if Plaintiffs and other similarly situated American citizens are not afforded the relief demanded below.

WHEREFORE, Plaintiffs request this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

<u>**COUNT III**</u>
**UNLAWFUL AGENCY ACTION IN VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. §§ 702, 706**
<u>**(Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)**</u>

271.    The foregoing allegations are realleged and incorporated herein.

272.    Defendants' actions in placing Plaintiffs and other similarly situated American citizens on the federal terror watch list, officially imposing on Plaintiffs and other similarly situated American citizens the stigmatizing label of "known or suspected terrorists," and disseminating the stigmatizing label to state and local authorities, foreign governments, private corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, the captains of sea-faring vessels, among other official and private entities and individuals, without a constitutionally adequate legal mechanism, were and are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and contrary to constitutional rights, power, privilege, or immunity, and should be set aside as unlawful pursuant to 5 U.S.C. § 706.

273.    Defendants' actions in nominating Plaintiffs and other similarly situated American citizens to the federal terror watch list blatantly violate the requirement that

"'nominations' must not be solely based on race, ethnicity, national origin, religious affiliation, or First Amendment protected activities."  49 U.S.C. § 114(h)(3).

274.    Defendants' failure to provide Plaintiffs and other similarly situated American citizens, who had been unreasonably burdened or denied boarding on commercial flights or entering the United States across the border and sought to challenge their placement on the federal terror watch list, with a constitutionally adequate mechanism that affords them notice of the reasons and bases for their placement on the federal terror watch list and a meaningful opportunity to contest their continued inclusion on the federal terror watch list is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and contrary to constitutional rights, power, privilege, or immunity, and should be set aside as unlawful pursuant to 5 U.S.C. § 706.

275.    Because Plaintiffs and other similarly situated American citizens do not present a security threat to commercial aviation, Defendants' actions as described above in including Plaintiffs and other similarly situated American citizens on the federal terror watch list that unreasonably burdens or prevents them from boarding commercial flights or entering the United States across the border, are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and contrary to constitutional rights, power, privilege, or immunity, and should be set aside as unlawful pursuant to 5 U.S.C. § 706.

276.    Because Defendants' watch list is based on always-wrong, or in the alternative almost-always wrong, predictions of who among the innocent will engage in criminal conduct in the future, Defendants' federal terror watch list violates 5 U.S.C. § 706's prohibition on arbitrary government action.

277.    Plaintiffs and other similarly situated American citizens and lawful permanent residents are not required to exhaust the DHS TRIP process, under the holding in *Darby v. Cisneros*, 509 U.S. 137 (1993).  *See* United States District Court, Eastern District of Virginia, Case No. 11-cv-00050 (2011); Dkt. 70 at 22; attached as Memorandum Opinion (Exhibit 4).

WHEREFORE, Plaintiffs request this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

## COUNT IV
## VIOLATION OF THE FIFTH AMENDMENT
## TO THE UNITED STATES CONSTITUTION
## (Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)
## (Equal Protection)

278.    The foregoing allegations are realleged and incorporated herein.

279.    Defendants' actions in placing Plaintiffs and other similarly situated American citizens on the federal terror watch list, officially imposing on Plaintiffs and other similarly situated American citizens the stigmatizing label of "known or suspected terrorists," and disseminating the stigmatizing label to state and local authorities, foreign governments, private corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, the captains of sea-faring vessels, among other official and private entities and individuals, without a constitutionally adequate legal mechanism are discriminatory and constitute an action that targets religious conduct for distinctive treatment.

280.    Defendants' actions in nominating Plaintiffs and other similarly situated American citizens to the federal terror watch list blatantly violate the requirement that "'nominations' must not be solely based on race, ethnicity, national origin, religious affiliation, or First Amendment protected activities."  49 U.S.C. § 114(h)(3).

47

281.    By placing Plaintiffs and other similarly situated American citizens on the federal terror watch list, Defendants have treated Plaintiffs and other similarly situated American citizens like second-class citizens.

