# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **ADIS KOVAC, et al.;** | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 3:18-cv-110-L |
| | ) | |
| v. | ) | |
| | ) | |
| **CHRISTOPHER WRAY**, et al.; | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS**

i

# TABLE OF CONTENTS

Table of Contents ............................................................................................................................ii

Table of Authorities........................................................................................................................iv

Introduction......................................................................................................................................1

Statement of Relevant Facts............................................................................................................2

Standard of Review..........................................................................................................................4

Argument .........................................................................................................................................5

    I.     The federal watch list violates Plaintiffs' substantive due process right to freedom of movement...............................................................................................................................5

        A.     History reflects a right of movement inherent in the Due Process Clause. .........................6

        B.     The text of the United States Constitution and an analysis of the Bill of Rights' penumbras reflects that the right of movement is inherent to the Due Process Clause. ..................................6

        C.     The No Fly List interferes with Plaintiffs' right of movement. ...........................................7

        D.     The Selectee List interferes with Plaintiffs' right of movement.........................................8

    II.     Because the No Fly List and the Selectee List both interfere with the exercise of a fundamental right, strict scrutiny applies. .........................................................................................9

        A.     The TSDB and the aviation subset lists lack a compelling government interest..............10

        B.     The TSDB and the aviation subset lists are not narrowly tailored. ...................................10

           i.     The watch lists are underinclusive. ..................................................................................11

           ii.     The watch lists are overinclusive. ...................................................................................12

    III.    The No Fly List and Selectee List deprive Plaintiffs of their procedural due process rights...
.......................................................................................................................................................12

        A.     Defendants have burdened two critical interests, the right of movement and Plaintiffs' stigma-plus interest in their reputations. .........................................................................................13

           i.     The widespread dissemination of the watch list and its publicly identifiable consequence constitute a publication that satisfies the stigma-plus prong. .....................................................14

  ii.  The stigma plus prong is satisfied because the dissemination of the watch list burdens Plaintiffs' interests and alters their rights and status. ...................................................16

 B.  The risk of erroneous deprivation is almost absolute and attributable to the bottom-of-the-barrel inclusion standard. ...................................................................................17

 C.  Defendants have not provided Plaintiffs with any process whatsoever. ...........................19

IV.  Plaintiffs have adequately pled Equal Protection claims. ...........................................................20

V.  Plaintiffs' non-delegation claim arises from the lack of Congressional direction to Defendants to create a terrorist watch list that is, in large part, a list of innocent people. ..............22

VI.  This Court has jurisdiction over Plaintiffs' claims....................................................................24

VII.  Placement on the No Fly List and Selectee Lists is a reviewable agency action; therefore, Plaintiffs have stated an Administrative Procedure Act claim............................................................24

Conclusion ..........................................................................................................................................................25

Certificate of Service..........................................................................................................................................27

## <u>TABLE OF AUTHORITIES</u>

Cases

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................ 4

*Bd. of Regents v. Roth*, 408 U.S. 564 (1972) ............................................................... 14

*Bostic v. Schaefer*, 760 F.3d 352 (4th Cir. 2014) ......................................................... 9

*Braatz, L.L.C. v. Red Mango FC, L.L.C.*, 642 Fed. Appx. 406 (5th Cir. 2016) ............ 4

*Brandt v. Bd. of Coop. Educ. Servs., Third Supervisory Dist.*, 820 F.2d 41 (2d Cir. 1987) .............................. 14

*Children's Seashore House v. Waldman*, 197 F.3d 654 (3d Cir. 1999) ....................... 9

*Darby v. Cisneros*, 509 U.S. 137 (1993) ..................................................................... 25

*Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d 38 (2d Cir. 2001). ...................... 14, 16

*Ege v. United States Dep't of Homeland Sec.*, 784 F.3d 791(2015) ........................... 24

*Elhady v. Wray*, Case No. 16-cv-375 (E.D. Va. 2016) ......................................10, 20, 24

*Elston v. Talladega Cty. Bd. of Educ.*, 997 F.2d 1394 (11th Cir. 1993) ...................... 21

*Evans v. Chalmers*, 703 F.3d 636 (4th Cir. 2012) ...................................................... 14

*Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523 (6th Cir. 2002) ............... 20

*First Nat. Bank v. Bellotti*, 435 U.S. 765 (1978) ......................................................... 11

*Griswold v. Connecticut*, 381 U.S. 479 (1965) .......................................................... 5, 7

*Grutter v. Bollinger*,539 U.S. 306 (2003) ................................................................... 10

*Hawkins v. Freeman*, 195 F.3d 732 (4th Cir. 1999) ..................................................... 9

*Humphries v. County of L.A.*, 554 F.3d 1170 (9th Cir. 2009) ...................................... 16

*Hunt v. Cromartie*, 526 U.S. 541 (1999)) ................................................................... 20

*Industrial Union Department, AFL-CIO v. American Petroleum Institute*, 448 U.S. 607 (1980) .................. 22

iv

*Johnson v. Bredesen*, 624 F.3d 742 (6th Cir. 2010) ........................................................................ 20

*Kent v. Dulles,* 357 U.S. 116 (1958) ................................................................................ 5, 6

*Latif v. Holder,* 686 F.3d 1122 (9th Cir. 2012) .......................................................................... 24

*Mathews v. Eldridge,* 424 U.S. 319 (1976) .......................................................................... 13

*Michael H. v Gerald D.,* 491 U.S. 110 (1989) ........................................................................ 6

*Mohamed v. Holder,* 266 F. Supp. 3d 868 (E.D. Va. 2017) .............................................. 9, 10, 25

*Mohamed v. Holder,* Civil Action No. 1:11-cv-50 (AJT/MSN), 2015 U.S. Dist. LEXIS 92997 (E.D. Va.

    July 16, 2015) ................................................................................. 5, 15, 18, 19

*Mohamed v. Holder,* No. 1:11-cv-50 (AJT/TRJ), 2011 U.S. Dist. LEXIS 96751 (E.D. Va. Aug. 26, 2011)

    ............................................................................................................... 14, 17

*Mohamed v. Holder,* No. 11-1924, 2013 U.S. App. LEXIS 26340 (4th Cir. May 28, 2013)................... 24

*Morris v. Livingston,* 739 F.3d 740 (5th Cir. 2014) .......................................................... 12

*Paul v. Davis,* 424 U.S. 693 (1976) .................................................................................. 16

*Randall v. Scott,* 610 F.3d 701 (11th Cir. 2010) ................................................................ 9

*Reno v. Flores,* 507 U.S. 292 (1993) ................................................................................ 9

*S. Carolina Med. Ass'n v. Thompson,* 327 F.3d 346 (4th Cir. 2003) ...................................... 22

*Sciolino v. City of Newport News,* 480 F.3d 642 (4th Cir. 2007) ........................................ 14

*Shapiro v. Thompson,* 394 U.S. 618 (1969) ................................................................. 5, 8, 9

*Siegert v. Gilley,* 500 U.S. 226 (1991). ........................................................................... 17

*Skinner v. State of Okl. ex rel. Williamson,* 316 U.S. 535 (1942) ........................................ 9

*Sylvia Dev. Corp. v. Calvert Cty., Md.,* 48 F.3d 810 (4th Cir. 1995) ..................................... 21

*Terry v. Ohio,* 392 U.S. 1 (1968). ................................................................................... 18

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252 (1977) ..................................................... 20

*Washington v. Davis,* 426 U.S. 229 (1976)........................................................................................... 20

