**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| **ADIS KOVAC, ET AL.,** | |
| Plaintiffs, | |
| v. | Case No. 3:18-cv-110-L |
| **CHRISTOPHER WRAY, ET AL**<br>*Director of the Federal Bureau of*<br>*Investigation,* | |
| Defendants. | |

## REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

## INTRODUCTION

Congress directed the Transportation Security Administration (TSA) to use information from government agencies to identify individuals who may pose a threat to civil aviation or national security. As the Government has shown, the overwhelming weight of authority in the watchlisting area favors dismissal of the constitutional and statutory challenges raised here. Just last month, another court rejected analogous due process claims brought by an individual claiming to be on the Selectee List. *See Abdi v. Wray*, 2:17-cv-622-DB (D. Utah April 23, 2018) (Exhibit A). As with multiple courts before it, the *Abdi* court dismissed the procedural due process claim because the Fifth Amendment does not contemplate "a right to convenient or unimpeded travel," and because the plaintiff could not show that "publication of the watchlist" and "public screening" at airports amounts to governmental defamation under the stigma-plus test. *Id.* at *5-6. Plaintiffs' opposition brief offers no convincing reason why the outcome should be any different here.

## ARGUMENT

**I.      This Court Lacks Jurisdiction Over Challenges to the Adequacy of DHS TRIP.**

49 U.S.C. § 46110 vests exclusive jurisdiction in the courts of appeal to review orders issued "in whole or in part" by TSA. Like similar channeling statutes, Section 46110 has been interpreted broadly to apply to claims "inescapably intertwined" with TSA orders. *See Ligon v. LaHood*, 614 F.3d 150, 154–57 (5th Cir. 2010). This circuit gives "expansive construction" to the term "order" in Section 46110, requiring only an agency decision that "imposes an obligation, denies a right, or fixes some legal relationship." *Id.* at 154. DHS TRIP "fixes [the] legal relationship" between TSA and individuals by defining the exclusive method through which travelers may request redress for difficulties encountered at airport security checkpoints. For travelers complaining of heightened screening or denial of boarding, the process culminates in a decision whether to correct any record, including an entry in the TSDB (if applicable), and the transmission of a final determination letter under 49 C.F.R. § 1560.205(d). That determination is a TSA order subject to review in the courts of appeal under Section 46110. *See Latif v. Lynch*, No. 3:10-cv-750-BR, 2017 WL 1434648, at *6–9 (D. Or. April 21, 2017), *appeal filed sub nom Kariye v. Sessions*, 2017 WL 143648 (9th Cir. Aug. 8, 2017).

In resisting the application of Section 46110, Plaintiffs rely principally on *Mohamed v. Holder*, No. 11-1924, 2013 U.S. App. LEXIS 26340 (4th Cir. May 28, 2013), where the Fourth Circuit, in an unpublished order, held that an action seeking removal from the No Fly List and challenging the adequacy of redress procedures was properly before the district court, because a remedy would involve both TSA and the Terrorist Screening Center (TSC), and the circuit court's jurisdiction under Section 46110 extends only to TSA. The reasoning in *Mohamed* is unpersuasive, for it artificially conflates TSC's listing decision and TSA's use of watchlists to determine the appropriate level of security screening for individual travelers or to bar them from flying altogether. The orders giving effect to watchlist placements are issued by TSA, not TSC. *See Mokdad v. Lynch*, 804 F.3d 807, 816 (6th Cir. 2015) (Batchelder, J., dissenting) (Since "TSA prevented Mokdad from boarding flights" and "DHS denied Mokdad's request for relief in a TRIP determination, . . . [t]he actions of the TSA and DHS give teeth to the actions of the TSC and . . . must be considered together."). Congress understood that TSA would rely on information from other agencies in screening passengers, and instructed it to use "all appropriate records in the consolidated and integrated terrorist watchlist maintained by the Federal Government." 49 U.S.C. § 44903(j)(2)(C)(ii). Congress further ordered TSA to create a redress process for travelers "delayed or prohibited from boarding a flight" by application of the screening system based on that information. 49 U.S.C. § 44903(j)(2)(C)(iii)(I). And Congress granted exclusive jurisdiction to the courts of appeals to hear challenges to orders made "in whole or in part" under these authorities. *Id.* § 46110(a). Since Plaintiffs' claims challenge a TSA order or are inescapably intertwined with such an order, they must be brought in the court of appeals.

