**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **ADIS KOVAC, et al.,** | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| **v.** | § | Civil Action No. 3:18-CV-0110-L |
| | § | |
| **CHRISTOPHER WRAY, et al.,** | § | |
| | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the court is Defendants' Motion to Dismiss (Doc. 8), filed April 13, 2018. After careful consideration of the pleadings, motion, response, reply, and applicable law, the court **denies in part** and **grants in part** Defendants' Motion to Dismiss.

## I.      Factual Background and Procedural History

Plaintiffs are Adis Kovac ("Mr. Kovac"), Bashar Aljame ("Mr. Aljame"), Abraham Sbyti ("Mr. Sbyti"), Suhaib Allababidi ("Mr. Allababidi"), and Fadumo Warsame ("Ms. Warsame") (sometimes collectively, "Plaintiffs"). Plaintiffs are United States citizens and are all Muslims. Plaintiffs allege that they are included in the Government's Terrorism Screening Database ("TSDB" or "watchlist") which, among other things, has prevented them from boarding commercial flights that traverse United States airspace or caused them to be subjected to additional screening when traveling by air or entering the country at a land border or port.

On January 17, 2018, Plaintiffs filed their Complaint for Injunctive and Declaratory Relief ("Complaint") (Doc. 1), contending that their alleged inclusion on the watchlist and the lack of an adequate process of redress for those individuals placed erroneously on the watchlist violate their

rights to due process and equal protection under the Fifth Amendment of the United States Constitution, the non-delegation doctrine of the United States Constitution, and the Administrative Procedure Act. Defendants are officials of multiple government agencies charged with oversight of portions of the TSDB, including implementation, maintenance, and redress processes: Christopher Wray, Director of the Federal Bureau of Investigation ("FBI"); Charles Kable, Director of the Terrorist Screening Center ("TSC"); Deborah Moore, Director of Transportation Security Redress ("TSR") and of the Department of Homeland Security Traveler Redress Inquiry Program ("DHS TRIP"); Joseph McGuire, Director of the National Counterterrorism Center ("NCTC");[1] David Pekoske, Administrator of the Transportation Security Administration ("TSA"); and Kevin McAleenan, Commissioner of United States Customs and Border Protection ("CBP")[2] (sometimes collectively, "Defendants"). Compl. ¶¶ 19-24. Defendants are sued in their official capacities only. *Id.* Plaintiffs assert federal subject matter jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. §§ 702 and 706. *Id.* ¶ 25. Plaintiffs allege the following facts in their Complaint, which, together with all reasonable inferences, are taken as true for the purposes of analyzing Defendants' Motion to Dismiss.[3]

---

[1] Plaintiffs named Nicholas Rasmussen as a Defendant. Effective December 27, 2018, Joseph McGuire was sworn in as Director of the National Counterterrorism Center. Under Rule 25(d) of the Federal Rules of Civil Procedure, he "is automatically substituted as a party."

[2] At the time Plaintiffs filed the Complaint, Kevin McAleenan was the Acting Commissioner of the United States Customs and Border Protection. On March 20, 2018, he was sworn in as Commissioner of the United States Customs and Border Protection.

[3] In setting forth the background facts, the court accepts all well-pleaded facts in Plaintiffs' Complaint as true and views them in the light most favorable to Plaintiffs. *Sonnier v. State Farm Mutual Auto Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007). Additionally, in its statement of the facts related to the specific programs, agencies, and related matters referenced in the Complaint, the court has relied on matters of public record, of which it may take judicial notice. *See Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (In deciding a Rule 12(b)(6) motion to dismiss, a court may "take judicial notice of matters of public record.") (internal quotation marks and citations omitted). Matters of public record considered by the court include

## A. Statutory and Regulatory Background

### 1. The TSA

The TSA, an agency within the DHS, has the duty to secure all modes of transportation, including aviation security. 49 U.S.C. § 114(d). The TSA is responsible for "day-to-day Federal security screening operations for passenger air transportation," *id.* § 114(e)(1), and for developing "policies, strategies, and plans for dealing with threats to transportation security," *id.* § 114(f)(3). Congress directed the TSA to establish procedures for notifying appropriate officials "of the identity of individuals known to pose, or suspected of posing, a risk of air piracy or terrorism or a threat to airline or passenger safety." *Id.* § 114(h)(2). This mandate requires the TSA, "in consultation with other appropriate Federal agencies and air carriers," *id.* § 114(h)(3), "to use information from government agencies to identify [travelers] who may be a threat to civil aviation or national security," *id.* § 114(h)(3)(A), and to "prevent [those individuals] from boarding an aircraft, or take other appropriate action with respect to that individual," *id.* § 114(h)(3)(B). The TSA may "issue . . . such regulations as are necessary to carry out [its] functions," *id.* § 114(l)(1), as well as "prescribe regulations to protect passengers and property on an aircraft," *id.* § 44903(b).

### 2. The TSC and the TSDB ("No Fly List" and "Screening List")

In September 2003, Former Attorney General John Ashcroft established the TSC to consolidate the Government's approach to terrorism screening. Compl. ¶ 29. The TSC is a multi-agency center administered by the FBI. The TSC "develops and maintains the federal government's consolidated TSDB" that serves as "the federal government's master repository for

---

statutes, regulations, and the statement before the House Committee on Homeland Security by Christopher M. Piehota, then-Director of the TSC, referenced by Defendants in support of their motion to dismiss. *See* Safeguarding Privacy and Civil Liberties While Keeping Our Skies Safe: Hearing Before the H. Comm. on Homeland Security, 113th Cong. 1-2 (2015) (statement of Christopher M. Piehota, Director, TSC/FBI).

suspected international and domestic terrorist records used for watch list related screening." *Id.*

The TSDB is a consolidated database containing identifying information of persons known or

reasonably suspected to be terrorists. *See* Safeguarding Privacy and Civil Liberties While Keeping

Our Skies Safe: Hearing Before the H. Comm. on Homeland Security, 113th Cong. 1-2 (2015)

(statement of Christopher M. Piehota, Director, TSC/FBI) ("Piehota Statement"). The TSDB has

two subsets: the "No Fly List" and the "Selectee List." Compl. ¶ 30. Individuals on the No Fly

List are prohibited from boarding commercial flights that traverse United States airspace.

Individuals on the Selectee List are systematically subject to enhanced screening at airports and

land border crossings. *Id.* While the DHS TRIP discloses to United States citizens if they are on

the No Fly List, it does not disclose if they are on the Selectee List. *Id.* ¶ 115.

The procedure for submission of identity information for inclusion in the TSDB is known

as the "nomination process." Piehota Statement at 11. Government agencies "nominate"

individuals who may qualify for inclusion and submit those "nominations" to the NCTC for

inclusion in its Terrorist Identities Datamart Environment ("TIDE") database. *Id.* at 12. The

NCTC reviews TIDE entries and recommends specific entries to the TSC for inclusion in the

TSDB. *Id.* The FBI also nominates to the TSDB individuals with what it characterizes as

suspected ties to domestic terrorism. *Id.*

"Before placing any information into the TSDB, the TSC utilizes a multi-level review

process to ensure that the nomination meets the criteria for inclusion. Generally, nominations to

the TSDB must satisfy two requirements." *Id.* First, the facts and circumstances pertaining to the

nomination must meet the "reasonable suspicion standard of review." *Id.* Second, "the biographic

information associated with a nomination must contain sufficient identifying data so that a person

being screened can be matched to or disassociated from another watchlisted individual." *Id.*

"Reasonable suspicion" requires "articulable facts which, taken together with rational inferences, reasonably warrant the determination" that an individual "is known or suspected to be or has been engaged in conduct constituting, in preparation for, in aid of or related to terrorism and terrorist activities." *Id.* "The 'reasonable suspicion' standard is based on the totality of the circumstances in order to account for the sometimes fragmentary nature of terrorist information." *Id.*; *see generally* Compl. ¶¶ 57-60.

Plaintiffs allege that Defendants have not stated publicly "the entirety of what standards or criteria are applied to determine whether an American citizen on the consolidated watch list will be placed on the No-Fly List, Selectee List ('SSSS') or other list that is distributed to the TSA, CBP or other screening agencies." Compl. ¶ 61. Plaintiffs contend that the "standards for watch list inclusion do not evince even internal logic." *Id.* ¶ 62. As a result, hundreds of thousands of individuals are ensnared in the TSDB via a process that disproportionately targets American Muslims. *Id.* ¶¶ 71, 77, 80. Plaintiffs allege that Defendants use the watchlist, not as a tool to enhance aviation and border security, but for nefarious, unlawful purposes, including coercing innocent Americans into becoming informants, and disseminating defamatory, false, and stigmatizing information to millions of Americans. *Id.* ¶ 78. Plaintiffs further allege that because the TSC disseminates the TSDB status to local authorities, foreign governments, and private contractors, placement in the TSDB restricts innocent Americans' ability to exercise their rights of movement and travel while the consequences also affect their ability to buy a gun, obtain or renew a hazmat license, or work in an airport. *Id.* ¶¶ 49-52.

### 3. The DHS TRIP

Congress has specifically directed the DHS to establish a redress procedure for individuals wrongly identified as a threat. 49 U.S.C. § 44926(a). Section 44926(a) provides:

The Secretary of Homeland Security shall establish a timely and fair process for individuals who believe they have been delayed or prohibited form boarding a commercial aircraft because they were wrongly identified as a threat under the regimes utilized by the Transportation Security Administration, United States Customs and Border Protection, or any other office or component of the Department of Homeland Security.

Congress has required the TSA to "establish a procedure to ensure airline passengers, who are delayed or prohibited from boarding a flight because the advanced passengers prescreening system determined that they might pose a security threat, to appeal such determination and correct information contained in the system," *id.* § 44903(j)(2)(C)(iii)(I), and to "establish a timely and fair process for individuals identified as a threat under [the passenger screening system] to appeal to the [TSA] the determination and correct any erroneous information." *Id.* § 44903(j)(2)(G)(i).

Pursuant to this authority, the TSA established and administers the DHS TRIP, through which travelers may request the correction of any erroneous information if they believe they have been unfairly or incorrectly delayed or denied boarding on an aircraft or entering a sterile area as a result the watchlist. *See* 49 C.F.R. §§ 1560.201-.207. The TSA promulgated regulations governing the DHS TRIP process and allowing travelers to initiate the redress process by submitting a redress inquiry form. *Id.* § 1560.205(b); *see also* DHS TRIP: One Stop Travelers' Redress Process, Department of Homeland Security (Nov. 4, 2016), http:/www.dhs.gov/one-stop-travelers-redress-process (last visited Feb. 28, 2019). Upon receipt of an inquiry form, the TSA, in coordination with the TSC and other appropriate federal law enforcement or intelligence agencies, if necessary, will "review all the documentation and information requested from the

individual" who is seeking redress, "correct any erroneous information, and provide the individual with a timely written response." 49 C.F.R. § 1560.205(d).[4]

Plaintiffs allege that the DHS TRIP process is inadequate, as it fails to provide "a fair and effective mechanism through which they can challenge the TSC's decision to place them on the terrorist watch list." Compl. ¶ 108.

## B. Individual Plaintiffs' Allegations

Mr. Kovac is a United States citizen and an American Muslim residing in New Jersey. *Id.* ¶ 14. He alleges that he is on the Government's "No Fly List" and, thereby, is prevented from boarding flights that travel into, out of, or through United States airspace. *Id.* ¶¶ 121-152. He contends that, on or about October 17, 2014, he appeared at the O'Hare International Airport in Chicago, Illinois, to board his international flight to Turkey, printed his boarding pass, and was thoroughly searched and cleared by TSA security. *Id.* ¶¶ 121-122. Once boarding for his flight commenced, however, TSA agents stopped him at the gate entrance and prevented him from boarding. *Id.* ¶¶ 121-123. He further alleges that the TSA agents interrogated him at the gate publicly in front of the other passengers and airline personnel, escorted him to the baggage claim area and searched his luggage, and then informed him that he was cleared to fly. *Id.* ¶¶ 124-126. By that time, however, he had already missed his flight and, as a result, he had to reschedule his flight for the following day and pay the fees associated with the flight change. *Id.* ¶ 127. Mr.

