# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **ADIS KOVAC, et al.;** | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 3:18-cv-110-L |
| | ) | |
| v. | ) | |
| | ) | |
| **CHRISTOPHER WRAY**, et al.; | ) | |
| | ) | |
| Defendants. | ) | |

---

# [CORRECTED] REPLY IN SUPPORT OF LEAVE TO FILE
# SECOND AMENDED COMPLAINT AND
# OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
# PLAINTIFF WARSAME FOR LACK OF STANDING

## TABLE OF CONTENTS

*TABLE OF AUTHORITIES* ............................................................................................ ii

*INTRODUCTION* ......................................................................................................... 1

*ARGUMENT* ................................................................................................................ 2

   **I.**   **Plaintiff Warsame's Claims Have not been Mooted** ..................................... 2

   **II.**  **Plaintiffs Are not Precluded from Seeking Reconsideration** ......................... 3

  **III.**    **The Government's Futility Arguments Should Be Saved for Motion to Dismiss Practice** ............................................................................................................. 4

  **IV.**    **Plaintiffs' Amended Complaint is not Futile** ............................................... 4

    A.   Plaintiffs Allege a Deprivation of a Protected Liberty Interest in Travel ................... 5

    B.   Plaintiffs Have Alleged Stigma-Related Deprivation of Liberty ............................. 7

    C.   Plaintiffs Have Alleged A Separate APA Claim ................................................... 9

    D.   Plaintiffs Have Alleged an Equal Protection Claim .............................................. 11

    E.   Plaintiffs Have Alleged a Fourth Amendment Claim ........................................... 14

        1.   Plaintiffs Have Standing to Raise a Fourth Amendment Claim ......................... 14

        2.   The Government Lacks Reasonable Suspicion Regardless of a Warrant Requirement ...15

        3.   Plaintiffs Plausibly Allege the Government Needs a Warrant and Probable Cause ........18

        4.   Plaintiffs Properly Allege Fourth Amendment Claims against TSA and FBI .................. 18

    F.   Plaintiffs Have Stated a First Amendment Claim ................................................. 20

    G.   Plaintiffs RFRA Claims Are not Futile ............................................................... 23

        1.   The Government's Penalizing by Placing and Keeping Sybti on the Watchlist in Retaliation for Exercising their Religious Rights Violates RFRA .............................. 24

        2.   The Government Cannot Establish a Compelling Interest at this Stage ........................ 26

        3.   Plaintiffs Are Dismissing Their Religious Questioning Claim ............................... 27

*CONCLUSION* ............................................................................................................. 27

## <u>TABLE OF AUTHORITIES</u>

### Cases

*Abdi v. Wray*, 2018 WL 1940411 (D. Utah Apr. 23, 2018) ...........................................6

*Abordo v. State of Hawai'i*, 902 F. Supp. 1220 (D. Haw. 1995) ...........................25

*Alasaad v. Nielsen*, 17-cv-11730, 2018 WL 2170323 (D. Mass. May 9, 2018) ...............................14, 17, 20

*Anibowei v. Barr*, No. 3:16-CV-3495-D, 2019 WL 623090 (N.D. Tex. Feb. 14, 2019) ...........................19

*Banik v. Tamez*, No. 7:16-CV-462, 2017 WL 1228498 (S.D. Tex. Apr. 4, 2017) ...................................3

*Bazzi v. Lynch*, No. 16-10123, 2016 WL 4525240 (E.D. Mich. Aug. 30, 2016) ...........................6

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ...........................................25

*Beydoun v. Sessions*, 871 F.3d 459 (6th Cir. 2017) ...........................................5, 6

*BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996) ...........................................22

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) ...........................................23, 26

*Cherri v. Mueller*, 951 F. Supp. 2d 918 (E.D. Mich. 2013) ...........................................12

*Cramer v. Skinner*, 931 F.2d 1020 (5th Cir. 1991) ...........................................7

*EEOC v. Big Lots Stores, Inc.*, 08-CV-177, 2009 WL 10677383 (E.D. Tex. May 27, 2009) ...................4

*Elhady v. Piehota*, 303 F. Supp. 3d 453 (E.D. Va. 2017) ...........................................4

*Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872 (1990) ...........................23

*Fikre v. FBI*, 904 F.3d 1033 (9th Cir. 2018) ...........................................2

*Gundy v. United States*, No. 17-6086, 2019 WL 2527473 (U.S. June 20, 2019) ...........................................

*In Matter of Search of Info. Associated with Facebook Account Identified by Username Aaron.Alexis that is Stored at Premises Controlled by Facebook, Inc.*, 21 F. Supp. 3d 1 (D.D.C. 2013) ...........................................21

*In re Grand Jury Proceeding*, 842 F.2d 1229 (11th Cir. 1988) ...........................................21

*Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977) ...........................................12

*K.P. v. LeBlanc*, 627 F.3d 115 (5th Cir. 2010) ...........................................19

*Kadura v. Lynch*, No. CV 14-13128, 2017 WL 914249 (E.D. Mich. Mar. 8, 2017) ...................................6

*Kenemer v. Arkansas Fuel Oil Co.*, 151 F.2d 567 (5th Cir. 1945) ...........................................3

*Kirksey v. Bd. of Sup'rs of Hinds Cty., Miss.,* 554 F.2d 139 (5th Cir. 1977) ....................................................13

*Koenig v. Maryland*, 09-cv-3488, 2010 WL 148706 (D. Md. Jan. 13, 2010)................................................21

*Kovac v. Wray*, 363 F. Supp. 3d 721 (N.D. Tex. 2019) .............................................................3, 11, 19, 27

*League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523 (6th Cir. 2007) .............................................7

*League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831 (5th Cir. 1993)............13

*Legatus v. Sebelius*, 901 F. Supp. 2d 980 (E.D. Mich. 2012) ............................................................23

*Mack v. Warden Loretto FCI*, 839 F.3d 286 (3d Cir. 2016) ............................................................24

*Matter of Life Partners Holdings, Inc.,* No. 17-11477, --- F.3d ----, 2019 WL 2315028 (5th Cir. May 31, 2019) ............................................................19

*Mistretta v. United States*, 488 U.S. 361 (1989)............................................................10

*Mohamed v. Holder*, 266 F. Supp. 3d 868 (E.D. Va. 2017) ........................................... 5, 14

*Mohamed v. Holder*, 995 F. Supp. 2d 520 (E.D. Va. 2014) ............................................... 15, 25

*Mohamed v. Holder*, No. 1:11-CV-50 AJT/MSN, 2015 WL 4394958 (E.D. Va. July 16, 2015) ..............7

*NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958) ............................................................21

*Paul v. Davis*, 424 U.S. 693 (1976) ............................................................7

*Poly-Am., Inc. v. Serrot Int'l Inc.,* 2002 WL 206454 (N.D. Tex. Feb. 7, 2002) ............................................4

*Reporters Comm. for Freedom of Press v. Am. Tel. & Tel. Co.*, 593 F.2d 1030 (D.C. Cir. 1978) ........... 21, 22

*Richmond Black Police Officers Ass'n v. City of Richmond, Va.*, 548 F.2d 123 (4th Cir. 1977) ....................22

*Riley v. California*, 573 U.S. 373 (2014) ............................................................16, 17, 18

*Scherfen v. DHS*, No. 3:CV-08-1554, 2010 WL 456784 (M.D. Pa. Feb. 2, 2010) ...................................6

*Sessions v. Dimaya*, 138 S. Ct. 1204 (2018)............................................................22

*Sherbert v. Verner*, 374 U.S. 398 (1963) ............................................................24

*St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616 (7th Cir. 2007)......................................26

*Stanford v. Texas*, 379 U.S. 476 (1965) ............................................................22

*Suhre v. Haywood Cty.*, 131 F.3d 1083 (4th Cir. 1997)............................................................14

*Sylvia Dev. Corp. v. Calvert Cty.*, 48 F.3d 810 (4th Cir. 1995)............................................... 11, 13

