# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

|  |  |
|---|---|
| ADIS KOVAC, *et al.*, | |
| *Plaintiffs*, | |
| v. | Case No. 3:18-cv-110-X |
| CHRISTOPHER WRAY, *et al.,* | |
| *Defendants.* | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendants move the Court to grant summary judgment to Defendants on Plaintiffs' remaining Administrative Procedure Act (APA) claim. The reasons supporting this motion are set forth in the concurrently filed memorandum, and in the certified Administrative Record (AR) relevant to this claim.

In accordance with Local Rule 7.1(c), Defendants have separately provided a proposed order for the Court's review and entry.

Dated: July 29, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

_____/s/ Antonia Konkoly_____
ANTONIA KONKOLY
CHRISTOPHER R. HEALY
Trial Attorneys
Federal Programs Branch
United States Department of Justice
Civil Division
1100 L Street NW
Washington, DC 20005
Tel: (202) 514-2395
christopher.healy@usdoj.gov
antonia.konkoly@usdoj.gov

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

ADIS KOVAC, *et al.*,

       *Plaintiffs*,

   v.

CHRISTOPHER WRAY, *et al.*,

       *Defendants.*

Case No. 3:18-cv-110-L

## MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

PROCEDURAL HISTORY ................................................................................................ 2

STANDARD OF REVIEW ................................................................................................ 3

STATEMENT OF UNDISPUTED MATERIAL FACTS ................................................. 4

The Defendant Agencies .................................................................................................... 4

The TSDS .......................................................................................................................... 6

Information-Sharing .......................................................................................................... 9

Redress .............................................................................................................................. 10

The Redress Process for Travelers Who Experience Delays ............................................ 12

Enhanced Redress Procedures for U.S. Persons Who Are Denied Boarding .................. 13

The Plaintiffs .................................................................................................................... 14

ARGUMENT ..................................................................................................................... 15

I.      The Court Should Enter Summary Judgement for Defendants as to the Substantive – or Alleged "Placement" – Component of Plaintiffs' APA Claim. ....................................... 15

II.     The Court Should Enter Summary Judgment for Defendants as to the Procedural Component of Plaintiffs' APA Claim. ............................................................................... 16

        A.      Judgment Should Be Entered for the Government on Plaintiffs' APA Claims that TSDS Procedures Are "Contrary to Constitutional Right." ...................... 16

        B.      TSDS Policies and Procedures Are Not Arbitrary or Capricious. .................... 17

                1.      The Government's Nondisclosure Policy Is Not Arbitrary or Capricious. ........ 19

                2.      The DHS TRIP Procedures Are Not Arbitrary or Capricious. ............................ 20

                3.      The Government's TSDS Information-Sharing Practices and Procedures Are Not Arbitrary or Capricious. ................................................................... 22

CONCLUSION .................................................................................................................. 23

# TABLE OF AUTHORITIES

**CASES**

*Abdi v. Wray,*
  942 F.3d 1019 (10th Cir. 2019) ................................................................................................ 20

*Am. Bioscience, Inc. v. Thompson,*
  269 F.3d 1077 (D.C. Cir. 2001) ................................................................................................. 4

*Beydoun v. Sessions,*
  871 F.3d 459 (6th Cir. 2017) .................................................................................................... 22

*Buffalo Marine Services Inc. v. United States,*
  663 F.3d 750 (5th Cir. 2011) ..................................................................................................... 4

*Camp v. Pitts,*
  411 U.S. 138 (1973) ................................................................................................................... 4

*CIA v. Sims,*
  471 U.S. 159 (1985) ................................................................................................................. 21

*Elhady v. Kable,*
  993 F.3d 208 (4th Cir. 2021) .......................................................................................18, 19, 20

*Ghedi v. Mayorkas,*
  16 F.4th 456 (5th Cir. 2021)................................................................................................17, 20

*Kovac v. Wray,*
  363 F. Supp. 3d 721 (N.D. Tex. 2019) ...............................................................................3, 18, 24

*Kovac v. Wray,*
  449 F. Supp. 3d 649 (N.D. Tex. 2020) ..............................................................................3, 18

*Kovac v. Wray,*
  No. 3:18-CV-00110-X, 2020 WL 6545913 (N.D. Tex. Nov. 6, 2020) ................................. 3, 18

*Kovac v. Wray,*
  No. 3:18-CV-00110-X, 2022 WL 717260 (N.D. Tex. Mar. 10, 2022) ...................................... 3

*Latif v. Lynch,*
  3:10-cv-00750 (BC), 2016 WL 1239925 (D. Or. Mar. 28, 2016) ......................................13, 17

*Luminant Generation Co., LLC v. EPA,*
  714 F.3d 841 (5th Cir. 2013) ..................................................................................................... 4

*Marshall Cnty. Health Care Auth. v. Shalala,*
  988 F.2d 1221 (D.C. Cir. 1993) ................................................................................................. 4

*Morrow v. Dillard,*
   580 F.2d 1284 (5th Cir. 1978) .................................................................................................. 18

*Permian Basin Petroleum Ass'n v. Dep't of the Interior,*
   127 F. Supp. 3d 700 (W.D. Tex. 2015) ...................................................................................... 4

*Rahman v. Chertoff,*
   530 F.3d 622 (7th Cir. 2008) .................................................................................................. 21

*Redeemed Christian Church of God v. U.S. Citizenship & Immigr. Servs.,*
   331 F. Supp. 3d 684 (S.D. Tex. 2018) ...................................................................................... 4

*Snepp v. United States,*
   444 U.S. 507 (1980) ................................................................................................................ 21

*Texas Clinical Labs, Inc. v. Sebelius,*
   612 F.3d 771 (5th Cir. 2010) .................................................................................................... 4

*Wilson v. U.S. Dep't of Agric.,*
   991 F.2d 1211 (5th Cir. 1993) .................................................................................................. 4

*Yogi Metals Grp., Inc. v. Garland,*
   --- F.4th ---, 2022 WL 2315033 (5th Cir. June 28, 2022) ........................................................ 4

**STATUTES**

5 U.S.C. § 706 ............................................................................................................................ 3, 4

6 U.S.C. § 111 ................................................................................................................................. 5

6 U.S.C. § 202 ................................................................................................................................. 5

28 U.S.C. § 533 ............................................................................................................................... 5

28 U.S.C. § 534 ............................................................................................................................. 25

49 U.S.C. § 114 ............................................................................................................... 5, 6, 10, 17

49 U.S.C. § 44903 ................................................................................................................... 5, 6, 11

49 U.S.C. § 44926 ......................................................................................................................... 11

49 U.S.C. § 46110 ......................................................................................................................... 14

50 U.S.C. § 3056 ............................................................................................................................. 5

**REGULATIONS**

28 C.F.R. § 0.85 .............................................................................................................................. 5

28 C.F.R. § 20.33 ........................................................................................................................... 23

## INTRODUCTION

Terrorism remains a grave and persistent threat to our national security and civil aviation. One crucially important tool for U.S. counterterrorism efforts has been the creation of a consolidated terrorist watchlist, the Terrorist Screening Dataset (TSDS),[1] which allows U.S. authorities to identify known and suspected terrorists seeking to board aircraft, enter the country, or engage in other potentially threatening activity. Several different components of the federal government work together in this enterprise. The Federal Bureau of Investigation (FBI) investigates terrorist threats, and the Terrorist Screening Center (TSC), a multi-agency center administered by the FBI, maintains the TSDS. The Department of Homeland Security (DHS) is charged with preventing terrorist attacks within the U.S. Within DHS, the Transportation Security Administration (TSA) is responsible for securing all modes of transportation, with a focus on preventing terrorist attacks against civil aviation and other methods of transportation. Among other things, TSA relies upon certain subsets of the TSDS to screen passengers attempting to fly on United States commercial aircraft, or any commercial flight to, from, over, or within the U.S.