282.    Defendants' above-described actions were motivated by the religious status of Plaintiffs and other similarly situated American citizens and on the basis of the constitutionally-protected free exercise of religion of Plaintiffs and other similarly situated American citizens.

283.    Defendants' above-described actions have had a discriminatory effect upon and have disparately impacted Plaintiffs and other similarly situated American citizens who are Muslim American travelers, and not travelers of other faiths.

284.    Defendants' above-described actions, policies, course of conduct, or pattern of practice that mandate or permit the above-described treatment of Plaintiffs and other similarly situated American citizens does not serve a compelling state interest or a legitimate or public purpose, nor are they the least restrictive means or narrowly tailored to achieve any such interest.

WHEREFORE, Plaintiffs request this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

## COUNT V
### VIOLATION OF THE UNITED STATES CONSTITUTION
### (Non-Delegation)

285.    The foregoing allegations are realleged and incorporated herein.

286.    Congress has not provided the Executive Branch with intelligible principles from which the Executive can implement its watch list schemes regarding civil aviation and

national security.

287.   Congress has not directed the Executive Branch to create either a No-Fly List or a Selectee List.

288.   Congress has not authorized the Executive Branch to utilize the federal terror watch list to encourage financial institutions to close bank accounts or ban wire transfers, to encourage car dealerships to restrict test drives or purchases of vehicles, or state and local law enforcement to detain individuals based on their watch list status.

289.   Congress has not authorized the Executive Branch to disseminate the terror watch list to local and state authorities, foreign countries, private corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, the captains of sea-faring vessels, among other official and private entities and individuals.

290.   The Executive Branch's assignment of the watch listing function to TSC violates Congress' directive that TSA determine who belongs on federal terror watch lists and the consequences that flow from being on those lists.

291.   Congress has not delegated to TSA the authority to create a process that can culminate in the removal of individuals from the TSDB.

292.   In the alternative, Congress's delegation to TSA to create a redress process is defective because the Executive Branch has allocated watch list authority in a manner that prevents TSA from creating a redress process.

293.   As a result, Defendants have illegally acted beyond their authority.

WHEREFORE, Plaintiffs request this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

**Prayer for Relief**

WHEREFORE, Plaintiffs respectfully request:

1.      A declaratory judgment that Defendants' policies, practices, and customs violate the Fifth Amendment to the United States Constitution and the Administrative Procedure Act;

2.      A declaratory judgment that Defendants' policies, practices, and customs violate the non-delegation doctrine of the United States Constitution;

3.      An injunction that:

      a.      requires Defendants to remedy the constitutional and statutory violations identified above, including the removal of Plaintiffs from any watch list or database that burdens or prevents them from flying or entering the United States across the border; and,

      b.      requires Defendants to provide individuals designated on the federal terror watch list with a legal mechanism that affords them notice of the reasons and bases for their placement on the federal terror watch list and a meaningful opportunity to contest their continued inclusion on the federal terror watch list;

4.      A trial by jury;

5.      An award of attorneys' fees, costs, and expenses of all litigation, pursuant to 28 U.S.C. § 2412; and,

6.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

NOW COME Plaintiffs, by and through their undersigned counsel, and hereby demand trial by jury of the above-referenced causes of action.

Respectfully submitted,

COUNCIL ON AMERICAN-ISLAMIC
RELATIONS – DALLAS (CAIR-DFW)

BY:      /s/ Nikiya Natale
NIKIYA NATALE (TX: 24090290)
*Attorney for Plaintiffs*
Civil Rights Director
P.O. Box 741625
Dallas, TX 75374
Phone: 469-998-2246

CAIR LEGAL DEFENSE FUND

BY:      /s/ Lena Masri
LENA F. MASRI (DC: 1000019) ‡
GADEIR I. ABBAS (VA: 81161) ‡ *
AHMED MOHAMED (NY: 938392)
*Attorneys for Plaintiffs*
453 New Jersey Ave, SE
Washington, DC 20003
Phone: (202) 488-8787

‡ *Admission to practice in this Court*
*forthcoming*
* *Licensed in VA, not in D.C.  Practice*
*limited to federal matters*

Date:  January 17, 2017