*Washington v. Harper,* 494 U.S. 210 (1990) ........................................................................................ 12

*Wayte v. United States,* 470 U.S. 598 (1985) ...................................................................................... 20

*Whren v. United States,* 517 U.S. 806 (1996) ...................................................................................... 20

*Yakus v. United States,* 321 U.S. 414 (1944)........................................................................................ 22

*Zablocki v. Redhail,* 434 U.S. 374 (1978)........................................................................................... 7, 8

## Statutes

49 U.S.C. § 114(h)(3) ....................................................................................................................... 22, 23

49 U.S.C. § 46110 ................................................................................................................................ 24

49 U.S.C. 114(h)(3)(A) ........................................................................................................................ 10

5 U.S.C. § 706........................................................................................................................................ 25

## Other Authorities

Zechariah Chafee, Jr., *Three Human Rights in the Constitution of 1787* 166 (1956)........................................ 6

**INTRODUCTION**

Plaintiffs, Adis Kovac, Bashar Aljame, Abraham Sbyti, Suhaib Allababidi, and Fadumo Warsame, are innocent, law-abiding American citizens.  They have never been arrested, charged, or convicted of a terrorism-related offense.  And yet, the federal government has designated—without any process at all—each of them as terrorists, disseminated that designation to millions throughout the country and world, and attached penalties, restrictions, and stigma to Plaintiffs and the thousands of other innocent Americans languishing on the defendants' secret watchlists.

Defendants affixed this designation by placing each plaintiff in the Terrorist Screening Database ("TSDB"), the technical name for the defendants' terrorist watch list.  Their entries are annotated in various ways.  Mr. Kovac's entry, for instance, is annotated in a way that prevents him from boarding any flight—domestic or international—that traverses US airspace.  The entries for Mr. Sbyti and Mr. Aljame, on the other hand, are annotated in a way that frequently subjects them to prolonged interrogations—sometimes about their religious beliefs and practices—and invasive searches of their electronics.  But for each of the Plaintiffs, the core consequence is the same: their country has relegated them to a kind of second-class status, a status that separates Mr. Kovac from family and opportunity, exiled Mr. Aljame from this country for almost two years, and invited the Defendants to attempt to coerce Mr. Sybti into becoming their informant.

But as the well-pled allegations of this complaint make clear, all of these consequences and all of the shame that comes with being on defendants' terrorist watchlist is for naught.  There is no security benefit to this watchlist.  It has never prevented a terrorist act. And the defendants know this.  In fact, this sprawling secretive program would stop just as many terrorist acts—zero—if Defendants selected people for inclusion randomly instead of the illegal, irrational process they use now.

The violations alleged here reflect malicious practices administered with no regard for the rights of innocent citizens. Discovery, if permitted, will record its unlawfulness in high definition.

1

## STATEMENT OF RELEVANT FACTS

Through extra-judicial and secret means, the federal government ensnares hundreds of thousands of individuals in its terrorist watch list, the Terrorist Screening Database, via a process that disproportionately targets American Muslims. Dkt. 1 at 1, 77. This list has two primary groupings: the Selectee List and the No Fly List. *Id.* at 30. Persons on the selectee watch list are systematically subject to extra screening at airports and land border crossings, and often find "SSSS" on their boarding passes—an indication of the passenger's status as a "known or suspected terrorist" to airport screeners. *Id.* Persons on the No Fly List are prevented from boarding flights into, out of, or even through United States airspace. *Id.*

Plaintiffs are persons who the Defendants have placed in the TSDB. Their TSDB entries contain both No Fly List and Selectee List annotations. Plaintiffs are Muslims and United States citizens who have been wrongfully designated on the federal terrorist watch list and falsely stigmatized as "known or suspected terrorists" by Defendants. *Id.* at 14-18. None of the Plaintiffs were provided notice of the factual basis for their placement on the watch list, either before or after their listing. *Id.* at 145, 187, 209, 226, and 242. Nor were any of the Plaintiffs given notice of the deprivation of their liberty interests or violation of their constitutional rights. *Id.* at 146, 188, 210, 226, and 243. Most importantly, none have been charged or convicted of a terrorism-related offense. *Id.* at 119.

Defendants utilize the watchlist, not as a tool to enhance aviation and border security, but for nefarious, unlawful purposes, including to coerce innocent Americans into becoming informants and disseminating defamatory, stigmatizing information to millions to restrict innocent Americans' ability to exercise their rights of movement and to travel.[1] The pain and suffering caused by Defendants' actions are real and severe.

---

[1] The watchlist and improper purposes that the Defendants utilize the watchlist for are outlined in detail in the Complaint. *See* Dkt. 1 at 1-120.

2

For example, DHS agents approached Mr. Sybti in an attempt to coerce him to become an informant in Lebanon. *Id.* at 204-205. Defendants offered to remove his name from the federal watch list if he agreed, raising the inference that Defendants placed Mr. Sybti on the list in order to coerce him. He has been extensively interrogated, his electronics have been confiscated and searched, and because of the watchlist, he has been humiliated by CBP officers who have waited for him to deplane and then questioned him about his religious practices. *Id.* at 193-196. At one point, Defendants asked, "do you go to a mosque." *Id.* at 196. In Texas, Defendants surveilled Mr. Sybti for months with Agent Eric "randomly" showing up to coerce and "befriend" Mr. Sybti. *Id.* at 204-208.

Similarly, FBI agents have questioned Mr. Kovac about his religious and political views and opinion on Sharia law (Islamic law) at least four times, including at the airport. *Id.* at 132-140. Because his TSDB entry is annotated in a way to deny him the ability to fly through US airspace, Mr. Kovac has been denied boarding at least twice. *Id.* at 121-143. Since October 17, 2014, Mr. Kovac has not been able to fly. *Id.* Defendants have targeted his family and interrogated many of his family members. *Id.* at 141-142. An FBI agent has informed Mr. Kovac that he needs to take a lie detector test or else wait several years before being removed from the No Fly List. *Id.* at 140.

From 2013 to 2015, Defendants exiled Mr. Aljame in Jordan by denying him the ability to fly home to the United States. *Id.* at 161. When he flies now, Mr. Aljame must obtain clearance before he is given a boarding pass, he endures long interrogations and intensive searches, and his documents are confiscated, he is separated from his loved ones, and has missed flights because of Defendants' treatment of him. *Id.* at 177-185. Mr. Aljame's 10-year-old son has even been required to get clearance before being allowed to board. *Id.* at 179-180. Recently, Mr. Aljame was denied entry into Jordan and was deported back to Texas as a result of the international dissemination of the TSDB. *Id.* at 186.

Mr. Allababidi is a successful businessman ensnared by Defendants' discriminatory watchlist. *Id.* at 216. Prior to being added to it, Mr. Allababidi traveled frequently and had Global Entry. *Id.* at

216-217.  His Global Entry, because of the Defendants' actions, was revoked without explanation, and he has endured humiliating searches, long interrogations, and his electronics have been confiscated and downloaded.  *Id.* at 217-224. Even his infant children have not been spared the misery of the watchlist.  *Id.* at 229.  Mr. Allababidi has missed flights, had his vacations ruined, and even forgone business opportunities because of Defendants.  *Id.* at 229-231.

Defendants' watchlist has affected Ms. Warsame's travels since 2015.  *Id.* at 235.  She is always delayed and needs clearance before flying [*id.* at 235-236]; subjected to long, humiliating searches and interrogations [*id.* at 237]; and upon information and belief, has been denied a credit card and bank loan due to the watchlist [*id.* at 239].