## II.     The No Fly List Claim Should Be Dismissed as Unripe.

Mr. Kovac now has been notified of his No Fly List status and given an opportunity to seek additional information about the basis for his listing. *See* Opp at 25. If he elects to do so, he will receive the applicable No Fly List criterion and, to the extent possible, a summary of the factual basis for his placement. *See generally Latif v. Lynch*, 2016 WL 1239925, at *5 (D. Or. Mar. 28, 2016). If the ripeness doctrine means anything, then surely it precludes a litigant from claiming he has been denied a meaningful opportunity to challenge a watchlist placement while he is midway through a redress process designed to accomplish precisely that. *See,*

*e.g.*, *Wright v. Hollingsworth*, 260 F.3d 357, 358 (5th Cir. 2008) (dismissing complaint where plaintiff only filed a first step grievance but "did not pursue the grievance remedy to conclusion").[1]

*Mohamed v. Holder*, 995 F. Supp. 2d 520 (E.D. Va. 2014) is no help to Mr. Kovac. The exhaustion analysis in that case was tied to the prior DHS TRIP procedures, which did not require the Government to inform applicants that they were on the No Fly List or to provide additional information about the basis for inclusion. The court reasoned that exhaustion would not assist the court in resolving the case because the plaintiff "would not receive any substantive information as to whether he was . . . on the No Fly List," or the grounds for his potential inclusion. *Id.* at 534. Similarly, the court found "no reason to think that the DHS TRIP process would develop any of the additional factual record relevant for purposes of Mohamed's constitutional claims." *Id.* at 535. That rationale does not apply to the revised process, which *does* provide "substantive information" about whether an individual is on the List, including the relevant criterion and, to the extent possible, unclassified information about the reasons for inclusion; and which *would* develop "the additional factual record" needed to assess his constitutional claims. Indeed, when the plaintiff in *Mohamed* later challenged the *revised* TRIP procedures, the court acknowledged the substantial revisions to the process and required plaintiff to complete the process before proceeding with his legal claims. *Mohamed v. Holder*, 1:11-cv-50, Dkt 204 (Dec. 20, 2015). Numerous courts have taken the same approach. *See* MTD at 9 (collecting cases).[2]

### III.    The Procedural Due Process Claims Should Be Dismissed.

#### a.    The Screening Plaintiffs Have Not Pleaded A Deprivation of the Right to Travel.

In decision after decision, courts have concluded that the right to travel is not offended by delays, inconveniences, or other difficulties akin to those at issue here. Under these cases, no protected interest in

---

[1] The same reasoning applies to Mr. Kovac's substantive due process claim, which invites the Court to second-guess the national security judgments underlying his listing and declare that the Executive Branch lacks authority to prevent him from boarding a commercial aircraft – before the Government formalizes an administrative decision, and without the benefit of an administrative record. *See, e.g.*, *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49 (1967) (ripeness doctrine prevents premature adjudication).

[2] Although *Darby v. Cisneros*, 509 U.S. 137 (1993), holds that courts may not impose exhaustion as a discretionary prerequisite for an APA challenge to final agency action, the reasoning in *Darby* does not apply to the constitutional claims. *See id.* at 153–54. *Darby* also does not affect the ripeness or standing requirements. *See*, *e.g.*, *Howell v. INS*, 72 F.3d 288 (2d Cir. 1995) (Walker, J., concurring).

travel is violated where a traveler is subject to heightened screening and questioning as a result of alleged inclusion on a watchlist. *See, e.g., Abdi*, 2:17-cv-622-DB, at *5; *see also* MTD at 10-11 (collecting cases). That is no less true where, in addition to heightened screening and questioning, the traveler claims to have been subject to repeated detentions in the course of his travel. *Kadura v. Lynch*, 2017 WL 914249, at *3 (E.D. Mich. Mar. 8, 2017). These watchlisting decisions are a logical extension of a long, virtually unbroken line of cases rejecting right-to-travel challenges to policies that only incidentally burden an individual's ability to travel. The Screening Plaintiffs ignore these authorities, instead falling back on the alleged deprivation of a purported "right to movement." But the Plaintiffs cannot avoid unfavorable screening cases merely by recasting their alleged harm in novel constitutional terms. As explained below, there is no such thing as a "fundamental right to movement," and courts repeatedly have refused to consider watchlisting challenges under that rubric. Instead, the question is whether inconvenience or delays at the airport amount to a cognizable violation of the right to travel. The overwhelming weight of authority holds that it does not.