---

[4] In their motion to dismiss, Defendants make reference to "revised redress procedures." *See* Defs.' Mot. to Dismiss 5 (citing *Latif v. Lynch*, 2016 WL 1239925, at *5 (D. Or. March 28, 2016)). From what the court can discern, the "revised redress procedures" are not codified, have not been subject to a rule-making process, and are not published in the Federal Register or the Code of Federal Regulations. Nothing, therefore, precludes Defendants from changing the process at any time with no notice to the public or those placed on the watchlist. Further, the "revised redress procedures" are not part of the allegations in the Complaint and, thus, may not be considered by the court in addressing Defendants' motion to dismiss for failure to state a claim. Finally, under these unique circumstances, the court declines to take judicial notice of any "revised redress procedures" at the motion-to-dismiss stage.

Kovac contends that the following day, he again appeared at the O'Hare International Airport to board his rescheduled flight, but, once again, at the gate entrance, TSA agents stopped and interrogated him publicly and then escorted him to the baggage claim area and searched his luggage. This time, he alleges, the TSA agents confiscated his cell phone and, upon information and belief, downloaded the data from his cell phone. *Id.* ¶¶ 128-131. He alleges that afterwards, "two FBI agents—one male and one female—interrogated [him] . . . about his travel plans in Turkey and Syria, his views and opinions on Sharia (Islamic) law, his life, family, friends and employment." *Id.* ¶ 132. Following the interrogation, the FBI agents informed Mr. Kovac that he would not be allowed to board his flight and should return home. *Id.* ¶ 133. As a result, Mr. Kovac was unable to board his flight and lost the money he paid for the flight. *Id.* ¶¶ 133-134. He alleges that an FBI agent has informed him that he needs to take a lie detector test or else wait several years before being removed from the No Fly List. *Id.* ¶ 140. He further alleges that because his TSDB entry is annotated in a way to deny him the ability to fly through United States airspace, he has been denied boarding and, since October 17, 2014, he has not been able to fly. *Id.* ¶ 144. He alleges Defendants have also targeted his family and interrogated many of his family members. *Id.* ¶¶ 141-142.

The remaining four Plaintiffs allege that they are on the "Selectee List" and, thereby, are subject to extra screening at airports and land border crossings. *Id.* ¶¶ 153-247. Their boarding passes are often stamped "SSSS," an indication of the passenger's status as a "known or suspected terrorist" to airport screeners. *Id.* ¶¶ 171, 191, 211, 227, 235.

Mr. Sybti is a United States citizen and an American Muslim residing in Dallas, Texas. *Id.* ¶ 16. He alleges that, on or about June 1, 2016, DHS agents approached him in an attempt to coerce him to become an informant in Lebanon. *Id.* ¶¶ 204-205. He contends that Defendants

offered to remove his name from the watchlist if he agreed, raising the inference that Defendants placed him on the list to coerce him into becoming an informant. *Id.* ¶ 204. He further alleges he has been extensively interrogated, his electronics have been confiscated and searched, and because of the watchlist, he has been humiliated by CBP officers who have waited for him to deplane and then questioned him about his religious practices. *Id.* ¶¶ 193-196. He contends that at one point, Defendants asked, "do you go to a mosque[?]" and, in Texas, surveilled him for months with an agent who identified himself as "Agent Eric," "randomly" showing up to coerce and "befriend" him. *Id.* ¶¶ 196, 204-208.

Mr. Aljame is a United States citizen and an American Muslim residing in Dallas, Texas. *Id.* ¶ 15. He alleges that in April 2013, he was stopped at the airport in Amman, Jordan, and, without explanation, prevented from boarding his flight to San Diego, California. *Id.* ¶ 154. He alleges that on two separate occasions he went to the United States Embassy in Amman, Jordan, to find out why he was denied boarding and was, instead, interrogated by FBI agents, one of whom offered to arrange a flight for him to Chicago, Illinois, rather than San Diego, California, if he agreed to take a lie detector test. *Id.* ¶¶ 157-159. He further alleges that as a "direct result of being prevented from flying to the United States," he "and his family were forced to remain in Jordan for approximately two years." *Id.* ¶ 161. He alleges that in April 2015, he attempted to board a flight to the United States with a connection in Frankfort, Germany. He alleges that when he deplaned in Frankfort, Germany, CBP officers escorted him to the baggage claim area, confiscated his passport, and interrogated him. *Id.* ¶¶ 162-166. He contends that he was cleared eventually to board his flight to the United States. *Id.* ¶ 167. According to Mr. Aljame, since April 2015, when he travels by air he must check in manually with airline representatives to obtain a boarding pass, rather than at a kiosk, and the airline representative must clear his name with the DHS before he

is permitted to board his flight. *Id.* ¶¶ 168-171. He alleges he continues to endure long interrogations and secondary inspections, has had documents confiscated, has been separated from his loved ones, and has missed flights because of Defendants' treatment of him. *Id.* ¶¶ 177-185. He alleges that in June 2015, he and his ten-year-old son were denied boarding at Dubai International Airport and required to wait several hours before the DHS cleared them to fly to the United States. *Id.* ¶¶ 179-180. Recently, he alleges, he was detained and denied entry into Jordan and was deported by Jordanian officials back to Dallas, Texas. *Id.* ¶ 186.

Mr. Allababidi is a United States citizen and an American Muslim residing in Dallas, Texas. *Id.* ¶ 17. He alleges he is a successful businessman ensnared by Defendants' discriminatory watchlist. *Id.* ¶ 216. He alleges that, prior to being added to the watchlist, he traveled frequently and had "Global Entry." *Id.* ¶¶ 216-217. He contends that because of Defendants' actions, his "Global Entry" was revoked without explanation, and he has endured humiliating searches, long interrogations, and his electronics have been confiscated and downloaded. *Id.* ¶¶ 217-224. He further contends that he has missed flights, had his vacations ruined, and has forgone business opportunities because of Defendants. *Id.* ¶¶ 229-231.

Ms. Warsame is a United States citizen and an American Muslim residing in Dallas, Texas. *Id.* ¶ 18. She alleges that Defendants' watchlist has affected her travels since 2015. *Id.* ¶ 235. She alleges she is always delayed and needs clearance before flying [*id.* ¶¶ 235-236]; subjected to long, humiliating searches and interrogations [*id.* ¶ 237]; and upon information and belief, has been denied a credit card and bank loan due to the watchlist [*id.* ¶ 239].

Each Plaintiff contends, upon information and belief, that his or her nomination to and designation on the federal terror watchlist was made based solely upon a hunch (formed upon race, ethnicity, national origin, religious affiliation, guilt-by-association, or First Amendment protected

activities). *Id.* ¶¶ 2, 150, 189, 214, 233, 246, 251, 261.  Each further contends, upon information and belief, that because he or she is included on the federal terror watchlist, Defendants disseminated and are continuing to disseminate his or her designation as a "known or suspected terrorist" to state and local authorities, foreign governments, corporations, private contractors, airlines, gun sellers, car dealerships, and financial institutions, among other official and private entities and individuals. *Id.* ¶¶ 151, 215, 234, 247, 257, 266, 272.  Each Plaintiff has filed a redress request challenging his or her alleged placement on the watchlist.  *Id.* ¶¶ 147, 173, 197, 225, 240. In response to his redress inquiry, in 2018, after Defendants filed their motion to dismiss, Mr. Kovac received confirmation from the DHS that he is on the No Fly List.  With respect to the redress inquiries of the remaining four Plaintiffs, each received a form letter from the DHS that neither confirmed nor denied the existence of terrorist watchlist records related to him or her, failed to set forth any basis for his or her inclusion on a watchlist, and failed to state whether Defendants had resolved the complaint at issue.  *Id.* ¶¶ 113, 174-175, 198, 226, 241.

Plaintiffs allege they were never charged or convicted of a terrorism-related offense, provided notice of the factual bases for their respective placements on the watchlist before or after their listings, given a meaningful opportunity to contest their designation, or given notice of the deprivation of their liberty interests or violation of their constitutional rights.  *Id.* ¶¶ 145-146, 187, 209, 242.

C.     **This Lawsuit**

Plaintiffs have filed a five-count Complaint based on their alleged inclusion in the TSDB and the alleged lack of an adequate process of redress for challenging erroneous placement on the "No Fly List" or "Screening List."  In Count I, titled "Failure to Provide Post-Deprivation Notice and Hearing in Violation of the Fifth Amendment Right to Procedural Due Process," Plaintiffs

contend that their alleged inclusion on the watchlist and the associated stigmatizing label of "known or suspected terrorist," without notice or a constitutionally adequate legal mechanism to challenge the placement, deprive them of their protected liberty interest in traveling free from unreasonable burdens, freedom from false stigmatization, and nonattainder (the interest against being singled out for punishment without trial), in violation of their constitutional right to procedural due process. *Id.* ¶¶ 248-258.

In Count II, titled "Deprivation of Protected Liberties in Violation of Fifth Amendment Right to Substantive Due Process," Plaintiffs contend that their alleged inclusion on the watchlist and the associated stigmatizing label of "known or suspected terrorist," unduly burden these same liberty interests, as Defendants' interference is not necessary to further a compelling governmental interest and has not been narrowly tailored to achieve that interest, in violation of their constitutional right to substantive due process. *Id.* ¶¶ 259-270.

In Count III, titled "Unlawful Agency Action in Violation of the Administrative Procedure Act, 5 U.S.C. §§ 702, 706 (APA)," Plaintiffs contend that Defendants' actions detailed in the Complaint "were and are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and contrary to constitutional rights, power, privilege, or immunity, and should be set aside as unlawful pursuant to 5 U.S.C. § 706." *Id.* ¶ 272.

In Count IV, titled "Violation of the Fifth Amendment to the United States Constitution (Equal Protection)," Plaintiffs contend that Defendants' actions detailed in the Complaint, "have had a discriminatory effect upon and have disparately impacted Plaintiffs and other similarly situated American citizens who are Muslim American travelers, and not travelers of other faiths," in violation of their constitutional right to equal protection. *Id.* ¶ 283.

In Count V, titled "Violation of the United States Constitution (Non-Delegation)," Plaintiffs contend that Defendants, in implementing and disseminating the watchlist and in providing an inadequate redress procedure, "have illegally acted beyond their authority" in violation of the non-delegation doctrine. *Id.* ¶ 293.

Plaintiffs seek the following declaratory judgment and injunctive relief:

1. A declaratory judgment that Defendants' policies, practices, and customs violate the Fifth Amendment to the United States Constitution and the Administrative Procedure Act;

2. A declaratory judgment that Defendants' policies, practices, and customs violate the non-delegation doctrine of the United States Constitution;

3. An injunction that:

   a. requires Defendants to remedy the constitutional and statutory violations identified above, including the removal of Plaintiffs from any watch list or database that burdens or prevents them from flying or entering the United States across the border; and,

   b. requires Defendants to provide individuals designated on the federal terror watch list with a legal mechanism that affords them notice of the reasons and bases for their placement on the federal terror watch list and a meaningful opportunity to contest their continued inclusion on the federal terror watch list.

*Id*. at 50. Plaintiffs also seek trial by jury, attorney's fees, and costs. *Id.*

On April 13, 2018, Defendants moved to dismiss the Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). In support, they contend that: (1) 49 U.S.C. § 46110 bars this action because it provides for "exclusive" jurisdiction in the courts of appeals to review orders issued "in whole or in part" by the TSA; (2) Mr. Kovac has failed to exhaust his administrative remedies and his claims are, therefore, not ripe for adjudication; and (3) Plaintiffs have failed to state a claim upon which relief may be granted, and all claims must, therefore, be

dismissed under Federal Rules of Civil Procedure 12(b)(6). Defendants' Motion to Dismiss has been fully briefed and is ripe for adjudication. The court will address the parties' arguments after setting forth the applicable legal standards.

## II.     Legal Standards

### A.     Rule 12(b)(1) - Lack of Subject Matter Jurisdiction

A federal court has subject matter jurisdiction over civil cases "arising under the Constitution, laws, or treaties of the United States," or over civil cases in which the amount in controversy exceeds $75,000, exclusive of interest and costs, and in which diversity of citizenship exists between the parties. 28 U.S.C. §§ 1331, 1332. Federal courts are courts of limited jurisdiction and must have statutory or constitutional power to adjudicate a claim. *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994) (citations omitted); *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). Absent jurisdiction conferred by statute or the Constitution, they lack the power to adjudicate claims and must dismiss an action if subject matter jurisdiction is lacking. *Id.*; *Stockman v. Federal Election Comm'n*, 138 F.3d 144, 151 (5th Cir. 1998) (citing *Veldhoen v. United States Coast Guard*, 35 F.3d 222, 225 (5th Cir. 1994)). A federal court must presume that an action lies outside its limited jurisdiction, and the burden of establishing that the court has subject matter jurisdiction to entertain an action rests with the party asserting jurisdiction. *Kokkonen*, 511 U.S. at 377 (citations omitted). "[S]ubject-matter jurisdiction cannot be created by waiver or consent." *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 919 (5th Cir. 2001).