*Tanvir v. Tanzin*, 894 F.3d 449 (2d Cir. 2018) ................................................................. 24, 25

*Thomas v. Cty. of L.A.*, 978 F.2d 504 (9th Cir. 1992) ............................................................14

*Thomas v. Review Bd. of Indiana Employment Sec. Div.*, 450 U.S. 707 (1981) ..................24

*Torraco v. Port Auth. of New York & New Jersey*, 615 F.3d 129 (2d Cir. 2010) ...............6

*Townes v. Jarvis*, 577 F.3d 543 (4th Cir. 2009) .....................................................................11

*United States v. Aguilar*, 883 F.2d 662 (9th Cir. 1989) ........................................................23

*United States v. Christie*, 825 F.3d 1048 (9th Cir. 2016) ......................................................24

*United States v. Citizens State Bank*, 612 F.2d 1091 (8th Cir. 1980) ................................21

*United States v. Cortez*, 449 U.S. 411 (1981) .........................................................................15

*United States v. Cotterman*, 709 F.3d 952 (9th Cir. 2013) ....................................................17

*United States v. Irving*, 452 F.3d 110 (2d Cir. 2006) ............................................................16

*United States v. Kim*, 103 F. Supp. 3d 32 (D.D.C. 2015) ...............................................16, 18

*United States v. Kolsuz*, 185 F. Supp. 3d 843 (E.D. Va. 2016) .......................................15, 17

*United States v. Kolsuz*, 890 F.3d 133 (4th Cir. 2018) .....................................................16, 17

*United States v. Meyer*, 503 F.3d 740 (9th Cir. 2007) ...........................................................23

*United States v. Molina-Gomez*, 781 F.3d 13 (1st Cir. 2015) ................................................16

*United States v. Saboonchi*, 48 F. Supp. 3d 815 (D. Md. 2014) ...........................................17

*United States v. Shenandoah*, 595 F.3d 151 (3d Cir. 2010) ....................................................7

*Valmonte v. Bane,* 18 F.3d 992 (2d Cir. 1994) .........................................................................8

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) ....................12

*Zurcher v. Stanford Daily*, 436 U.S. 547 (1978) ....................................................................22

## Statutes

42 U.S.C. § 2000 ................................................................................................................. 23, 26

46 U.S.C. § 70101 ................................................................................................................... 9, 10

49 U.S.C. § 114 ............................................................................................................................ 9

49 U.S.C. § 44903 ................................................................................................ 9, 10

49 U.S.C. § 44909 ................................................................................................ 10

49 U.S.C. § 46110 ................................................................................................ 27

6 U.S.C. § 488 ..................................................................................................... 10

6 U.S.C. § 621 ..................................................................................................... 10

6 U.S.C. § 622 ..................................................................................................... 10

## Other Authorities

Irina D. Manta & Cassandra Burke Robertson, *Secret Jurisdiction*, 65 Emory L.J. 1313, 1351 (2016) ........................................................................................................................... 25

Richard F. Grimmett, *9/11 Commission Recommendations: Implementation Status* Congressional Research Service (Dec. 4, 2006) .......................................................................................... 13

## INTRODUCTION

Since January 2018, when this litigation began, much has become know about Defendants'
Watchlisting System.  In July last year, the Boston Globe's Spotlight investigative team unearthed a
previously unknown expansion of the Watchlisting System called Quiet Skies that assigns under cover
air marshals to hound travelers at airports and record innocuous observations about their target, "like
excessive fidgeting or perspiration, or having a cold, penetrating stare."[1]  A DHS Privacy Impact
Assessment Update published on April 19, 2019, after this Court's decision, indicates that this is a
watchlist program that, it turns out, CBP drives—providing TSA with access to CBP's Automated
Targeting System "to identify individuals for enhanced screening during air travel."[2]  And information
gleaned from other watchlist litigation, which became publicly available after the Court's decision, has
revealed a Watchlisting System run amok, shared with foreign governments and private entities all
over the world, and imposing a comprehensive set of consequences that cover large swaths of a
person's life, from license denials and seizure of one's electronic devices to employment bans and
immigration-related delays.

In the face of all of this, the Government seeks to deny Plaintiffs' Motion to Amend, mostly
on futility grounds, suggesting that Plaintiffs do not state any valid claims against the Watchlisting
System.  While these arguments are premature and should be raised in a Motion to Dismiss once the
Amended Complaint is docketed, they do not cover the entirety of the amendment Plaintiffs seek.
Defendants concede now that DHS "consents to its addition as a Defendant to this suit."  Dkt. 26 at
7.  Because Rule 15 allows for amendment at any time "with the opposing party's written consent,"

---

[1] Lawmakers Want Answers about TSA Program that Tracked Americans, Kris Van Cleave, CBS News, July
30, 2018. available at: https://www.cbsnews.com/news/tsa-quiet-skies-lawmakers-want-answers-from-tsa-about-program-that-tracked-americans/
[2] Privacy Impact Assessment Update for Secure Flight, DHS, April 19, 2019. Available at:
https://www.dhs.gov/sites/default/files/publications/pia-tsa-spqs018i-april2019_1.pdf

the issue here is not whether or not the Court will allow for an amended complaint, but rather the extent of the amendment the Court will permit.

This case regards a watchlisting system that targets more than a million people and adversely affects the many millions more—family, friends, fellow congregants, and colleagues—that are connected in any way to listees. The constitutional issues, needless to say, are of the utmost importance. An amended complaint that reflects the latest information about the watchlisting system and includes the full set of legal claims Plaintiffs aim to pursue is warranted.

## ARGUMENT

### I. Plaintiff Warsame's Claims Have not been Mooted

The Government first seeks the dismissal of Plaintiff Warsame because—like many other people who have sued the Government for being placed on the watchlist—her TSDB status may have been amended. *See* Dkt. 26 at 5-6. But even if the Government removed Warsame from the TSDB database, which Defendants have not asserted and Plaintiffs do not themselves concede, that does not moot this case. As explained in *Fikre v. FBI*, 904 F.3d 1033, 1039-40 (9th Cir. 2018), the removal of individuals from the No Fly List (a subset of the broader watchlist) would not moot the case for two reasons. First, the "voluntary cessation" doctrine applies to prevent mootness. *Id.* To avoid the "voluntary cessation" doctrine, the Government must "repudiate[]" the decision" to have put Warsame on the TSDB in the first place. *Id.* at 1040. To do that, the Government must both "acknowledge[]" that Warsame "did not belong the list," and aver "that [s]he will not be returned on the list based on the currently available evidence." *Id.* And second, a secretly-changed status does not cure the harm of placement as the historical fact of having a prior TSDB status can continue to affect listees both in how the federal government treats them and a lingering stigma. *Id.* The stigma, as the Ninth Circuit explained in *Fikre,* can only be cured by a "declaration" exonerating Warsame from her wrongful placement. *Id.*

Moreover, the Government's motion assumes the Government has taken Warsame off the watchlist, an assumption that Plaintiffs dispute, the Government has not proven, and is not fit for a motion to dismiss in any event. If Warsame remains on the watchlist, she would still be at risk for all of the non-travel related liberty injuries discussed in the Proposed Amended Complaint ("AC") ¶¶ 72-106, even if the Government annotated her status to eliminate her travel-related injuries for the time being.

## II.    Plaintiffs Are not Precluded from Seeking Reconsideration

The Government (Opp. at 8 n.6) next claims that Plaintiffs cannot seek reconsideration of those issues where the Court dismissed with prejudice because they are "old matters" or arguments "that could have been raised before the entry of the judgment or order." Those issues, specifically, are the dismissal of Plaintiffs' travel-based due process claims (*see* Section IV(A), below) and CBP's status as a Defendant. Other than by claiming Plaintiffs cannot seek reconsideration, the Government does not challenge CBP's status as a Defendant in its Opposition.