While working to ensure that air travel is safe and secure, the Government has also undertaken efforts to protect civil rights and civil liberties. Before an individual is placed in the TSDS, his or her nomination undergoes several independent layers of review to ensure that the requisite criteria are met. When combined with regular post-placement reviews and audits of TSDS information, these procedures offer ample assurance that TSDS placements are appropriately supported and warranted by the underlying information. Individuals who suspect or believe their travel has been affected by TSDS placement may also seek redress with DHS's Traveler Redress Inquiry Program (DHS TRIP), pursuant to which the Government will closely review the individual's TSDS placement, if any, and remove the individual if it is determined that he or she no longer meets the criteria for inclusion.

Plaintiffs' sole remaining claim is asserted under the Administrative Procedure Act (APA), and contains both a substantive component, challenging the legality of Plaintiffs' alleged TSDS placement(s), as well as a procedural component, asserting that TSDS policies and procedures are arbitrary and capricious. Defendants are entitled to summary judgment on both components of this claim. First, as to

---

[1] The TSDS was formerly known as the Terrorist Screening Database (TSDB).

the substantive component, as set forth in Defendants' classified supplemental memorandum—submitted for the Court's *in camera* and *ex parte* use only—to the extent that one or more Plaintiffs was or is in the TSDS and/or one of its subset lists, any such placements were supported by evidence meeting the relevant inclusion criteria. In addition, any purported TSDS nominations at issue here were not made in contravention of the requirement that such actions "must not be solely based on ethnicity, national origin, religious affiliation, or First Amendment protected activities," as Plaintiffs allege. ECF No. 1 (Compl.) ¶ 273.

Second, for the detailed reasons set forth *infra*, Plaintiffs' procedural challenge likewise fails on its merits, where all challenged TSDS policies and procedures—including non-disclosure of status, information-sharing, and administrative redress—are properly designed to balance the extraordinary public interest in preventing catastrophic terrorist attacks, while also protecting civil rights and liberties.

Accordingly, the Court should grant summary judgment in Defendants' favor as to the sole remaining APA claim at issue in this action.

## PROCEDURAL HISTORY

Plaintiffs are United States citizens who allege that they were or are improperly included in the TSDS, and that the Government's terrorist screening policies are unlawful. Kovac alleged that he was on the No Fly List subset of the TSDS, while the other Plaintiffs alleged that they were or are included in the Selectee List, pursuant to which they have allegedly received heightened security screening at airports. Together, Plaintiffs brought claims alleging violations of substantive and procedural due process and equal protection under the Fifth Amendment to the United States Constitution, the APA, and the non-delegation doctrine.

Defendants initially responded to Plaintiffs' Complaint with a motion to dismiss, which the Court granted in part and denied in part. Specifically, the Court dismissed Plaintiffs' equal protection and non-delegation claims, as well as their procedural and substantive due process claims premised on an asserted liberty interest in their reputations. *Kovac v. Wray*, 363 F. Supp. 3d 721, 762 (N.D. Tex. 2019) (*Kovac I*). The Court further dismissed, with prejudice, all claims against CBP, and all due process claims premised on Plaintiffs' asserted liberty interest in travel, with the sole exception of Plaintiff Kovac's due process

claims, which were based on an allegation of placement on the No Fly List. *Id.* The Court also allowed due process claims asserting Plaintiffs' purported liberty interest in nonattainder, and their APA claim, to move forward. *Id.* Subsequently, Kovac was informed that he had been removed from the No Fly List, and the Court, accordingly, further dismissed his travel-related due process claims. *See Kovac v. Wray*, 449 F. Supp. 3d 649, 656 (N.D. Tex. 2020) (*Kovac II*). And the case was once again narrowed when the Court granted Defendants' Rule 12(c) motion for judgment on the pleadings as to Plaintiffs' asserted non-attainder claims. *Kovac v. Wray*, No. 3:18-CV-00110-X, 2020 WL 6545913 (N.D. Tex. Nov. 6, 2020) (*Kovac III*). Thus, ultimately (and currently) only the APA claim survived the pleading stage of litigation.

Thereafter, the Government submitted an administrative record on the remaining APA claim, and moved for leave to submit a portion of that record for *ex parte* and *in camera* review only. Plaintiffs opposed the motion for leave, seeking access to the *ex parte* portion of the record, and cross-moved for the opportunity to seek discovery. The Court granted the Government's motion for leave and denied in relevant part Plaintiff's motion to supplement the record or access the *ex parte* materials. In its ruling, the Court also clarified that the surviving APA claim comprises both a substantive challenge to Plaintiffs' alleged TSDS placements, as well a challenge to the TSDS procedures. *Kovac v. Wray,* No. 3:18-CV-00110-X, 2022 WL 717260, at *5 (N.D. Tex. Mar. 10, 2022) (*Kovac IV*).

## STANDARD OF REVIEW

The sole remaining claim at issue in this suit is asserted under the APA, under which agency action may be set aside if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "'A decision is arbitrary or capricious only when it is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Yogi Metals Grp., Inc. v. Garland*, --- F.4th ---, 2022 WL 2315033, at *1 (5th Cir. June 28, 2022) (quoting *Wilson v. U.S. Dep't of Agric.*, 991 F.2d 1211, 1215 (5th Cir. 1993) (internal quotations omitted)). "This narrow standard of review does not seek the court's independent judgment," but rather "asks only whether the agency engaged in reasoned decision making based on consideration of the relevant factors." *Id.*; *see also, e.g., Redeemed Christian Church of God v. U.S. Citizenship & Immigr. Servs.*, 331 F. Supp. 3d 684, 694 (S.D. Tex. 2018) ("The agency decision need only have a rational basis, and it does not have to be a decision which the court

would have made.") (citation omitted). Courts must further defer to the agency's findings of fact if they are supported by substantial evidence, *Buffalo Marine Services Inc. v. United States*, 663 F.3d 750, 753-54 (5th Cir. 2011), and an agency's decision is presumptively valid; the plaintiff bears the burden of showing otherwise, *Texas Clinical Labs, Inc. v. Sebelius*, 612 F.3d 771, 775 (5th Cir. 2010).

Review of APA claims are limited to the administrative record. 5 U.S.C. § 706; *Camp v. Pitts*, 411 U.S. 138, 142 (1973); *Luminant Generation Co., LLC v. EPA*, 714 F.3d 841, 850 (5th Cir. 2013) (in APA cases, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."). Accordingly, "[w]hen assessing a summary judgment motion in an APA case, 'the district judge sits as an appellate tribunal.'" *Permian Basin Petroleum Ass'n v. Dep't of the Interior*, 127 F. Supp. 3d 700, 706 (W.D. Tex. 2015) (quoting *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)). "'The entire case on review is a question of law, and only a question of law.'" *Id.* (quoting *Marshall Cnty. Health Care Auth. v. Shalala,* 988 F.2d 1221, 1226 (D.C. Cir. 1993)). "In such a case, summary judgment merely serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Id.* (citation omitted).

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### The Defendant Agencies

1.     Several different components of the federal government work together to secure the United States and its borders and aviation system from terrorist threats. The FBI investigates and analyzes intelligence relating to both domestic and international terrorist threats, *see* 28 U.S.C. § 533, 28 C.F.R. § 0.85(l). The FBI also administers the TSC, a multi-agency Executive organization established by Presidential Directive in 2003 and tasked with, *inter alia*, "consolidat[ing] the Government's approach to terrorism screening and provid[ing] for the appropriate and lawful use of Terrorist Information in screening processes." Homeland Security Presidential Directive (HSPD) 6 (Sept. 16, 2003), Kovac_PublicAR (PAR) 11 (APP_7).