## **STANDARD OF REVIEW**

To survive a Rule 12(b)(6) motion to dismiss, a complaint need only contain sufficient facts that, accepted as true, state a plausible claim for relief on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "The plausibility standard is not akin to a 'probability requirement.'" *Iqbal*, 556 U.S. at 678. "Even if it seems 'almost a certainty to the court that the facts alleged cannot be proved to support the legal claim,' the claim may not be dismissed so long as the complaint states a claim." *Clark v. Amoco Prod. Co.*, 794 F.2d 967, 970 (5th Cir. 1986).  The Fifth Circuit view motions to dismiss under Rule 12(b)(6) with disfavor.  *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011).  The Court must view the complaint in the light most favorable to Plaintiffs and resolve every doubt in their behalf before determining whether Plaintiffs have stated a valid claim for relief. *Nottingham v. Richardson*, 499 Fed. Appx. 368, 372-373 (5th Cir. 2012).

Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction may either be facial, i.e. based on the facts alleged on the face of the Complaint, or factual, i.e. based on extrinsic evidence submitted by the Defendants.  *See Braatz, L.L.C. v. Red Mango FC, L.L.C.*, 642 Fed. Appx. 406 (5th Cir. 2016).  Defendants have introduced no extrinsic facts relevant to this Court's continuing

jurisdiction.  Accordingly, Defendants' jurisdictional challenge is facial and must be evaluated under the same standard as a Rule 12(b)(6) motion, with all allegations accepted as true and in the light most favorable to the Plaintiffs.  *Id.*

## ARGUMENT

**I.     The federal watch list violates Plaintiffs' substantive due process right to freedom of movement.**

Defendants' argument against the existence of a right of movement, which encompasses domestic and international, provides nothing more than a depressing and pessimistic misrepresentation of the strength of our constitutional rights. But *Glucksberg's* analysis controls the outcome of this claim, and *Glucksberg* leads to the conclusion that there is a right of movement in the Constitution violated by the watch list. *Washington v. Glucksberg*, 521 U.S. 702 (1997).  As the Eastern District of Virginia observed in *Mohamed,* "the general right of free movement is a long recognized, fundamental liberty." *Mohamed v. Holder*, Civil Action No. 1:11-cv-50 (AJT/MSN), 2015 U.S. Dist. LEXIS 92997, at *20 (E.D. Va. July 16, 2015). The Supreme Court previously observed "[f]reedom of movement is basic to our scheme of values." *Kent v. Dulles,* 357 U.S. 116, 126 (1958).  The Supreme Court also "long ago recognized that the nature of our federal union and our constitutional concepts of personal liberty unite to require that all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement." *Shapiro v. Thompson,* 394 U.S. 618, 629 (1969). This language is unequivocal.

Defendants' invitation to conduct the substantive due process analysis anew produces the same outcome.  The Supreme Court requires courts to follow its "established method of substantive-due-process analysis" which has "two primary features." *Glucksberg*, 521 U.S. at 721. The first step is to "carefully formulat[e] the interest at stake." *Id.* at 722. The second step is to determine whether the freedom in dispute is among those "fundamental rights and liberties" rooted in our country's history. *Id.* at 720-721; *accord Griswold v. Connecticut*, 381 U.S. 479, 481-86 (1965) (examining history and legal

5

tradition to infer fundamental rights as penumbras to the Constitution's text).  Because the formulation of the interest at stake requires this Court to determine "the most specific level at which a relevant tradition protecting, or denying protection to, the asserted right can be identified," both steps of the *Glucksberg* analysis are contained within the historical and precedential review that follows. *Michael H. v Gerald D.,* 491 U.S. 110, 127 (1989).

    A.  <u>History reflects a right of movement inherent in the Due Process Clause.</u>

The historical examination *Glucksberg* requires is broad and probing. *See Glucksberg*, 521 U.S. at 710-715.  In *Glucksberg*, the Supreme Court analyzed historical treatises and colonial history. *Id.*  This history shows a right of movement embedded within American tradition.  The desire for more freedom of movement led many of our forebears to embark on the treacherous journey from Europe to the New World. Many English colonists were motivated by "[t]he unhappiness and frustration caused by the various restrictions on freedom of movement in England." Zechariah Chafee, Jr.[2], *Three Human Rights in the Constitution of 1787* 166 (1956) (relied on in *Kent*, 357 U.S. at 125-126).  Colonists' experiences in England with religious discrimination and an inability to move from town to town, led to America's Founders viewing freedom of movement as a right "already embodied" in the Constitution.  *Id.* at 164, 175.

    B.  <u>The text of the United States Constitution and an analysis of the Bill of Rights' penumbras reflects that the right of movement is inherent to the Due Process Clause.</u>

The Constitution's enumerated rights presume a freedom of movement. First, Article IV of the Constitution entitles citizens of one state to the privileges and immunities of all the states. By conferring such equal treatment, Article IV necessarily presupposes that citizens will move from one state to another state.   Similarly, Article I of the Constitution gives Congress the ability to regulate interstate commerce, and commerce with foreign states.  This authorization anticipates a zone of

---

[2] In *Kent v. Dulles,* the Supreme Court relied extensively on Professor Chafee's work.

movement as well: the movement of goods and people between states and between the United States and other countries.  The First Amendment, which guarantees the right to assemble, implies a zone of movement: citizens must be able to move within and between states and countries in order to freely assemble.  The First Amendment also guarantees the right to free exercise of religion. This guarantee implies a zone of movement: for many citizens, movement is a necessary component of free exercise of religion. Aside from congregating regularly with members of their faith at a site of worship, many religions encourage pilgrimage in foreign countries. For example, Catholics travel to the Vatican, Jews to Israel, and Muslims to Mecca. More broadly, the Ninth Amendment reserves unenumerated rights to the People.

Our constitutional scheme—from the Commerce Clause to the Bill of Rights, from federalism to the Citizenship Clause—necessarily presupposes the existence of a right of movement.  Just as the Supreme Court in *Griswold* recognized "zones of privacy" in threading together various constitutional guarantees, this Court should recognize zones of movement emanating from various constitutional guarantees.  *See Griswold*, 381 U.S. 479, 481-86.

C.   The No Fly List interferes with Plaintiffs' right of movement.

Defendants' inclusion of Plaintiff Kovac on the No Fly List is a clear violation of his right to movement because it "significantly interferes with the exercise of a fundamental right." *Zablocki v. Redhail*, 434 U.S. 374, 388 (1978).   The federal government's watch list replicates the same impermissible dynamics declared unconstitutional in *Zablocki*. Plaintiff Kovac's status on the No Fly List prevents him from traveling overseas, from boarding any flight over United States airspace (whether domestic or international), and from performing basic functions related to his job and daily life. Dkt. 1 at 121-152. The federal government's watch lists replicate the impermissible dynamics declared unconstitutional in *Zablocki*.  No Fly Listees are second class citizens.  Persons on the No Fly List are practically unable to travel overseas or even domestically.  The No Fly List prevents listees

7

from attending professional gatherings, going on vacation, performing their religious pilgrimages, and other functions. Air travel is a facilitator of movement, particularly for those who are time, resource, or health constrained. Forcing Plaintiff Kovac to take circuitous routes over land and sea constitutes an impermissible "serious intrusion" on his right of movement. *See Zablocki,* 434 U.S at 387. Defendants' actions impose the same impermissible obstacle in *Zablocki*—a monetary outlay that was previously unrelated to the exercise of the right—in addition to a substantial increase in the finite resource that is time. The No Fly List is a substantial obstacle to exercising the right of movement.