**b.   The No Fly List Plaintiff Has Not Pleaded a Deprivation of the Right to Travel.**

Like the Screening Plaintiffs, Mr. Kovac ignores the controlling right-to-travel decisions and appeals instead to a supposed fundamental right of movement, which he alleges has been burdened by being forced to take "circuitous routes over land and sea." Opp at 8. Mr. Kovac's focus on a general freedom of movement obscures important doctrinal distinctions between interstate and international travel, the two constitutional interests that are actually at issue here. To the extent his claim focuses on the right to interstate travel, there can be no plausible deprivation, because a traveler does not have a constitutional right to the most convenient form of travel, such as traveling by airplane as opposed to car. *See Town of Southold*, 477 F.3d at 54 (holding that there is no constitutional right to the most convenient form of travel); *Cramer v. Skinner*, 931 F.2d 1020, 1031 (5th Cir. 1991) (same). And to the extent he is claiming that the No Fly List interferes with international travel, any deprivation would not trigger the due process protections ordinarily afforded under *Mathews v. Eldridge*, 424 U.S. 319 (1976). The Supreme Court has distinguished between "the *freedom* to travel outside the United States" and "the *right* to travel within the United States," *Haig v. Agee*, 453 U.S. 280, 306 (1981), the former being "no more than an aspect of the 'liberty' protected by the Due Process Clause of the Fifth

Amendment," and "subordinate to national security . . . consideration." *Id.* at 306-07; *Califano v. Aznavorian*, 439 U.S. 170, 176-77 (1978). In either case, Mr. Kovac cannot show that he is entitled to greater process.

   **c.  Plaintiffs Have Not Pled a Constitutionally Protected Interest in Their Reputations.**

   Under the Supreme Court's "stigma-plus" test, plaintiffs alleging reputational harm must demonstrate: (1) they suffered a stigma from governmental action; plus (2) they experienced an alteration or extinguishment of "a right or status previously recognized by state law." *See Paul v. Davis*, 424 U.S. 693, 711 (1976). The allegations in the complaint satisfy neither element. With respect to stigmatizing governmental action, Plaintiffs cannot plausibly show that the Government has disseminated their purported watchlist status in a way that would reach the public at large. As numerous courts have held, the government does not publicly defame someone when it shares information about him in narrow, confidential channels. *See, e.g.*, *Abdi*, 2:17-cv-622-DB ("publication of watchlist," even in combination with "public screening," does not amount to public disclosure for the purposes of the stigma-plus test); MTD at 13-14 (collecting cases). Plaintiffs ignore this authority, instead focusing on a Second Circuit employment decision where a stigma-plus claim survived summary judgment because "stigmatizing charges" had been "placed in the discharged employee's personnel file and [were] likely to be disclosed." *Brandt v. Bd. of Coop. Educ. Servs.*, 820 F.2d 41, 45 (2d Cir. 1987). *Brandt* actually cuts against Plaintiffs' position, recognizing that there must actually be a showing of such disclosure in order for a stigma-plus claim to prevail. *Id.* at 45. Indeed, the *Brandt* court repeatedly emphasized the need for actual "public disclosure" in order to make out a stigma-plus claim. *Id.* at 43–44; *see also Tebo v. Tebo*, 550 F.3d 492, 503 (5th Cir. 2008) (mere presence of stigmatizing information in a file not normally available to the public is insufficient).

   Further, while Plaintiffs speculate that the Government reveals watchlist status to certain third party stakeholders—*e.g.*, "state and local authorities," "gun sellers," the "captains of sea-faring vessels," Compl. ¶ 20—they offer nothing to support such allegations and do not contend that anything of the kind has happened to them. Indeed, to the extent watchlist information is shared with law enforcement entities or other Government agencies, such sharing is carefully constrained by regulation, precisely in order to *limit* its dissemination. 49 U.S.C. §114(r). Plaintiffs also speculate about various circumstances in which third parties

might *infer* alleged watchlist status from the fact that someone is screened, or from "repeated 'SSSS' designation" on boarding passes. Opp. at 15. These arguments for "inferred" stigmatization have been rejected. *United States v. Skipwith*, 482 F.2d 1272, 1275 (5th Cir. 1973) (noting "the almost complete absence of any stigma attached to being subjected to search at a known, designated airport search point").[3]