In considering a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, "a court may evaluate (1) the complaint alone, (2) the complaint supplemented by undisputed facts evidenced in the record, or (3) the complaint supplemented by undisputed facts plus the court's

resolution of disputed facts." *Den Norske Stats Oljeselskap As v. HeereMac Vof*, 241 F.3d 420, 424 (5th Cir. 2001) (citation omitted). Thus, unlike a Rule 12(b)(6) motion to dismiss for failure to state a claim, the district court is entitled to consider disputed facts as well as undisputed facts in the record and make findings of fact related to the jurisdictional issue. *Clark v. Tarrant Cnty.*, 798 F.2d 736, 741 (5th Cir. 1986). All factual allegations of the complaint, however, must be accepted as true. *Den Norske Stats Oljeselskap As*, 241 F.3d at 424.

### B.    Rule 12(b)(6) - Failure to State a Claim

To defeat a motion to dismiss filed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 742 (5th Cir. 2008); *Guidry v. American Pub. Life Ins. Co.*, 512 F.3d 177, 180 (5th Cir. 2007). A claim meets the plausibility test "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted). While a complaint need not contain detailed factual allegations, it must set forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted). The "[f]actual allegations of [a complaint] must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (quotation marks, citations, and footnote omitted). When the allegations of the pleading do not allow the court to infer more than the mere possibility of wrongdoing, they fall short of showing that the pleader is entitled to relief. *Iqbal*, 556 U.S. at 679.

In reviewing a Rule 12(b)(6) motion, the court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm Mutual Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007); *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004); *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). In ruling on such a motion, the court cannot look beyond the pleadings. *Id.*; *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). The pleadings include the complaint and any documents attached to it. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000). Likewise, "'[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [the plaintiff's] claims.'" *Id.* (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)). In this regard, a document that is part of the record but not referred to in a plaintiff's complaint and not attached to a motion to dismiss may not be considered by the court in ruling on a 12(b)(6) motion. *Gines v. D.R. Horton, Inc.*, 699 F.3d 812, 820 & n.9 (5th Cir. 2012) (citation omitted). Further, it is well-established and "'clearly proper in deciding a 12(b)(6) motion [that a court may] take judicial notice of matters of public record.'" *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (quoting *Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007) (citing *Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994)).

The ultimate question in a Rule 12(b)(6) motion is whether the complaint states a valid claim when it is viewed in the light most favorable to the plaintiff. *Great Plains Trust Co. v. Morgan Stanley Dean Witter*, 313 F.3d 305, 312 (5th Cir. 2002). While well-pleaded facts of a complaint are to be accepted as true, legal conclusions are not "entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679 (citation omitted). Further, a court is not to strain to find inferences favorable to the plaintiff and is not to accept conclusory allegations, unwarranted deductions, or

legal conclusions. *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (citations omitted). The court does not evaluate the plaintiff's likelihood of success; instead, it only determines whether the plaintiff has pleaded a legally cognizable claim. *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004). Stated another way, when a court deals with a Rule 12(b)(6) motion, its task is to test the sufficiency of the allegations contained in the pleadings to determine whether they are adequate enough to state a claim upon which relief can be granted. *Mann v. Adams Realty Co.*, 556 F.2d 288, 293 (5th Cir. 1977); *Doe v. Hillsboro Indep. Sch. Dist.*, 81 F.3d 1395, 1401 (5th Cir. 1996), *rev'd on other grounds*, 113 F.3d 1412 (5th Cir. 1997) (en banc). Accordingly, denial of a 12(b)(6) motion has no bearing on whether a plaintiff ultimately establishes the necessary proof to prevail on a claim that withstands a 12(b)(6) challenge. *Adams*, 556 F.2d at 293.

## III. Analysis

### A. Defendants' Challenge to the Court's Subject Matter Jurisdiction

As a threshold matter, Defendants argue that this court lacks subject matter jurisdiction to consider Plaintiffs' challenges to the adequacy of the DHS TRIP under 49 U.S.C. § 46110, which grants exclusive jurisdiction to the federal courts of appeals to review the "orders" of a number of federal agencies, including the TSA. *See* Defs.' Mot. to Dismiss 6-7 (Doc. 8). Defendants further contend that the court also lacks jurisdiction over Plaintiffs' claims challenging their alleged placement in the TSDB, as "*all* claims inescapably intertwined with orders that fall within Section 46110 are subject to the statute's channeling effect, including claims against TSC for alleged placement in the TSDB." *Id.* at 7 (original emphasis). Plaintiffs counter that their claims fall outside the scope of section 46110 because they are not merely challenging the adequacy of the DHS TRIP redress procedures but also are challenging their continued placement on the watchlist,

a placement made by the TSC, which is not one of the agencies enumerated in section 46110. Pls.' Resp. 24 (Doc. 9). According to Plaintiffs, because their continued placement on the watchlist requires scrutiny of both the TSA's and the TSC's actions, section 46110 does not deprive this court of jurisdiction, as it only provides for exclusive appellate jurisdiction of TSA orders. *Id.*

Whether a district court has subject matter jurisdiction to hear Plaintiffs' challenges to the DHS TRIP redress procedures and inclusion in the TSDB is an issue of first impression in the Fifth Circuit. The court begins with the language of the statute.

Title 49 U.S.C. § 46110(a) of the Federal Aviation Act vests the courts of appeals with jurisdiction to review the orders of certain federal agencies, including the TSA. Section 46110 provides:

> [A] person disclosing a substantial interest in an order issued by the Secretary of Transportation (or the Under Secretary of Transportation for Security with respect to security duties and powers designated to be carried out by the Under Secretary or the Administrator of the Federal Aviation Administration with respect to aviation duties and powers designated to be carried out by the Administrator) in whole or in part under this part, part B, or subsection (I) or (s) of section 114 may apply for review of the order by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit or in the court of appeals of the United States for the circuit in which the person resides or has its principal place of business.

49 U.S.C. § 46110(a). (Although the Under Secretary of Transportation for Security was the head of the TSA when it was created in 2001 as part of the Department of Transportation, the TSA and its "functions, personnel, assets, and liabilities" were moved to the DHS in 2002. *See* 6 U.S.C. § 203(2).) Section 46110(c) provides, in relevant part, that the courts of appeals have "exclusive jurisdiction to affirm, amend, modify, or set aside any part of the [TSA's] order." *Id.* § 46110(c).

 "Specific grants of jurisdiction to the courts of appeals override general grants of jurisdiction to the district courts." *Ligon v. Lahood*, 614 F.3d 150, 154 (5th Cir. 2010) (citation omitted). Further,

"[w]here Congress has provided for review jurisdiction in the courts of appeals, jurisdiction there is exclusive." *Id.* at 154-55 (citation omitted) (collecting cases). In addition, "a plaintiff may not circumvent the exclusive jurisdiction of the court of appeals by collaterally attacking an administrative order in a federal district court." *Id.* at 155 (citation omitted).

With section 46110, Congress arguably sought to limit the jurisdiction of the district courts by channeling review of a TSA final order to the courts of appeals. The Supreme Court has recognized that the scope of exclusive jurisdiction provisions such as section 46110 should include action by district courts that would enjoin the outcome of the relevant agency's order. *City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320 (1958). In *City of Tacoma*, the statutory provision at issue was section 313(b) of the Federal Power Act, which vested in the courts of appeals exclusive jurisdiction for judicial review of orders of the Federal Power Commission. *Id.* at 335. The Court ruled that this provision

> necessarily precluded de novo litigation between the parties of all issues inhering in the controversy, and all other modes of judicial review. Hence, upon judicial review of the Commission's order, all objections to the order, to the license it directs to be issued, and to the legal competence of the licensee to execute its terms, must be made in the Court of Appeals or not at all.

*Id.* at 336 (footnote omitted). Later decisions of the Supreme Court have reiterated that exclusive jurisdiction provisions bar litigants form "requesting the District Court to enjoin action that is the outcome of the agency's order[,]" *FCC v. ITT World Communications, Inc.*, 466 U.S. 463, 468 (1984), but not claims that are "wholly collateral to a statute's review provisions and outside the agency's expertise." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212 (1994) (internal quotation marks and citation omitted).

In considering the application of section 46110 in this case, the court must focus on the nature of Plaintiffs' allegations. As previously summarized by the court, Plaintiffs assert five

causes of action against six Defendants. Plaintiffs' allegations and causes of action, however, can be divided into two groups. First, Plaintiffs challenge the adequacy of redress procedures established to contest inclusion in the TSDB, contending that the procedures are unconstitutional and also unlawful under the APA. Second, Plaintiffs challenge their alleged placement on the "No Fly List" and "Screening List," arguing that their continued inclusion on these lists is unconstitutional and also unlawful under the APA. The court considers Defendants' jurisdictional challenges in the context of these two categories of claims asserted by Plaintiffs in the Complaint.

### 1.    Plaintiffs' Challenges to the Adequacy of the DHS TRIP

In opposition to Defendants' jurisdictional challenge, Plaintiffs contend that section 46110 does not deprive this court of jurisdiction over their claims challenging the adequacy of the redress procedures under the DHS TRIP. In support, Plaintiffs rely primarily on an unpublished Fourth Circuit decision in which the court held that an action seeking removal from the No Fly List and challenging the adequacy of redress procedures was properly before the district court, as any remedy would involve both the TSA and the TSC, and the circuit court's authority under section 46110 only extended to the TSA's orders. *See Mohamed v. Holder*, No. 11-1924, 2013 U.S. App. LEXIS 26340, at *5-6 (4th Cir. May 28, 2013) ("[W]e do not fairly discern from either grant of authority a congressional intent to remove such claims from review of the district court."). The D.C. Circuit and Ninth Circuit have similarly held that the district court has jurisdiction in such cases. *See Ege v. United States Dep't of Homeland Sec.*, 784 F.3d 791, 796 (D.C. Cir. 2015); *Latif v. Holder*, 686 F.3d 1122, 1128-29 (9th Cir. 2012).[5] As reasoned by the D.C. Circuit in *Ege*:

---

[5] In *Latif v. Holder*, involving similar challenges by United States citizens to their placement on the No Fly List as well as to the redress procedures under the DHS TRIP, the Ninth Circuit reversed the district court's ruling that plaintiffs' challenges were within the exclusive jurisdiction of the court of appeals under 49 U.S.C. § 46110, holding instead that "district courts have original jurisdiction over travelers' substantive

> Because "TSC—not TSA—actually reviews the classified intelligence information about the travelers and decides whether to remove them from the List" and "established the policies governing that stage of the redress process," we agree that [the court of appeals] cannot, on section 46110 review, provide relief to an individual included on the No Fly List or in the TSDB by "simply amending, modifying, or setting aside TSA's orders by directing TSA to conduct further proceedings."

*Ege*, 784 F.3d at 795-96 (quoting *Latif*, 686 F.3d at 1128-29) (internal citations omitted).  More recently, relying on the reasoning in *Ege* and *Latif*, a federal district court in Minnesota and a federal district court in Virginia have similarly held that section 46110 does not deprive the district court of jurisdiction to consider challenges to the redress process relating to an individual's alleged inclusion on the watchlist.  *See Wilwal v. Nielsen*, 346 F. Supp. 3d 1290, 1304 (D. Minn. 2018); *Elhady v. Piehota*, 303 F. Supp. 3d 453, 461-62 (E.D. Va. 2017).

In support of their position that section 46110 deprives this court of subject matter jurisdiction over Plaintiffs' challenges to the adequacy of the DHS TRIP redress process, Defendants rely on *Mokdad v. Lynch*, 804 F.3d 807 (6th Cir. 2015).  *See* Defs.' Mot. to Dismiss 6

---

challenges to inclusion on the [No Fly] List," as well as "original jurisdiction over Plaintiffs' claim that the Government failed to afford them an adequate opportunity to contest their apparent inclusion on the [No Fly] List."  *Latif v. Holder*, 686 F.3d 1122, 1130 (9th Cir. 2012).  On remand, the parties filed cross-motions for partial summary judgment on the plaintiffs' challenges.  The district court granted the plaintiffs' motion and held that, for purposes of their due process claim, the plaintiffs had a constitutionally protected liberty interest in traveling internationally by air, and in their reputations, and also found that the DHS TRIP procedures violated due process.  In response, the Government informed the court that it was revising its DHS TRIP procedures to address the constitutional deficiencies noted by the court and filed a notice describing the revised procedures.  Ultimately, the district court concluded that the revised procedures satisfied procedural due process in principle, granted summary judgment in the Government's favor on the plaintiffs' claims challenging the adequacy of the redress procedures, and dismissed their challenges to placement on the No Fly List for lack of jurisdiction, reasoning that under the revised DHS TRIP procedures, only the TSA administrator had ultimate authority to remove a DHS TRIP applicant from the No Fly List.  *See Latif v. Lynch*, No. 3-10-cv-750-BR, 2017 WL 1434648, at *6-9 (D. Or. Apr. 21, 2017), *appeal docketed sub nom. Kariye v. Sessions*, No. 17-35634 (9th Cir. Aug. 8, 2017).  As previously noted, the revised redress procedures considered by the district court on remand in *Latif*—at the summary judgment stage of the proceedings—are not before this court at the motion-to-dismiss stage.  *See supra* note 4.