But as explained in Plaintiffs' Motion, *see* Dkt. 21 at 10, a partial dismissal (unless designated otherwise) is an interlocutory decision and "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b); *Kenemer v. Arkansas Fuel Oil Co.,* 151 F.2d 567, 568 (5th Cir. 1945) (interlocutory decisions may "be reconsidered and reviewed, as the court might see fit, at any time prior to final judgment"). *Banik v. Tamez,* No. 7:16-CV-462, 2017 WL 1228498, at *1 (S.D. Tex. Apr. 4, 2017), relied upon by the Government (Opp. at 8 n.6), was a final judgment.

As described in detail in Sections III and IV of Plaintiffs' Motion, Plaintiffs have updated its Complaint to include detailed factual allegations against both CBP and in support of its travel-based liberty interests. Those specific allegations, many based on information made public subsequent to Rule 12 briefing, explain in authoritative detail how CBP helps lead the watchlisting system, and wields

watchlist information to search and seize the electronics of people targeted, detain them at border crossings aggressively and for hours in a manner that makes it known to co-travelers and the family of listees that the United States believes the target is a known or suspected terrorist.  Consistent with Federal Rule of Civil Procedure 54(b), Plaintiffs seek reconsideration of the Court's original dismissals with prejudice.  *Kovac v. Wray*, 363 F. Supp. 3d 721, 763 (N.D. Tex. 2019).

## III.   The Government's Futility Arguments Should Be Saved for Motion to Dismiss Practice

The rest of the Government's arguments (Opp. at 9-40), are a motion to dismiss dressed up as various arguments regarding futility.  But, as explained in Plaintiffs' initial Motion—and not responded to anywhere in the Government's opposition—the Northern District of Texas's "almost unvarying practice when futility is raised is to address the merits of the claim or defense in the context of a Rule 12(b)(6) or Rule 56 motion ….where the procedural safeguards are surer." *Poly-Am., Inc. v. Serrot Int'l Inc.*, 2002 WL 206454, at *1-*2 (N.D. Tex. Feb. 7, 2002); *see also EEOC v. Big Lots Stores, Inc.*, 08-CV-177, 2009 WL 10677383, at *3 (E.D. Tex. May 27, 2009) (noting that 12(b)(6) evaluations of futility are the general practice of the Northern District of Texas).  That same procedure should be followed here.

## IV.   Plaintiffs' Amended Complaint is not Futile

To the extent this Court decides to depart from that general practice, none of the Government's futility arguments have merit.[3]

---

[3] If the Court *does* reach the Government's futility arguments—which it should not—Plaintiffs expect the Government not to burden the Court or Plaintiffs' counsel with a second, exhaustive motion to dismiss should the Court grant Plaintiffs' Motion to Amend.

4

### A.     Plaintiffs Allege a Deprivation of a Protected Liberty Interest in Travel[4]

"Plaintiffs' movement-related liberty interests involve the right to travel by airplane or reenter the United States without being detained for additional screening." *Elhady v. Piehota*, 303 F. Supp. 3d 453, 461 (E.D. Va. 2017). Whatever the precise standard for determining when a movement-related deprivation is sufficient to require due process, that standard is met by "invasive additional screening and other liberty-constraining activities when they fly or reenter the country at a land border or port," including being "detained for hours," which "has caused them to avoid travel." *Id.* at 464 (noting conflicting decisions about when travel-related deprivations constitute constitutional harm but that the above allegations establish standing regardless of what test is used); *see also Mohamed v. Holder*, 266 F. Supp. 3d 868, 875 (E.D. Va. 2017) ("Plaintiff's decision not to engage in international travel because of the difficulties he reasonably expects to encounter upon return to the United States is sufficient to demonstrate standing") (stringcite omitted).

Here, for instance, Plaintiff Aljame was not only required to wait four hours for he and his son to be cleared, AC ¶ 226, and interrogated upon arrival for several hours (not merely "screened" prior to flying), AC ¶ 228, he was also denied entry to Jordan and deported back to Dallas due to the Government's watchlist designation, AC ¶ 232. Aljame also now alleges he was previously on the No Fly List, AC ¶¶ 235-236. The past harm from that No Fly List status continues to provide him with standing to contest his watchlist placement. *Fikre*, 904 F.3d at 1039-40; *see* Section I, above; *see also Tarhuni v. Sessions,* 692 Fed. App'x 477, 478 (9th Cir. 2017) (unpublished opinion) (individual taken off the No Fly List still had claim to challenge TSDB placement). Plaintiff Allababidi was not merely screened, but also publicly humiliated, AC ¶ 287, and has had his electronics confiscated and searched, AC ¶¶ 276-78. And Sybti—who has also had his phone seized and searched, AC ¶ 242—was not merely delayed, but specifically detained, AC ¶ 262. Sybti was also subjected to religious questioning.

---

[4] Plaintiffs are seeking reconsideration on this issue.

AC ¶ 245. Meanwhile, unlike the mostly-isolated events described in the cases proffered by the Government, the delays are incessant and repeated, every time Plaintiffs fly. AC ¶¶ 214, 218, 240, 260-61, 292, 301. The result is that all five Plaintiffs are now deterred from traveling as a result of watchlist placement. AC ¶ 195, 238, 266, 288.

The Government (Opp. at 9-12), argues that no Plaintiff other than Kovac has a liberty-related due process interest. The Government (at 10-12) primarily relies on *Green v. TSA*, 351 F. Supp. 2d 1119 (W.D. Wash. 2005), and *Beydoun v. Sessions,* 871 F.3d 459 (6th Cir. 2017). In *Green*, plaintiffs were not on the TSDB list but merely had names similar to those who had, and alleged only stigma-plus injury as a result. 351 F. Supp. 2d at 1128-29. In *Beydoun*, the Court's only reason for finding a lack of travel-related standing as to one plaintiff was insufficient detail, noting that "Beydoun has not attempted to provide any information about when those delays occurred, how long the delays were, what type of enhanced screening he was subjected to, or indeed any information beyond general allegations that he has been prevented from traveling." 871 F.3d at 467. As to the other *Beydoun* plaintiff, he merely alleged "instances when he has been delayed or subjected to additional screening, with delays ranging from ten minutes to one hour in duration." *Id..* These delays, with no allegations of detention, are minor relative to the hours-long and repeated delays, replete with detention and invasion of privacy, suffered by Plaintiffs when they attempt to travel.

There is likewise no discussion of similar, substantial information about the length, use of force, and other attributes of detention and delay in *Abdi v. Wray*, 2018 WL 1940411, at *4 (D. Utah Apr. 23, 2018), *Kadura v. Lynch*, No. 14-cv-13128, 2017 WL 914249, at *6 (E.D. Mich. Mar. 8, 2017); and *Bazzi v. Lynch*, No. 16-10123, 2016 WL 4525240, at *5 (E.D. Mich. Aug. 30, 2016), *aff'd sub nom. Beydoun v. Sessions*, 871 F.3d 459 (6th Cir. 2017). Those opinions merely stand for the proposition that the plaintiffs in those cases did not sufficiently allege a travel-related liberty deprivation, *Kadura v.*

6

*Lynch*, 2017 WL 914249 at *6.  They do not mean that placement on the watchlist does not rise to a travel-related liberty deprivation as a matter of law.

The Government's other cases (Opp. at 11) are inapposite. *Scherfen v. DHS*, No. 08-cv-1554, 2010 WL 456784, at *7 (M.D. Pa. Feb. 2, 2010), has nothing to do with travel-related liberty injury sufficient to create constitutional standing.  And in *Torraco v. Port Auth. of New York & New Jersey*, 615 F.3d 129, 133 (2d Cir. 2010), the factual details of the delay (and the legal analysis) are minimal. It appears (a) that the delay described was merely a conditional delay in order to travel with a firearm, and (b) the plaintiff was not held in screening for a day, but simply had to take a different flight. Here, Plaintiffs too have missed flights due to consistent and unconditional screening. *See* AC ¶¶ 171, 227, 274.  Plaintiffs do not claim that missing a flight, alone, constitutes constitutional injury.  Rather, Plaintiffs assert that the repeated delays, detention, invasion of privacy, and other liberty-infringing conduct (including missed flights) caused solely due to the Government's conduct rises to that level. None of the other cases cited by the Government (at 13) are even marginally on point.  *See League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 535 (6th Cir. 2007) (dealing with whether there was a constitutional difference between a driver's license and driver's certificate);  *Cramer v. Skinner*, 931 F.2d 1020, 1022 (5th Cir. 1991) (individual traveler did not have standing to challenge restrictions on airlines imposed at Love Field); *United States v. Shenandoah*, 595 F.3d 151, 154 (3d Cir. 2010) (sex offender registry is not a restriction on travel).