2.     The National Counterterrorism Center (NCTC) analyzes and integrates intelligence relating to international terrorism and counterterrorism, and serves as the central knowledge bank on

known and suspected terrorists and international terror groups. 50 U.S.C. § 3056(a), (d)(1), (d)(6). NCTC maintains classified information concerning international terrorists in its Terrorist Identities Datamart Environment (TIDE). PAR_310 (Declaration of Timothy P. Groh (Groh Decl.) ¶ 21) (APP_20).

3.      DHS is charged with "prevent[ing] terrorist attacks within the United States," 6 U.S.C. § 111(b)(1)(A), and "reduc[ing] the vulnerability of the United States to terrorism," *id.* § 111(b)(1)(B); *see also id.* § 202(1). Within DHS, TSA is responsible for securing all modes of transportation, including prevention of terrorist attacks against civil aviation and other methods of transportation. *See* 49 U.S.C. § 114(d). TSA is further responsible for day-to-day federal security screening operations for passenger air transportation, 49 U.S.C. § 114(e)(1), and for developing "policies, strategies, and plans for dealing with threats to transportation security," *id.* § 114(f)(3).

4.      TSA implements a multi-faceted approach to aviation security, which includes passenger pre-screening, checkpoint screening, post-checkpoint security measures, and security threat assessments for individuals with privileged access to commercial aviation, such as pilots, flight attendants, and aviation workers. *See* PAR_383-92 (Declaration of Hao-Y Tran Froemling (Froemling Decl.) ¶¶ 30-51) (APP_72-80). One of TSA's responsibilities is to ensure aircraft security by using information from government agencies to identify individuals on airline passenger lists who may be a threat to civil aviation or national security and prevent such individuals from boarding an aircraft, or take other appropriate actions. *See* 49 U.S.C. § 114(h)(3). TSA executes this mandate in part through the Secure Flight program, which "compar[es] passenger information to the automatic selectee and no fly lists and utilize[s] all appropriate records in the [TSDS]." 49 U.S.C. § 44903(j)(2)(C)(ii). After completing the comparison of passenger information, TSA provides instructions to aircraft operators to identify individuals for standard, enhanced, or expedited screening at a security checkpoint, or to deny individuals transport or authorization to enter a U.S. airport's sterile area. PAR_384 (Froemling Decl. ¶ 31) (APP_73).

5.      All aviation passengers must undergo security screening prior to entering the secure area of an airport and boarding an aircraft, and any passenger may be selected for enhanced screening. PAR_385 (Froemling Decl. ¶ 34) (APP_74). TSA applies the same checkpoint screening procedures to all individuals designates for enhanced screening, regardless of whether the designation is due to TSDS

status, randomly, or for other reasons, and the boarding pass does not indicate why someone has been selected. PAR_378-79 (Froemling Decl. ¶ 12) (APP_70-71). The majority of passengers designated for enhanced security screening are so designated for reasons other than TSDS status; further, individuals who are not in the TSDS may be designated for enhanced screening on multiple consecutive flights, diminishing the ability of any individual to infer TSDS status from repeated designation for enhanced screening. PAR_377-78 (Froemling Decl. ¶¶ 10-11) (APP_69-70). Enhanced screening typically includes screening of the person through a walk-through metal detector, the Advanced Imaging Technology (also known as an "AIT"), and a pat-down, and screening of accessible property through a scanner, an explosives trace detection search, and physical search of the interior of the passenger's accessible property, electronics, and footwear. PAR_387-88 (Froemling Decl. ¶ 39) (APP_75-76).

### The TSDS

6.       Pursuant to HSPD-6, TSC consolidated several government terrorist watchlists into a single database. PAR_11 (APP_7); PAR_305-06 (Groh Decl. ¶¶ 4-5) (APP_15-16). The TSDS contains identifying information of known or suspected terrorists. PAR_307-08 (Groh Decl. ¶¶ 9-11) (APP_17-18). The vast majority of the identities in the TSDS are foreign nationals who are not located in, and have no known nexus to, the U.S. PAR_308 (Groh Decl. ¶ 14) (APP_18). In fact, U.S. persons[2] make up less than 0.5 percent (*i.e.*, one two-hundredth) of the identities in the TSDS. *Id.* As a result of the dynamic intelligence environment, regular reviews of the data, and the redress process, the TSDS is constantly changing as it is continuously reviewed and updated. PAR_308 (Groh Decl. ¶ 12) (APP_18).

7.       To include a known or suspected terrorist identity in the TSDS, the nomination must rely upon articulable intelligence or information which, based on the totality of the circumstances and, taken together with rational inferences from those facts, creates a reasonable suspicion that the individual is engaged, has been engaged, or intends to engage, in conduct constituting, in preparation for, in aid or in furtherance of, or related to, terrorism and/or terrorist activities, and the nomination must include sufficient identifying information. PAR_310-11 (Groh Decl. ¶ 22) (APP_20-21). Mere "hunches" or the reporting of suspicious activity alone are not sufficient. PAR_311 (Groh Decl. ¶ 24) (APP_21).

---

[2] U.S. Persons, as defined in Executive Order 12333, are U.S. citizens and legal permanent residents.

Nominations must not be based solely on the individual's race, ethnicity, or religious affiliation, nor solely on beliefs and activities protected by the First Amendment. PAR_311 (Groh Decl. ¶ 25) (APP_21).

8.      TSA may designate airline passengers for enhanced screening who meet the reasonable suspicion standard for TSDS inclusion and for whom the TSDS record contains a full name and a full date of birth. PAR_377-78 (Froemling Decl. ¶ 10) (APP_69-70). Individuals who meet this minimum requirement are included in the "Expanded Selectee List," a subset of the TSDS. PAR_377-78 (Froemling Decl. ¶ 10 & n. 15) (APP_69-70). The No Fly List and the Selectee List are separate subset lists of the TSDS, and placement on those subsets requires additional heightened substantive derogatory criteria to be met. *See* PAR_311-12 (Groh Decl. ¶ 26) (APP_21-22); PAR_377-78 (Froemling Decl. ¶ 10 & n. 15) (APP_69-70).[3] The TSA Administrator has final authority over implementation of the No Fly, Selectee, and Expanded Selectee Lists and makes final determinations concerning inclusion on the No Fly List for U.S. persons seeking redress through DHS TRIP. *Id.*

9.      To maintain thorough, accurate and current terrorism information, the TSDS is subjected to rigorous and ongoing quality control measures. PAR_316-17 (Groh Decl. ¶¶ 41-46) (APP_26-27). First, before any individual is added to the TSDS, the nominating agency assesses the available, relevant information, including any exculpatory information, to determine whether the applicable standard is met, and the TSC completes a *de novo* review of available, relevant information under the same standard and makes the final decision whether to include the individual in the TSDS. PAR_309 (Groh Decl. ¶ 16) (APP_19). In addition, TSC conducts biannual reviews of all U.S. persons in the TSDS to ensure continued placement is warranted based on available, relevant information—and, further, subsequent to each encounter also conducts a new review to ensure the individual's placement is still warranted.[4] PAR_309 (Groh Decl. ¶ 16) (APP_19); PAR_317 (Groh Decl. ¶ 44) (APP_27). Available, relevant information, including exculpatory information, is carefully reviewed to evaluate whether the individual

---

[3] While TSA applies the same checkpoint procedures to individuals on the Expanded Selectee List as individuals on the Selectee List, TSA values having separate Selectee and Expanded Selectee Lists. PAR_378 (Froemling Decl. ¶ 10 n. 15) (APP_70). Although the No Fly List criteria are public, the Selectee List criteria are not public because disclosure would give known or suspected terrorists information that may assist in developing strategies to circumvent security screening. PAR_312 (Groh Decl. ¶ 27) (APP_22); PAR_4 (APP_2).