D.  <u>The Selectee List interferes with Plaintiffs' right of movement</u>

The Selectee List also violates the remaining Plaintiffs' right of movement. While the No Fly List inflicts a complete flight ban, the Selectee List makes travel so painful and humiliating that listees elect to forego it. For instance, Plaintiff Allababidi has been severely discouraged from traveling to the point that in October 2017, he passed up a business travel to China in order to avoid suffering the humiliation, frustration, and hassle that he experiences at the hands of Defendants. Dkt. 1 at 231. But beyond deterring travel, the Selectee List also regulates international movement. Defendants disseminate the Selectee List to more than 40 countries and do so "with the purpose and hope that those foreign governments will constrain the movement" of listees. Dkt. 1 at 33. Foreign governments are unlikely to grant visas to the Plaintiffs on the Selectee List, prohibit listees from entering, detain listees, or impose other consequences that make international travel dangerous for listees. Plaintiff Aljame is a prime example as he was been denied entry into Jordan and deported back to the United States as a result of his status on the watch list being disseminated to Jordan. *See* Dkt. 1 at 186. The Supreme Court has held that "[i]f a law has no other purpose…than to chill the assertion of constitutional rights by penalizing those who choose to exercise them, then it is patently unconstitutional." *Shapiro v. Thompson*, 394 U.S. 618 (1969). The Selectee List imposes precisely such an intentional penalty.

## II.   Because the No Fly List and the Selectee List both interfere with the exercise of a fundamental right, strict scrutiny applies.

Strict scrutiny is "essential" where government action interferes with "basic civil rights." *Skinner v. State of Okl. ex rel. Williamson*, 316 U.S. 535, 5x41 (1942). When an asserted right is deemed "fundamental," that interest is "entitled… to the protection of strict scrutiny judicial review of the challenged legislation." *Hawkins v. Freeman*, 195 F.3d 732, 739 (4th Cir. 1999). The Due Process Clause provides "heightened protection against government interference with certain fundamental rights," *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997), and interference with a Due Process fundamental right "warrants the application of strict scrutiny." *Bostic v. Schaefer*, 760 F.3d 352, 375 (4th Cir. 2014). Strict scrutiny requires government interference to be "narrowly tailored to serve a compelling state interest." *Reno v. Flores,* 507 U.S. 292, 302, 113 S. Ct. 1439, 1447 (1993).

The No Fly List has been held to implicate the fundamental right of movement.  *See Gulet Mohamed v. Eric R. Holder, Jr., et al.* Case No. 11-cv-00050 (2011), Dkt. 70, Page ID #1099-1100 ("The general right of free movement is a long recognized, fundamental liberty" and "[a]t some point, governmental actions taken to prevent or impede a citizen from reaching the border infringe upon the citizen's right to reenter the United States.") A similar analysis extends to the Selectee List and the TSDB generally. The fundamental right of movement falls squarely within the ambit of the Due Process Clause.  *Shapiro*, 394 U.S. at 634.  Because strict scrutiny governs the Defendants' imposition of severe travel-related burdens on Plaintiffs through the TSDB, early dismissal is inappropriate.

The government cannot satisfy *its* burden to prove that the TSDB is narrowly tailored to fulfill a compelling governmental interest in a Rule 12(b)(6) posture.  *See, e.g., Randall v. Scott*, 610 F.3d 701, 710-713 (11th Cir. 2010); *Children's Seashore House v. Waldman*, 197 F.3d 654, 660 n.4 (3d Cir. 1999). Defendants' heavy reliance on *Mohamed v. Holder*, 266 F. Supp. 3d 868, 880 (E.D. Va. 2017) is misplaced.  Rather, *Holder* supports Plaintiffs' position since it was decided in a *summary judgment* posture, *after* the court had determined that "[t]he effect of the No Fly List on the fundamental right

of interstate travel is at least as great as other effects on fundamental rights found to constitute significant interference" and "precludes [individuals] from engaging in a wide range of constitutionally protected activities." *Id.* at 879-880. Plaintiffs' allegations here survive a motion to dismiss.

A.   The TSDB and the aviation subset lists lack a compelling government interest.

Defendants claim that their watchlist exists to promote aviation and national security. Dkt. 8 at 3; 49 U.S.C. 114(h)(3)(A) (authorizing the TSA to prevent, take action against, or notify law enforcement of "individuals on passenger lists who may be a threat to civil aviation *or* national security" from boarding airplanes). But their compelling government interest cannot be established in a motion to dismiss posture, particularly where Plaintiffs have pled that the watch list fails to promote its stated purpose. *See Mohamed*, 266 F. Supp. 3d at 880. Defendants' true purpose of the watch list is to "provide law enforcement with a tool to coerce American Muslims into becoming informants." Dkt. 1 at 264; *Accord Elhady v. Wray,* 16-cv-375 Dkt. 22 (E.D. Va. Dec. 12, 2016) (outlining numerous plaintiffs being recruited as informants in exchange for their removal from the watch list). Defendants here attempted to coerce Plaintiff Sybti into becoming an informant by offering to remove him from the watch list. *Id.* at 203-205. These allegations are well pled and supported by specific facts that give rise to the inference that the watch list's purpose is more about recruiting informants than protecting planes.

B.   The TSDB and the aviation subset lists are not narrowly tailored.

A regulation that burdens fundamental rights must be narrowly tailored to further compelling government interests. This requirement ensures such regulations are "specifically designed and narrowly framed to accomplish" the purpose underlying the regulation. *Grutter v. Bollinger,* 539 U.S. 306, 333 (2003) (internal quotation marks and citation omitted). In order to be narrowly tailored, these lists must neither leave unregulated "significant influences bearing on" aviation security and

national security nor "sweep too broadly" by affecting conduct that does not bear on those interests. *First Nat. Bank v. Bellotti*, 435 U.S. 765, 788-795 (1978).

### i.     The watch lists are underinclusive.

The TSDB, Selectee List, and No Fly List are underinclusive because they produce results adverse to governmental interests. The Government asserts that disclosure of its investigative interest in a person actively harms national security.  *See* Dkt. 8 at 19, 22.  Defendants rely on *Mohamed* and argue that a disclosure of watch list status could enable evasion by the subject, endanger law enforcement agents, and encourage a subject to accelerate plans for an attack.  Case No. 11-cv-00050 (E.D. Va. 2011), Dkt. 167 at Ex 5 – Steinbach Decl, ¶ 13.  But by the very nature of its implementation, the watch list discloses who is on or off of it.  Persons on the No Fly List are prevented from flying; persons on the Selectee List receive an "SSSS" stamp on their boarding passes and undergo heightened security every time they fly.  Dkt. 1 at 30.  *See* Steinbach Decl. ¶ 13, 16 (conceding ways that listees could evade detection, gain information or otherwise obtain a law enforcement advantage).   In *First Nat. Bank v. Bellotti*, the Supreme Court struck down a law that infringed on a fundamental right because the law adversely affected the compelling interests it was meant to serve.  435 U.S. 765, 788-795 (1978).  Like *Bellotti*, the No Fly List and Selectee Lists harm the interests at which they are aimed.