With respect to the "plus" factor, defamation alone cannot establish a deprivation of a liberty interest; there must be a change of legal status as well. *Tebo*, 550 F.3d at 503. Relying on out-of-circuit precedent, Plaintiffs argue that the "plus" factor is satisfied so long as the alleged defamation is coupled with "government-imposed effect distinct from the stigma it attaches to them." Opp at 17. That is incorrect. The law requires a change of legal status – a governmentally imposed burden that "remove[s] or significantly alter[s] a life, liberty, or property interest recognized and protected by state law." *Tebo*, 550 F.3d at 503. Here, Plaintiffs' primary support for this theory again arises from the alleged and unsubstantiated experiences of third parties not before the Court. Plaintiffs do not allege that they have been prohibited from purchasing a gun, or from obtaining a hazmat license, or from working in the sterile area at an airport. On the contrary, the only alleged harms are burdens on travel resulting from heightened screening or denial of boarding. The doctrine requires an actual alteration or extinguishment of a "right or status previously recognized by state law," *Tebo*, 550 F.3d at 503, not theoretical alterations allegedly experienced by third parties.

### d.   The Redress Process Is Constitutionally Adequate.

As the Government has shown, when properly balanced, the Government's interest in the continued effectiveness of the TSDB as a counterterrorism tool is entitled to significant weight, and the process Plaintiffs received was more than due process required. MTD at 17-19. In response, Plaintiffs offer the remarkable observation that they have conducted "a quantitative analysis of the TSDB's performance over the last decade." Opp. at 28. Plaintiffs contend that only one "the perpetrators of terrorist acts inside the United States in the last decade" was on a watchlist prior to committing an act of terrorism. *Id.* But even if the Court

---

[3] *See also Scherfen v. DHS*, 2010 WL 456784, at *7 (M.D. Pa. Feb. 2, 2010) ( "heightened screening at airports and border crossing points does not necessarily signify inclusion" on a watchlist, as "[t]ravelers may be pulled out of line, searched, and questioned for a variety of reasons, unrelated to watch lists.").

could credit this naked assertion, correlating reported acts of violence and the No Fly List says nothing about whether the placement of individuals on the No Fly List may have thwarted potential acts of violence, and much less whether individuals who are placed on the List (or, as allegedly relevant here, the Selectee List) were appropriately placed under the applicable standard. Indeed, this assessment fundamentally misunderstands the purpose of watchlisting, which is not to investigate or punish criminal conduct, but rather to identify – to the extent possible in a dynamic, ever-evolving threat environment – individuals who *may* pose a threat to national security, 49 U.S.C. § 114(h)(3)(A), and to take "appropriate action with respect to that individual," *id.* § 114(h)(3)(B). *See Latif*, 2016 WL 1239925, at *12 (rejecting similar challenge to use of prospective threat assessment in watchlisting context).

Contrary to Plaintiffs' suggestion, the risk of erroneous deprivation under the current system is small. As a matter of law, the Government commits "error" only when it places someone in the TSDB who does not satisfy the standard for inclusion. *See Kaley v. United States*, 134 S. Ct. 1090, 1101 (2014) (analyzing a procedural due process claim and explaining that "an asset freeze depriving a defendant of that interest is *erroneous* only when unsupported by a finding of [the applicable legal standard]."). Plaintiffs have failed to identify a meaningful connection between the additional procedure they seek and the purported gaps in the Government's decision-making process. Plaintiffs insist that reasonable suspicion standard does not meaningfully limit the Government's discretion, Opp. at 18, but they gloss over the safeguards in place to minimize error and entirely ignore the Government's constitutionally based expertise in the field. These measures have been outlined by TSC (see, MTD at 3), which has described the continuous review, rigorous cross-checking, and quality control at every stage of the watchlisting process, nomination to redress.

**IV.    Plaintiffs' Substantive Due Process Claim Should Be Dismissed.**

Plaintiffs' substantive due process claim should be rejected at the outset because it ignores the Supreme Court's instruction that the substantive due process inquiry "must begin with a careful description of the asserted right." *Reno v. Flores*, 507 U.S. 292, 302 (1993). Refusing to apply this standard, Plaintiffs insist that their alleged travel burdens violate a broad, fundamental right of "movement." This invites the Court to do precisely what the Supreme Court has cautioned against – expanding substantive due process by framing the