(Doc. 8). In *Mokdad*, the Sixth Circuit concluded that a procedural challenge to the DHS TRIP redress process "amount[ed] to a challenge to a TSA order[,]" and that, therefore, the TSA was "a required party to [the plaintiff's] litigation about the adequacy of the redress procedures." *Id.* at 811-12. Because the plaintiff had failed to include the TSA as a defendant to the lawsuit, the court dismissed without prejudice his claims challenging the adequacy of the redress process. Notably, the Sixth Circuit "declined to opine . . . whether § 46110 would deprive the district court of subject-matter jurisdiction over Mokdad's claims challenging the adequacy of the redress process, including any broad constitutional claims, if he were to file a new suit naming TSA as a defendant." *Id.* at 812. In this case, by contrast, Plaintiffs have included the TSA as a Defendant. The concerns expressed by the Sixth Circuit in *Mokdad* are, therefore, not present in this case. In addition, contrary to Defendants' argument, nothing about the Sixth Circuit's decision in *Mokdad* compels this court to conclude that section 46110 deprives it of jurisdiction over Plaintiffs' claims challenging the adequacy of the DHS TRIP redress process, as the Sixth Circuit expressly declined to opine on the jurisdictional question.

In light of the foregoing, and having carefully considered the decisions of the Fourth Circuit in *Mohamed*, the Ninth Circuit in *Latif*, the D.C. Circuit in *Ege*, and the federal district courts in *Wilwal* and *Elhady*, the court finds the reasoning in these cases persuasive and similarly concludes that section 46110 does not bar its consideration of Plaintiffs' challenge to the adequacy of the redress process under the circumstances of this case, in which Plaintiffs are also raising broad constitutional challenges to their continued inclusion in the TSDB. The court, therefore, will deny Defendants' Rule 12(b)(1) motion to dismiss Plaintiffs' Complaint insofar as Plaintiffs' challenges relate to the adequacy of the redress procedures under the DHS TRIP.

## 2.     Plaintiffs' Challenges to Placement on the Watchlist

As previously stated, Defendants also contend that the court lacks jurisdiction over Plaintiffs' challenges to their inclusion on the watchlist, as "all claims inescapably intertwined with orders that fall within the Section 46110 are subject to the statute's channeling effect, including claims against TSC for alleged placement in the TSDB." *See* Defs.' Mot. to Dismiss 7 (Doc. 8). For the reasons that follow, the court rejects Defendants' argument.

The purpose of the inescapable-intertwinement doctrine is to prevent a plaintiff from "circumvent[ing] the exclusive jurisdiction of the court of appeals by collaterally attacking an administrative order in a federal district court." *Ligon*, 614 F.3d at 155 (citation omitted).[6] A claim is inescapably intertwined under section 46110 if it alleges that the plaintiff was injured by an agency order and that the court of appeals has authority to hear the claim on direct review of the agency order. *See generally City of Tacoma*, 357 U.S. at 336.

First, Defendants' reliance on the doctrine of inescapable intertwinement is predicated on the court's acceptance of their primary jurisdictional argument, namely, that section 46110 bars the district court from hearing Plaintiffs' challenges to the adequacy of the redress procedure. The court has rejected Defendants' primary argument and, accordingly, need not reach their contingent argument that the doctrine of inescapable intertwinement also channels Plaintiffs' challenges to their inclusion in the TSDB to the courts of appeals.

---

[6] The court recognizes that the Fifth Circuit gives "expansive construction" to the term "order" in section 46110, requiring only an agency decision that "imposes an obligation, denies a right, or fixes some legal relationship." *Ligon v. LaHood*, 614 F.3d 150, 154 (5th Cir. 2010) (citation omitted). This, however, does not alter the court's analysis, as Plaintiffs are not contesting that the redress procedure results in a TSA order.

Second, even were the court to consider Defendants' argument, the court notes that in *Mokdad*, discussed above, the Sixth Circuit rejected a nearly identical argument and stated:

> [W]e decline to accept the government's invitation to expand the inescapable-intertwinement doctrine so as to find Mokdad's claim against the TSC is pulled within the ambit of the exclusive-review statute that applies to the TSA. Doing so not only would be inconsistent with existing law but also would run the risk of inadvertently expanding the number and range of agency orders that might fall under exclusive-jurisdiction provisions that Congress did not intend to sweep so broadly.

*Mokdad*, 804 F.3d at 815. As in *Mokdad*, Defendants, in effect, are urging the court to find that "a direct challenge to one agency's order is inescapably intertwined with another agency's order— that Plaintiffs' challenge to TSC's orders placing them on the No Fly List or the Selectee List are inescapably intertwined with both TSA's orders denying them boarding and TSA's orders governing the redress process." *Id.* at 814. The court agrees with the Sixth Circuit that "this would be an unprecedented departure from the doctrine of inescapable intertwinement[.]" *Id.*[7] In sum, the considerations undergirding the doctrine of "inescapable intertwinement" that led the Fifth Circuit to apply it in *Ligon* are not at play here.

For these reasons, the court will deny Defendants' Rule 12(b)(1) motion to dismiss Plaintiffs' Complaint for lack of subject matter jurisdiction.

---

[7] Certain district courts have reached the opposite conclusion from the Sixth Circuit in *Mokdad* and held that a plaintiff's challenge to the TSC's orders placing him or her on the No Fly List or the Selectee List is inescapably intertwined with the TSA's orders governing the redress process, thereby depriving the district court of subject matter jurisdiction under section 46110. *See, e.g., Scherfen v. United States Dep't of Homeland Sec.*, 2010 WL 456784, at *11 (M.D. Pa. 2010); *Green v. Transportation Sec. Admin.*, 351 F. Supp. 2d 1119, 1127-28 (W.D. Wash. 2005). **The court, however, is persuaded by the Sixth Circuit's reasoning in *Mokdad*, and declines to follow the district court opinions in *Scherfen* and *Green*, both decided many years prior to the Sixth Circuit's decision in *Mokdad*.**

**B.      Ripeness and Exhaustion of Administrative Remedies – Mr. Kovac's Claims**

Defendants argue that before bringing this action challenging his placement on the "No Fly List" and the inadequacy of the redress procedures, Mr. Kovac should be required to exhaust "the congressionally mandated administrative redress process" and, until that time, "his challenge to his alleged placement on the No Fly List is premature."   Defs.' Mot. to Dismiss 8 (Doc. 8). Plaintiffs counter that there are no regulations regarding the DHS TRIP that mandate exhaustion and that "there is nothing 'hypothetical' about [Mr. Kovac's] claims."   Pls.' Resp. 24 (Doc. 9). Plaintiffs further assert that Mr. Kovac filed for redress through the DHS TRIP and that, after Defendants filed their motion to dismiss, he received confirmation that he is on the "No Fly List." *Id.*  Defendants confirm in their reply brief that Mr. Kovac submitted a redress inquiry to the DHS TRIP and has been notified that his name appears on the "No Fly List."   *See* Reply 3 (Doc. 10). Under these facts, and for the reasons that follow, the court concludes that Mr. Kovac's claims are ripe for adjudication and that no further exhaustion of administrative remedies is required.

Article III of the Constitution confines the federal courts to adjudicating actual "cases" and "controversies." U.S. Const. art. III, § 2.  In an attempt to give meaning to Article III's "case or controversy requirement," the courts have developed a series of principles termed "justiciability doctrines." *United Transp. Union v. Foster*, 205 F.3d 851, 857 (5th Cir. 2000).  One such doctrine is ripeness.  The "[r]ipeness doctrine 'is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction.'" *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 286 (5th Cir. 2012) (quoting *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 58 n.18 (1993)); *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 670 n.2 (2010) ("Ripeness reflects constitutional considerations that implicate Article III limitations on judicial power, as well as prudential reasons for refusing to exercise jurisdiction." (internal

quotation marks omitted)). The ripeness doctrine prevents the courts, "through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies," while also protecting "agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967), *overruled on other grounds, Califano v. Sanders*, 430 U.S. 99 (1977). A case is ripe for adjudication if all remaining questions are legal and further factual development is unnecessary. *New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans*, 833 F.2d 583, 587 (5th Cir. 1987). A claim is not ripe if it "rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal punctuation and citations omitted). Two key considerations exist for courts evaluating the ripeness of an action: "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *New Orleans Pub. Serv.*, 833 F.2d at 586 (quoting *Abbott Labs.*, 387 U.S. at 149). Finally, "[R]ipeness may be used to express the exhaustion principle that administrative remedies should be tried before running to the courts." 13B The Late Charles A. Wright, et al., Federal Practice & Procedure § 3532.6 (3d ed. 2008).

Defendants appear to be using the doctrine of ripeness in this case to "express the exhaustion principle that administrative remedies should be tried before running to the courts." *Id.* "Where Congress specifically mandates, exhaustion is required." *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992), *superseded by statute on other grounds, as recognized in Booth v. Churner*, 532 U.S. 731, 740 (2001). When exhaustion is not congressionally mandated, on the other hand, "sound judicial discretion" generally governs. *Id.* A federal court cannot require a plaintiff to exhaust administrative remedies before seeking judicial review of a final agency action under the

APA when neither the relevant statute nor an agency rule imposes such a requirement. *Darby v. Cisneros*, 509 U.S. 137, 153-54 (1993). For non-APA claims, "federal courts must balance the interest of the individual in retaining prompt access to a federal judicial forum against countervailing institutional interests favoring exhaustion." *McCarthy*, 503 U.S. at 146. Requiring administrative exhaustion allows the agency to "correct its own mistakes with respect to programs it administers before it is haled into federal court" and helps to avoid piecemeal appeals. *Id.* at 145-46.

In balancing these conflicting considerations, the Fifth Circuit has recognized that exhaustion should not be required in certain limited circumstances, including situations in which:

> (1) the unexhausted administrative remedy would be plainly inadequate, (2) the claimant has made a constitutional challenge that would remain standing after exhaustion of the administrative remedy, (3) the adequacy of the administrative remedy is essentially coextensive with the merits of the claim (e.g., the claimant contends that the administrative process itself is unlawful), and (4) exhaustion of administrative remedies would be futile because the administrative agency will clearly reject the claim.

*Dawson Farms, LLC v. Farm Serv. Agency*, 504 F.3d 592, 606 (5th Cir. 2007) (quoting *Taylor v. United States Treasury Dep't*, 127 F.3d 470, 477 (5th Cir. 1997)). In addition, exhaustion may be excused when (5) irreparable injury will result absent immediate judicial review. *Id.* (citation omitted).

The court concludes that it would be inappropriate to require exhaustion in this case. First, contrary to Defendants' assertion, Congress has not mandated exhaustion of the DHS TRIP process, and there are no regulations regarding the DHS TRIP that mandate exhaustion. *See* 49 U.S.C. §§ 44903(j)(2) & 44926(a) (directing the DHS to create a redress program without requiring that travelers take advantage of it). The court could not, therefore, under the holding in *Darby v. Cisneros*, *supra*, require Mr. Kovac to exhaust the DHS TRIP process before proceeding with his

APA appeal in Count III. To require exhaustion with respect to Mr. Kovac's other claims would, therefore, only bifurcate substantially related claims and create, not avoid, piecemeal litigation.

In addition, the DHS TRIP process would not provide Mr. Kovac with an opportunity to present for consideration his constitutional claims. The DHS TRIP process addresses only whether a traveler who has submitted an inquiry is, in fact, the individual listed in the TSDB, and if so, whether there is sufficient information to support the listing. Consequently, at the conclusion of the DHS TRIP process, even were the TSC to voluntarily remove Mr. Kovac from the No Fly List, the underlying constitutional infirmities he alleges that allowed his name to be included on the list and distributed to airlines would remain in place, unreviewed and with no assurances that he would not suffer the same alleged injury in the future.