**B.    Plaintiffs Have Alleged Stigma-Related Deprivation of Liberty**

Plaintiffs also have a cognizable due process interest under the "stigma-plus" test.  That test finds that suffering stigma from governmental action plus a negative impact on legally-recognized right or status constitutes constitutional injury. *Paul v. Davis*, 424 U.S. 693, 711 (1976).  Plaintiffs meet both prongs of the test.

The Government (Opp. at 13-14) suggests there is no evidence of stigma.  But, since the briefing before the district court's initial decision, we now know that the Government's placement on the watchlist has been shared not only broadly within the Government, but also to state and local governments, foreign nations, and even private parties. AC ¶ 47, 103. As one district court recognized, "a person's placement on the No Fly List would likely become known over time to persons beyond government agencies or the airlines, with accompanying adverse consequences visited upon a restricted person." *Mohamed v. Holder*, No. 11-cv-50, 2015 WL 4394958, at *6 (E.D. Va. July 16, 2015). Ultimately, as the hallmarks of watchlist status are simple to devise, Plaintiffs' watchlist status becomes public to "Plaintiffs' family members, friends, and associates," AC ¶ 45, as well as "airline representatives and other airline personnel," AC ¶ 46. So, the Government's argument regarding lack of stigma fails.

Plaintiffs have also shown that the plus factor applies. For instance, Kovac has suffered invasive searches as a result of his placement, 2AC ¶ 209-10, while Allababidi has had Global Entry status cancelled, AC ¶ 270; *see also Valmonte v. Bane*, 18 F.3d 992, 1001 (2d Cir. 1994) (all a plaintiff must show is a "deprivation of" an "opportunity" which is "caused by a statutory impediment"). Warsame "was unable to get a credit card or receive a bank loan." AC ¶ 296. The Government suggests these deprivations are not enough to show "plus," Opp. at 14-15, but its limited reasoning does not support its claim. For instance, the Government suggests that it has the absolute right to eliminate Allababidi's Global Entry status. *Id.* at 14-15.  But—as explained in the Complaint and not rebutted by the Government, "[a]lthough the Government claims that these are non-reviewable security determinations, the reporting of information that informs the security determination is not unreviewable and is actionable if done in an illegal or discriminatory manner. *Rattigan v. Holder*, 689 F.3d 764, 767 (D.C. Cir. 2012)." AC ¶ 323.  (The Government also suggests Allababidi did not formally

accuse his Watchlist Status of being to blame, but it would be impossible to read the Amended Complaint otherwise.  *See* AC ¶¶ 79, 269-70, 323.)

The Government separately argues (Opp. at 15-17) that Plaintiffs' nonattainder theory cannot go forward.  The Government's arguments here are duplicative of the extensive briefing on this subject already (Dkts. 15, 18, and 20).  Nothing more needs to be added to this extensive briefing.

### C.      Plaintiffs Have Alleged A Separate APA Claim

The Government suggests (Opp. at 17) the APA claim should be dismissed as coextensive with the procedural due process claim.  This is incorrect.  Instead, Plaintiffs allege that placement on the watchlist is contrary to a constitutional right. AC ¶ 346, 348-49. So any constitutional violation, not just procedural due process, would also give rise to an APA claim.

 Plaintiffs also allege that watchlist placement is "not in accordance with law." AC ¶ 346, 348-49. Thus, the APA claim should also succeed because there is no statutory support for the watchlist. *See* 5 U.S.C. § 706(2)(C) ("in excess of statutory jurisdiction, authority, or limitations, or short of statutory right").

To be sure, statutory provisions passed by Congress do assume the existence of a national terrorism database. *See, e.g.*, 49 U.S.C. § 114(h)(1); 49 U.S.C § 44903(j)(2)(C)(ii). But the Government does not cite to—and Plaintiffs are not aware of—any legislative authority for the Government to create the watchlist in the first place. Thus, except for two specific circumstances inapplicable to any of Plaintiffs' allegations,[5] Congress has provided the Executive with neither statutory authorization

---

[5] *See* 49 U.S.C § 44903(j)(2)(C)(v) ("The Administrator, in coordination with the Terrorist Screening Center, shall include on the No Fly List any individual who was a detainee held at the Naval Station, Guantanamo Bay, Cuba, unless the President certifies in writing to Congress that the detainee poses no threat to the United States, its citizens, or its allies."); *see also* 46 U.S.C. § 70101, note (DHS instructed, in context of cruise ships only, to "develop guidelines, policies, and operating procedures for the collection, removal, and updating of data maintained, or to be maintained, in the 'no transport' and 'automatic selectee' lists described in subsection (a)(1) that are designed to ensure the accuracy and integrity of the lists.")

for creating the watchlist nor any intelligible principle on how to develop the watchlist. Congress provided no instructions as to what constitutes a sufficient risk to national security to justify the deprivation of rights the TSDB causes; what standards should govern factual determinations placing a person on the list; whether it is appropriate to discriminate specifically against Muslims and focus exclusively on so-called "Islamic terrorism" in compiling the list; or what procedural processes should be put in place in order to protect the rights of individuals nominated to the list, including, as this case shows, United States citizens. Indeed, in the Intelligence Reform and Terrorism Prevention Act of 2004, PL 108–458, December 17, 2004, Congress asked DHS to provide this information *to Congress*, demanding "(A) the criteria for placing the name of an individual on the watch list, (B) the minimum standards for reliability and accuracy of identifying information, (C) the degree of information certainty and the range of threat levels that are to be identified for an individual; and (D) the range of applicable consequences that are to apply to an individual, if located." 49 U.S.C. § 44909(c)(2). If Congress was not aware of what the legal criteria and consequences of watchlist placement were, it hardly could have authorized it. *Mistretta v. United States*, 488 U.S. 361, 372 (1989) (Congress must delegate its authority with an "intelligible principle"); *Gundy v. United States*, No. 17-6086, 2019 WL 2527473, at *11 and 15 & (U.S. June 20, 2019) (Gorsuch, J., dissenting) (In order to "protect minority interests, or apt to provide stability and fair notice …. *Congress* must set forth standards 'sufficiently definite and precise to enable Congress, the courts, and the public to ascertain' whether Congress's guidance has been followed.").

Other than the two inapplicable provisions in 49 U.S.C § 44903(j)(2)(C)(v) and *also* 46 U.S.C. § 70101 that are described in footnote 5 above, the Terrorist Screening Center (*see* AC ¶¶ 2, 7, 19, and 86) appears in only one other place in the entirety of the (unannotated) United States Code. In 6 U.S.C. § 621(10), a provision providing for definitions for Chemical Facility Anti-Terrorism Standards, Congress defines "terrorist screening database" as meaning "the terrorist screening database

maintained by the Federal Government Terrorist Screening Center or its successor." Nothing else in Title VI—or elsewhere—provides for creation of the "terrorist screening database" or sets standards to guide its contours.  Instead, the only two relevant instances of that term merely require vetting against the database.  *See* 6 U.S.C. §§ 488a and 622. The Terrorist Screening Center itself has never been authorized by Congress, either.

Congress may have acknowledged the existence of the Terrorist Screening Center and the TSDB, but it has never authorized them. As far as Plaintiffs are aware, Congress has also not authorized the TSDB's extensive and damaging use at land borders, where CBP justifies placement on the list as grounds for detentions for many hours, as well as the searching and seizing of phones and other electronics.  *See* AC ¶ 42 and Exhibit 58 (CBP Directive No. 3340-049A). This whole watchlisting enterprise has been invented out of whole cloth by the Executive Branch.  Congress has not provided the Government with any intelligible principle to guide this invented endeavor. This lack of delegation separately constitutes a violation of the Administrative Procedures Act, in that the TSDB—as well as many of its components, including the CBP's usage and participation—are wholly without any statutory authorization.