[4] An "encounter" is an event in which an individual is identified during a screening process or law enforcement stop to be a potential match to an individual who is in the TSDS. PAR_315 (Groh Decl. ¶ 37) (APP_25).

7

still meets the standard for inclusion. *Id.* Nominating agencies are also expected to conduct annual reviews. PAR_316 (Groh Decl. ¶ 43) (APP_26). Individuals who experience travel-related screening difficulties such as delayed or denied boarding may also seek redress through DHS TRIP. PAR_360-65 (Declaration of Deborah O. Moore (Moore Decl.) ¶¶ 3-16) (APP_60-65); PAR_309 (Groh Decl. ¶ 16) (APP_19); PAR_318-21 (Groh Decl. ¶¶ 52-63) (APP_28-31).

10.    Nominations to the TSDS are made by federal agencies based on credible information from a wide variety of intelligence sources; additionally, foreign partners may submit identities to be considered for nomination to the TSDS. PAR_309-10 (Groh Decl. ¶ 18) (APP_19-20). Nominating agencies and partners provide identities that meet the standard for inclusion in the TSDS and which have a nexus to international terrorism to the NCTC, and to the FBI for identities with a nexus to domestic terrorism. PAR_310 (Groh Decl. ¶ 19) (APP_20). Accordingly, before an individual is added to the TSDS, information supporting a nomination undergoes a multi-step review process, with review by the nominating agency, then by the NCTC or FBI (as appropriate), and then again by TSC to ensure compliance with interagency standards for inclusion. PAR_310 (Groh Decl. ¶ 20) (APP_20).

11.    TSDS determinations are not categorical judgments based on statistical models or generic behavioral indicators. PAR_328 (Declaration of Michael J. Orlando (Orlando Decl.) ¶ 11) (APP_36). The watchlisting system combines intelligence analysis with policy-based criteria for denying boarding or requiring additional security screening before boarding an aircraft. *Id.* This system relies on informed judgments by experienced analysts and agents who evaluate TSDS nominations based on individual circumstances, taking into account the particular intelligence that distinguishes the individual under review. *Id.* These analysts and agents draw on years of experience and training and from a body of source material; they have a variety of investigative and intelligence-gathering tools at their disposal and make use of subject-matter experts from throughout the intelligence community to inform their judgment. PAR_329 (Orlando Decl. ¶ 14) (APP_37).

12.    TSC is ultimately responsible for determining if the information associated with a nomination meets the established standards for inclusion in the TSDS or its subset lists. PAR_311-12 (Groh Decl. ¶ 26) (APP_21-22).

13.     At any time that a federal agency (whether or not it was the nominator) identifies new or updated information about a watchlist record, it is expected to make a request to NCTC/TSC to modify or remove that record. PAR_317 (Groh Decl. ¶ 45) (APP_27). Nominating agencies conduct annual reviews of all their nominations of U.S. persons to the TSDS, and each nominating agency has internal procedures to prevent, identify, and correct any errors. PAR_316 (Groh Decl. ¶ 43) (APP_26).

14.     Other government entities provide further oversight and input into watchlisting procedures, including Inspectors General, the Government Accountability Office, and Congress. PAR_318 (Groh Decl. ¶¶ 48-50) (APP_28). Such reviews have resulted in additional quality assurance mechanisms at TSC, which have improved accuracy and efficiency. *Id.*

### Information-Sharing

15.     It is the policy of the U.S. Government not to disclose TSDS status, which is law enforcement privileged; certain subset lists of the TSDS are also SSI. *See* 49 U.S.C. § 114(r) and 49 C.F.R. part 1520. PAR_320 (Groh Decl. ¶ 61) (APP_30); PAR_333 (Orlando Decl. ¶ 20) (APP_40); PAR_392-93 (Froemling Decl. ¶ 52) (APP_80-81); PAR_9 (APP_5). TSDS information therefore is not shared with the public and is subject to strict access controls. PAR_398 (Froemling Decl. ¶ 62) (APP_86); PAR_321 (Groh Dec. ¶¶ 64-65) (APP_31). The information is protected from disclosure and is accessible only to persons who have an official "need to know," such as federal law enforcement officials for their screening and vetting functions. PAR_307 (Groh Dec. ¶ 10) (APP_17); PAR_2 (APP_1).

16.     Pursuant to HSPD-6, agencies authorized or required to conduct terrorist screening or to use information for diplomatic, military, intelligence, law enforcement, immigration, transportation security, visa, and protective processes are given access to terrorism information to facilitate their respective public missions. PAR_11 (APP_7); PAR_013 (Groh Dec. ¶ 30) (APP_23). TSC exports subsets of TSDS information to the following federal government entities: DHS, Department of State, FBI (including the National Crime Information Center (NCIC), *see* ¶ 17, *infra*, and the Department of Defense. PAR_313-14 (Groh Decl. ¶ 32) (APP_23-24). For other agencies and events, TSC runs lists of names against the TSDS and reports the results to the agency requester. *Id.* Memoranda of understanding ("MOUs") between TSC and its screening partners specify the terms by which TSDS information is

shared and used. *Id.* Screening partners must use TSDS information for lawful screening purposes, in accordance with their own legal authorities, and subject to the restrictions specified in relevant MOUs. *Id.* Prohibited disclosure of internal government information, let alone information protected by statutory law and privilege (such as TSDS information), constitutes a serious breach of official duties. *Id.*

17.     TSDS exports enable the FBI to share relevant information necessary for its partners to carry out their respective missions in a concerted effort to prevent terrorist attacks. PAR_331 (Orlando Decl. ¶ 16) (APP_38). The TSDS allows FBI to leverage the combined resources of state, local, and federal law enforcement to provide information on the activities of known or suspected terrorists whom they encounter. *Id.* The TSC exports a subset of TSDS, referred to as the Known or Suspected Terrorist (KST) File, to the NCIC. PAR_331 (Orlando Decl. ¶ 17) (APP_38). Users access information in the NCIC Files by entering an identifier, such as a date of birth or social security number; a user cannot perform a search if only a name is entered, and information is returned to the user only if both the name and numeric identifier match a record in any of the files in NCIC. PAR_345 (Declaration of Scott A. Rago, Acting Deputy Assistant Director, Operational Programs Branch, CJIS, FBI (Rago Decl.) ¶ 6) (APP_51).[5]  In order for an entity to search information in the NCIC, the entity must apply for and obtain an Originating Agency Identifier (ORI) from the Criminal Justice Information Services (CJIS) Division of the FBI. PAR_346 (Rago Decl. ¶ 9) (APP_52). NCIC access is subject to stringent security controls and regular audits, and the applicable federal security policy is set forth in the CJIS Security Policy. PAR_351-52 (Rago Decl. ¶¶ 20-23) (APP_57-58).

**Redress**

18.     Congress directed DHS to establish a timely and fair redress process for travelers who believe they have been delayed or prohibited from boarding a commercial aircraft because they have been wrongly identified as a threat. *See* 49 U.S.C. § 44926(a). Congress further directed the Administrator of TSA to create a process to enable airline passengers who are delayed or prohibited from boarding a flight

---

[5] The Rago Declaration is erroneously titled "Declaration of Michael A. Christman," but should have been titled "Declaration of Scott A. Rago." The inadvertent error does not affect the contents or substance of the declaration, however. *See* PAR_343 (Rago Decl. ¶ 1) (APP_49) (introducing Mr. Rago as the declarant and setting forth his qualifications to attest to the representations in the declaration); PAR_353 (signature page, bearing Mr. Rago's signature) (APP_59).

because TSA's "passenger prescreening system determined that they might pose a security threat, to appeal such determination and correct information contained in the system" as necessary. *Id.* § 44903(j)(2)(C)(iii)(I). TSA implements this mandate through DHS TRIP, which serves as a single point of contact for a wide variety of complaints and inquiries regarding travel difficulties. PAR_361 (Moore Decl. ¶ 5) (APP_61); PAR_7-10 (APP_3-6).