Furthermore, the No Fly List and Selectee List incompletely regulate harmful conduct bearing on national security. The watch list only affects movement by plane or across the border. This neglects other forms of movement, such as wholly domestic travel by train, bus, or motor vehicle.  This incongruity renders the list underinclusive, particularly considering recent terrorist attacks perpetuated by driving vehicles into crowds. The watch list is also underinclusive, because its predictive-preventive model of listing is "no more effective than a list of randomly selected individuals."  Dkt. 1 at 94- 107. Of all the perpetrators of terrorist acts inside the United States in the last decade, only "one of these perpetrators was designated on the federal terror watch list…prior to their criminal conduct." But that

person—Omar Mateen—"was removed from [the List] prior to perpetrating his terrorist attack." *Id.* at 97. Thus, Defendants' watchlisting system is completely incapable of stopping actual terrorists.

### ii.    The watch lists are overinclusive.

The watch list is overinclusive because it ensnares innocent persons engaged in legal conduct in its web, based on predictive judgments that are no better than a randomized selection. Individuals on the No Fly List cannot fly for any purpose, including to engage in lawful, constitutionally-protected activities such as attending political, religious, or family gatherings. Individuals on the Selectee List are screened at airports and borders even when Defendants possess no information from which to infer that they intend an act of violence. These lists are compiled based on expected future conduct. *See Mohamed,* No. 11-cv-00050 (E.D. Va.), Dkt. 1689, Page ID # 2288 (noting that placement on the watch list is reserved for individuals that "pose[] a threat of committing" certain acts rather than simply individuals who are in the process of committing those acts).

Defendants have never presented evidence that their predictions are effective or reliable. Indeed, a quantitative analysis of the watchlist reveals that, based on its processes and performance over the last decade, the watchlisting system ensnares large numbers of innocent Americans while not monitoring any real terrorists. Dkt. 1 at 94-107. Plaintiffs have stated a substantive due process claim.

### III.   The No Fly List and Selectee List deprive Plaintiffs of their procedural due process rights.

To establish a due process violation, a plaintiff has to demonstrate that he had a protected interest, that the defendant deprived him of that interest, and that the deprivation was without due process of law. *Morris v. Livingston*, 739 F.3d 740, 749-50 (5th Cir. 2014). "The procedural protections required by the Due Process Clause must be determined with reference to the rights and interests at stake in the particular case." *Washington v. Harper*, 494 U.S. 210, 229 (1990). If a government deprivation concerns an interest protected by the Due Process Clause, a court must weigh three factors to determine what process is due: (1) "the private interest that will be affected by the official action, (2)

12

"the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

The watch list has deprived or substantially burdened Plaintiffs of their right of movement, and their reputational interests afforded by the stigma-plus doctrine. The watch list also imposes a host of other specific legal disabilities on listees—including not being able to purchase a gun in states like New Jersey to not being able to obtain employment at airports. The risk of erroneous deprivation is enormous insofar as the watch list has not included a single actual perpetrator of terrorism over the last decade. Substituting a common-sense requirement that the Defendants charge or arrest a person prior to listing them will lower the risk of erroneous deprivation. Finally, because the government uses the watch list, not to protect aviation, but to coerce Muslims into becoming informants, Defendants' interest in maintaining its list is minimal. Thus, the *Mathews* factors counsel a comprehensive and assertive judicial intervention against the watch list.

A. Defendants have burdened two critical interests, the right of movement and Plaintiffs' stigma-plus interest in their reputations.

The right of movement includes Plaintiffs' right to undertake both domestic and international travel. The No Fly List's flight ban violates the fundamental right of movement by preventing individuals from utilizing an entire form of transportation. The Selectee List, likewise, violates Plaintiffs' right of movement insofar as it causes large domestic delays, and its international dissemination restricts Plaintiffs' ability to travel abroad.

Plaintiffs' reputational interests are also burdened. To satisfy the stigma-plus doctrine, which establishes constitutional protections against government defamation, plaintiffs must show a "stigmatic statement" by the government accompanied by "state action that distinctly alter[s] or extinguishe[s]" the defamed's status or otherwise burdens his interests. *Evans v. Chalmers,* 703 F.3d

13

636, 654 (4th Cir. 2012).  A stigmatic statement is any statement that "might seriously damage his standing and associations in his community." *Bd. of Regents v. Roth*, 408 U.S. 564, 573 (1972).  Because the defamatory statement must affect one's standing, some type of dissemination or publication of the statement must be demonstrated.  And the requirement for state action beyond the defamation is simply "other government action adversely affecting the plaintiff's interests." *Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d at 55 (2d Cir. 2001).

> **i.** **The widespread dissemination of the watch list and its publicly identifiable consequence constitute a publication that satisfies the stigma-plus prong.**

Defendants overstate the dissemination requirement of a stigma-plus claim, arguing that Plaintiffs must show that the stigmatizing statement was made available to the "general public." Dkt. 8 at 13-16.  But no court has ever declared such a requirement, and Defendants cite no authority and concoct no rationale as to why this Court should adopt this novel and unreasonable threshold.

There is no general public accessibility requirement.  The "Fourth Circuit has recognized in at least one case a 'constitutional' harm based on the inclusion of defamatory information in a non-public government file if there is a 'likelihood' of dissemination to the public." *Mohamed v. Holder*, No. 1:11-cv-50 (AJT/TRJ), 2011 U.S. Dist. LEXIS 96751, at *20-22 (E.D. Va. Aug. 26, 2011) citing *Sciolino v. City of Newport News*, 480 F.3d 642, 650 (4th Cir. 2007). As the Second Circuit explained, Circuits that have confronted this issue—including the Seventh, Eighth, Tenth, and D.C. Circuit Courts—have all concluded that the dissemination requirement is satisfied even "where the stigmatizing charges are placed in the discharged employee's personnel file and are likely to be disclosed." *Brandt v. Bd. of Coop. Educ. Servs., Third Supervisory Dist.,* 820 F.2d 41, 45 (2d Cir. 1987).  Thus, even an internal dissemination of a stigmatizing statement is sufficient to satisfy the stigma prong.

Even if this Court requires Plaintiffs to demonstrate that the stigmatizing statements were disseminated beyond the government, Plaintiffs have pled that showing.  Plaintiffs allege that

Defendants disseminate its watch list to "state and local authorities,[3] foreign governments, private corporations, private contractors, airlines, gun sellers, car dealerships, the captains of sea-faring vessels, among other official and private entities and individuals." Dkt. 1 at 44. These allegations are based on government documents, the first-hand experiences of Plaintiffs, and are otherwise well pled and non-speculative. Defendants' international dissemination of Plaintiff Aljame's watch list status caused him to be denied entry and deported from Jordan. To ignore these allegations, as the Defendants appear to urge this Court to do, is not permissible at this stage of the litigation.