asserted right in sweeping terms. In any case, Plaintiffs' asserted "right to movement" is not a fundamental right protected by substantive due process. While the Supreme Court has at times discussed a person's freedom of movement, it has done so in the course of addressing specific protected interests in interstate and international travel. *See, e.g., Kent v. Dulles*, 357 U.S. 116, 126 (1958) (discussing "[f]reedom of movement" in the context of finding protected interest in international travel); *United States v. Guest*, 383 U.S. 745, 759 (1966) (discussing "free movement" in the context of interstate travel). The Court has never held that the freedom to travel from state to state or across national borders connotes a broader "right to movement," and it certainly has never suggested that such a broader right, if it did exist, would meet substantive due process's rigorous "fundamental" standard. On the contrary, the origins of the right to interstate travel "reflect a concern over state discrimination against outsiders rather than concerns over a general ability to move about." *Hutchins v. Dist. of Columbia*, 188 F.3d 531 (D.C. Cir. 1999); *see also Attorney Gen. of New York v. Soto-Lopez*, 476 U.S. 898, 902 (1986) (referring to the "right to free interstate migration"). The Court has "cast strong doubt on the idea that there [is] a fundamental right to movement," having noted that "even a bona fide residence requirement would burden the right to travel if travel meant merely movement." *Hutchins*, 188 F.3d at 537.

Plaintiffs have failed to plausibly allege the deprivation of a protected liberty interest giving rise to procedural due process protections, let alone the deprivation of a *fundamental* right protected by substantive due process. *See, e.g., Beydoun v. Sessions*, 871 F.3d 459, 468 (6th Cir. 2017) (rejecting substantive due process challenge to Selectee List). But even if the Court could identify a fundamental right at stake, the Selectee and No Fly Lists would still pass constitutional scrutiny. *See Mohamed*, 266 F. Supp. 3d 868 (E.D. Va. 2017) (rejecting substantive due process challenge to No Fly List). Heightened screening and the denial of boarding bear a close relationship to the aim of preventing terrorism, while protecting valuable intelligence and law enforcement reporting that powers the watchlisting enterprise, and Plaintiffs' objections to the No Fly and Selectee List are baseless. The suggestion, for example, that only individuals who have been charged with a crime should be listed fails any logic for a workable security alternative, and ignores Congress's mandate that TSA screen for individuals who "may" be a threat. 49 U.S.C. § 114(h). Nor is there merit to the argument that the watchlist is "under-inclusive" because it could result in disclosure of the Government's investigative

9

interest in suspected terrorists who attempt to fly. Opp at 11. To whatever extent a denial of boarding leads individuals to speculate that they may be of concern to the Government, it is far more harmful to public safety to allow boarding to a person counterterrorism officials have judged presents a risk of terrorism.

## V.      Plaintiffs' Remaining Claims Should Be Dismissed.

The opposition brief does not address the deficiencies in Plaintiffs' Equal Protection claim. The pleading standard in this circuit is clear: a plaintiff must plausibly allege that he was treated differently from others similarly situated, and that the unequal treatment was the result of discriminatory animus. *Williams v. Bramer*, 180 F.3d 699, 705 (5th Cir. 1999). Allegations about disparate impact are not sufficient, and Plaintiffs' purported "direct evidence" of discrimination—a purportedly leaked, unauthenticated document that they claim shows a "disproportionately" high number of residents of Dearborn, Michigan have been watchlisted— plainly falls short. Even if it could be properly considered, nothing in it purports to invoke a religious classification, or would be proof of discriminatory intent, even indirectly.

Plaintiffs also fail to state a claim that watchlisting constitutes an unconstitutional delegation of legislative power. As described in *Whitman*, the first and last time the Supreme Court concluded that Congress unconstitutionally delegated its legislative power was in 1935, when it struck down two New Deal statutes. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474-75 (2001). The statutory scheme underlying the watchlisting enterprise charges the Executive Branch with establishing "policies and procedures requiring air carriers [to] . . . prevent [an] individual [who may be a threat to civil aviation or national security] from boarding an aircraft, or take other appropriate action with respect to that individual. 49 U.S.C. § 114(h)(1)-(3). This alone "clearly delineated" the general policy, but the general policy was supplemented by numerous implementation directives. *See, e.g.*, *Id.* § 114(f)(2) (to "assess threats to transportation"); *id.* § 114(f)(3) (to "develop policies, strategies, and plans for dealing with threats to transportation security").[4]

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should dismiss this action with prejudice.

---

[4] As Plaintiffs implicitly concede, their APA claim is coextensive with their constitutional claims challenging their alleged placement in the TSDB and the available redress procedures. *See* MTD at 24-25. The APA claim should therefore be dismissed for the same reasons.

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

ANTHONY J. COPPOLINO
Deputy Branch Director
Civil Division, Federal Programs Branch

 /s/ Samuel M. Singer
SAMUEL M SINGER (D.C. Bar 1014022)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave, NW
Washington, D.C.  20530
Telephone:  (202) 616-8014
Fax:  (202) 616-8470