Also weighing against requiring further exhaustion in this case is Mr. Kovac's interest in a prompt adjudication of his claims, first filed over one year ago, coupled with the lack of any information pertaining to how long the process of further exhaustion would take. *Cf. Coit Indep. Joint Venture v. Federal Sav. & Loan Ins. Corp.*, 489 U.S. 561, 586-87 (1989) (holding that available administrative remedy was inadequate, and, therefore, declining to require exhaustion, when administrative agency was not required to render a decision within a reasonable time limit).

Moreover, the court has no reason to believe that the DHS TRIP process would create a factual record more helpful than the one that already exists for the purposes of Mr. Kovac's constitutional claims, given the limited scope of the issues addressed in the DHS TRIP. As previously stated, Defendants acknowledge that Mr. Kovac was informed he was on the "No Fly List" after Defendants filed their motion to dismiss. *See* Reply 3 (Doc. 10).

Finally, Defendants' reliance on *Shearson v. Holder*, 725 F.3d 588, 594 (6th Cir. 2013), is misplaced. *See* Defs.' Mot. to Dismiss 9 (Doc. 8). In *Shearson*, the Sixth Circuit, while

recognizing that exhaustion is not mandatory in this context, affirmed a district court's decision requiring a plaintiff challenging the adequacy of the redress program to exhaust her administrative remedies. The court explained:

> While there are deficiencies in the Redress Program process, we agree with the district court that Shearson should be required to exhaust her administrative procedures by submitting a traveler inquiry form through the Redress Program before she can proceed with this case. There is very little guidance in any Circuit considering administrative exhaustion as it pertains to the Redress Program and there is no case law in this Circuit. However, when considering the purposes of the exhaustion doctrine, making Shearson submit a Traveler Redress inquiry is reasonable to promote judicial efficiency and allow the agencies involved an opportunity to resolve problems with their procedures.

*Shearson*, 725 F.3d at 594. Here, in contrast to the plaintiff in *Shearson*, Defendants concede that Mr. Kovac submitted a redress inquiry to the DHS TRIP and, in their reply, confirm that he has been notified of his "No Fly List" status. *See* Reply 3 (Doc. 10).

Under these circumstances, the court rejects as untenable Defendants' position that Mr. Kovac's claims are not ripe and that he must further exhaust administrative remedies before he can proceed in this court. No order or remedy would necessarily result from further administrative process. In addition, in cases relied upon by Defendants, the plaintiffs had not even sought redress through DHS TRIP. Here, Mr. Kovac has not only filed a redress inquiry, but he has also been notified that he is on the No Fly List. Therefore, the court concludes Mr. Kovac's claims are ripe and declines to prevent review of his claims by creating an exhaustion requirement when none has been statutorily mandated.

## C. Claims Against Defendant CBP

Defendants move to dismiss all claims against the CBP. In support, they argue that Plaintiffs fail to allege any wrongful acts by the CBP and do not seek a remedy with respect to the

CBP. Defs.' Mot. to Dismiss 9 (Doc. 8). In their response, Plaintiffs do not address dismissal of the CBP.

When a party fails to pursue a claim or defense beyond the party's initial complaint, the claim is deemed abandoned or waived. *Black v. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006) (plaintiff abandoned claim when she failed to defend claim in response to motion to dismiss); *see also Keenan v. Tejeda*, 290 F.3d 252, 262 (5th Cir. 2002) (noting that "an issue raised in the complaint but ignored at summary judgment may be deemed waived[]") (citation omitted). As Plaintiffs have failed to pursue these claims, the court concludes that they have abandoned or waived their claims against the CBP. Accordingly, based on Plaintiffs' abandonment or waiver of their claims against the CBP, the court will grant Defendants' Motion to Dismiss all claims against Defendant CBP, and these claims will be dismissed with prejudice.

### D. Plaintiffs' Constitutional and APA Claims

Defendants move to dismiss Counts I through V of the Complaint on numerous grounds, some of which overlap. With respect to Plaintiffs' substantive due process claims (Count II), Defendants' overriding argument is that the court should dismiss these claims because Plaintiffs' inclusion in the TSDB has not deprived them of any "fundamental right" as required to establish a substantive due process violation. In particular, Defendants contend that inclusion on the No Fly List (in the case of Mr. Kovac) or Screening List (in the case of the remaining four Plaintiffs) does not result in a burden sufficient to maintain a substantive due process claim. Defendants make similar arguments in support of their motion to dismiss Plaintiffs' procedural due process claims (Count I), contending that Plaintiffs have not alleged a sufficient deprivation of any liberty interests and that, even if they have, the DHS TRIP redress procedures are constitutionally adequate. Defendants move to dismiss Plaintiffs' APA claims (Count III) on similar grounds, arguing that

their APA claims are largely coextensive with their constitutional claims and, therefore, fail for the same reasons. Defendants further contend that Plaintiffs cannot separately demonstrate that the DHS TRIP redress process is arbitrary or capricious in violation of the APA. In support of their motion to dismiss Plaintiffs' equal protection claims (Count IV), Defendants contend that the watchlist criteria are facially neutral and Plaintiffs' allegations of disparate impact are conclusory, formulaic, and insufficient to state a claim for a violation of their rights to equal protection. Finally, in support of their motion to dismiss Plaintiffs' claims that the watchlist constitutes an unconstitutional delegation of legislative power in violation of the non-delegation doctrine (Count V), Defendants argue that Plaintiffs fail to state a claim because consideration of the applicable statutes reveals that Congress has provided "intelligible principles" both as to the goals the TSA should seek to achieve and also how it should go about achieving them.

In the interest of clarity and to minimize redundancies, the court will first address Plaintiffs' substantive due process claims (Count II), as many of Defendants' arguments undergird and overlap with those made in support of dismissing Plaintiffs' procedural due process claims (Count I).

### 1. Plaintiffs' Substantive Due Process Claims (Count II)

In Count II, titled "Deprivation of Protected Liberties in Violation of Fifth Amendment Right to Substantive Due Process," Plaintiffs contend that their inclusion on the watchlist and the associated stigmatizing label of "known or suspected terrorist," unduly burden "their liberty interests in travel, freedom from false stigmatization, and nonattainder." Compl. ¶ 260. Plaintiffs further allege that Defendants' interference is not necessary to further a compelling governmental interest and has not been narrowly tailored to achieve that interest, in violation of their constitutional right to substantive due process. *Id.* ¶¶ 259-270. Plaintiffs also contend that

Defendants' actions are arbitrary and capricious, lack even a rational relationship to any legitimate government interest, and have unduly deprived them of their constitutional rights. The court first addresses Plaintiffs' contention that Defendants' actions have unduly burdened their right to travel, sometimes referred to in the pleadings as their right to movement, in violation of the substantive due process clause.

### a.     Right to Travel

Plaintiffs allege that, by maintaining them on the No Fly List (in the case of Mr. Kovac) and Selectee List (in the case of Messrs. Sbyti, Aljame, and Allababidi, and Ms. Warsame, sometimes collectively, the "Screening List Plaintiffs"), Defendants have placed an undue burden on their fundamental right to travel.[8] Defendants contend that Plaintiffs have failed to allege an undue burden on a fundamental right and any substantive due process challenge based on the right to travel or to movement must, therefore, be dismissed. For the reasons that follow, the court rejects Defendants' argument with respect to Mr. Kovac, who is on the No Fly List, but agrees with their argument with respect to the Screening List Plaintiffs.

The Due Process Clause of the Fifth Amendment guarantees that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. Unlike procedural due process, substantive due process "protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992) (citation and internal quotation marks omitted). It "provides heightened protection against government interference with certain

---

[8] Plaintiffs raise an as-applied substantive due process challenge and also a facial substantive due process challenge, contending that "there are no circumstances where their placement or the placement of others similarly situated on the federal terror watch list is narrowly tailored to achieve any compelling government interest." Compl. ¶ 269.

fundamental rights and liberty interests," which are held to a more exacting standard of strict scrutiny. *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997). "The conceptual essence of 'substantive' due process is the notion that the Due Process Clause—in addition to setting procedural minima for deprivations of life, liberty, or property—bars outright 'certain government actions regardless of the fairness of the procedures used to implement them.'" *Brennan v. Stewart*, 834 F.2d 1248, 1255 (5th Cir. 1988) (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). One form of "substantive" due process is the substantive protections in the Bill of Rights that have been "incorporated" into the Fourteenth Amendment to limit the power of the states. *See McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 791 (2010) (Scalia, J., concurring). In addition, "[a] liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (internal citations omitted). Historically, the *Glucksberg* analysis has applied to the determination of whether a right is fundamental. That analysis requires "a careful description of the asserted fundamental liberty interests," which must be "objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Glucksberg*, 521 U.S. at 720-21.

Plaintiffs' substantive due process claim therefore depends, in part, on whether they have a fundamental right of travel that has been substantially burdened and is, therefore, subject to strict scrutiny. If a fundamental right is implicated and strict scrutiny, therefore, applies, a law will not be upheld unless the government demonstrates that the law is necessary to further a compelling governmental interest and has been narrowly tailored to achieve that interest. *Reno v. Flores*, 507 U.S. 292, 302 (1993). If a right is not fundamental, then the law that allegedly burdens the right

is ordinarily subject to rational basis review and will be deemed constitutional unless the plaintiff can demonstrate that it is not reasonably related to a rational government interest. *See Harris v. Hahn*, 827 F.3d 359, 365 (5th Cir. 2016) (citation omitted).

"Freedom to travel throughout the United States has long been recognized as a basic right under the Constitution." *Dunn v. Blumstein*, 405 U.S. 330, 338 (1972) (internal quotation omitted); *see also Kent v. Dulles*, 357 U.S. 116, 125-26 (1958) ("The right to travel is a part of the 'liberty' of which the citizen cannot be deprived without the due process of law under the Fifth Amendment. . . . Travel abroad, like travel within the country, may be necessary for a livelihood. It may be as close to the heart of the individual as the choice of what he eats, or wears, or reads. Freedom of movement is basic in our scheme of values." (citations omitted)); *Califano v. Aznavorian*, 439 U.S. 170, 176 (1978) ("[T]he constitutional right to interstate travel [has been] recognized by this Court for over 100 years."); *United States v. Guest*, 383 U.S. 745, 757 (1966) (The constitutional right of interstate travel is "a right that has been firmly established and repeatedly recognized.") (collecting cases); *Shapiro v. Thompson*, 394 U.S. 618, 629 (1969), *overruled on other grounds by Edelman v. Jordan*, 415 U.S. 651, 670-71 (1974) (recognizing that the nature of "our Federal Union and our constitutional concepts of personal liberty unite to require that all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement.").

While the right to interstate travel is firmly established, the United States has a history of judicially sanctioned restrictions on citizens' international travel in the interests of foreign affairs and national security including, among others, restrictions on the issuance and use of passports and the imposition of travel bans. *See, e.g., Regan v. Wald*, 468 U.S. 222, 242-44 (1984) (upholding regulations "preventing travel to Cuba by most American citizens"); *Haig v. Agee*, 453

U.S. 280, 293 (1981) ("The history of passport controls since the earliest days of the Republic shows congressional recognition of Executive authority to withhold passports . . . ."). Moreover, the Supreme Court has strongly implied, though it has not explicitly stated, that there is no fundamental right to international travel. *See Haig*, 453 U.S. at 307 (The Supreme Court "has often pointed out the crucial difference between the freedom to travel internationally and the right of interstate travel."). The Supreme Court has also observed:

> "The constitutional right of interstate travel is virtually unqualified." . . . By contrast the "right" of international travel has been considered to be no more than an aspect of the "liberty" protected by the Due Process Clause of the Fifth Amendment. As such this "right," the Court has held, can be regulated within the bounds of due process.

*Califano*, 439 U.S. at 176 (quoting *Guest*, 383 U.S. at 757-58); *see also Haig*, 453 U.S. at 306 (recognizing that international travel "is subject to reasonable governmental regulation.").

The court first turns to Mr. Kovac's substantive due process claim.