### D.    Plaintiffs Have Alleged an Equal Protection Claim

The Government argues that Plaintiffs' new equal protection allegations do not state a claim. Opp. at 18-19. The Government claims Plaintiffs have failed to sufficiently allege "the existence of purposeful discrimination motivating the state action that caused the complained-of injury." *Id.* at 18 (citing *Kovac*, 363 F. Supp. 3d at 760).  The Government suggests Plaintiffs "revised allegations, even if assumed to be true, at best plausibly support a showing of disparate impact, not intent—and thus do not support a claim of discriminatory animus."  Opp. at 18 (citing *Townes v. Jarvis*, 577 F.3d 543, 552 (4th Cir. 2009), and *Sylvia Dev. Corp. v. Calvert Cty.*, 48 F.3d 810, 818 (4th Cir. 1995)).

But the Plaintiffs' claims of intentional discrimination against Muslims, Arabs, and Asians from Majority-Muslim countries is well pled. For instance, the Amended Complaint notes that: "Defendants consider origin from Muslim-majority countries, travel to Muslim majority countries, travel on religious pilgrimages, learning Arabic, attending mosques, zakat donations to Muslim charities, the wearing of typical Muslim dress, the frequency of Muslim prayer, adherence to Islamic religious practices, affiliations with Muslim organizations, and associations with other Muslims as suspicious factors supporting inclusion in the TSDB." AC ¶ 128. So "when Defendants review lists of social networks and known associates of a currently watchlisted individual, they routinely choose to nominate Arab or Muslim names that cross their desk on the stereotyped basis of race, religion, or national origin alone. Meanwhile, Defendants gloss over any stereotypically white, Christian, English, or Western-European names that may appear in the same network lists, such as classmates or colleagues." AC ¶ 131.

Yes, the Complaint's allegations spell out the existence of disparate impact as well as disparate treatment and intentional discrimination. But this disparate impact is the result of "the Government's knowing, intentional, and purposeful use of religious, racial, and national origin criteria." AC ¶ 132; *see also* AC ¶ 133-36 (Defendants treat actual known terrorist connections as not worthy of inclusion when the target is a white Christian nationalist). And while illicit motive is not necessary to establish an equal protection claim, that too is alleged. The Government uses "the watchlist" as "a bludgeon to coerce everyday American Muslims into spying on their neighbors and becoming government informants." AC ¶ 138; *see also* AC ¶ 139, 249-254. "Presence on the watchlist is deployed as an intimidation tactic and used to coercively justify the denial of American-Muslims' civil rights, such as the right to have an attorney present during law enforcement questioning." AC ¶ 138.

Plaintiffs have thus alleged that the Government's conduct has "had a discriminatory effect upon and ha[s] disparately impacted Muslim American travelers, and not travelers of other faiths."

*Cherri v. Mueller*, 951 F. Supp. 2d 918, 937 (E.D. Mich. 2013).  "Indeed, central to Plaintiffs' [Complaint] is that the policy, custom and practice is only applied against Muslims, and not travelers of other faiths." *Id.* And "Plaintiffs have sufficiently alleged that such policy, practice and custom targets a suspect class and has no rational basis." *Id.* "At this stage in the case, Plaintiffs' allegations are sufficient." *Id.*

Indeed, "proof of discriminatory intent … can in some situations be inferred from the mere fact of differences in treatment."  *Int'l Bd. of Teamsters v. U.S.*, 431 U.S. 324, 335 (1977).  Thus, when "a clear pattern, unexplainable" through proper motives, "emerges," disparate treatment or impact suffices. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). Thus, that a "stark" pattern alone may be "determinative." *Id.*; *see also Kirksey v. Bd. of Sup'rs of Hinds Cty., Miss.,* 554 F.2d 139, 148 (5th Cir. 1977) (en banc) (superseded by statute on other grounds as stated in *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 867 (5th Cir. 1993)).

Plaintiffs can further buttress their claims of discriminatory motive and intentional discriminatory treatment with a consistent pattern of targeting Muslims, AC ¶¶ 124-137.  The historical background of the watchlist as a response to perceived threats from Muslims lends further support. *See* Richard F. Grimmett, *9/11 Commission Recommendations: Implementation Status* Congressional Research Service (Dec. 4, 2006)[6], at 1, 19, 21, and 31-33 (TSDB was a response to 9/11 Commission, which was aimed at "counter[ing] Islamic terrorism"); *Sylvia Development Corp. v. Calvert County*, 48 F.3d 810, 819 (4th Cir. 1995) (stating that "consistent pattern" and "historical background" are "probative factors" for finding "discriminatory intent").

---

[6] https://fas.org/sgp/crs/homesec/RL33742.pdf.

### E.      Plaintiffs Have Alleged a Fourth Amendment Claim

#### 1.      Plaintiffs Have Standing to Raise a Fourth Amendment Claim

The Government claims (Opp. at 20) that Plaintiffs cannot bring their Fourth Amendment claim because they "ha[v]e [not] made a single allegation regarding any specific plans for future international travel." Of course, by the time any Plaintiff alleges a specific future trip that Plaintiff booked, the date and travel would come and go before resolution, and the Government would then claim the dispute is moot. *See, e.g.,* AC ¶¶ 214, 240, 260 (Plaintiffs suffer injury every time they travel). What the Government is really arguing is that no Plaintiffs can ever challenge the Government's First and Fourth (and First) Amendment violations, even though those violations repeatedly take place pursuant to specific Government policies.

The Government, naturally, cites no case stating that a specific alleged itinerary is necessary to make such challenges. Every case that has addressed these allegations has rejected the Government's arguments. In *Wilwal v. Nielson*, for instance, the Court explained that "Courts do not require plaintiffs to engage in international travel when they have experienced difficulties at the border and reasonably expect the same difficulties when returning to the United States from future travel." 346 F. Supp. 3d 1290, 1302 (D. Minn. 2018) (stringcite omitted).[7] Similarly, the court in *Alasaad v. Nielsen* reminded the Government that "Plaintiffs' allegations of future harm are no less concrete because they omit specific plans or dates of future travel." 17-cv-11730, 2018 WL 2170323, at *10 (D. Mass. May 9, 2018). Each of these cases also cite numerous authorities over a variety of jurisdictions for the well-established proposition that the "possibility of recurring injury ceases to be speculative when actual repeated incidents are documented." *Id.* (quoting *Thomas v. Cty. of L.A.*, 978 F.2d 504, 507 (9th Cir.

---

[7] *Wilwal* only involved Fourth Amendment seizure and excessive force challenges to the watchlist, but the Government does not explain why this would make a difference.  Indeed, the Government does not even explain why its argument, if adopted, would apply to all of Plaintiffs' travel-related claims.

1992)); *see also Wilwal*, 346 F. Supp. 3d at 1302 (citing *Suhre v. Haywood Cty.*, 131 F.3d 1083, 1091 (4th Cir. 1997) ("[P]ast injury [i]s probative of likely future injury")); *Mohamed*, 266 F. Supp. 3d at 875 (same).

### 2.     The Government Lacks Reasonable Suspicion Regardless of a Warrant Requirement

The Government claims Plaintiffs' arguments are premised on the requirement of a warrant and probable cause. (Opp. at 20-25.)  But this is incorrect.  Plaintiffs' Fourth Amendment claim as pled is much broader, asserting that the manner in which Defendants conduct the electronic searches challenged here cannot be constitutionally authorized under *any* legal standard relevant to a search. Indeed, Plaintiffs allege "Defendants lack consent, reasonable suspicion, probable cause, or a warrant for their seizures and searches of watchlisted individuals' electronic devices." AC ¶ 370; *see also id.* at ¶ 371. Plaintiffs specifically cite *U.S. v. Kolsuz*, 185 F. Supp. 3d 843, 858 (E.D. Va. 2016) for the proposition that a "forensic search of computer is [a] border search requiring reasonable suspicion." AC ¶ 370. And TSDB status does not indicate that this reasonable suspicion standard has been met.