19.     Travelers who have experienced a screening-related travel difficulty, including those who believe that they experienced such problems because they were wrongly identified as a threat, or those who have been denied boarding on a commercial aircraft, may submit an inquiry to DHS TRIP. PAR_362 (Moore Decl. ¶ 7) (APP_62-63); PAR_7-8 (APP_3-4).[6] In their inquiry, travelers may provide any comments or additional information that they deem relevant, including any exculpatory information. *Id.*

20.     Upon receipt of an inquiry, DHS TRIP reviews the information submitted and evaluates each inquiry to determine which DHS components or other governmental agencies have equities in the issues underlying the claimed travel difficulties. In addition to reviewing the traveler's submission, DHS TRIP also reviews relevant government databases, and refers the inquiries to the appropriate DHS TRIP component(s), and/or any other governmental agencies with equities. PAR_362-63 (Moore Decl. ¶ 9) (APP_62-63); PAR_8 (APP_4). Approximately 98 percent of DHS TRIP inquiries have no connection with any identity in the TSDS. PAR_363 (Moore Decl. ¶ 11) (APP_63); PAR_8 (APP_4).

21.     If a traveler experienced problems because he or she was "misidentified"—*i.e.*, the traveler's name is the same as or similar to the name of a different individual who is included in the TSDS—then DHS TRIP, in coordination with all relevant government agencies, attempts to prevent future misidentification. PAR_362 (Moore Decl. ¶ 10) (APP_62).

22.     In the small fraction of cases when DHS TRIP determines that a traveler is an exact or possible match to an identity in the TSDS, DHS TRIP refers the matter to the TSC Redress Office. PAR_362 (Moore Decl. ¶ 11) (APP_62); PAR_8 (APP_4). As explained below, there are different

---

[6] DHS TRIP provides the traveler a Redress Control Number (RCN), which travelers may use when making future air travel reservations. PAR_362 (Moore Decl. ¶ 8) (APP_62); PAR_7 (APP_3). In conjunction with TSA's Secure Flight Program, airlines have modified their reservation systems to allow an individual with an RCN to enter it into the reservation system to prevent the individual from being misidentified. PAR_362 (Moore Decl. ¶ 8) (APP_62).

processes that follow from this point, one of which is applicable to travelers who experience delays allegedly due to TSA's Watchlist Matching Program, and another that applies to U.S. Persons (defined as a U.S. citizen or Lawful Permanent Resident, *see* PAR_9 n.6) (APP_5), who have been denied boarding as a result of placement on the No Fly List and who meet other requirements. Although no Plaintiff alleges current placement on the No Fly List, because Plaintiff Adis Kovac was previously confirmed to be on the No Fly List, both processes are set forth, in turn, below.

<u>**The Redress Process for Travelers Who Experience Delays**</u>

23.     When a traveler is a confirmed match to the TSDS, TSC reviews the available derogatory and exculpatory information about the traveler, including any information provided by the traveler as a part of the inquiry, to determine whether the person identified in the TSDS continues to satisfy the criteria for inclusion or should be removed or have his or her status otherwise modified. PAR_363-64 (Moore Decl. ¶ 12) (APP_63-64); PAR_319-20 (Groh Decl. ¶¶ 56-60) (APP_29-30); PAR_8. The TSC Redress Office consults with the nominator to ensure that any new or exculpatory information is considered as part of the redress review. PAR_319 (Groh Decl. ¶ 58); PAR_8 (APP_4).

24.     When changes to a record's status are warranted, TSC's Redress Office ensures such corrections are made and verifies that such modifications or removals are carried over to the screening systems that receive TSDS data. PAR_320 (Groh Decl. ¶ 60) (APP_30); PAR_9 (APP_5). DHS TRIP sends a determination letter advising the traveler of the results of the adjudication of the redress inquiry. PAR_320 (Groh Decl. ¶ 60) (APP_30); PAR_9 (APP_5). When appropriate, the DHS TRIP redress process will result in removal of a traveler from the TSDS and/or one of its subsets. PAR_363-65 (Moore Decl. ¶¶ 12, 16) (APP_63-64); PAR_319-20 (Groh Decl. ¶¶ 59-60) (APP_29-30); PAR_8-9 (APP_4-5).

25.     Once all relevant agencies have reviewed a redress inquiry and record, DHS TRIP issues a determination letter to the traveler. PAR_364 (Moore Decl. ¶ 13) (APP_64); PAR_9 (APP_5). In light of national security and law enforcement interests, the determination letter generally provides the results of the individual's redress inquiry without disclosing whether the traveler was, or is, included in a federal watchlist used by TSA for passenger pre-boarding screening (including the TSDS and its subsets) or

revealing other sensitive information. PAR_364 (Moore Decl. ¶ 14) (APP_64); *see also*, *e.g.*, PAR_514-15 (November 17, 2017 DHS TRIP Redress letter to Plaintiff Suhaib Allababidi) (APP_106-07).

26.     FBI, TSC, and TSA have each assessed that disclosure of TSDS status during the redress process—to individuals who have not been denied boarding—would cause harm to national security and law enforcement efforts, and would be detrimental to transportation security, and that disclosure of any underlying derogatory information would cause additional harm to national security. PAR_332-41 (Orlando Decl. ¶¶ 19-36) (APP_39-48); PAR_321-22 (Groh Decl. ¶¶ 64-67) (APP_31-32); PAR_392-97 (Froemling Decl. ¶¶ 52-60) (APP_81-85). Compelled disclosure of a traveler's TSDS status in these circumstances would have a devastating effect on the usefulness of the TSDS and imperil the effectiveness of critical law enforcement tools used to protect national security. PAR_332-41 (Orlando Decl. ¶¶ 19-36) (APP_39-48).

27.     If the Government were forced to disclose TSDS status to those required to undergo enhanced screening, terrorists would know who would be required to undergo additional screening at airports, and could use that information to attempt to evade security measures and gain access to the commercial aviation system to perpetrate an attack. PAR_393-96 (Froemling Decl. ¶¶ 53-59) (APP_82-84). The information could be used to identify the best operatives, to predict the likelihood of detection, and to take countermeasures to attempt to avoid that detection, and could specifically compromise countermeasures such as federal air marshals. *Id.* Moreover, requiring disclosure of whether or not an individual is in the TSDS or the reasons for such inclusion, beyond the limited disclosure contemplated by the process for U.S. persons denied boarding, could jeopardize the integrity and secrecy of ongoing counterterrorism investigative or intelligence activities, and prompt individuals to take countermeasures and evade detection. PAR_332-41 (Orlando Decl. ¶¶ 19-36) (APP_39-48); *see also* PAR_321-22 (Groh Decl. ¶¶ 64-67) (APP_31-32); PAR_391-96 (Froemling Decl. ¶¶ 49-59) (APP_80-84).