Beyond formal dissemination, a person's watch list status becomes known to others. In *Mohamed,* the court concluded that "a person's placement on the No Fly List would likely become known over time to persons beyond government agencies or the airlines." 2015 U.S. Dist. LEXIS 92997, at *22-23 (E.D. Va. July 16, 2015). This is because the Defendants impose their flight ban at the airport and "any member of the general public who would actually witness a person being excluded from boarding might draw an adverse inference concerning that person's reputation." *Id.* The *Mohamed* Court also noted that "a person's inability to fly would become known to…a person's actual or prospective employer who would call upon that person to travel by air, or to extended family members whom a person might not be able to visit except through air travel, or to members of religious, professional or social organizations in which participation might require air travel." *Id.*

The same logic applies to individuals on the Selectee List. The only explanation for repeated "SSSS" designation is placement on the Selectee List. People who travel multiple times with listees will see that the listee is subjected to heightened screening and questioning each time they travel by air, and infer a "terrorist" status. It is a fact family members, colleagues, and co-religionists must take

---

[3] Police officers across the country also have easy access to the List's contents. As the Baltimore Police Department recently explained, the watch list "is automatically linked to the National Crime Information Center (NCIC) and is always accessible." Policy 802. The watch list is also now made available to municipal courts (*See* https://theintercept.com/2016/03/15/terrorist-watch list-errors-spread-to-criminal-rap-sheets/.) "which then make bail determinations based on an individual's status on the watch list." Dkt. 1 at 54.

into consideration when planning travel.  In the real world, a person's No Fly List or Selectee List status becomes known to that person's family, friends, and professional colleagues.   These consequences cannot be ignored.

> ii.     *The stigma plus prong is satisfied because the dissemination of the watch list burdens Plaintiffs' interests and alters their rights and status.*

The "plus" prong is met when the government denies some "tangible interest" or directs an "alteration of a right or status" recognized by law; but the "plus" does not need to rise to the level of a constitutional violation. *Humphries v. County of L.A.*, 554 F.3d 1170, 1187–88 (9th Cir. 2009). Whether or not there is a rights violation is simply not relevant to determining if the plus factor is satisfied.

The Second Circuit's logic in *Doe v. Dep't of Pub. Safety ex rel. Lee* articulates this. 271 F.3d 38 (2d Cir. 2001). In *Doe,* the Second Circuit sought to determine what would be sufficient to constitute a plus factor in accordance with the seminal stigma-plus decision, *Paul v. Davis*, 424 U.S. 693, 711 (1976). *Id.* at 54.   *Doe* explained that *Paul* concluded that the liberty identified by the Fourteenth Amendment could not "encompas[s] an individual's unadorned interest in his or her reputation," because if it did, the existence of a federal procedural due process claim would depend "entirely on whether the defendant happened to be a state officer or a private citizen." *Id.* at 53–54. In order to avoid this outcome—which is the purpose of the plus factor—a plaintiff must identify "some material indicium of governmental involvement beyond the mere presence of a state defendant." *Id.* at 54. It would be enough, then, for "an allegation of defamation" to be accompanied by "other government action adversely affecting the plaintiff's interests." *Id.* at 55. Therefore, the plus factor does not have to be a violation of Plaintiffs' legal rights. *Doe*'s rationale is also consistent Supreme Court precedent that "reputation alone, apart from some more tangible interests," is insufficient to give rise to a procedural due process claim, and in doing so, established the plus factor requirement. *Paul v. Davis,* 424 U.S. 693, 701 (1976). *Seigert v. Gilley* makes clear that a plus factor exists so long as the damage identified does not "flo[w] from injury caused by [defendants] to [a plaintiff's] reputation." 500 U.S.

16

226 (1991). Instead, the key inquiry is whether the injury alleged "flow[ed] from the injury to [the employee's] reputation" rather than from an additional government-imposed effect unrelated to the defamation itself. *Id.* at 234.

Here, Defendants' listing of Plaintiffs has a government-imposed effect distinct from the stigma it attaches to them. Both the No Fly and the Selectee Lists cause heightened screening at land borders and airports.  This government-imposed effect is both distinct and unrelated to the stigma itself and consistent with this Court's interpretation of *McGrath* in *Mohamed*.  Plaintiffs satisfy the plus prong because the federal watch list is disseminated throughout the federal government and to state and local authorities so that those agencies take various action against listees. *See Mohamed,* 2011 U.S. Dist. LEXIS 96751, at *20 (the stigmatizing list was disseminated to "government departments and agencies, which then used the list to take actions against organizations and their members.").

Even if this Court finds that Plaintiffs must demonstrate a rights violation or status alteration to satisfy the plus prong, Plaintiffs have made this showing.  The No Fly List imposes a flight ban, which violates Plaintiffs' right of movement.  The Selectee List imposes a substantial burden upon Plaintiffs' right to movement, causing many listees to forego travel.  Defendants disseminate both the Selectee List and the No Fly List internationally in order to restrain the movement of listees, which also violates plaintiffs' right of movement.  In short, these various disabilities constitute independent rights violations and together demarcate the special, second-class status of listees.

 B. <u>The risk of erroneous deprivation is almost absolute and attributable to the bottom-of-the-barrel inclusion standard.</u>

The administrative process used to place a person on the No Fly List "has an inherent, substantial risk of erroneous deprivation." *Mohamed,* 2011 U.S. Dist. LEXIS 96751, at *29.  Plaintiffs' quantitative analysis of the TSDB's performance over the last decade, based on publicly available information, leads to the inescapable conclusion that the federal government's watch list would be "no more effective than a list of randomly selected individuals."  Dkt. 1 at 94-107.  This essentially

perfect level of inaccuracy is a function of the watch list's exotic inclusion standard.  The federal government places individuals on the No Fly List if there is "reasonable suspicion to establish that the individual is a known or suspected terrorist," and the individual poses a threat of committing at least one of several acts of terrorism. *Mohamed*, 2015 WL 4394958, at *3 (E.D. Va. July 16, 2015).  In other words, the minimum showing necessary to place an individual on the watch list is: (1) a reasonable suspicion (2) of a suspicion (3) that an individual poses a threat of conduct. The government places people on the Selectee List if they are "associated with "TERRORIST ACTIVITY."  Dkt. 1-2 at 54.

These questions point to the constitutional defect of the watch list's standards: because the standards are unmoored from actual criminal conduct, they are basically meaningless as objective measures. Compare the No Fly List and Selectee List standards—reasonable suspicion of a suspicion that an individual poses a threat on one hand and reasonable suspicion that a person is associated with terrorism—to the *Terry v. Ohio* standard, from which the watch list borrows language and attempts to cloak itself with a veneer of familiarity and legitimacy: "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest."  392 U.S. 1, 22 (1968). In other words, an officer may stop an individual for less than probable cause if they reasonably suspect that the individual is committing a crime. Using a vague and prospective threat standard is what makes the watch list's inclusion standards exotic, unprecedented, and miles below what the term of art reasonable suspicion actually means. Most individuals on the watch list, in the government's eyes, pose a threat of becoming terrorists or are simply "associated" with terrorism--at least according to nominations supported by "articulable facts" gathered and analyzed by one of several intelligence agencies and approved for placement at a rate better than 99% by an agency not authorized by Congress to compile such a list.

In short, because the risk of erroneous deprivation is essentially perfect and attributable to the watch list's inclusion standards, the substitution of inclusion standards that require the government to charge or arrest someone prior to listing would substantially diminish the risk of erroneous deprivation.  This is a conclusion that this Court commended previously in *Mohamed*, explaining that "[g]iven the liberty interests at stake and the substantial and enduring impact a No Fly List placement has on those liberty interests, much recommends a pre-deprivation ex parte, in camera judicial review." *Mohamed,* Civil Action No. 1:11-cv-50 2015 U.S. Dist. LEXIS 92997, at *29 (E.D. Va. July 16, 2015).