### i.     Mr. Kovac

To support his claim that the No Fly List violates the constitutional guarantee of substantive due process, Mr. Kovac, a United States citizen, claims that he has a constitutionally protected fundamental right to travel, sometimes labeled a right to movement, both domestically and internationally, and that the No Fly List violates that right. Mr. Kovac's allegations of present and future harms arise from his inability to fly. He alleges that he is on the Government's "No Fly List" and, thereby, is prevented from boarding flights that travel into, out of, or through United States airspace. Compl. ¶¶ 121-152. Defendants have confirmed that Mr. Kovac is on the No Fly List. *See* Reply 3 (Doc. 10). Mr. Kovac further alleges that because his TSDB entry is annotated in a way to deny him the ability to fly through United States airspace, he has been denied boarding and, since October 17, 2014, he has not been able to fly. Compl. ¶ 144.

For these reasons, Mr. Kovac contends that his placement on the No Fly List unduly burdens his right to interstate and international travel, which, as previously discussed, is "an important aspect of the citizen's 'liberty' guaranteed in the Due Process Clause of the Fifth Amendment." *Aptheker v. Secretary of State*, 378 U.S. 500, 505 (1964) (quoting *Kent*, 357 U.S. at 127). It is true that the right to international travel is not, like the right to interstate travel, "virtually unqualified," but rather is subject to "reasonable governmental regulation." *Haig*, 453 U.S. at 306-07 (citation omitted). Nevertheless, "a governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means [that] sweep unnecessarily broadly and thereby invade the area of protected freedoms." *Aptheker*, 378 U.S. at 508 (quoting *NAACP v. Alabama*, 377 U.S. 288, 307 (1964)).

Whether Mr. Kovac's alleged disabilities as a result of his inclusion on the No Fly List unconstitutionally burden the exercise of his right to interstate or international travel cannot be decided at this stage as a matter of law. Mr. Kovac's factual allegations, taken as true, suffice to make plausible his substantive due process claim.[9] Otherwise stated, Mr. Kovac has plausibly alleged at this stage of the litigation that his inclusion in the No Fly List caused him to suffer a deprivation of a liberty interest as that term is historically understood.

---

[9] In support of their argument that Mr. Kovac's substantive due process claim should be dismissed, Defendants cite to *Mohamed v. Holder*, 266 F. Supp. 3d 868 (E.D. Va. 2017), *appeal dismissed sub nom. Mohamed v. Sessions*, No. 17-7235 (4th Cir. Dec. 21, 2017), in which the district court rejected a substantive due process challenge to the No Fly List. *See* Reply 9 (Doc. 10). Defendants omit the crucial detail, however, that the case was decided at the summary judgment stage, after full development of the factual record. At the motion-to-dismiss stage, the same district court concluded that the plaintiff had adequately alleged that the No Fly List violated his rights to substantive due process. *See Mohamed v. Holder*, 995 F. Supp. 2d 520, 537 (E.D. Va. 2014) ("Mohamed's factual allegations, taken as true, suffice to make plausible his substantive due process claim.").

ii.     *The Screening List Plaintiffs*

The Screening List Plaintiffs allege that they have been victims of regular secondary inspections, prolonged searches, interrogations, and restrictions traveling abroad.  According to the Screening List Plaintiffs, they have still been admitted to board flights.  Defendants contend that the Screening List Plaintiffs have not pleaded a deprivation of the right to travel because the screenings merely caused travel delays.  Defs.' Mot. to Dismiss 10 (Doc. 8).  In response, the Screening List Plaintiffs argue that inclusion on the Selectee List violates their right to movement or travel insofar as it causes large domestic delays, and its international dissemination restricts their ability to travel abroad.  Even taking their allegations as true, the Screening List Plaintiffs, unlike Mr. Kovac, have not stated a substantive due process violation.

Government action implicates the right to travel under the Due Process Clause when it "actually deters travel, when impeding travel is its primary objective, or when it uses a classification that serves to penalize the exercise of the right."  *Attorney Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 903 (1986) (internal quotations and citations omitted).  A fundamental right will only be implicated by government action that, at a minimum, "*significantly* interferes with the exercise of a fundamental right."  *Zablocki v. Redhail*, 434 U.S. 374, 388 (1978) (emphasis added).  As stated by the Fifth Circuit, "travelers do not have a constitutional right to the most convenient form of travel."  *Cramer v. Skinner*, 931 F.2d 1020, 1031 (5th Cir. 1991).  "Minor restrictions on travel simply do not amount to the denial of a fundamental right that can be upheld only if the Government has a compelling justification."  *Id.*

As recently stated by the Sixth Circuit in a similar case affirming the district court's conclusion that placement on the Selectee List did not amount to the deprivation of a fundamental right to travel:

The district court correctly held that Plaintiffs did not allege that any protected interest was violated by them being on the Selectee List. While Plaintiffs may have been inconvenienced by the extra security hurdles they endured in order to board an airplane, these burdens do not amount to a constitutional violation. Importantly, Plaintiffs have not actually been prevented from flying altogether or from traveling by means other than an airplane. Therefore, Plaintiffs' cases are distinguishable from those in which the plaintiffs claimed they could not fly at all because they were on the No Fly List.

*Beydoun v. Sessions*, 871 F.3d 459, 468 (6th Cir. 2017) (citations omitted); *see also Latif*, 969 F. Supp. 2d at 1303-04 ("Having to show identification to board a commercial aircraft and undergoing enhanced security screening for less than an hour does not rise to the same level of deprivation as being denied boarding on any flight for the indefinite future.").

For these reasons, the court determines that the Screening List Plaintiffs have failed to state a claim that their inclusion in the Screening List caused them to suffer a deprivation of a liberty interest based on their right to travel, as that term is historically understood.

### b. Plaintiffs' Reputational Interest

In addition to alleging a deprivation of the right to travel as part of their substantive due process claims, Plaintiffs allege an infringement of their constitutionally protected interest in their reputations, also described as their "right to be free from false government stigmatization as individuals who are known or suspected to be terrorists." Compl. ¶ 253. There is no "constitutional doctrine converting every defamation by a public official into a deprivation of liberty within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Paul v. Davis*, 424 U.S. 693, 702 (1976). "[R]eputation alone, apart from some more tangible interests such as employment, is [n]either 'liberty' nor 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause." *Id.* at 701; *see also Siegert v. Gilley*, 500 U.S. 226, 233 (1991) ("[I]njury to reputation by itself [is] not a 'liberty' interest protected under the

[Due Process Clause].").  Since *Paul*, the Court has repeatedly admonished judges to be wary of turning the Due Process Clause into "a font of tort law" by permitting plaintiffs to constitutionalize state tort claims through artful pleading.  *See, e.g.*, *Daniels*, 474 U.S. at 332.

The Supreme Court has recognized a constitutionally-protected interest in "a person's good name, reputation, honor, or integrity."  *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971).  As such, it has formulated a standard, known as the "stigma-plus" test, to determine whether reputational harm infringes a liberty interest.  *Paul*, 424 U.S. at 711.  To satisfy this two-part test, plaintiffs alleging reputational harm must show that: (1) they suffered a stigma from governmental action; plus (2) they experienced an alteration or extinguishment of "a right or status previously recognized by state law."  *Id.*  The Fifth Circuit "has consistently applied *Paul* by requiring that [plaintiffs] show a stigma plus an infringement of some other interest."  *San Jacinto Sav. & Loan v. Kacal*, 928 F.2d 697, 701 (5th Cir. 1991) (original emphasis).  Defendants contend that Plaintiffs fail to allege adequately either element of the "stigma-plus" test and, therefore, have not alleged a constitutionally protected interest in their reputations.

In the Complaint, Plaintiffs allege that Defendants have publicly labeled them as "individuals who are 'known or suspected to be' terrorists, or who are otherwise associated with terrorist activity[.]"  Compl. ¶ 34.  Plaintiffs allege based on their personal experiences, government and other public reports, that Defendants disseminate watchlist records for each Plaintiff to other government agencies, foreign governments like the European Union, private corporations, local authorities such as police officers and captains of sea-faring vessels.  *Id.* ¶¶ 44, 151, 190, 215, 234, 247.  Plaintiffs also contend that their alleged watchlist status functions to motivate traffic stops and to prohibit individuals from purchasing guns, obtaining Hazmat licenses, or working in sterile areas of airports.  *Id.* ¶¶ 46-53.  They further allege that watchlist information

is shared with municipal courts, which then use the information to make bail determinations. *Id.* ¶ 54.

The court concludes that these allegations are insufficient, as they are not factual allegations sufficient to plead public stigmatization. Plaintiffs have not alleged that the TSA has disclosed to the general public their purported placement on a watchlist, or that Defendants otherwise publicly labeled them as "individuals who are 'known or suspected to be' terrorists, or who are otherwise associated with terrorist activity[.]" *See* Compl. ¶ 253. Although Plaintiffs allege that Defendants have revealed their alleged TSDB status to certain third party stakeholders, including "state and local authorities," "foreign governments," "gun sellers," and the "captains of sea-faring vessels," *see id.* ¶ 20, they do not allege that Defendants have disclosed their purported status to the general public. Plaintiffs do not allege, for example, that there is a public list of persons to whom guns cannot be sold, or that such lists are posted at gun retailers, or that similar lists exist for use by the captains of "sea-faring vessels" or car dealerships, or that any such information is otherwise made public by or at the behest of Defendants within their community.

With respect to Plaintiffs' allegations that their boarding passes are stamped with the designation "SSSS," purportedly to reflect watchlist status, they do not allege that the purported significance of the designation is known to the general public or that the public knows what their passes contain. Further, as Defendants aptly point out, several courts have correctly observed that "[s]ince every air passenger is subjected to a search, there is virtually no 'stigma attached to being subjected to search at a known, designated airport search point.'" Defs.' Mot. to Dismiss 15 (Doc. 8) (quoting *United States v. Hartwell*, 436 F.3d 174, 180 (3d Cir. 2006)); *see also United States v. Skipwith*, 482 F.2d 1272, 1275 (5th Cir. 1973) (noting "the almost complete absence of any stigma attached to being subjected to search at a known, designated airport search point"); *accord United*

*States v. Wehrli*, 637 F.2d 408, 409 (5th Cir. 1981) (same).  Additionally, every person entering

the United States is subject to inspection by CBP officials.  *United States v. Ramsey*, 431 U.S. 606,

619 (1977) ("Border searches . . . have been considered to be 'reasonable' by the single fact that

the person or item in question had entered our country from outside.")  In light of this case

authority, the court agrees with Defendants that Plaintiffs' allegations related to secondary

inspection, even if true, do not establish the requisite public dissemination of stigmatizing

information to state a valid claim on this basis.

In sum, the court agrees with Defendants that "unsupported speculation that watchlist status

is shared widely amongst various entities cannot support a claim absent any plausible allegations

that the Plaintiffs have been the subject of such information sharing and meaningfully harmed as

a result."  Defs.' Mot. to Dismiss 16 (Doc. 8).  The only allegation Plaintiffs have put forward in

this regard is that they have been screened at airports and inspected at border crossings.  As already

stated, there is no stigma attached to lawful screening and inspection.[10]

---

[10] The court recognizes that one district court has found that similar allegations sufficed to state a plausible claim that the dissemination of the watchlist may be so widespread that it is "tantamount to public disclosure," even if only distributed to other government and private entities that need the information for official objectives. *See Elhady v. Piehota*, 303 F. Supp. 3d 453, 465 (E.D. Va. 2017) (holding that plaintiffs on the watchlist adequately alleged the "stigma" prong of the "stigma-plus" test with allegations that "their status in the TSDB has been disseminated to third parties outside the relevant federal agencies and airlines, including state and local authorities, courts, foreign governments, gun sellers, banks, and car dealers.") While the court agrees with much of the *Elhady* decision, it declines to adopt the aggregation theory of stigma therein set forth.  The court agrees with Defendants that various alleged and isolated instances of information-sharing cannot be lumped together, particularly absent credible allegations of reputational harm flowing from those individual disseminations. Rather, if specific instances of information-sharing are defamatory, they must be alleged separately.  *See Paul*, 424 U.S. at 701 (requiring injury to reputation to be coupled with "tangible interests such as employment"); *see also Tarhuni v. Holder*, 8 F. Supp. 3d 1253, 1275 (D. Or. 2014) (holding that that an instruction to an airline to deny boarding does "not constitute dissemination of the stigmatizing information in such a way as to reach the community at large[.]"); *Abdi v. Wray*, 2018 WL 1940411, at *3 (D. Utah Apr. 23, 2018), *appeal docketed*, No. 18-4078 (10th Cir. May 29, 2018) ("publication of watchlist," even in combination with "public screening," does not amount to public disclosure for purposes of the "stigma" prong of the "stigma plus" test).  Plaintiffs have not alleged any specific instance of any allegedly defamatory information sharing but rather "improperly attempt to

In sum, Plaintiffs' allegations pertaining to the "stigma" prong of the "stigma plus" test are "merely consistent with" Defendants' purported liability and "stop[ ] short of the line between possibility and plausibility of entitlement to relief." *See Iqbal*, 556 U.S. at 678. As pled, the "stigma" prong of Plaintiffs' "stigma plus" claims are not viable.