As described in the Complaint, the Government places people on the watchlist based on a modified and watered down "reasonable suspicion" test.  AC ¶ 30, 50, 56, 58. That test determines whether there is "a reasonable suspicion that the individual is engaged, has been engaged, or intends to engage, in conduct constituting in preparation for, in aid or in furtherance of, or related to, terrorism and/or terrorist activities." AC ¶ 30. As then explained in *Mohamed v. Holder*, 995 F. Supp. 2d 520, 531 (E.D. Va. 2014), conduct that can constitute being "related to" or "in aid" of terrorism sufficient to place an individual on the watchlist "is not necessarily related to any unlawful conduct."  Yet, once the Government decides this person meets this "reasonable suspicion" of being suspected of something vaguely related to terrorism test, the Government—as a matter of policy—asserts that this establishes the "reasonable suspicion" that is required, under Fourth Amendment law, for electronic

searches.  AC ¶ 42 and Exhibit 5.  This is an unconstitutionally permissive standard, since the law requires "reasonable suspicion" of "criminal activity." *U.S. v. Cortez*, 449 U.S. 411, 417 (1981).  Further, that criminal activity must be "ongoing or imminent." *Kolsuz*, 185 F. Supp. 3d at 859 (citing *Cortez*, 449 U.S. at 417) ("An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity."). Yet, as the Government has noted in this case, the purported purpose the watchlist "is not to investigate or punish criminal conduct." Government's Reply in Support of Motion to Dismiss, Dkt. 10, at 8. And, in any event, placement on a watchlist does not satisfy this standard. *See* n.7, below.

Further, searching the electronics of individuals suspected of having some relationship to terrorism is squarely evidentiary and intelligence-gathering; it is not a search for contraband or firearms that justifies a warrant exception at the border. *U.S. v. Kolsuz*, 890 F.3d 133, 143 (4th Cir. 2018) (noting "the scope of a warrant exception should be defined by its justifications" and warning that a border warrant exception would not apply in a situation where "the government invokes the border exception on behalf of its generalized interest in law enforcement and combatting crime") (citations omitted).

The Government suggests that no reasonableness, at all, is necessary in order to search electronic devices. Opp. at 22 (citing standard for "routine searches" at border). This is incorrect. The Government searches Plaintiffs' phones in one of two ways. First, the Government performs manual searches of Plaintiffs' phones by requiring them to unlock their phone via password or biometric data. *See* AC ¶¶ 27. Second, the Government seizes the phone and performs a forensic search.  *See* AC ¶¶ 42, 175, 242. Both of these types of searches require, at minimum, reasonable suspicion.

As explained by several courts, nonroutine border searches which are abnormally "intrusive" require at least reasonable suspicion.  *United States v. Molina-Gomez*, 781 F.3d 13, 19 (1st Cir. 2015) (explaining that non-routine border searches, such as those that are highly intrusive or destructive, require reasonable suspicion); *United States v. Irving*, 452 F.3d 110, 123 (2d Cir. 2006) ("Although

routine border searches of a person's belongings are made reasonable by that person's decision to enter this country, more invasive searches, like strip searches, require reasonable suspicion."); *see also Wilwal,* 346 F. Supp. at 1304  As explained in a long, well-thought opinion involving this precise issue in *Alasaad ,* No. 2018 WL 2170323, at *13-20, the Supreme Court's analysis in *Riley v. California*, 573 U.S. 373 (2014), establishes that even a manual search of an electronic device such as one's phone is intrusive for Fourth Amendment purposes, requiring heightened scrutiny.  *See also U.S. v. Kim,* 103 F. Supp. 3d 32, 54-58 (D.D.C. 2015) (applying *Riley* to border search). This is because "[c]ell phones" and other "minicomputers" "differ in both a quantitative and a qualitative sense from other objects." *Riley*, 573 U.S. at 393.

One district court post *Riley*—in a different context—found that a manual search that "involved using the iPhone's touch screen, which was not password protected, to scroll through [an individual's] recent calls and text messages," did not require reasonable suspicion.  *United States v. Kolsuz,* 185 F. Supp. 3d 843, 853 (E.D. Va. 2016) (noting decision), *aff'd*, 890 F.3d at 139 and 141 (noting scope of manual search and that plaintiff had not appealed this issue). But that analysis, even if adopted, would not apply when the Government is forcing Plaintiffs to provide passwords or biometric access, as it is here.

Meanwhile, even the district court in *Kolsuz* required reasonable suspicion for a forensic search. 185 F. Supp. 3d at 855-56.  As explained by *U.S. v. Cotterman*, a forensic search is problematic because it gives "the examiner access to far more data, including password-protected, hidden or encrypted, and deleted files, than a manual user could access." 709 F.3d 952, 963 n.9 (9th Cir. 2013), at least without the password.  *See also U.S. v. Saboonchi*, 48 F. Supp. 3d 815, 817 (D. Md. 2014); *U.S. v. Kolsuz,* 185 F. Supp. 3d at 843, 856 (E.D. Va. 2016); *U.S. v. Kolsuz,* 890 F.3d 133 at 140 (4th Cir. 2018).

**3.     Plaintiffs Plausibly Allege the Government Needs a Warrant and Probable Cause**

Although the caselaw firmly supports at least a reasonable suspicion test—which the Government cannot meet here because watchlist placement does not satisfy the reasonable suspicion standards under the Fourth Amendment—Plaintiffs also believe that both manual searches (with a compelled password) and forensic searches require probable cause and a warrant.  Again, as *Alasaad* helpfully explained, "the Supreme Court rejected the reasonable suspicion standard when it came to cell phones because it 'would prove no practical limit at all when it comes to cell phone searches.'" 2018 WL 2170323, *20 (quoting *Riley*, 573 U.S. at 398.) Digital device searches at the border, perhaps even when supported by reasonable suspicion, raise the same concerns." *Alasaad*, 2018 WL 2170323 at *20.  As *Riley* noted, "[i]n the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement." 573 U.S. at 382. Yet the border search exception to a warrant only applies in certain circumstances, based on whether the item or individual constitutes contraband or poses a threat in entering the country and so should not be allowed in.  *Kim*, 103 F. Supp. 3d at 56. But a cell phone is not contraband and does not pose a threat to the country.  And the Plaintiffs cannot, by constitutional right, be denied entry, as they are all United States citizens.  AC ¶¶ 13-17.  So no border search exception can apply.  Instead, the Government is merely using the happenstance of the border to conduct a criminal investigation inquiry.  This does not constitute a border search at all.  *See Kim*, 103 F. Supp.3d at 57.  If it is not a border search, it cannot be justified by the border search doctrine. *Id.*  And thus, as explained in *Riley*, if no warrant exception applies, a warrant and probable cause is required. 573 U.S. at 382.

**4.     Plaintiffs Properly Allege Fourth Amendment Claims against TSA and FBI**

The Government contends that even if Plaintiffs allege Fourth Amendment injury against CBP, they do not do so with respect to the FBI or TSA.  Opp. at 26.   The Government further

suggests that any claims against TSA must be brought in the Court of Appeals under 49 U.S.C. § 46110. *Id.* at 26-27.