### Enhanced Redress Procedures for U.S. Persons Who Are Denied Boarding

27.     In 2015, TSA adopted revised DHS TRIP procedures for any U.S person who is denied boarding due to No Fly status and files a redress inquiry. *See generally Latif v. Lynch*, 3:10-cv-00750 (BC), 2016 WL 1239925, at *5 (D. Or. Mar. 28, 2016) (describing process); PAR_7-10 (APP_3-6) (same). If it

13

is determined that the individual is appropriately on the No Fly List, DHS TRIP will inform him of such status and of the opportunity to seek additional information. If the individual takes this opportunity, DHS TRIP will provide the individual with the No Fly List criterion or criteria on which his placement was based and, to the extent possible consistent with national security and law enforcement interests, a summary of the factual basis for the placement. *See id.* The amount and type of information provided will vary on a case-by-case basis, depending on the facts and circumstances.[7] The individual then has an opportunity to submit any information that he considers potentially relevant to status. DHS TRIP, in consultation with relevant TSA offices, will review the submission and provide it to TSC for appropriate action, including potentially removing the individual from the No Fly List. EPAR_9 (APP_5).

28.     Where TSC concludes that the individual should remain on the No Fly List, it will provide a recommendation to the TSA Administrator. *Id.* The TSA Administrator reviews the information on the individual's placement, including both TSC's recommendation and any information the individual submitted, and will either issue a final order removing the individual from, or maintaining him on, the No Fly List, or remand the letter back to TSC with a request for additional information or clarification. *Id.* If TSA issues a final order, the order will state (to the extent possible consistent with national security and law enforcement interests) the basis for the decision, and will further notify the individual of the ability to seek judicial review pursuant to 49 U.S.C. § 46110. *Id.*

### The Plaintiffs

29.     All Plaintiffs are U.S. citizens. Although four of them allege that they were previously denied boarding on flights, none of the Plaintiffs allege that they are currently on the No Fly List.

30.     Bahsar Aljame filed DHS TRIP traveler inquiries on or around July 22, 2014 and May 25, 2016. PAR_420 (APP_87); PAR_441-46 (APP_88-93); PAR_473-75 (APP_96-98). DHS TRIP issued final determination letters in response to those inquiries on or about September 30, 2014 and July 13, 2016, respectively. PAR_449-50 (APP_94-95); PAR_481-82 (APP_99-100).

31.     Suhaib Allabadibi filed a DHS TRIP traveler inquiry on or around August 6, 2017 and August 27, 2020. PAR_484 (APP_101); PAR_489-90 (APP_102-03); PAR_511-12 (APP_104-05). DHS.

---

[7] In some circumstances, it may not be possible to provide an unclassified summary when the national security and law enforcement interests at stake are taken into account.

DHS TRIP issued a final determination letter in response to those inquiries on or about November 17, 2017 and September 24, 2020, respectively. PAR_514-15 (APP_106-07); PAR_557-58 (APP_108-09).

32.     Adis Kovac filed DHS TRIP traveler inquiries on or around November 6, 2014 and on December 4, 2017. PAR_560 (APP_110); PAR_591-602 (APP_111-22). On or around April 20, 2018, DHS TRIP issued a letter confirming that, as of that date, Mr. Kovac was "on the U.S. Government's No Fly List because" he had "been identified as an individual who 'may be a threat to civil aviation or national security.'" PAR_603 (APP_123). The letter further informed Mr. Kovac of the opportunity available to him, under the revised redress procedures for U.S. persons confirmed to be on the No Fly List, *see supra* ¶¶ 27-28, to request additional information about this placement. *Id.* On or around May 3, 2018, though his attorney, Mr. Kovac availed himself of this opportunity, and requested additional information about his placement. PAR_610 (APP_124). On or around July 18, 2019, DHS TRIP issued a further letter to Mr. Kovac, informing him that "[a]fter further review of your inquiry, we have determined that you no longer satisfy the criteria for placement on the No Fly List. You have been removed from the No Fly List, and will not be placed back on the No Fly List based on currently available information." PAR_624 (APP_125).

33.     Abraham Sbyti filed a DHS TRIP traveler inquiry on or around March 22, 2015. PAR_631-35 (APP_126-30). DHS TRIP issued a final determination letter in response to this inquiry on or about July 30, 2015. PAR_663-64 (APP_131-32).

34.     Fadumo Warsame filed a DHS TRIP traveler inquiry on or around January 1, 2017. PAR_666 (APP_133); PAR_671-75 (APP_134-38). DHS TRIP issued a final determination letter in response to this inquiry on or about February 23, 2017. PAR_688-89 (APP_139-40).

**[See *Ex Parte* Supplement]**

**ARGUMENT**

**I.     The Court Should Enter Summary Judgement for Defendants as to the Substantive – or Alleged "Placement" – Component of Plaintiffs' APA Claim.**

The purpose of TSDS watchlisting is not to investigate or punish criminal conduct, but rather to identify—to the extent possible in a dynamic, ever-evolving threat environment—individuals who *may*

pose a threat to national security, 49 U.S.C. § 114(h)(3)(A), and to take "appropriate action with respect to that individual," *id.* § 114(h)(3)(B). *See Latif v. Lynch*, 2016 WL 1239925, at *12 (D. Or. Mar. 28, 2016) (explaining, with approval, that No Fly List placements constitute "predictive judgments" or "threat assessments" that must be based on presently-known, articulable facts"). Thus, unlike prosecutorial decisions regarding past conduct, TSDS watchlisting decisions are based on current assessments of prospective risks. TSDS watchlisting decisions are the result of assessments made by trained agents and analysts as to whether an individual meets the defined watchlisting criteria *at any given point in time*.

As set forth in Defendants' classified supplement to this memorandum—submitted for the Court's *in camera* and *ex parte* use only—to the extent that one or more Plaintiffs was or is in the TSDS and/or one of its subset lists, any such placements were supported by evidence meeting the relevant inclusion criteria at the relevant point in time. In addition, any purported TSDS nomination was not made in contravention of the requirement that such actions "must not be solely based on ethnicity, national origin, religious affiliation, or First Amendment protected activities," as Plaintiffs allege. Compl. ¶ 273. Accordingly, Defendants are entitled to summary judgment as to the substantive (or alleged "placement") component of Plaintiffs' APA claim, for the reasons discussed in the *ex parte* supplement.

**[See *Ex Parte* Supplement]**

**II.      The Court Should Enter Summary Judgment for Defendants as to the Procedural Component of Plaintiffs' APA Claim.**

**A.      Judgment Should Be Entered for the Government on Plaintiffs' APA Claims that TSDS Procedures Are "Contrary to Constitutional Right."**

This Court previously dismissed all of Plaintiffs' constitutional claims. *See Kovac I*, 363 F. Supp. 3d at 762-63 (dismissing reputation-based constitutional claims and travel-based constitutional claims for all Plaintiffs except Kovac); *Kovac II*, 449 F. Supp. At 655-56 (dismissing Kovac's travel-based claims as moot); *Kovac III*, 2020 WL 6545913, at *2- 5 (dismissing all Plaintiffs' nonattainder-based constitutional claims). For all of the same reasons, the Court should enter judgment for the Government on the aspects of Plaintiffs' APA claim that raise those same constitutional theories. *See* Compl. ¶ 272 (alleging that TSDS violates the APA as, *inter alia*, "contrary to constitutional right[]" for depriving reputational liberty interests "without a constitutionally adequate legal mechanism"); *id.* ¶ 274-75 (alleging, similarly, a

violation of the APA for depriving travel-based constitutional liberty interests). Because the reputational and travel-based constitutional claims have all been decided in the Government's favor, those rulings are law of the case, and the Government is entitled to summary judgment for the same reasons. *See Morrow v. Dillard*, 580 F.2d 1284, 1289 (5th Cir. 1978) ("a rule of law enunciated by a federal court . . . will, normally, apply to the same issues in subsequent proceedings in the same case.").