### C.   Defendants have not provided Plaintiffs with any process whatsoever.

Defendants do not provide Plaintiffs or any other listee with any process whatsoever.  Each of the Plaintiffs have alleged that they did not, at any time, receive notice of the factual basis for their placement on the federal watch list or even notice that they had been listed. Dkt. 1 at 145, 187, 209, 226, and 242.  Rather, each of them first learned of their designation subsequent to their names having been added to the federal watch list. Nor were any of the Plaintiffs given notice of the deprivation of their liberty interests or violation of their constitutional rights.  *Id.* at 146, 188, 210, 226, and 243.

Defendants make much of DHS TRIP, but DHS TRIP—administered by TSA—does not affect the TSC and does not prevent the wide dissemination of Plaintiffs' TSDB status.  It has no effect on the non-travel related consequences which form the basis of many of the plaintiffs' claims, such as being recruited as an informant. And while persons on the No Fly List can now use DHS TRIP to learn obtain confirmation of their status, the same is not true for persons on the Selectee List.  As the court in *Elhady* held, where the plaintiffs in that case alleged that "their placement on the Watch List or the Selectee List subjects them to invasive additional screening and other liberty-constraining activities when they fly or reenter the country at a land border or port," the plaintiffs plausibly alleged that "their inclusion on the Watch List or Selectee List caused them to suffer a

deprivation of liberty interest as that term is historically understood. *Elhady v. Wray*, United States District Court, Eastern District of Virginia, Case No. 16-cv-375 (2016), Dkt. 47, Page ID # 960.

### IV.    Plaintiffs have adequately pled Equal Protection claims.

The "central purpose" of the equal protection clause ("EPC") is "prohibiting the United States from invidiously discriminating between individuals or groups." *Washington v. Davis*, 426 U.S. 229, 239 (1976). The EPC forbids the government from making "distinctions that (1) burden a fundamental right; (2) target a suspect class; or (3) intentionally treat one individual differently from others similarly situated without any rational basis." *Johnson v. Bredesen*, 624 F.3d 742, 746 (6th Cir. 2010). If a plaintiff shows that he was "subjected to unequal treatment based upon their race or ethnicity during the course of an otherwise lawful traffic stop, that would be sufficient to demonstrate a violation of the Equal Protection Clause." *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 533 (6th Cir. 2002). A violation of equal protection occurs where the government improperly relies on a protected group affiliation to apply the law. *Id.* (quoting *Whren v. United States*, 517 U.S. 806, 813 (1996)).

A plaintiff can successfully plead an equal protection clause claim where there is direct evidence that the government agency explicitly uses inappropriate criteria for classification. *United States v. Avery*, 137 F.3d 343, 355 (6th Cir. 1997). Direct evidence "seldom exists." *Id.* Where it does, and the equal protection claim is "based on an overtly discriminatory classification," plaintiffs are not required to show discriminatory intent. *Wayte v. United States*, 470 U.S. 598, 610 n.10 (1985); *Farm Labor*, 308 F.3d at 534 n.4; *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999). "[W]hether [an] official action was motivated by intentional discrimination demand[s] a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). "[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the [discriminatory treatment] bears more heavily on one [protected class] than another." *Washington v. Davis*, 426 U.S. 229, 242 (1976).

Plaintiffs have plead enough facts demonstrating the plausibility that Defendants compile their watch list with discriminatory intent. "Discriminatory intent may be established by evidence of . . . substantial disparate impact." *Elston v. Talladega Cty. Bd. of Educ.*, 997 F.2d 1394, 1406 (11th Cir. 1993); *see also*, *Sylvia Dev. Corp. v. Calvert Cty., Md.*, 48 F.3d 810, 819 (4th Cir. 1995) (holding that "evidence of a 'consistent pattern' of actions by the decisionmaking body disparately impacting members of a particular class of persons" constitutes one of the factors "recognized as probative of whether a decisionmaking body was motivated by a discriminatory intent."). Where such disparate impact evidence is particularly stark, "[d]iscriminatory intent may be found 'even where the record contains no direct evidence of bad faith, ill will or any evil motive on the part of public officials.'" *Elston,* 997 F.2d at 1406. Both direct evidence and the totality of the relevant facts demonstrate that Plaintiffs have clearly pled equal protection claims that they will win. Plaintiffs' evidence consists of leaked government documents showing that the watch list contains a disproportionate number of Muslims [Dkt. 1-3]; American cities that have large Muslim populations are disproportionally represented in the watch lists [Dkt 1-3; Dkt. 1 at ¶ 7]; travel to Muslim majority countries is a factor for inclusion on the watch list [*Id.* at 9]; and almost all, if not all, public instances of the inclusion of American Citizens and Permanent Residents on the watch list have been have been Muslims *Id.* at 80.  The list itself is often used as a tool to coerce Muslims to cooperate with authorities in surveillance of Muslim communities. *Id.* at 78.  Unsurprisingly, Defendants' actions have disparately impacted Muslim American travelers, and not travelers of other faiths. *Id.* at 283.

Nonetheless, Plaintiffs have also pled that Defendants use impermissible and inaccurate religious profiles in compiling the federal watch list. *Id.* at 91. Defendants' actions in designating Plaintiffs on the federal watch list and disseminating the stigmatizing label of "known or suspected terrorist" have been motivated by Plaintiffs' constitutionally-protected free exercise of religion. *Id.* at 282. By placing Plaintiffs on the federal watch list for engaging in conduct like that engaged in by non-

Muslim travelers, Defendants have treated Plaintiffs like second-class citizens. *Id.* at ¶ 263, 281. Accordingly, Plaintiffs have adequately pleaded an Equal Protection claim.

> **V.**    **Plaintiffs' non-delegation claim arises from the lack of Congressional direction to Defendants to create a terrorist watch list that is, in large part, a list of innocent people.**

Congress cannot delegate its legislative power. *Yakus v. United States*, 321 U.S. 414, 424 (1944). But Congress may specify "the basic conditions of fact upon whose existence or occurrence… it directs that its statutory command shall be effective." *Id.* at 424-425.  However, "where Congress lays down by legislative act an *intelligible principle* to which the person or body authorized to [exercise the assigned duty] is directed to conform, such legislative action is not a forbidden delegation of legislative power."  *S. Carolina Med. Ass'n v. Thompson*, 327 F.3d 346, 350 (4th Cir. 2003). Courts may narrowly construe a statute in order to avoid a delegation issue.  *Industrial Union Department, AFL-CIO v. American Petroleum Institute*, 448 U.S. 607 (1980) (hereinafter the "*Benzene* Case").

The terrorist watchlist presents a delegation issue similar to *Benzene* and *Kent v. Dulles,* 357 U.S. 116 (1959), because the law which provides the authority for the watchlist does not describe what a "threat" is and what level of "threat" is necessary to sentence an innocent American to a lifetime of terrorist watchlist consequences without due process. Like the law at issue in *Benzene*, 49 U.S.C. § 114(h)(3) contains a guiding principle which gives the agency unprecedented authority. Like *Benzene*, the lack of authorization for the agency's sweeping approach weighs in favor of a narrower construction. For example, the Court in *Benzene* was concerned with the difference between "absolute safety" and the "elimination of significant harm," (*Industrial Union Department, AFL-CIO v. American Petroleum Institute,* 448 U.S. at 646), and construed the statute to require a finding of significant harm. *Id.*  There is even less guidance here. At least the statute in the *Benzene* Case contained a standard-- significant harm—which could be applied to limit or guide the agency's discretion.