Moreover, even assuming Plaintiffs had adequately alleged the "stigma" prong of the "stigma plus" test, with respect to the Screening List Plaintiffs, they have not adequately alleged a change in legal status under the "plus" prong. The "plus" prong must be satisfied by a change in "a right or status previously recognized by . . . law," *Paul*, 424 U.S. at 711, not simply damage that "flows from injury caused by the defendant to a plaintiff's reputation." *Siegert*, 500 U.S. at 234. As a threshold matter, the court rejects Plaintiffs' contention that the "plus" factor is satisfied so long as the alleged defamation is coupled with "government-imposed effect[s] distinct from the stigma that it attaches to them." Pls.' Resp. 17 (Doc. 9). As correctly noted by Defendants, the law requires a change in status—a governmentally imposed burden that "remove[s] or significantly alter[s] a life, liberty, or property interest recognized and protected by state law." Reply 7 (Doc. 10) (quoting *Tebo v. Tebo*, 550 F.3d 492, 503 (5th Cir. 2008)).

Viewing all well-pleaded allegations as true, the court concludes that the Screening List Plaintiffs have failed to adequately allege that they experienced a change in "a right or status previously recognized by . . . law." *Paul*, 424 U.S. at 711. They allege that placement on the watchlist substantially contributes to a number of tangible consequences to their legal rights or status, including foreclosing their ability to buy certain guns in certain states, to obtain the necessary license to transport hazardous materials, and to obtain certain jobs at an airport. These

---

aggregate separate, purely theoretical events with no meaningful connection to each other or the Plaintiffs themselves." *See* Defs.' Mot. to Dismiss 16 (Doc. 8).

allegations, however, relate to alleged experiences of third parties not before the court. As Defendants note, Plaintiffs never allege that "*they* have been prohibited from purchasing a gun, or from obtaining a hazmat license, or from working in the sterile area of an airport." Reply 7 (Doc. 10) (emphasis added). Theoretical alterations in rights previously recognized that are experienced by third parties do not satisfy the "plus" portion of the "stigma plus" doctrine, requiring an actual alteration or extinguishment of a "right or status previously recognized by state law[.]" *Tebo*, 550 F.3d at 503. With regard to Mr. Kovac, although the court concludes that his inclusion on the No Fly List is sufficient to satisfy his burden of pleading the "plus" factor of the "stigma-plus" test— *see, e.g., Latif v. Holder*, 28 F. Supp. 3d 1134, 1150 (D. Or. 2014) (inclusion on the No Fly List sufficient under the "plus" prong of the "stigma-plus" test because plaintiffs could no longer fly)— he has failed to satisfy the "stigma" portion of the test, as previously discussed.

For these reasons, the court concludes that Plaintiffs have failed to allege a violation of their rights to substantive due process based on a constitutionally protected right to their reputations, sometimes described as a liberty interest in being free from false governmental stigmatization, and will grant Defendants' Motion to Dismiss these claims.

### c. Plaintiffs' Interest in Nonattainder

Plaintiffs also contend that their alleged inclusion on the watchlist and the associated stigmatizing label of "known or suspected terrorist," without notice or a constitutionally adequate legal mechanism to challenge the placement, deprive them of their protected liberty interest in nonattainder. Compl. ¶ 258. A Bill of Attainder is "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 468 (1977) (collecting cases). "Article I, § 9, of the Constitution, applicable to Congress, provides that '(n)o Bill of Attainder or

ex post facto Law shall be passed[.]'" *Id.* at n.30. "[T]he Bill of Attainder Clause was found to 'reflect . . . the Framers' belief that the Legislative Branch is not so well suited as politically independent judges and juries to the task of ruling upon the blameworthiness of, and levying appropriate punishment upon, specific persons.'" *Id.* (quoting *United States v. Brown*, 381 U.S. 437, 445 (1965)).

Defendants fail to make any argument in their motion to dismiss with respect to Plaintiffs' asserted liberty interest in nonattainder. Accordingly, the court need not address this issue.

### 2. Plaintiffs' Procedural Due Process Claims (Count I)

In Count I, titled "Failure to Provide Post-Deprivation Notice and Hearing in Violation of the Fifth Amendment Right to Procedural Due Process," Plaintiffs contend that their alleged inclusion on the watchlist and the associated stigmatizing label of "known or suspected terrorist," without notice or a constitutionally adequate legal mechanism to challenge the placement, deprive them of their protected liberty interest in traveling free from unreasonable burdens, freedom from false stigmatization, and nonattainder, in violation of their constitutional right to procedural due process. *Id.* ¶¶ 248-258. Defendants move to dismiss Plaintiffs' procedural due process claims, arguing that Plaintiffs have failed to allege the deprivation of a protected interest and that, even if they have, the legal mechanism for challenging their placement on the watchlist is constitutionally adequate.

The Due Process Clause of the Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. "In procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the

deprivation of such an interest without due process of law." *Zinermon v. Burch*, 494 U.S. 113, 125-26 (1990) (citing *Parratt v. Taylor*, 451 U.S. 527, 537 (1981)).

"The requirements of procedural due process apply only to the deprivation of interests encompassed by the [Constitution's] protection of liberty and property." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 569 (1972). As a threshold issue, therefore, the government action complained of must "deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth . . . Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). If government deprivation concerns an interest protected by the Due Process Clause, a court must weigh the following three factors to determine what process is due: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335; *see also Washington v. Harper*, 494 U.S. 210, 229 (1990) ("The procedural protections required by the Due Process Clause must be determined with reference to the rights and interests at stake in the particular case.").

### a.      Deprivation of a Cognizable Liberty Interest

Plaintiffs contend that their inclusion on the watchlist deprives them of the following interests protected by due process: (1) "a liberty interest in traveling free from unreasonable burdens," which they sometimes refer to as a "right to movement"; (2) a liberty interest in the "right to be free from false government stigmatization"; and (3) "a liberty interest in nonattainder." Compl. ¶¶ 252-254. In analyzing Plaintiffs' substantive due process claims, the court has already concluded, *supra*, that Mr. Kovac has adequately alleged a range of protectable interests, including

his right to travel, that have been affected adversely by his inclusion on the No Fly List. Further, all Plaintiffs have alleged that inclusion on the watchlist violates their liberty interest in nonattainder, and Defendants did not provide any arguments that support dismissal of this claim.

### b. The Constitutional Adequacy of the DHS TRIP

The "central meaning of procedural due process" is that "[p]arties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified." *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) (internal quotation marks omitted); *see Mathews*, 424 U.S. at 333 ("The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'") (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

Defendants contend that the TSC's policies governing the TSDB and the "revised DHS TRIP procedures" allow for a constitutionally adequate mechanism for due process. In response, Plaintiffs argue that because Defendants refuse to notify individuals whether they are included in the TSDB, this denies them an opportunity to participate in challenging their status. As previously noted, the "revised DHS TRIP procedures" referenced by Defendants in their motion to dismiss and reply brief are not properly before the court at the motion-to-dismiss stage. *See supra* note 4.

Viewing all well-pleaded allegations in the Complaint as true, as the court must when considering a motion to dismiss under Rule 12(b)(6), it concludes that Plaintiffs allege plausibly that the DHS TRIP redress procedures do not provide them constitutionally sufficient due process. As another district court recently concluded in rejecting a similar motion to dismiss a procedural due process claim brought by plaintiffs challenging the constitutionality of the DHS TRIP redress procedures, the "ultimate due process merits of the TSDB's governing procedures and DHS TRIP are tethered to the *Mathews* factors, which are 'fact-intensive consideration[s],' and which 'when

considered within the context of [these] allegations, necessarily require an evidentiary record beyond that presented to the Court in connection with the Government's motion to dismiss.'" *Elhady*, 303 F. Supp. 3d at 466 (quoting *Mohamed v. Holder*, 995 F. Supp. 2d 520, 538-39 (E.D. Va. 2014) (holding that watchlist plaintiffs adequately alleged procedural due process violation)); *see also Wilwal*, 346 F. Supp. 3d at 1304 (holding that watchlist plaintiff "sufficiently alleged, at the motion to dismiss stage, that the Government's watchlist redress procedures do not provide him constitutionally sufficient due process.").[11]

For these reasons, the court cannot conclude, as a matter of law, that the DHS TRIP provides sufficient process to defeat Plaintiffs' procedural due process claims. The court determines, therefore, that Plaintiffs have pled "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Accordingly, the court will deny Defendants' Motion to Dismiss Count I of the Complaint.

---

[11] The Government's interest in combating terrorism is no doubt substantial and compelling. As the Defendants have also acknowledged, however, an individual placed on the No Fly List or Screening List does not receive any notice of his or her placement on the list, pre-deprivation, or the reasons for his or her inclusion. Further, an individual's inclusion on the No Fly List or Screening List and the dissemination of that list are accomplished without any judicial involvement or review, and according to a standard of proof that is far less than that typically required when the deprivation of significant constitutional liberties are implicated. *See generally* Safeguarding Privacy and Civil Liberties While Keeping Our Skies Safe: Hearing Before the H. Comm. on Homeland Security, 113th Cong. 1-2 (2015) (statement of Christopher M. Piehota, Director, TSC/FBI). While the Government has a significant and compelling interest, an American citizen placed on the No Fly List or Screening List has countervailing liberty interests and is entitled to a meaningful opportunity to challenge that placement. While judicial review of some sort is available pursuant to 49 U.S.C. § 46110, as previously discussed, it is not at all clear that such review will effectively address the constitutional issues presented by a citizen's inclusion on the No Fly List or Screening List. To resolve the procedural due process claim, therefore, the court must engage in a fact-intensive consideration of the personal liberties involved, the Government's compelling interest in combating terrorism, the procedures used in connection with the No Fly List and Screening List, and the use made of the No Fly List and Screening List. Development of the factual record will also allow Defendants to present evidence of the "revised redress procedures," currently not before the court, for its consideration. *See supra* note 4.

### 3. Plaintiffs' APA Claims (Count III)

Defendants next move to dismiss Plaintiffs' claims that the policies and redress procedures related to the watchlist violate the APA. Under the APA, the reviewing court must affirm an agency decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 375 (1989); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Louisiana State v. United States Army Corps of Engineers*, 834 F.3d 574, 580 (5th Cir. 2016). The court must consider whether Defendants considered the relevant factors and whether Defendants made a "clear error of judgment." *Motor Vehicle*, 463 U.S. at 43.

Plaintiffs allege that Defendants violated the APA's protection against arbitrary agency actions by placing them in the TSDB "without a constitutionally adequate legal mechanism," which they contend was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Compl. ¶¶ 256, 266, 272, 279. Defendants argue that Plaintiffs' APA claims are "largely coextensive with their constitutional claims." Defs.' Mot. to Dismiss 24 (Doc. 8). Defendants further contend that "the [APA] claim would fail for the same reasons the procedural due process claim does, and Plaintiffs cannot separately demonstrate that the DHS TRIP process is arbitrary or capricious in violation of the APA." *Id.* The court disagrees. For the same reasons previously discussed in the court's procedural due process analysis, it concludes that Plaintiffs' factual allegations make plausible their claim that Defendants' actions were arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. *See* 5 U.S.C. § 706(2)(A), (B). As with Plaintiffs' due process claims, Plaintiffs' APA claims cannot be resolved at the motion-to-dismiss stage without development of the factual record. *See supra* note 11.

For these reasons, the court will deny Defendants' Motion to Dismiss Count III of the Complaint.

### 4. Plaintiffs' Equal Protection Claims (Count IV)

In Count IV, Plaintiffs contend that Defendants' actions detailed in the Complaint, "have had a discriminatory effect upon and have disparately impacted Plaintiffs and other similarly situated American citizens who are Muslim American travelers, and not travelers of other faiths," in violation of their constitutional right to equal protection. Compl. ¶ 283. Defendants move to dismiss Plaintiffs' equal protection claim, arguing that Plaintiffs' allegations "simply restate[] the 'threshold element' of the claim without any elaboration, fail[] to allege a plausible comparison to similarly situated groups, and thus [are] yet again an inadequate formulaic recitation of the claims." Defs.' Mot. to Dismiss 23 (citing *Iqbal*, 556 U.S. at 678). For the reasons that follow, the court agrees.