**First**, Plaintiffs' allege Fourth Amendment harms attributable to both the TSA and FBI.  As the Government concedes (at 26), Plaintiffs allege that it was TSA that searched his phone. AC ¶ 175. Plaintiffs allege that this was done as a "matter of official practice and policy." AC ¶ 367.  Plaintiffs also allege that the screening-agency search and seizure of electronic devices is directly triggered by the FBI and Terrorist Screening Center's decisions to place and maintain Plaintiffs on the watchlist, which the TSC ultimately controls.  AC ¶ 51, 77.  The Government suggests this is implausible because, citing a blog that they do not link to, "as a matter of official policy, TSA does not search phones or download data." Opp. at 26. But plaintiffs attach as an exhibit the 2013 Watchlisting Guidance, which specifically commands all agencies, including the TSA and FBI, who encounter a watchlisted information regarding "electronic media/devices observed or copied: (a) cell phone list and speed dial numbers (b) laptop images (c) GPS (d) thumb drives (e) disks (f) iPod or MP3 (g) PDAs (e.g. Palm Pilots, Trios) (h) Kindle or iPad (electronic books)" and more; it also provides instructions surrounding the collection of "social networking accounts" and more.  AC Exhibit 1, 2013 Watchlisting Guidance at 60, 64, 68-69.  Between factual allegations of unlawful conduct, alongside an official Government policy statement instructing TSA to commit the unlawful acts, on one side, and a blog post that supposedly denies that the TSA does this, the Court must accept Plaintiffs' assertions as true. *Matter of Life Partners Holdings, Inc.*, No. 17-11477, --- F.3d ----, 2019 WL 2315028, at *1 n.2 (5th Cir. May 31, 2019).

Plaintiffs also allege that all watchlist encounters, including those which constitute Fourth Amendment violations, proceed under the direction of the FBI and TSC. AC ¶ 69.  In order to state a claim against the FBI, Plaintiffs "need only allege either 'some connection' or a 'special relationship' between the named defendant and enforcement of the challenged policy." *Anibowei v. Barr*, No. 3:16-

CV-3495-D, 2019 WL 623090, at *5 (N.D. Tex. Feb. 14, 2019) (quoting *K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010) (other citations omitted).  Plaintiffs allegations of FBI direction and oversight meet this minimal standard.

*Second*, 49 U.S.C. § 46110 does not limit the Court's jurisdiction in this case. This Court has already held in a detailed opinion that Section 46110 does not apply given the broad, constitutional challenges to the Government's conduct.  *Kovac*, 363 F. Supp. 3d at 740-44.  The Government does not and cannot provide any meaningful distinction to the challenges to the adequacy of DHS TRIP discussed in that opinion and the challenges to TSA's search-and-seizure policies that the Government suggests must be severed from this case due to 49 U.S.C. § 46110.

### F.     Plaintiffs Have Stated a First Amendment Claim

The Government's searches and copying are done in pursuit of intelligence and information about Plaintiffs' and similarly situated watchlisted individuals' communications, expressions, social media activities, and associations. AC ¶ 377. Its searches through Plaintiffs' phones specifically sought information about Plaintiffs' expressed speech and personal associations. *Id.* These searches violate the First Amendment. AC ¶ 378.

In a landmark decision relating to the watchlist, a district court held that watchlisted plaintiffs properly asserted First Amendment claim related to border searches of phones for associational or expressive content. *Alasaad*, 2018 WL 2170323, at *23. As explained in *Alasaad*, the searches themselves violate Plaintiffs' right to free association.  2018 WL 2170323 at *22-23.  No different result should occur here.

The Government suggests (Opp. at 27) "Plaintiffs may not obtain prospective relief based simply on an alleged subjective chilling effect a governmental policy has on their speech." This confuses the Free Speech component of the First Amendment from the Freedom of Association component under which Plaintiffs bring their claims.   There has and will continue to be a chilling

effect on Plaintiffs' right to association. Despite the Government's assertion that there is " no plausible allegation that any of their associations have been so targeted for increased scrutiny as a result of searches of their electronic device," Opp. at 29, the Complaint explains how the Government takes the data they obtain from private searches and use it to nominate the friends and relatives of Plaintiffs to the watchlist as well.  AC ¶¶ 8, 31, 43, 59, 126.   As explained in *Alasaad*, the searches themselves violate Plaintiffs' right to free association.  2018 WL 2170323 at \*22-23.

The Government separately suggests that Plaintiffs claims must fail to the extent they "seek redress for alleged injuries done to others." Opp. at 29 (citing AC ¶ 382). This again ignores that Plaintiffs are bringing a Free Association claim, not a speech claim.  By illegally obtaining information about Plaintiffs' associates, the Government directly interferes with the Plaintiff's ability to freely associate with those individuals.  This violates Plaintiffs' rights and is not a third-party claim. *U.S. v. Citizens State Bank*, 612 F.2d 1091, 1093 (8th Cir. 1980) (accepting appellants' argument that disclosure of third party information would discourage third parties from associating with appellant, and gave appellants standing for Free Association claim); *In re Search of Facebook Username Aaron.Alexis*, 21 F. Supp. 3d 1, 7 (D.D.C. 2013). And even if this were not the case, a third party has standing to avoid the forced disclosure of its third-party associates because the third-party associates could not file suit without disclosing the association.  *Koenig v. Maryland*, 09-cv-3488, 2010 WL 148706, at \*1 n.1 (D. Md. Jan. 13, 2010) (citing *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 458–60 (1958)).

Finally, the Government suggests that Plaintiffs' First Amendment claim cannot survive in light of the Government's supposed "good faith" investigation. Opp. at 27-28 The Government, relying on *Reporters Committee for Freedom of Press v. AT&T*, 593 F.2d 1030, 1054 (D.C. Cir. 1978), alleges that "the First Amendment offers no procedural or substantive protections against good faith criminal investigative activity beyond that afforded by the Fourth and Fifth Amendments."  Opp. at 28. But that part of Judge Wilkey's opinion was a concurring opinion not joined by any other judge. *See id.* at

1071 n.4 (Spottswood, J., declining to join Part IV(A)(1)(b) of Judge Wilkey's opinion specifically because the First and Fourth Amendment analysis "may not always coincide"), and 1079 (Skelly Wright, J., dissenting). Wilkey's reasoning has been rejected by other courts. *See In re Grand Jury Proceeding*, 842 F.2d 1229, 1233 (11th Cir. 1988) (joining the Second, Eighth, Ninth, and Tenth Circuits in expressly rejecting Wilkey's Part IV(A)(1)(b) analysis). As far as Plaintiffs are aware, it is not the law anywhere. Watchlist designations aren't "criminal" information in any event.[8]

Even if the "good faith exception" rule proposed by the Government were the law, *AT&T* defines "good faith investigation" very narrowly; "good faith" means "good faith criminal investigation" of "felony" conduct, 593 F.2d at 1062. This is important because the "probable cause" for the investigation provides constitutional protection under the First Amendment. *See id.* at 1055 ("where the materials sought to be seized may be protected by the First Amendment, the requirements of the Fourth Amendment must be applied with 'scrupulous exactitude'" *Id.* (quoting *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978), and *Stanford v. Texas*, 379 U.S. 476, 485 (1965)).

Here in contrast, Plaintiffs' allegations are that the Government is searching through their phones and electronic devices neither as part of any criminal investigation nor supported by probable cause, but by a desire to intrude on Plaintiffs' associations and punish them. The Government acts both for the sake of a generalized interest in intelligence and surveillance and as leverage to force Plaintiffs to act as informants against their communities, often in violation of their religious beliefs.

---

[8] If TSDB placement has the effect of a criminal record, *Richmond Black Police Officers Ass'n v. City of Richmond, Va.*, 548 F.2d 123, 129 (4th Cir. 1977) (criminal conviction not moot because it would subject individual to 28 U.S.C. § 534), then the process required for placement must satisfy criminal due process. And without providing the required due process attendant to criminal law, the Government may not impose criminal consequences. *Sessions v. Dimaya*, 138 S. Ct. 1204, 1217 (2018); *Hoffman*, 455 U.S. at 499-500; *see also BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 (1996) ("Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose.").

AC ¶¶ 138-39, 252-54. And the Government only asserts, at most, a generalized and watered-down reasonable suspicion of potentially-non-criminal conduct. *See* § (E)(2), above. "Good faith" does not mean "anything the Government argues is in the public interest." It has a very narrow definition, and the Government cannot meet it here.