### B.   TSDS Policies and Procedures Are Not Arbitrary or Capricious.

Plaintiffs separately claim that TSDS procedures are arbitrary or capricious. *See e.g.* Compl. ¶¶ 273, 275. The arbitrary or capricious standard is "'highly deferential,' and [a court] must afford the agency's decision 'a presumption of regularity.'" *Ghedi v. Mayorkas*, 16 F.4th 456, 468 (5th Cir. 2021).

### 1.   The Government's Nondisclosure Policy Is Not Arbitrary or Capricious.

First, in light of the Government's paramount interest in preventing terrorist attacks, it is fully reasonable—not arbitrary or capricious—for the Government to withhold a traveler's TSDS status and the reasons for that status for individuals on the Selectee List. Indeed, there are numerous compelling reasons for the Government's nondisclosure policy with respect to individuals on the Selectee List. Unlike the No Fly List, where status may be confirmed for U.S. persons who are denied boarding and seek redress, a known or suspected terrorist required to undergo enhanced security screening is not told his or her own status in the TSDS, and it cannot be deduced based upon experiences at airports or the border. PAR_321-22 (Groh Decl. ¶¶ 65-67 & n.13) (APP_31-32). Travelers may be required to undergo additional screening or inspection for a wide variety of reasons having nothing to do with the TSDS, and the majority of passengers designated for enhanced security screening are so designated for reasons other than TSDS Status. PAR_377-78 (Froemling Decl. ¶ 10) (APP_69-70). Individuals who are not in the TSDS may be designated for enhanced screening on multiple consecutive flights, diminishing the ability of any individual to infer TSDS status from repeated designation for enhanced screening. PAR_378 (Froemling Decl. ¶ 11) (APP_70). And TSA applies the same checkpoint screening procedures to all individuals designated for enhanced screening, for any reason. PAR_378-79 (Froemling Decl. ¶ 12) (APP_70-71); PAR_384-85 (Froemling Decl. ¶ 32) (APP_73-74).

17

Compelled disclosure of a traveler's TSDS status—beyond those limited circumstances contemplated by the DHS TRIP procedures, *see supra* SOF ¶¶ 27-28—would have a devastating effect on the usefulness of the TSDS and imperil the effectiveness of a critical law enforcement tool used to protect national security. *See* PAR_341 (Orlando Decl. ¶ 36) (APP_48). For example, disclosure of TSDS status would tend to reveal the Government's investigative interest (or lack thereof) in that individual, as well as the investigative procedures and techniques of investigating agencies associated with that individual's status. PAR_321-22 (Groh Decl. ¶¶ 64-67) (APP_31-32); PAR_334-35 (Orlando Decl. ¶¶ 21-23) (APP_41-42). It would be of considerable value to terrorist groups to confirm which individuals may not be of investigative or intelligence interest and who are thus more likely to escape scrutiny. PAR_322 (Groh Decl. ¶ 66) (APP_32); PAR_335 (Orlando Decl. ¶ 23) (APP_42). Signaling the Government's investigative interest in a particular person can be especially damaging where subjects or former subjects of investigation have associates whom the Government may still be investigating for potential ties to terrorist activity. PAR_334-35 (Orlando Decl. ¶ 22) (APP_41-42). Information regarding one subject may reflect law enforcement interest in other subjects, and alerting those other subjects could cause them to flee, destroy evidence, or take steps to alter their conduct or communications so as to avoid detection of future activities. *Id.* By the same token, terrorists would know whether they are required to undergo additional screening at airports, and use that information to attempt to evade enhanced security screening and other security measures to gain access to the commercial aviation system to perpetrate an attack. PAR_391-96 (Froemling Decl. ¶¶ 49-59) (APP_79-84). Unlike persons on the No Fly List, who are denied boarding, persons otherwise on the TSDS can still gain access to sterile area of airports, and can attempt social engineering or use of insiders. PAR_377-78 (Froemling Decl. ¶ 10) (APP_69-70); PAR_394 (Froemling Decl. ¶ 55) (APP_82). Thus, as the Fourth Circuit recently emphasized, the "reason for" "the government['s] …. general policy of not disclosing TSD[S] status, whether positive or negative, in response to inquiries," is "apparent." *Elhady v. Kable*, 993 F.3d 208, 215 (4th Cir. 2021). "Disclosure would disrupt and potentially destroy counterterrorism investigations because terrorists could alter their behavior, avoid detection, and destroy evidence." *Id.* In these circumstances, the Government's policy of protecting TSDS status during the redress process is plainly reasonable.

The Government's policy of protecting the underlying sensitive and classified information that supports an individual's placement or maintenance in the TSDS is also not arbitrary or capricious. Inclusion in the TSDS is often based on highly sensitive information, including information that pertains to law enforcement techniques and procedures, information that would undermine the confidentiality of sources, information that would endanger witness and law enforcement personnel, information that would undermine the privacy of individuals involved in the investigation, information that would seriously impair the ability of a law enforcement agency to conduct future investigations, and classified information that, if disclosed, reasonably could be expected to harm national security. PAR_338 (Orlando Decl. ¶ 30) (APP_45). Revealing information about why a person was included in the TSDS would therefore reasonably be expected to risk circumvention of critical law enforcement activities and cause harm to national security by providing potential terrorists with operationally valuable information about the nature of the government's interest in them, as well as exposing Government sources and methods used to obtain the relevant derogatory information. PAR_321 (Groh Decl. ¶ 65) (APP_31); PAR_339 (Orlando Decl. ¶ 31) (APP_46). *Elhady*, 993 F.3d at 215 (noting that "the government will not publicly disclose how an individual came to be included" in the TSDS, because "[d]oing so could alert terrorists to the tactics used by the government to detect them"); *see also, e.g.*, *CIA v. Sims*, 471 U.S. 159, 170 (1985) (noting that "[t]he reasons are too obvious to call for enlarged discussion" as to why it is important to protect "the secrecy and integrity of the intelligence process"); *Snepp v. United States*, 444 U.S. 507, 509 n.3 (1980) ("The Government has a compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service.").

Thus, disclosing the reasons and bases for placement on the TSDS would force nominating agencies such as the FBI to choose between, on the one hand, disclosing information that could reasonably be expected to harm national security and law enforcement interests by compromising an investigation, exposing a source, or revealing sensitive surveillance techniques, and, on the other, withholding information that could be used to identify and prevent a terrorist attack. PAR_339-40

(Orlando Decl. ¶ 32) (APP_46-47).   Refraining from providing this information during the redress process for persons delayed in travel due to alleged placement on the TSDS is plainly reasonable.

### 2.   The DHS TRIP Procedures Are Not Arbitrary or Capricious.

The DHS TRIP process is not arbitrary or capricious because it adequately protects individuals from erroneous listings on the TSDS, while protecting the Government's important national security interests. As numerous courts have recognized, the private interests affected by alleged TSDS placement are limited—especially where any traveler may experience similar delays when traveling by air—while the Government's interest in prevention of catastrophic terrorist attacks is extraordinary. *See Ghedi*, 16 F.4th at 466 (recognizing "no right to hassle-free travel" in response to due process claims); *Elhady*, 993 F.3d at 221 (explaining that the "burdens" alleged by plaintiffs claiming TSDS placement "are not dissimilar from what many travelers routinely face, whether in standard or enhanced screenings . . . After all, most travelers who face lengthier enhanced screenings are not in the TSDB but are instead chosen randomly."); *Abdi v. Wray*, 942 F.3d 1019, 1031 (10th Cir. 2019) (similar); *Beydoun v. Sessions*, 871 F.3d 459, 468 (6th Cir. 2017) (similar). Against this backdrop, the current nomination, placement, quality assurances, and DHS TRIP procedures, reasonably ensure that the risk of erroneous TSDS listing is appropriately low. *See* PAR_309-13 (Groh Decl. ¶¶ 17-29) (APP_19-23); PAR_316-21 (Groh Decl. ¶¶ 41-63) (APP_26-31); PAR_326-29 (Orlando Decl. ¶¶ 8-14) (APP_34-37); PAR_362-65 (Moore Decl. ¶¶ 7-16) (APP_62-65).