Here, the statute provides no guidance as to when Defendants should list a person. 49 U.S.C. § 114(h)(3) only directs the TSA to establish policies requiring air carriers to identify passengers who "may be a threat to aviation or national security" based on government information, and to notify law enforcement, deny boarding, or take other appropriate action if such an individual is identified. On the other hand, 49 U.S.C. § 114(h) does not contain the word "terrorist." Section 114(h) does not direct any agency to create a watch list. Nor does it establish the TSC or direct the agency to administer the watch list; indeed, when this law passed, TSC did not even exist. Yet, the TSC is carrying out the lion's share of those functions under executive directives. And by directing TSC to disseminate its watch list to private parties and foreign governments for the purpose of constraining the movement and activities of innocent Americans, TSC is plainly acting without the authority of Congress.

Contrary to Defendants' assertions, the governing statute also lacks an intelligible principle because it does not describe when an individual "may be a threat" sufficient to deny boarding. While 49 U.S.C. § 114(h)(3) gives TSA authority to "notify appropriate law enforcement agencies, prevent…from boarding an aircraft, or take other appropriate action" with respect to an individual "who may be a threat to civil aviation or national security," it does not describe what level of threat is necessary for denial of boarding, what level of threat is necessary for enhanced screening, and lacks any guidance to that effect.

If Congress intended a watch list so broad as to include individuals who are reasonably suspected of being suspected terrorists who may pose a threat of terrorism--which is a standard far below reasonable suspicion alone—it did not say so explicitly. In fact, the governing sections of the statute contain no mention of "terrorists" or a terrorist watch list.  49 U.S.C. § 114(h). Because the statute lacks any guidance as to what kind of standard should apply as to those who "pose a threat," it is an unconstitutional delegation of legislative authority—a conclusion that any reasonable person standing in the shoes of the Defendants would reach.

23

## VI.     This Court has jurisdiction over Plaintiffs' claims.

Defendants incorrectly contend that 49 U.S.C. § 46110 bars this action, because it provides for "exclusive" jurisdiction in the courts of appeals to review orders issued "in whole or in part" by TSA.[4] But Plaintiffs are not merely challenging "the adequacy of DHS TRIP redress procedures." Plaintiffs are challenging that the "TSC is the final arbiter of whether an individual's name is retained on or removed from the watch list, including those of Plaintiff." Dkt. 1 at 112.  The Fourth Circuit has held that Section 46110 does *not* provide for initial Court of Appeals review in watch list cases like these.  *Mohamed v. Holder*, No. 11-1924, 2013 U.S. App. LEXIS 26340, at *4-6 (4th Cir. May 28, 2013) ("the efficacy of our review is limited by our inability to directly review the TSC's actions").  After citing the Congressional directive to TSA to create a redress process and the contents of 46110 itself, the Fourth Circuit held that "we do not fairly discern from either grant of authority a congressional intent to remove such claims from review in the district court." *Id.* at 5-6.  The D.C. Circuit and Ninth Circuit are in accord.  *Ege v. United States Dep't of Homeland Sec.*, 784 F.3d 791, 796 (2015); *Latif v. Holder*, 686 F.3d 1122, 1128-29 (9th Cir. 2012).

Later, the Eastern District of Virginia held that "the Fourth Circuit reasoned that placement on the No Fly List 'necessarily requires scrutiny of both the TSC's and TSA's actions,' and '49 U.S.C. § 46110 gives the [courts of appeals] broad powers of review over orders of the TSA' but not 'similar independent authority over the TSC.'" *Elhady v. Wray*, Case No. 16-cv-375 (E.D. Va. 2016), Dkt. 47, Page ID # 956.  Section 46110 "does not evidence Congress' intent to exclude [a watch list] challenge to past and future restrictions on his ability to travel from consideration in the district court." *Id.*

## VII.    Placement on the No Fly List and Selectee Lists is a reviewable agency action; therefore, Plaintiffs have stated an Administrative Procedure Act claim.

---

[4] Defendants' argument should be rejected for two additional reasons. First, Section 46110 predates the creation of TSC and the terrorist watch list by decades, making it implausible that Congress sought to limit challenges to an agency that did not yet exist and agency action that had no agency had undertaken before. Second, to the extent that Section 46110 does confer appellate jurisdiction, it would be unconstitutional insofar as fundamental rights cannot be accorded the constitutionally mandated protections under Section 46110's deferential standard.

Plaintiffs' Administrative Procedure Act ("APA") claim is clear: presence on the No Fly List, and/or in the TSDB, are reviewable agency actions under 5 U.S.C. § 706. Dkt. 1 at 272. Placement on the watchlist is *itself* a reviewable action, and exhaustion of DHS TRIP remedies is not necessary for judicial review. *See, e.g., Mohamed v. Holder*, 995 F. Supp. 2d 520, 534 (E.D. Va. 2014) ("[I]t is difficult to see how exhaustion of DHS TRIP would significantly assist the Court in adjudicating or resolving Mohamed's claims."); *see also, Darby v. Cisneros*, 509 U.S. 137 (1993). Defendants turnabout on this issue is disturbing as they acknowledged, in *Mohamed,* that "Congress has not mandated exhaustion of the DHS TRIP process" and "there are no regulations regarding DHS TRIP that mandate exhaustion. *Id.* Requiring Plaintiffs to exhaust DHS TRIP "would essentially bifurcate substantially related, if not common, claims and create, rather than avoid, piecemeal litigation." *Id.* Exhaustion would not aid the Court in adjudicating or resolving Plaintiffs' claims. As illustrated, Defendants merely provide a letter, if you are on the No Fly List, Defendants will inform you on your status on the list; if you are on the Selectee List, Defendants neither confirm or deny your status on the list.) without allowing a listee (or the courts, to see the alleged substantive derogatory information the government allegedly possesses *See id.* Nor do the Defendants tell a listee why they are on the lists or why they are being treated as untouchable, second class Americans. Plaintiffs' APA claims should survive a motion to dismiss.

Defendants' ripeness arguments with respect to the No Fly List fail for the same reasons as their exhaustion arguments. Plaintiff Kovac is on the No Fly List, as Defendants confirmed via DHS TRIP less than two weeks ago. Thus, there is nothing "hypothetical" about his claims (or those of the other Plaintiffs), which attacks the constitutionality of the No Fly List. *See id.* at 535.

## CONCLUSION

Plaintiffs respectfully request this Honorable Court DENY Defendants' Motion to Dismiss the Complaint.

Respectfully submitted,

COUNCIL    ON    AMERICAN-ISLAMIC
RELATIONS – DALLAS (CAIR-DFW)

BY:     /s/ Nikiya Natale
NIKIYA NATALE (TX: 24090290)
Pro Bono Counsel
P.O. Box 741625
Dallas, TX 75374
Phone: 469-998-2246

CAIR LEGAL DEFENSE FUND

BY:     /s/ Lena Masri
LENA F. MASRI (DC: 1000019)
GADEIR I. ABBAS (VA: 81161) *
AHMED MOHAMED (LA: 36590)∞
453 New Jersey Ave, SE
Washington, DC 20003
Phone: (202) 742-6420

*Licensed in VA, not in D.C.  Practice limited to
federal matters
∞ Licensed in LA, not in D.C. Practice limited to
federal matters.*

*Attorneys for Plaintiffs*

Dated:  May 4, 2018

**CERTIFICATE OF SERVICE**

I hereby certify that on May 4, 2018, I electronically filed the foregoing document with the Clerk of the Court for the Northern District of Texas using the ECF System, which will send notification to the registered participants of the ECF System as listed on the Court's Notice of Electronic Filing.

*/s/  Ahmed M. Mohamed*