As a threshold matter, the parties' failure to cite to the Fifth Amendment in the context of addressing alleged equal protection violations is erroneous. Because this case involves federal, not state, actors, the applicable equality guarantee is not the Fourteenth Amendment's explicit Equal Protection Clause; it is the guarantee implicit in the Fifth Amendment's Due Process Clause. *See Sessions v. Morales-Santana*, __ U.S. __, 137 S. Ct. 1678, 1686 (2017) (quoting *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975) ("[W]hile the Fifth Amendment contains no equal protection clause, it does forbid discrimination that is so unjustifiable as to be violative of due process. This Court's approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment." (citations and internal quotation marks omitted; alteration in original)).

The Equal Protection Clause prohibits the government from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This command "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985); *see also Harris*, 827 F.3d at 365 (noting that the Equal Protection Clause "keeps governmental decision makers from treating differently persons who are in all relevant respects alike.") (citation omitted). The Equal Protection Clause is implicated "only 'if the challenged government action classifies or distinguishes between two or more relevant groups.'" *Rolf v. City of San Antonio*, 77 F.3d 823, 828 (5th Cir. 1996) (quoting *Qutb v. Strauss*, 11 F.3d 488, 492 (5th Cir. 1993)); *see also Cornerstone Christian Sch. v. University Interscholastic League*, 563 F.3d 127, 139 (5th Cir. 2009). "State actors may create classifications facially, when such categorization appears in the language of legislation or regulation, or de facto, through the enforcement of a facially neutral law in a manner so as to disparately impact a discernible group." *Johnson v. Rodriguez*, 110 F.3d 299, 306 (5th Cir. 1997) (citation omitted). Disparate impact alone cannot suffice to state an equal protection violation. *See Washington v. Davis*, 426 U.S. 229, 246-50 (1976). A party who wishes to make out an equal protection claim must set forth allegations, or those from which the court can reasonably infer, that show "the existence of purposeful discrimination" motivating the state action that caused the complained-of injury. *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987) (citation omitted); *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264-66 (1977).

Plaintiffs do not dispute that the publicly disclosed criteria for placement on the watchlist are facially neutral. Instead, invoking *Washington v. Davis*, *supra*, Plaintiffs argue that they have "plead[ed] enough facts demonstrating the plausibility that Defendants compile their watch list with discriminatory intent." Pls.' Resp. 21 (Doc. 9). Plaintiffs contend they have plausibly pled

intental discrimination based on the disproportionate number of Muslims on the watchlist. Plaintiffs allege that persons living in Dearborn, Michigan, a town of approximately 100,000 residents with a high Arab and Muslim population, are disproportionately included on the watchlist. Compl. ¶¶ 7, 81. Plaintiffs also allege that travel to Muslim-majority countries—"travel that Muslim Americans are very likely to engage in"—is also a factor for inclusion on the watchlist. *Id.* ¶ 9. Plaintiffs further allege that, "Almost all publicly known instances of Americans being placed on the watch list [involve] Muslim[s] or persons who could be mistaken for Muslims." *Id.* ¶ 80. In addition, Plaintiffs refer to the "2013 Watchlisting Guidance" attached as Exhibit 1 to the Complaint, contending that it indicates that travel for no known lawful or legitimate purpose to a "locus of terrorist activity" can be a basis for being listed. *Id.* ¶ 83 According to the Complaint, although "locus of terrorist activity" is not defined, "upon information and belief, it likely includes any place where many Muslims reside." *Id.*

Even accepting the well-pleaded factual allegations in the Complaint as true (including the exhibits thereto),[12] and recognizing that disparate impact can evidence discriminatory intent in certain circumstances, *see supra*, the court determines that Plaintiffs have failed to allege plausibly facts sufficient to support that the watchlist was created based on, or operates through, intentional discrimination. Further, the court agrees with Defendants that Plaintiffs have not alleged a plausible comparison to similarly situated groups. Addressing similar equal protection claims brought by plaintiffs who are United States citizens and Muslims challenging their inclusion on

---

[12] Plaintiffs attach as Exhibits 1 through 3 to the Complaint what they contend are leaked government documents in support of their equal protection claim. Even considering the attached documents as part of the Complaint, the court concludes Plaintiffs have failed to state an equal protection claim. Nothing in these documents purports to invoke a religious classification or would provide proof of discriminatory intent, even indirectly.

the watchlist, other district courts have recognized that watchlist criteria are facially neutral and concluded that similar allegations of disparate impact were insufficient to state a claim for violation of the Equal Protection Clause. *See, e.g.*, *Elhady*, 303 F. Supp. 3d at 467; *Abdi v. Wray*, 2018 WL 1940411, at *1 (D. Utah Apr. 23, 2018), *appeal docketed*, No. 18-4078 (10th Cir. May 29, 2018); *see also Shearson v. Holder*, 865 F. Supp. 2d 850, 864-65 (N.D. Ohio 2011), *aff'd on other grounds*, 725 F.3d 580 (6th Cir. 2013). The court agrees with the equal protection analysis in these decisions and adopts the same analysis here with respect to Plaintiffs' equal protection claims. The court also notes that Plaintiffs have failed to provide any case authority supporting their equal protection claims in the context of the watchlist.

For these reasons, the court will grant Defendants' Motion to Dismiss Count IV of the Complaint.

### 5. Plaintiffs' Non-Delegation Claim (Count V)

In Count V, Plaintiffs allege that the watchlist constitutes an unconstitutional delegation of legislative power. "Congress may not constitutionally delegate its legislative power to another branch of Government." *Touby v. United States*, 500 U.S. 160, 165 (1991). When Congress, however, "lay[s] down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform, such legislative action is not a forbidden delegation of legislative power.'" *Mistretta v. United States*, 488 U.S. 361, 372 (1989) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)). To set forth a constitutionally permissible "intelligible principle" while delegating authority, Congress need only "clearly delineate[] the general policy, the public agency which is to apply it, and the boundaries of this delegated

authority." *Id.* at 372-73 (quoting *American Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)).[13]

As summarized previously, after the September 11, 2001 terrorist attacks, Congress gave the TSA "responsib[ility] for security in all modes of transportation." 49 U.S.C. § 114(d). Specific to aviation security, the TSA must work with the FBI to "assess current and potential threats to the domestic air transportation system" and "decide on and carry out the most effective method for continuous analysis and monitoring of security threats to that system." 49 U.S.C. § 44904(a). Congress directed the TSA to "share . . . data on individuals identified . . . who may pose a risk to transportation or national security" and to "notif[y] . . . airport or airline security officers of the identity of [such] individuals." 49 U.S.C. § 114(h)(1)-(2). The TSA must also,

> in consultation with other appropriate Federal agencies and air carriers, establish policies and procedures requiring air carriers (A) to use information from government agencies to identify individuals on passenger lists who may be a threat to civil aviation or national security; and (B) if such an individual is identified, notify appropriate law enforcement agencies, prevent the individual from boarding an aircraft, or take other appropriate action with respect to that individual.

49 U.S.C. § 114(h)(3).

Congress also required that the DHS "establish a timely and fair process for individuals who believe they have been delayed or prohibited from boarding a commercial aircraft because they were wrongly identified as a threat under the regimes utilized by [TSA], United States Customs and Border Protection, or any other office or component of [DHS]." 49 U.S.C. §

---

[13] The last time the Supreme Court concluded that Congress unconstitutionally delegated its legislative power was in 1935, when it struck down two New Deal statutes. *See Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 474 (2001) (citing *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935); *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935)). In *Panama Refining*, the statute at issue "provided literally no guidance for the exercise of discretion," and in *A.L.A. Schechter*, the statute "conferred authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring 'fair competition.'" *Id.*

44926(a).  In that regard, the DHS is required to "establish a procedure to enable airline passengers . . . to appeal such determination [that they pose a security threat] and correct information contained in the system." 49 U.S.C. § 44903(j)(2)(C)(iii).

Plaintiffs' arguments concerning the non-delegation doctrine overlap with their claims that the TSA exceeded its statutory authority.  They argue that the above-referenced statutes are drafted too vaguely, and that this court should, therefore, exercise constitutional avoidance so as to construe them in a way that disallows the watchlist.   Plaintiffs also contend the statutes do not provide an "intelligible principle" because they do not specifically describe what level of threat is necessary for the TSA to deny a passenger boarding.

Another district court recently rejected a similar non-delegation claim, stating:

> Upon review of the applicable statutes, the Court concludes that Congress has provided "intelligible principles" both as to the goals TSA should seek to achieve and also how it should go about achieving them, while leaving the day-to-day implementation of the scheme to TSA. Most importantly, Congress has specifically directed TSA to "prevent the individual [who may be a threat to civil aviation or national security] from boarding an aircraft," 49 U.S.C. § 114(h)(3)(B), which is exactly what the List does.

*Mohamed*, 266 F. Supp. 3d at 884; *see also Abdi*, 2018 WL 1940411, at *4 (dismissing non-delegation claim brought by plaintiffs on the watchlist); *Elhady*, 303 F. Supp. 3d at 467 (same). The court has reviewed the legal analysis in these cases addressing identical claims as those asserted in Count V of the Complaint and finds persuasive the reasoning in these decisions rejecting such claims.  The court adopts the same legal analysis and similarly concludes, after careful consideration of the applicable statutes and the parties' legal briefs, that this delegation of authority provides a general policy, the agencies which are to apply it, and the bounds within which

it is to be applied. As such, it sufficiently sets forth an "intelligible principle" and does not violate the non-delegation doctrine.[14]

For these reasons, the court will grant Defendants' Motion to Dismiss Count V of the Complaint.

## IV.     Conclusion

For the reasons herein stated, Defendants' Motion to Dismiss (Doc. 8) is **granted in part** and **denied in part**.

Defendants' Motion to Dismiss pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction is **denied**. Defendants' Motion to Dismiss Mr. Kovac's claims for failure to exhaust administrative remedies and ripeness is **denied**.

Defendants' Motion to Dismiss Mr. Kovac's claims pursuant to Rule 12(b)(6) for failure to state a claim is **granted** with respect to his Procedural Due Process Claim (Count I) and Substantive Due Process Claim (Count II), *but only insofar as Counts I and II are based on his alleged liberty interest in his reputation under the stigma-plus test*; his Equal Protection Claim (Count IV); and his Non-Delegation Claim (Count V). These claims are **dismissed without prejudice**. Remaining, therefore, are: Mr. Kovac's Procedural Due Process Claim (Count I) and Substantive Due Process Claim (Count II) predicated on his alleged liberty interests in his right to travel and to nonattainder (which Defendants did not challenge); and his APA Claim (Count III).

---

[14] Further, as Defendants correctly note, the Supreme Court has sustained a range of statutes against non-delegation challenges far less clearly delineated than the TSA's authority with respect to watchlisting to protect civil aviation and national security. *See* Defs.' Mot. to Dismiss 24 n.9 (Doc. 8) (collecting cases). If a violation of the non-delegation doctrine was not found in those circumstances, Plaintiffs' well-pleaded allegations, taken as true, similarly fail to state a claim that Congress unconstitutionally delegated its legislative authority to the TSA and the TSC.

Defendants' Motion to Dismiss Messrs. Sbyti's, Aljame's, and Allababidi's, and Ms. Warsame's claims pursuant to Rule 12(b)(6) for failure to state a claim is **granted** with respect to their Procedural Due Process Claims (Count I) and Substantive Due Process Claims (Count II), *but only insofar as Counts I and II are based on their alleged liberty interests in their right to travel and in their reputations under the "stigma plus" test*; their Equal Protection Claims (Count IV); and their Non-Delegation Claims (Count V). These claims are **dismissed without prejudice**, with the exception of their due process claims predicated on the right to travel, which are **dismissed with prejudice**. Remaining, therefore, are: Messrs. Sbyti's, Aljame's, and Allababidi's, and Ms. Warsame's Procedural Due Process Claims (Count I) and Substantive Due Process Claims (Count II) predicated on their liberty interest in nonattainder (Count II) (which Defendants did not challenge); and their APA Claims (Count III).[15]

Finally, the court **grants** Defendants' Motion to Dismiss all claims against Defendant CBP, and these claims are **dismissed with prejudice**.

**It is so ordered** this 5th day of March, 2019.

Sam A. Lindsay
United States District Judge

---

[15] With respect to the Screening List Plaintiffs' substantive and procedural due process claims, following the court's decision today, the only remaining liberty interest alleged in the Complaint is their alleged liberty interest in nonattainder, as Defendants have not challenged this portion of their Complaint.