The Government (Opp. at 27-28) also relies on *U.S. v. Meyer*, 503 F.3d 740, 751-53 (9th Cir. 2007). That case involves very different interests—private, consensual infiltration—and criminal procedural, rather than civil, remedies. It does not apply in the context here. In light of that entirely different context, *Meyer* uses a balancing test where there is a "legitimate law enforcement purpose that outweighs any harm to First Amendment interests." 503 F.3d at 753. There is a vast difference between finding no First Amendment violation and acknowledging the First Amendment harm before weighing competing interests and concluding that the remedy of criminal evidentiary exclusion is improper. *Meyer* also relies on *U.S. v. Aguilar*, which again points to the existence of probable cause as protecting the First Amendment interest, 883 F.2d 662, 705 (9th Cir. 1989), except in the cases of undercover investigations, which the Court distinguishes, *id.*

### G.   Plaintiffs RFRA Claims Are not Futile

"RFRA prohibits the 'Government [from] substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability" unless the Government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.'" *Burwell v. Hobby Lobby Stores, Inc.,* 573 U.S. 682, 695 (2014) (quoting 42 U.S.C. §§2000bb–1(a), (b) (emphasis removed).

As the Supreme Court explained in *Hobby Lobby*, whether a practice constitutes a substantial burden is determined solely by looking at whether a RFRA plaintiff believes the practice at issue constitutes a burden on their religion. *Id.* at 724. It is not up to the Court to "tell the plaintiffs that

their beliefs are flawed," *id.* or "presume to determine ... the plausibility of a religious claim," *id.* (quoting *Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 887 (1990)). So "courts often simply assume that a law substantially burdens a person's exercise of religion when that person so claims." *Legatus v. Sebelius*, 901 F. Supp. 2d 980, 991 (E.D. Mich. 2012) (stringcite omitted).

> **1.    The Government's Penalizing by Placing and Keeping Sybti on the Watchlist in Retaliation for Exercising their Religious Rights Violates RFRA**

The Government separately alleges that Sybti cannot show a RFRA violation based on informant pressure.  Opp. at 35. According to the Government, since acting as an informant was "voluntary," *id.*, Sybti's refusal to do so does not affect his religious beliefs.  But as the Complaint made clear, Sybti refused to do so because of his religious beliefs.  AC ¶¶ 397-401. When the state puts "substantial pressure on an adherent to modify his behavior and to violate his beliefs," the government substantially burdens the adherent's religion. *Thomas v. Review Bd. of Indiana Employment Sec. Div.*, 450 U.S. 707, 718 (1981). The "imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against appellant for her Saturday worship." *Sherbert v. Verner*, 374 U.S. 398, 404 (1963).

That the Government was willing to trade Sybti's status on the watchlist for him becoming a government informant constitutes punishment to the extent, as Plaintiffs allege, the Government did not have a right to put him on the list in the first instance.  *See* AC at Counts I-IV. And Plaintiffs alleges that the Government in fact uses TSDB and No Fly List placement as a pretext to coerce adherents to act as an informant.  AC ¶¶ 138-139, 338.  This pressure constitutes an undue burden on Plaintiffs' religion, and thus violates RFRA.  Whether Plaintiff submitted to this pressure or not does not affect the RFRA violation.  *See generally Tanvir v. Tanzin*, 894 F.3d 449 (2d Cir. 2018) (finding Plaintiffs' RFRA damages claim for keeping plaintiffs on watchlist in retaliation for not acting as RFRA proper, subject to potential qualified immunity); *Mack v. Warden Loretto FCI*, 839 F.3d 286, 301 (3d

Cir. 2016) (plaintiff stated RFRA claim for officers' punishing and harassing him for his religious practice); *United States v. Christie*, 825 F.3d 1048, 1055 (9th Cir. 2016) ("If a person has a sufficiently realistic fear that the government is going to punish him for exercising his religious beliefs in defiance of the law, he may unsheathe RFRA and file a preemptive strike in an effort to subdue the government before it treads further").

The Government's primary response to Sybti's actual RFRA claim is to deny the allegation as "not plausible." Opp. at 35. Not only is the claim "plausible," it actually happened, as Sybti describes. AC ¶¶ 248-254; *see* AC ¶ 253 ("They tried to entice Mr. Sybti into becoming an informant by offering to solve his travel problems if Mr. Sybti cooperated with them by acting as an informant in Lebanon."). Whatever *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007), requires, it does not allow the Government to avoid litigating a claim simply because they deny the allegation. And, in any event, there are repeated instances of this informant-coercion occurring to individuals other than Plaintiffs, proving the plausibility of these allegations. *See* Irina D. Manta & Cassandra Burke Robertson, *Secret Jurisdiction*, 65 EMORY L.J. 1313, 1351 (2016) ("there are repeated stories of government officials placing people on the list for reasons not authorized under their own procedures, such as coercing them to become informants on members of their ethnic or religious community") (multiple citations omitted); *Mohamed*, 995 F. Supp. 2d at 524 (similar situation occurring to plaintiff); *Tanvir v. Tanzin*, 894 F.3d 449, 454 (2d Cir. 2018) (same); AC ¶ 139.

The Government also suggests that this conduct only gives rise to a constitutional claim, not a RFRA claim. Opp. at 35. But conduct can violate the constitution and RFRA at the same time. *Abordo v. State of Hawai'i*, 902 F. Supp. 1220, 1231 (D. Haw. 1995) ("If an action violates the First Amendment, it will also violate the RFRA"). This is particularly true when RFRA exists to protect and expand Americans' First Amendment religious rights. *Id.* ("The RFRA simply provides greater

protection of an individual's right to freely exercise his religion than the Supreme Court has afforded under the Constitution.").

### 2.     The Government Cannot Establish a Compelling Interest at this Stage

As explained by the Supreme Court, "RFRA prohibits the 'Government [from] substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability' unless the Government 'demonstrates that application of the burden to ***the person***—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.'" *Hobby Lobby,* 573 U.S. at 705 (quoting 42 U.S.C. §§ 2000bb–1(a), (b)) (emphasis original).  If there is any "viable" less restrictive manner of accomplishing the same end, the Government cannot meet its burden. *Id. at* 728.  Nor do higher costs or inconveniences to the Government show that a less restrictive alternative is not viable.  *Id.* at 729.  Indeed, even an alternative that will require the creation of an entirely new Government program remains viable.  *Id.*

The Government alleges (Opp. at 36-38) that, for national security reasons, it has a compelling interest in the watchlisting system as currently enacted, and that the system uses the least restrictive means.  This is an extremely high burden to meet.  *Hobby Lobby,* 573 U.S. at 705.  The Government would have to establish not only a compelling interest in a watchlist that is entirely ineffective in promoting national security, *see* AC ¶¶ 107-123, but that every component of the watchlisting system is narrowly tailored to do the least amount of harm and interference to each individual Plaintiffs' religious beliefs.  Even if the Government could make this showing at trial, it cannot do so at the motion to dismiss stage.  *St. John's United Church of Christ v. Chicago,* 502 F.3d 616, 646 (7th Cir. 2007) ("accepting the City's [narrowly-tailored-to-meet-a-compelling-interest] assertions at this stage in the litigation is inconsistent with our obligation when reviewing a motion to dismiss").

### 3.     Plaintiffs Are Dismissing Their Religious Questioning Claim

The Government makes a variety of arguments against Plaintiffs' religious-questioning-based RFRA claim (Count VII).  Opp. at 30-34. Plaintiffs have decided to voluntarily dismiss this claim; if leave to amend is granted they will omit this claim from the filed First Amended Complaint.

## **CONCLUSION**

The Court should Grant Plaintiffs' Motion to Amend, and then commence discovery.

Date: June 26, 2019                                CAIR LEGAL DEFENSE FUND

                                                   BY:     /s/ Lena F. Masri
                                                   LENA F. MASRI (DC: 1000019)
                                                   GADEIR I. ABBAS (VA: 81161) *
                                                   *Attorneys for Plaintiffs*
                                                   453 New Jersey Ave, SE
                                                   Washington, DC 20003
                                                   Phone: (202) 488-8787

                                                   *\* Licensed in VA, not in D.C. Practice limited to federal matters*