Inclusion in the TSDS is subject to multiple levels of review. First, before any individual is added to the TSDS, the nominating agency assesses the available, relevant information, including any exculpatory information, to determine whether the applicable standard is met, and the TSC completes a *de novo* review of available, relevant information to make the final decision using the same standard before the individual is included in the TSDS. PAR_309 (Groh Decl. ¶ 16) (APP_19).  In addition, TSC conducts biannual reviews of all U.S. persons in the TSDS to ensure continued placement is warranted based on available, relevant information—and, further, subsequent to each encounter also conducts a new review (based on all relevant information, including any exculpatory information) to ensure the individual's placement is still warranted. PAR_309 (Groh Decl. ¶ 16) (APP_19); PAR_317 (Groh Decl. ¶ 44) (APP_27). Further, individuals who experience travel-related screening difficulties may seek redress

through DHS TRIP and, if the individual is a match to the TSDS, the TSC Redress Office and the nominator will consider the individual's inquiry and other available, relevant information to decide whether continued placement is warranted, PAR_309 (Groh Decl. ¶ 16) (APP_19)—and judicial review is also available. On balance, the harm to counterterrorism efforts caused by alerting individuals as to whether or not they are on a terrorist watchlist far outweighs the benefits of additional process for people who are merely subject to travel delays. *See Rahman v. Chertoff*, 530 F.3d 622, 627 (7th Cir. 2008) ("Any change that reduces the number of false positives on a terrorist watch list may well increase the number of false negatives."). For this reason, the current policies are neither arbitrary nor capricious.

Further, any additional procedural requirements would pose an enormous administrative and fiscal burden on the affected agencies. For example, expanding the revised redress procedures available to U.S. persons who are denied boarding to U.S. persons who experience enhanced screening would pose an extraordinary burden on the involved agencies, which the impacted private interests do not warrant. As explained above, travelers are required to undergo additional screening or inspection for a wide variety of reasons having nothing to do with the TSDS. And if the revised redress process for U.S. persons on the No Fly List were applied to U.S. persons who receive enhanced screening as a result of TSDS status, DHS TRIP estimates that its workload for revised redress cases would increase by more than 1400 percent. PAR_366-67 (Moore Decl. ¶ 20) (APP_66-67). This would lead to an impact in DHS TRIP's ability to provide a fair and timely redress process for all applicants, including the 98 percent of applicants who are cleared of any connection to the TSDS. *Id.* Additional challenges are posed by the fact that status in certain TSDS subsets constitutes SSI. PAR_392-93 (Froemling Decl. ¶ 52) (APP_80-81); PAR_364 (Moore Decl. ¶ 14) (APP_64). None of these administrative and fiscal burdens are warranted by the limited travel delays alleged by plaintiffs.

In sum, the current DHS TRIP redress policies and procedures are fully rational, and not arbitrary or capricious.

**3.** **The Government's TSDS Information-Sharing Practices and Procedures Are Not Arbitrary or Capricious.**

Plaintiffs also claim that the Government's TSDS information sharing practices are arbitrary or capricious, although they fail to specify any basis for their objections beyond the stigma-plus rationale the Court has already rejected. *See* Compl. ¶ 272; *see also Kovac I*, 363 F. Supp. 3d at 752-56. As the materials found in the administrative record illustrate, however, the Government's justifications for its information-sharing practices are fully reasonable, not arbitrary or capricious.

Pursuant to HSPD-6, terrorism information is shared with agencies and officials authorized or required to conduct terrorist screening or to use information for diplomatic, military, intelligence, law enforcement, immigration, transportation security, visa, and protective services. PAR_313 (Groh Dec. ¶ 30) (APP_23). These information-sharing requirements are in place "to further strengthen the ability of the United States Government to protect the people, property, and territory of the United States against acts of terrorism[.]" PAR_11 (APP_7).  Before such information-sharing practices were in place, each agency had "developed its own policies, rules standards, architectures, and systems to channel information" which "resulted in gaps and seams in the sharing of information." PAR_25 (APP_11). The implementation of these policies resulted in "extraordinary improvements in our capabilities to gather, analyze and share information needed to paint a more complete picture of the threat[.]" *Id.* In 2004, Congress also passed the Intelligence Reform and Terrorism Prevention Act of 2004 to "enable trusted partnerships among all levels of government, the private sector, and our foreign partners, in order to more effectively detect, prevent, disrupt, preempt, and mitigate the effects of terrorism against the territory, people, and interests of the U.S." PAR_26-27 (APP_12-13) (describing information sharing practices). These information-sharing practices also take privacy and civil liberties concerns into account. For example, HSPD-11 creates criteria to ensure the reliability of information and adequately protect privacy and civil liberties concerns. PAR_23-24 (APP_9-10). DHS and other agencies also regularly issue Privacy Impact Assessments and System of Records Notices as required by law "to inform the public about the personal information contained in government records and systems, how the information is used, and how the information is protected against unauthorized disclosure." *See* PAR_22 (APP_8).

In furtherance of these directives and policy goals, one primary method of information sharing is NCIC, which is an electronic information system used to support law enforcement entities nationwide for criminal justice purposes, administered by the FBI. *See* PAR_344-53 (Rago Decl. ¶ 5-8) (APP_50-59). NCIC contains 21 files, one of which is the Known or Suspected Terrorist (KST) file, which is a subset of TSDS information. PAR_345 (Rago Decl. ¶ 6) (APP_51). Certain private entities who assist governmental agencies in carrying out their criminal justice missions may be permitted to access NCIC information, subject to strict oversight and control. *Id.* In accordance with Federal regulations, private entities that receive access to NCIC must be either "(1) a qualified police department of a railroad or private college or university, 28 U.S.C. § 534(e), or (2) providing services for the administration of criminal justice in accordance with 28 C.F.R. § 20.33(a)(7)." PAR_346-47 (Rago Decl. ¶ 10) (APP_52-53). These private entities' access to NCIC information are governed by use agreements, PAR_347 (Rago Decl. ¶ 12) (APP_53), and subject to regular audits. PAR_351-52 (Rago Decl. ¶¶ 20-21) (APP_57-58). Examples of the types of private entities that have agreements that allow them access to NCIC are listed in the declaration. PAR_352 (Rago Decl. ¶ 23) (APP_58). Each of these entities assists governmental agencies in carrying out their criminal justice missions.

Plaintiffs' APA claim does not specify any particular basis—beyond the stigma-plus rationale the Court has already rejected—for their arbitrary and capricious challenge to the Government's information sharing practices. These policies reasonably balance the Government's need to share information in support of the Government's ongoing fight against terrorism with protections for privacy and civil liberties that cabin the Government's lawful use of personal information.

<u>CONCLUSION</u>

For the foregoing reasons, this Court should grant summary judgment in favor of Defendants.

Dated: July 29, 2022                           Respectfully submitted,

                                              BRIAN M. BOYNTON
                                              Principal Deputy Assistant Attorney General

                                              ANTHONY J. COPPOLINO
                                              Deputy Director, Federal Programs Branch

_____/s/ *Antonia Konkoly*_____
ANTONIA KONKOLY
CHRISTOPHER R. HEALY
Trial Attorneys
Federal Programs Branch
United States Department of Justice
Civil Division
1100 L Street NW
Washington, DC 20005
Tel: (202) 514-2395
christopher.healy@usdoj.gov
antonia.konkoly@usdoj.gov

*Attorneys for Defendants*

24