## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **ADIS KOVAC, et al.;** | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 3:18-cv-110-X |
| | ) | |
| v. | ) | |
| | ) | |
| **CHRISTOPHER WRAY, et al.;** | ) | |
| | ) | |
| Defendants. | ) | |

---

### PLAINTIFFS' OPPOSITION AND CROSS-MOTION FOR SUMMARY JUDGMENT

For reasons explained in the accompanying memorandum, Plaintiffs oppose Defendants' Motion for Summary Judgment and seek summary judgment against Defendants on Plaintiffs' Administrative Procedure Act (APA) claims. Plaintiffs request that the Court DENY the Defendants' motion, GRANT the Plaintiffs' motion, issue summary judgment in Plaintiffs' favor, and order additional briefing about the appropriate remedies for the Defendants' statutory violations.

In accordance with Local Rule 7.1(c), Plaintiffs have separately provided a proposed order for the Court's review and entry.

Dated: September 12, 2022

Respectfully submitted,

CAIR LEGAL DEFENSE FUND
BY: /s/ Lena Masri
Lena F. Masri (VA 93291)
lmasri@cair.com
Gadeir I. Abbas (VA 81161)*
gabbas@cair.com
Justin M. Sadowsky (VA 73382)
jsadowsky@cair.com
*Attorneys for Plaintiffs*

453 New Jersey Ave., S.E.
Washington, DC 20003
Phone: (202) 742-6420
Fax: (202) 488-0833

*Practice limited to federal matters.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................iii

INTRODUCTION ...........................................................................................................1

RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS..........................1

COUNTERSTATEMENT OF UNDISPUTED MATERIAL FACTS..........................................3

    I.    The No Fly and Selectee Lists...............................................................................3

    II.   The current redress process ...............................................................................6

    III.  The Plaintiffs .......................................................................................................8

STANDARD OF REVIEW ................................................................................................14

ARGUMENT....................................................................................................................15

    I.    The terrorist watch list has never been authorized by Congress and is in excess of the relevant agencies' statutory authority. ..................................................................15

        A.   The major questions doctrine applies because the watch list is an extraordinary assertion of federal agency power. ...................................................................................15

        B.   Congress has not clearly authorized federal agencies to create and maintain the watch list.

    II.   Plaintiffs' placement and continued retention on the watch list is arbitrary and capricious...19

    III.  The current redress process is arbitrary and capricious because it entirely fails to consider an important aspect of Congress's instructions and is not in accordance with law. ............................20

        A.   The redress process does not comply with Congress's command to provide a meaningful opportunity to correct erroneous information..................................................................20

        B.   The current redress process impermissibly distinguishes between individuals on the No Fly List and other individuals on the watch list. ........................................................................21

        C.   The Government's policy arguments do not excuse their disobedience of Congress's commands.............................................................................................................................22

CONCLUSION ................................................................................................................24

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Allentown Mack Sales & Service, Inc. v. NLRB*, 522 U.S. 359 (1998) ............................................. 14

*Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962) ................................................. 14

*Elhady v. Kable*, 391 F. Supp. 3d 562 (E.D. Va. 2019) ........................................................5, 16

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000)) ................................................. 15

*Fikre v. FBI*, 904 F.3d 1033 (9th Cir. 2018) ........................................................................ 23

*Latif v. Holder*, 28 F. Supp. 3d 1134 (D. Or. 2014) ...................................................... 7, 21, 23

*Long v. Pekoske*, 38 F.4th 417 (4th Cir. 2022) ...................................................................... 23

*Michigan v. EPA*, 576 U.S. 743 (2015) ......................................................................... 14, 19

*Midship Pipeline Co. v. FERC*, 45 F.4th __, 2022 WL 3535983 (5th Cir. 2022) ........................ 15, 17

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29 (1983) .......... 14, 19

*Nat'l Fed. of Indep. Bus. v. Dep't of Labor*, 142 S. Ct. 661 (2022) ................................................ 17

*Ring Precision, Inc. v. Jones*, 722 F.3d 711 (5th Cir. 2013) .......................................................... 15

*Sierra Club v. EPA*, 939 F.3d 649 (5th Cir. 2019) .................................................................. 21

*Southwestern Electric Power v. EPA*, 920 F.3d 999 (5th Cir. 2019) .............................................. 14

*Tanzin v. Tanvir*, 141 S. Ct. 486 (2020) ............................................................................. 23

*Tex. Oil & Gas Ass'n v. EPA*, 161 F.3d 923 (5th Cir. 1998) ..................................................... 15

*U.S. Chamber of Commerce v. U.S. Dep't of Labor*, 885 F.3d 360 (5th Cir. 2018) ........................... 14

*Wagafe v. Trump*, 2017 WL 2671254 (W.D. Wa June 21, 2017) ................................................. 6

*West Virginia v. EPA*, 142 S. Ct. 2587 (2022) ................................................................. 15, 17

**Statutes**

10 U.S.C. § 2801(c)(4) ............................................................................................... 5

18 U.S.C. § 2331(1) ....................................................................................................... 5

18 U.S.C. § 2331(5) ....................................................................................................... 5

18 U.S.C. § 2331 ........................................................................................................... 5

49 U.S.C. § 114(d) ....................................................................................................... 17

49 U.S.C. § 114(h)(3) ................................................................................................... 17

49 U.S.C. § 114(h)(3)(A) .............................................................................................. 18

49 U.S.C. § 44903(j)(2)(C)(iii)(I) ......................................................................... *passim*

49 U.S.C. § 44904(a) .................................................................................................. 17

49 U.S.C. § 44926(a) ........................................................................................ 6, 18, 20

49 U.S.C. §§ 44903(j)(2)(C)(ii) ................................................................................... 18

49 U.S.C. 114(f)(3) ..................................................................................................... 17

49 U.S.C. 114(h)(1) .................................................................................................... 18

5 U.S.C. § 706(2)(A) ......................................................................................... 1, 14, 21

5 U.S.C. § 706(2)(C) .................................................................................... 1, 14, 15, 18

# INTRODUCTION

The Administrative Procedure Act protects Americans from governmental overreach by imposing a series of common-sense limitations on federal agency action. Under 5 U.S.C. § 706(2)(C), giving due respect to separation-of-powers principles, agencies may not act "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." Agencies must also engage only in rational decision making, and courts are accordingly instructed to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

The placement of the Plaintiffs—five U.S. citizens who have never been charged, arrested, or convicted of a terrorism offense—on the terrorist watch list violates the APA thrice over.

First, the watch list itself violates the APA because Congress nowhere authorized its creation or maintenance. The Government asserts the extraordinary power to create a federal database containing extensive information about hundreds of thousands of individuals, and to use that information to intrude upon their lives and ability to travel in myriad ways. Unless and until Congress expressly approves such a system, the watch list unlawfully exceeds the relevant agencies' statutory jurisdiction and authority. Second, the Plaintiffs' placement and continued retention on the list is arbitrary and capricious because there is no available evidence supporting the Government's conclusion that they pose a threat to commercial aviation. Third, the Government's current redress process for individuals wrongfully placed on the watch list is also arbitrary and capricious. The process does not provide any meaningful avenue for most individuals on the list to correct erroneous information and, as a result, entirely fails to consider Congress's instructions to do so.

## RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS

26.    FBI, TSC, and TSA have each assessed that disclosure of TSDS status during the redress process—to individuals who have not been denied boarding—would cause

1

harm to national security and law enforcement efforts, and would be detrimental to national security, and that disclosure of any underlying derogatory information would cause additional harm to national security. PAR_332-41 (Orlando Decl. ¶¶ 19-36) (APP_39-48); PAR_321-22 (Groh Decl. ¶¶ 64-67) (APP_31-32); PAR_392-97 (Froemling Decl. ¶¶ 52-60) (APP_81-85). Compelled disclosure of a traveler's TSDS status in these circumstances would have a devastating effect on the usefulness of the TSDS and imperil the effectiveness of critical law enforcement tools used to protect national security. PAR_332-41 (Orlando Decl. ¶¶ 19-36) (APP_39-48).

**RESPONSE:** The underlying declarations cited for the Government's propositions are conclusory and contradicted by the experiences of Plaintiffs and others on the watchlist, who are easily able to discern their watch list status based on the treatment they endure when attempting to fly. Mr. Al-Jame, Mr. Allababidi, Mr. Sbyti, and Ms. Warsame gleaned that they were on the watch list after their travel was disrupted in a variety of ways, including hours-long delays, difficulties printing out boarding passes, being issued boarding passes with "SSSS" printed on them, being repeatedly singled out for extra security screening, and being subjected to private interrogations by federal agents. *See* PAR 445 (Al-Jame DHS TRIP File), 475 (same), 490 (Allababidi DHS TRIP File), 632 (Sbyti DHS TRIP File), 672 (Warsame DHS TRIP File). The declarations include no evidence supporting the bare assertions that disclosure of watch list status to individuals on the watch list would cause the posited harms.

27.  If the Government were forced to disclose TSDS status to those required to undergo enhanced screening, terrorists would know who would be required to undergo additional screening at airports, and could use that information to attempt to evade security measures and gain access to the commercial aviation system to perpetrate an attack. PAR_393-96 (Froemling Decl. ¶¶ 53-59) (APP_82-84). The information could

2

be used to identify the best operatives, to predict the likelihood of detection, and to take countermeasures to attempt to avoid that detection, and could specifically compromise countermeasures such as federal air marshals. *Id.* Moreover, requiring disclosure of whether or not an individual is in the TSDS or the reasons for such inclusion, beyond the limited disclosure contemplated by the process for U.S. persons denied boarding, could jeopardize the integrity and secrecy of ongoing counterterrorism investigative or intelligence activities, and prompt individuals to take countermeasures and evade detection. PAR_332-41 (Orlando Decl. ¶¶ 19-36) (APP_39-48); *see also* PAR_321-22 (Groh Decl. ¶¶ 64-67) (APP_31-32); PAR_392-97 (Froemling Decl. ¶¶ 49-59) (APP_80-84).

**RESPONSE:** The underlying declarations cited for the Government's propositions are conclusory and illogical. As discussed above in Plaintiffs' response to ¶ 26, anyone can discover their watch list status by traveling and observing how they are treated. The declarations include no evidence supporting the bare assertions that disclosure of watch list status to individuals on the watch list would cause the posited harms.

<u>**COUNTERSTATEMENT OF UNDISPUTED MATERIAL FACTS**</u>

**I.      The No Fly and Selectee Lists**

1.      Homeland Security Presidential Directive 6 (HSPD-6), an executive order issued in 2003, instructed the "Attorney General to establish an organization to consolidate the Government's approach to terrorism screening and to provide for the appropriate and lawful use of Terrorist Information in screening processes." Public Administrative Record (PAR) 11 (HSPD-6). The resulting organization, the Terrorist Screening Center (TSC), develops and maintains the federal government's consolidated Terrorism Screening Database (the "watch list"). *See* PAR 18 (HSPD-11).

2.      That consolidated watch list is the federal government's master repository for suspected international and domestic terrorist records used for watch-list-related screening. *See* PAR 2 (Watchlist Overview). The TSC shares the watch list with various "partners," including federal, state, and foreign government agencies and officials, who then use that information in their screening, vetting, credentialing, diplomatic, military, intelligence, law enforcement, visa, immigration, and other security functions. *Id.* at 5.

3.      An individual may be "nominated" to the watch list by a federal government agency based on information from law enforcement, immigration records, homeland security, the intelligence community, and foreign governments. PAR 3-4 (Watchlist Overview), 87 (MOU Terrorist Watchlist Redress Procedures), 309-10 (Groh Decl. ¶¶ 17-19). TSC makes the ultimate decision whether a nominated individual meets the minimum requirements for inclusion on the watch list—specifically, whether it has "reasonable suspicion" that the person is a "known or suspected terrorist." PAR 3 (Watchlist Overview).

4.      According to the Government, reasonable suspicion requires "articulable intelligence or information which, based on the totality of the circumstances and, taken together with rational inferences from those facts, creates a reasonable suspicion that the individual is engaged, has been engaged, or intends to engage, in conduct constituting in preparation for, in aid or in furtherance of, or related to, terrorism and/or terrorist activities." PAR 4 (Watchlist Overview).

5.      TSC selects a subset of individuals from the consolidated watch list for inclusion in the No Fly List and Selectee Lists. Individuals on the No Fly List "are prohibited from boarding flights on U.S. carriers as well as flights into, out of, over or within U.S. airspace," and individuals on the Selectee List "may be subject to additional security screening before being permitted to board an aircraft." PAR 2 (Watchlist Overview). The criteria for inclusion in the No Fly List, which is public, requires the TSC to determine that the individual poses:

(1) a threat of committing an act of international terrorism (as defined in 18 U.S.C. § 2331(1)) or domestic terrorism (as defined in 18 U.S.C. § 2331(5)) with respect to an aircraft (including a threat of piracy, or a threat to airline, passenger, or civil aviation security);

(2) a threat of committing an act of domestic terrorism (as defined in 18 U.S.C. § 2331(5)) with respect to the homeland;

(3) a threat of committing an act of international terrorism (as defined in 18 U.S.C. § 2331) against any U.S. Government facility abroad and associated or supporting personnel, including U.S. embassies, consulates and missions, military installations (as defined by 10 U.S.C. § 2801(c)(4)), U.S. ships, U.S. aircraft, or other auxiliary craft owned or leased by the U.S. Government; or

(4) a threat of engaging in or conducting a violent act of terrorism and who is operationally capable of doing so.

*Id.* at 4. The criteria for inclusion on the Selectee List is not public. *Id.*

6.    The consequences of being placed on the watch list can be life-altering. Most obviously, individuals on the watch list are subjected to enhanced screening procedures or barred from commercial airline travel altogether, turning routine travel into an exhausting and demoralizing ordeal. But the consequences stretch well beyond travel-related harms into countless facets of everyday life. As recent litigation revealed:

> [T]he FBI shares an individual's [watchlist] status with over 18,000 state, local, county, city, university and college, tribal, and federal law enforcement agencies and approximately 533 private entities for law enforcement purposes. These private entities include the police and security forces of private railroads, colleges, universities, hospitals, and prisons, as well as animal welfare organizations; information technology, fingerprint databases, and forensic analysis providers; and private probation and pretrial services. The dissemination of an individual's [watch list] status to these entities would reasonably be expected to affect any interaction an individual on the Watchlist has with law enforcement agencies and private entities that use [watch list] information to screen individuals they encounter in traffic stops, field interviews, house visits, municipal permit processes, firearm purchases, certain licensing applications, and other scenarios.

*Elhady v. Kable*, 391 F. Supp. 3d 562, 580 (E.D. Va. 2019). The federal government also uses watch list data in "visa" and "immigration" contexts, strongly suggesting that watch list placement adversely affects an individual's ability to obtain permanent residency, citizenship, and other statuses. PAR 5 (Watchlist Overview); *cf. Wagafe v. Trump*, 2017 WL 2671254, at *1 (W.D. Wa June 21, 2017)

(unreported) (describing allegations that federal immigration authorities unlawfully use vague and overbroad criteria to deny immigration applications).

## II.     The current redress process

7.      In 2007, Congress directed the Secretary of Homeland Security to "establish a timely and fair process for individuals who believe they have been delayed or prohibited from boarding a commercial aircraft because they were wrongly identified as a threat" under the regimes used by TSA, U.S. Customs and Border Protection (CBP), or any other office or component of the Department of Homeland Security (DHS). 49 U.S.C. § 44926(a); *see* PAR 360-61 (Moore Decl. ¶¶ 3-5).

8.      Congress also required the Administrator of TSA to "establish a procedure to enable airline passengers, who are delayed or prohibited from boarding a flight because the advanced passenger prescreening system determined that they might pose a security threat, to appeal such determination and correct information contained in the system." 49 U.S.C. § 44903(j)(2)(C)(iii)(I); *see also id.* § 44903(j)(2)(G)(i) (mandating the creation of "a timely and fair process for individuals identified as a threat … to appeal to the Transportation Security Administration the determination and correct any erroneous information").

9.      The Department of Homeland Security's Traveler Redress Inquiry Program (DHS TRIP) is the Government's effort to comply with that statutory mandate. An individual who is apparently placed on the watch list has only one avenue for redress: They must complete a standard form and submit it to DHS TRIP, which is then processed by the TSC Redress Office. PAR 7 (Watchlist Overview). The Redress Office reviews the request and determines whether the requester is an exact or near match to the watch list. *Id.* at 7-8. If so, the Redress Office reviews "the available information … includ[ing] any information submitted by the traveler" to determine whether the individual "should remain in the [watch list], be modified, or be removed." *Id.* at 8. DHS TRIP then

sends a determination letter with the results of their redress inquiry, but does not disclose whether the individual was, or is, included in the watchlist. *Id.* at 9.

10. Until 2014, that DHS TRIP process applied to all individuals who believed that they had been placed on the watch list or one of its subsets, including the No Fly List and the Selectee List. But in *Latif v. Holder*, 28 F. Supp. 3d 1134 (D. Or. 2014), the process was held to be unconstitutional as applied to individuals placed on the No Fly List. The court explained that, where the plaintiffs "were not given any notice of the reasons for their placement on the No-Fly List nor any evidence to support their inclusion on the No-Fly List," they lacked "any meaningful procedures … to contest their placement on the No-Fly List" in violation of the Due Process Clause and the Administrative Procedure Act (APA). *Id.* at 1161, 1163.

11. The *Latif* court ordered the Government to provide the plaintiffs "with notice regarding their status on the No Fly List and the reasons for placement on that List," which was "reasonably calculated to permit each Plaintiff to submit evidence relevant for their respective inclusions on the No-Fly List," subject to a "case-by-case" determination of whether "such disclosures [should] be limited or withheld altogether because any such disclosure would create an undue risk to national security." *Latif*, 28 F. Supp. 3d at 1162.

12. In response to the *Latif* decision, the Government revised the DHS TRIP procedures for U.S. citizens and lawful permanent residents who are on the No Fly List. PAR 9 n.6 (Watchlist Overview); *see also* PAR 365 (Moore Decl. ¶ 17); PAR 393 n.33 (Froemling Decl. ¶ 52).

13. Now, U.S. citizens and lawful permanent residents who are on the No Fly List and apply for redress "may be apprised of their status" and "will be provided an opportunity to request and receive additional information regarding their status," including, "where possible," "an unclassified summary of information supporting the individual's No Fly List status." PAR 9 (Watchlist Overview). The requesters "are then provided an opportunity to submit any information that they

consider potentially relevant to their status on the No Fly List," which TSC considers when determining whether the individual should remain on the List. *Id.* Those additional procedures are not extended to individuals on the Selectee List. *See* PAR 321 (MOU Between TSC and OPIC ¶ 65).

### III.   The Plaintiffs

14.    Plaintiffs are U.S. citizens who have never been charged, arrested, or convicted of a terrorism-related offense. They each flew for years without incident. Nevertheless, their lives were turned upside-down by their placements on the watch list.

15.    **Adis Kovac** is an American citizen. In 2014, Mr. Kovac booked a flight to Turkey, his country of birth, to visit his family for the first time since his arrival in the United States in 1996. PAR 566, 577 (Kovac DHS TRIP File). After passing through TSA security, Mr. Kovac was stopped by TSA agents at the gate, who asked to see his identification and boarding pass. The agents escorted Mr. Kovac to retrieve his luggage, which had been removed from the plane, and questioned him for "three or four hours," causing him to miss his flight. *Id.* at 577.

16.    Mr. Kovac rebooked his flight for the next day but, again, after he passed through security, he was barred from boarding the plane. PAR 577 (Kovac DHS TRIP File). This time, agents confiscated Mr. Kovac's cell phone, escorted him to baggage claim, searched his luggage and questioned him for "one or two hours." *Id.* Mr. Kovac rebooked his flight yet again, but "this time [he] was not allowed to get a boarding pass" and was finally "instructed that [he] was not allowed to travel by plane." *Id.*

17.    Similarly, in 2017, Mr. Kovac booked a flight from Chicago, Illinois to Newark, New Jersey, but was not allowed to receive a boarding pass when he arrived at the airport. PAR 577 (Kovac DHS TRIP File).

18.    Mr. Kovac submitted a DHS TRIP redress request in December 2017, PAR 591 (Kovac DHS TRIP File), and received official confirmation that he had been placed on the No Fly

List a few months later, *id.* at 603. In response, Mr. Kovac requested additional information about his placement on the No Fly List. *Id.* at 610.

19.      On July 18, 2019, Mr. Kovac received a bare-bones letter from DHS informing him, without elaboration, that "after further review of your inquiry, we have determined that you no longer satisfy the criteria for placement on the No Fly List." PAR 624 (Kovac DHS TRIP File). According to the letter, the Government "removed [Mr. Kovac] from the No Fly List" and he "will not be placed back on the No Fly List based on currently available information." *Id.* Mr. Kovac received no information about why he was placed on the No Fly List in the first place, and no confirmation or denial regarding whether he has been placed instead on a different list, like the Selectee List.

20.      **Bashar Al-Jame** is an American citizen. In 2013, Mr. Al-Jame made plans to return to the United States "to settle down with [his] family in San Diego, [California]." PAR 427 (Al-Jame DHS TRIP File). He booked a flight from Amman, Jordan to San Diego via Chicago. *Id.* at 445. But at the airport, Mr. Al-Jame was "shocked to be informed by the airline ticketing agent" that he would be denied boarding. *Id.* The agent instructed Mr. Al-Jame to reach out to the American embassy in Amman to determine why he was denied boarding. *Id.*

21.      At the embassy, Mr. Al-Jame was referred to a "Mr. Kevin," who described himself as an FBI agent. PAR 445 (Al-Jame DHS TRIP File). Mr. Kevin and Mr. Al-Jame spoke "in person and over the phone" "[f]or about two weeks," and Mr. Kevin asked Mr. Al-Jame "about all aspects of [Mr. Al-Jame's] life," including his travel and employment history. *Id.* at 445-46. No answers to Mr. Al-Jame's questions about his denial of boarding were forthcoming: Mr. Al-Jame asked Mr. Kevin "many times what I am accused of and he would reply, you tell me." *Id.* at 445. Mr. Al-Jame expressed willingness to take a lie detector test but, after promising to arrange the test, Mr. Kevin stopped contacting Mr. Al-Jame. *Id.* at 446.

22.    Continuing to seek an explanation, Mr. Al-Jame submitted a DHS TRIP redress request in July 2014. PAR 420 (Al-Jame DHS TRIP File). He received a boilerplate response. In relevant part, the letter read:

> DHS has researched and completed our review of your case. DHS TRIP can neither confirm nor deny any information about you which may be within federal watchlists or reveal any law enforcement sensitive information. However, we have made any corrections to records that our inquiries determined were necessary, including, as appropriate, notations that may assist in avoiding incidents of misidentification.

*Id.* at 449.

23.    In 2016, Mr. Al-Jame attempted to fly from Dallas, Texas to Amman, Jordan. PAR 475 (Al-Jame DHS TRIP File). At Dallas Fort Worth airport, Mr. Al-Jame was subjected to a humiliating ordeal before being allowed to board his flight: He was given a boarding pass with SSSS printed on it, picked out of a crowded security line "and asked to take off [his] shoes, [his] belt, and empty everything … right in front of everyone," subjected to a full body search and other screening, and his "carry-on bag was searched extensively and swa[bb]ed." *Id.*

24.    Mr. Al-Jame's ordeal was not over once he reached the gate—he "went through all the way to the airplane door [and was] then escor[t]ed b[ac]k against the wave of people to the TSA table inside the gate," where his "carry-on was checked and swa[bb]ed again one more time." PAR 475 (Al-Jame DHS TRIP File).

25.    When Mr. Al-Jame returned to Dallas, he was "escorted by two TSA officers who were expecting [him]" to an interrogation room, where he "had to empty [his] pockets like [he] was guilty of something." PAR 475 (Al-Jame DHS TRIP Request). One of the officers searched Mr. Al-Jame's carry-on bag, took his identification and credit cards, and "interrogated [him] about [his] trip [and] a history of [his] life." *Id.* Although Mr. Al-Jame answered the officer's questions to the best of his ability, "neither of [the] TSA officers gave [him] any reason" for his screening and interrogation. *Id.*

26.     Mr. Al-Jame has been consistently subjected to similarly onerous screening, searches, and interrogations in the years since that incident in Dallas. PAR 475 (Al-Jame DHS TRIP File). He submitted a DHS TRIP redress request in May 2016. *Id.* at 455. By way of (non)-explanation, he has received only the familiar neither-confirm-nor-deny boilerplate:

> DHS has researched and completed our review of your case. DHS TRIP can neither confirm nor deny any information about you which may be within federal watchlists or reveal any law enforcement sensitive information. However, we have made any corrections to records that our inquiries determined were necessary, including, as appropriate, notations that may assist in avoiding incidents of misidentification.

*Id.* at 481.

27.     **Suhai Allababidi** is an American citizen. In 2017, Mr. Allababidi planned a one-week summer vacation to Cancun, Mexico with his wife and five children. PAR 490 (Allababidi DHS TRIP File). When the family arrived at Dallas Fort Worth airport, Mr. Allababidi was not able to print out his boarding pass at a kiosk. *Id.* When he spoke with a ticketing agent, "[s]he spent at least 1 hour trying to print out" the boarding pass before calling Customs and Border Patrol (CBP) to request that the agency "release [the] [re]strictions" on printing out the boarding pass. *Id.*

28.     Mr. Allababidi's boarding pass—like those of his wife and his five children, including an infant—included an SSSS designation. PAR 490 (Allababidi DHS TRIP File). The family suffered through an arduous TSA security screening process, which took at least an hour and involved "going through every single item" of carry-on luggage. *Id.* The family eventually missed their flight due to the delay and, in attempting to rebook their tickets, went through "the whole process over the phone all over again." *Id.*

29.     At the conclusion of their vacation, the family "arrived at the [Cancun] airport [at] 3am," three hours before their 6am flight back to Texas. PAR 490 (Allababidi DHS TRIP File). Mr. Allababidi "wanted to make sure [he] had enough time for clearance," anticipating an ordeal similar to that which he endured on his way to Mexico. *Id.*

11

30.     Sure enough, it took the ticketing agent over an hour to get clearance from CBP to print his boarding pass, because "no one answered" her calls. PAR 490 (Allababidi DHS TRIP File). When someone finally answered, Mr. Allababidi was informed that he could send his wife and kids ahead of him through security, but he "had to keep one of [his] kids with [him]," because the child was so young that he was flying on Mr. Allababidi's lap. *Id.*

31.     Thirty minutes before his flight's departure, Mr. Allababidi was issued his boarding pass, and was able to board his flight. PAR 490 (Allababidi DHS TRIP File). When he arrived in the United States, Mr. Allababidi and his family "had to go through [a] secondary interview," in which "agents asked [him] a bunch of questions like usual" and "went through [their] bags, one piece at a time." *Id.*

32.     Mr. Allababidi's experiences have made him "hate traveling." PAR 490 (Allababidi DHS TRIP File). In his own words, "I am all for securing my country and [ensuring] my safety and [the] safety of others as well. I understand extra screening might be a good thing"—but he does not understand why he has been subjected to repeated delays, interviews, and extra screening when he attempts to fly. *Id.* He has offered to provide the Government with any information it might find helpful: "If there is any way I can help I would be more than happy to do so." *Id.* He "has been cooperative with government agents to the best of his ability, and has met with the FBI on more than one occasion." *Id.* at 550.

33.     But in response to his DHS TRIP redress requests, filed in August 2017 and August 2020, Mr. Allababidi received the same unilluminating response as Mr. Kovac and Mr. Al-Jame:

> DHS has researched and completed our review of your case. DHS TRIP can neither confirm nor deny any information about you which may be within federal watchlists or reveal any law enforcement sensitive information. However, we have made any corrections to records that our inquiries determined were necessary, including, as appropriate, notations that may assist in avoiding incidents of misidentification.

PAR 514, 557 (Allababidi DHS TRIP File).

34.    **Abraham Sbyti** is an American citizen. In February 2015, he flew from Dallas, Texas to Lebanon through Heathrow Airport in London. PAR 632 (Sbyti DHS TRIP File). He endured a variety of extra screening procedures on his journey to and from Lebanon, including extra searches and questioning by law enforcement. *Id.* Two weeks later, he was singled out for similar treatment in traveling to Punta Cana, Mexico with his wife. *Id.*

35.    As he explained in his DHS TRIP redress request filed in March 2015, Mr. Sbyti is "a proud, [l]aw abiding citizen" who "takes the safety and security of this country very seriously." PAR 632 (Sbyti DHS TRIP File). "[He] worked hard and pay[s] [his] taxes on time," and finds "it unfair to be subjected to such treatment every time [he] go[es] to visit [his] family or have a vacation." *Id.* Mr. Sbyti hoped that "this matter [could] be resolved in a timely and positive fashion." *Id.*

36.    But, unfortunately, he received only a now-familiar non-answer from the Government in response to his redress request:

> DHS has researched and completed our review of your case. DHS TRIP can neither confirm nor deny any information about you which may be within federal watchlists or reveal any law enforcement sensitive information. However, we have made any corrections to records that our inquiries determined were necessary, including, as appropriate, notations that may assist in avoiding incidents of misidentification.

PAR 663 (Sbyti DHS TRIP File).

37.    **Faduma Mohamed Warsame** is an American citizen. In December 2016, she missed her flight from Chicago, Illinois to Minneapolis, Minnesota "because of extra screening and inability to print [her] boarding pass before [she] had arrived at the airport or at a kiosk." PAR 672 (Warsame DHS TRIP File). On her way back to Chicago, she was again unable to print her boarding pass herself and was subjected to extra screening. *Id.* Ms. Warsame experienced similar restrictions "at least 4 more times between March 2015 and July 2016." *Id.*

38.    In response to her DHS TRIP redress request filed in January 2017, Ms. Warsame received the same response as the other plaintiffs:

DHS has researched and completed our review of your case. DHS TRIP can neither confirm nor deny any information about you which may be within federal watchlists or reveal any law enforcement sensitive information. However, we have made any corrections to records that our inquiries determined were necessary, including, as appropriate, notations that may assist in avoiding incidents of misidentification.

PAR 688 (Warsame DHS TRIP File).

## STANDARD OF REVIEW

The APA requires federal agency action to stay within the confines of Congress's dictates, instructing courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). Federal agencies "are required to engage in 'reasoned decision-making.'" *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (quoting *Allentown Mack Sales & Service, Inc. v. NLRB*, 522 U.S. 359, 374 (1998)). Accordingly, the APA also requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Arbitrary and capricious review is "narrow" and "a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29 (1983). The arbitrary and capricious standard is "not toothless, however." *Southwestern Electric Power v. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019). To pass muster, the agency's process must be "logical and rational." *Michigan*, 576 U.S. at 750 (quoting *State Farm*, 463 U.S. at 43); *see also U.S. Chamber of Commerce v. U.S. Dep't of Labor*, 885 F.3d 360, 382 (5th Cir. 2018). The agency must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). And an agency's action is unlawful where it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible

that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*; *see also Tex. Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 933 (5th Cir. 1998); *10 Ring Precision, Inc. v. Jones*, 722 F.3d 711, 723 (5th Cir. 2013).

## ARGUMENT

I.   **The terrorist watch list has never been authorized by Congress and is in excess of the relevant agencies' statutory authority.**

"Agencies have only those powers given to them by Congress." *Midship Pipeline Co. v. FERC*, 45 F.4th __, 2022 WL 3535983, at *5 (5th Cir. 2022). Under the major questions doctrine, it is not always enough that an agency asserts regulatory authority with "a colorable textual basis." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022). In "extraordinary cases" where "the 'history and breadth of the authority that the agency has asserted,' and the 'economic and political significance' of that assertion, provide a 'reason to hesitate before concluding that Congress' meant to confer such authority," *id.* at 2608 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)), the Government must identify "clear congressional authorization for the power it claims," *id.* at 2609 (citing *Utility Air Reg. Grp. v. EPA*, 573 U.S. 302, 324 (2014)).

Here, the major questions doctrine applies because the Government claims extraordinary, far-reaching authority in creating and administering the watch list. No clear statutory authorization for that power exists, so this Court should hold the watch list to exceed the relevant agencies' statutory authority. And even if the major questions doctrine does not apply, the dearth of statutory authorization dooms the watch list under a straightforward application of 5 U.S.C. § 706(2)(C).

### A.  **The major questions doctrine applies because the watch list is an extraordinary assertion of federal agency power.**

The remarkable breadth of the power claimed by the Government renders this case extraordinary. The Government asserts the ability to create a federal terror watch list that now includes hundreds of thousands of individuals, ensnaring them in an invisible web of consequences that are

15

imposed indefinitely and without recourse. Specifically, the Government claims that it may compile "biographic and biometric identifying information (e.g., name, date of birth, photographs, iris scans, and/or fingerprints) of known and suspected terrorists," PAR 2 (Watchlist Overview), many of whom are included in the database based only on a prospective determination that the individual may, in the future, "engage[]" or "intend[] to engage" in terrorism, *id.* at 4. The Government then uses that information to deny some individuals boarding on commercial flights and subject others to extensive security screening, even when those individuals cannot legally be arrested, detained, or otherwise restricted in their movements or conduct. *See Mohamed v. Holder*, No. 1:11-cv-50, Dkt. 70 at 19 (E.D. Va. January 17, 2018) (attached as Ex. 4 to Complaint, Dkt. 1). The Government may also subject those individuals to adverse immigration consequences, *see supra* ¶ 6, PAR 5 (Watchlist Overview), and distributes watch list information to thousands of law-enforcement and private entities, where it impacts "traffic stops, field interviews, house visits, municipal permit processes, firearm purchases, certain licensing applications, and other scenarios." *Elhady v. Kable*, 391 F. Supp. 3d 562, 580 (E.D. Va. 2019).

The Supreme Court has confronted several examples of agency action deemed to be "extraordinary cases" that demanded clear congressional authorization. None were as far-reaching or intrusive as the watch list. In *Brown & Williamson*, for example, FDA claimed that its authority over "drugs" and "devices" included the power to regulate tobacco products. *See* 529 U.S. at 126-27. Similarly, in *Utility Air Regulatory Group*, the EPA construed the term "air pollutant" in a specific provision of the Clean Air Act to cover greenhouse gases, effectively giving it "permitting authority over millions of small sources, such as hotels and office buildings." *West Virginia*, 142 S. Ct. at 2608 (citing *Utility Air Reg. Grp.*, 573 U.S. at 310, 324). And in *West Virginia*, the EPA claimed the power to "substantially restructure the American energy market" based upon Section 111(d) of the Clean Air Act, an obscure and little-used provision of the law. 142 S. Ct. at 2610.

16

Here, the Government does not claim the authority to regulate economic actors like hotels, office buildings, tobacco companies, or coal plants. Rather, it goes even further, and asserts power to intrude directly into the lives of hundreds of thousands of individuals, without notice or, in most cases, any explanation at all. That "is a claim of power to resolve a question of vast national significance" and is valid only if Congress clearly authorized it. *Nat'l Fed. of Indep. Bus. v. Dep't of Labor*, 142 S. Ct. 661, 667 (2022) (per curiam) (Gorsuch, J., concurring).

> **B.  Congress has not clearly authorized federal agencies to create and maintain the watch list.**

"Congress has nowhere clearly assigned so much power" to any federal agency. *Nat'l Fed. of Indep. Bus.*, 142 S. Ct. at 667 (Gorscuh, J., concurring). Tellingly, the Government identifies an executive order—not a federal statute—as the basis for its legal authority to create and administer the watch list. *See, e.g.*, PAR 81 (MOU Terrorist Watchlist Redress Procedures). But Homeland Security Presidential Directive 6 (HSPD-6) is not "a valid grant of authority from Congress," *Brown & Williamson*, 529 U.S. at 161, and does not bestow on the Government the authority to create an extralegal watch list without congressional authorization.

The Government may attempt to justify the watch list by pointing to general, wide-ranging grants of statutory authority to the federal agencies. For example, Congress charged TSA with overall responsibility for airline security, 49 U.S.C. § 114(d), and instructed TSA to work with the FBI to jointly "assess current and potential threats to the domestic air transportation system," and "decide on and carry out the most effective method for continuous analysis and monitoring of security threats to that system," 49 U.S.C. § 44904(a). Congress also mandated that TSA "develop policies, strategies, and plans for dealing with threats to transportation security," 49 U.S.C. 114(f)(3), and work with and use information from other government agencies, 49 U.S.C. § 114(h)(3). But "enabling legislation is generally not an open book to which the agency may add pages and change the plot line." *Midship Pipeline Co.*, 2022 WL 3535983, at *5 (quoting *West Virginia*, 142 S. Ct. 2609) (cleaned up). That

17

statutory language is a far cry from "clear congressional authorization" to collect identifying information about hundreds of thousands of people and then use that information to encroach upon their ability to access commercial flights, obtain visas, apply for municipal permits, purchase a firearm, and otherwise conduct their lives as law-abiding citizens. *See Utility Air*, 573 U.S. at 324.

Nor do Congress's more specific watch-list-adjacent directions provide the Government any help. In a few provisions of the U.S. Code, Congress provides instructions to TSA and other agencies about the use of "data on individuals identified on Federal agency databases who may pose a risk to transportation or national security." 49 U.S.C. 114(h)(1); *see also, e.g.*, 49 U.S.C. § 114(h)(3)(A) (requiring TSA to "establish policies and procedures requiring air carriers to use information from government agencies to identify individuals on passenger lists who may be a threat to civil aviation or national security"). Congress also directly ordered the creation of the DHS TRIP system. *See* 49 U.S.C. §§ 44903(j)(2)(C)(ii), 44903(j)(2)(C)(iii)(I), § 44903(j)(2)(G)(i); *see also* 49 U.S.C. § 44926(a). But those ancillary statutory directions—about how to use watch list data and address complaints about wrongful placements—are not adequate to show that Congress authorized the watch list's creation and maintenance in the first place. Unless and until Congress expressly authorizes the Terrorist Screening Center and the terrorist watch list, the Government's actions in creating and maintaining them are "in excess of statutory jurisdiction, authority, or limitations" and must be held unlawful by this Court. 5 U.S.C. § 706(2)(C).

* * *

As a final note, even if the major questions doctrine does not apply, the dearth of statutory authorization for the watch list runs afoul of 5 U.S.C. § 706(2)(C). Under either the major questions doctrine or a straightforward application of the command that this Court set aside any agency action "in excess of statutory jurisdiction [or] authority," the Government's creation and maintenance of the watch list is unlawful. *Id.*

## II.   Plaintiffs' placement and continued retention on the watch list is arbitrary and capricious.

To withstand an APA challenge, Plaintiffs' placement and retention on the watch list or one of its subsets must be "logical and rational," *Michigan*, 576 U.S. at 750 (quoting *State Farm*, 463 U.S. at 43), and the Government must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made,'" *State Farm*, 463 U.S. at 43. The Government relies on *ex parte* material filed *in camera* to argue that, if the Plaintiffs were placed on the watch list or one of its subsets, "any such placements were supported by evidence meeting the relevant inclusion criteria at the relevant point in time." Dkt. 90 at 16 (Govt Motion for SJ). As such, Plaintiffs, in challenging their apparent placements and retentions on the Selectee List, are fighting with one hand tied behind their backs. They do not have access to the standards that dictate which individuals are placed on the watch list or the Selectee List. *See* PAR 4 (Watchlist Overview), 406-07 (Froemling Decl., Ex. A, Final Order on Selective Security Information). Nor is there any official public confirmation or denial of Plaintiffs' placement on the watch list or Selectee List. And the Government's reasons for placing them and keeping them there are not public. *See* Dkt. 90 at 15-16 (Govt Motion for SJ).

Without any available explanation of the Government's behavior, Plaintiffs—American citizens who have never been charged, arrested, or convicted of any terrorism-related offense—are baffled by their possible inclusions on the Selectee List. Mr. Sbyti, for example, explained in his DHS TRIP redress request that he is "a proud, [l]aw abiding citizen, that takes the safety and security of this country very seriously," "work[s] hard and pay[s] [his] taxes on time," and "never had any problems with the law." PAR 632 (Sbyti DHS TRIP File). The Plaintiffs' attempts to understand and address the Government's concerns have been for naught. Mr. Al-Jame was repeatedly interviewed by a self-described FBI agent who "asked [him] about all aspects of [his] life," but he does not know what "the FBI agent was looking for." PAR 445 (Al-Jame DHS TRIP File). Similarly, Mr. Allababidi expressed

in his DHS TRIP redress request that he would be "more than happy to" help resolve any confusion in "any way," but, like the other Plaintiffs, has never been given an opportunity to refute any relevant allegations against him. PAR 490 (Allababidi DHS TRIP File). Plaintiffs are unaware of any reasonable basis for the Government to place them on the watch list, thereby systematically subjecting them to enhanced screening procedures, interviews by federal agents, and other humiliating ordeals whenever they attempt to board a commercial airplane—as well as the wide-ranging variety of non-travel related consequences described above.

### III. The current redress process is arbitrary and capricious because it entirely fails to consider an important aspect of Congress's instructions and is not in accordance with law.

#### A. The redress process does not comply with Congress's command to provide a meaningful opportunity to correct erroneous information.

The DHS TRIP redress process is the Government's attempt to implement Congress's command that airline passengers who are "delayed or prohibited from boarding a commercial aircraft" be provided with a "timely and fair process" to address and remedy wrongful placements on the watch list or one of its subsets. *See* 49 U.S.C. § 44926(a). More specifically, Congress instructed the Administrator of TSA to "establish a procedure to enable airline passengers, who are delayed or prohibited from boarding a flight because the advanced passenger prescreening system determined that they might pose a security threat, to appeal such determination and **correct information contained in the system**." 49 U.S.C. § 44903(j)(2)(C)(iii)(I) (emphasis added); *see also id.* § 44903(j)(2)(G)(i) (emphasis added) (mandating the creation of "a timely and fair process for individuals identified as a threat … to appeal to the Transportation Security Administration the determination and **correct any erroneous information**") (emphasis added).

As applied to individuals like the Plaintiffs, who have apparently been placed on the Selectee List, the DHS TRIP redress process is arbitrary and capricious because it "entirely fail[s] to consider an important aspect of the problem," *Sierra Club v. EPA*, 939 F.3d 649, 663 (5th Cir. 2019), and is

"not in accordance with law," 5 U.S.C. § 706(2)(A). Congress instructed that the Government provide airline passengers with a meaningful opportunity to correct erroneous information in the Government's terrorism databases. *Cf. Latif*, 28 F. Supp. 3d at 1162-63. And in order for an individual to correct erroneous information, they need to know what information is in the databases in the first place. "A traveler who has not been given any indication of the information that may be in the record does not have any way to correct that information." *Id.* at 1163. By the Government's own admission, it provides individuals on the Selectee List no information at all about the basis for their placement and retention on the List. *See* PAR 7-9 (Watchlist Overview) (describing the DHS TRIP redress process); *id.* at 321-22 (Groh Decl. ¶¶ 65-66) (discussing the Government's decision not to confirm or deny an individual's watch list status); *id.* at 449, 481, 514, 557, 663, 688 (form letters Plaintiffs received in response to their DHS TRIP redress requests). Because the Government refuses to provide Plaintiffs with **any** information about their apparent inclusion on the Selectee List—let alone information sufficient to meaningfully "correct information contained in the system"—the current DHS TRIP redress regime entirely fails to consider Congress's command and is not in accordance with the relevant statutory provisions. *See* 49 U.S.C. § 44903(j)(2)(C)(iii)(I); *see also id.* § 44903(j)(2)(G)(i).

> **B. The current redress process impermissibly distinguishes between individuals on the No Fly List and other individuals on the watch list.**

Congress did not distinguish between individuals placed on the No Fly List and individuals placed on the Selectee List, other subsets of the watch list, or the watch list generally. Rather, it instructed the Government to provide a meaningful appeal process to all "airline passengers, who are delayed or prohibited from boarding a flight because the advanced passenger prescreening system determined that they might pose a security threat." 49 U.S.C. § 44903(j)(2)(C)(iii)(I); *see also id.* § 44903(j)(2)(G)(i) ("individuals identified as a threat"). But the Government provides only a small subset of those airline passengers—namely, U.S. citizens and lawful permanent residents on the No

Fly List—with any information about their placement on the list. Upon submitting a redress request, those travelers (and only those travelers) "may be apprised of his or her status on the list," "will be provided an opportunity to request and receive additional information regarding their status" including "where possible when national security and law enforcement interests at stake are taken into account, an unclassified summary of information supporting the individual's No Fly List status." PAR 9 (Watchlist Overview).

Plaintiffs do not concede that the Government has satisfied its obligation to provide individuals on the No Fly List with a meaningful opportunity to correct any erroneous information in the terrorist database. But, as relevant to the Plaintiffs' APA challenge currently before this Court, the Government's special treatment of U.S. citizens and lawful permanent residents on the No Fly List highlights the illegality of its refusal to provide other affected passengers with any information at all. Congress mandated the creation of a redress process that provides every airline passenger who is "delayed or prohibited from boarding a flight because the advanced passenger prescreening system determined that they might pose a security threat" with a meaningful opportunity "to appeal such determination and correct information contained in the system." 49 U.S.C. § 44903(j)(2)(C)(iii)(I). The Government's refusal to do so transgresses Congress's command and violates the APA.

### C. The Government's policy arguments do not excuse their disobedience of Congress's commands.

The Government offers a variety of explanations for its refusal to provide Plaintiffs and other similarly-situated individuals with a meaningful opportunity to correct erroneous information contained in the terrorist database. None justify its disregard for Congress's instructions.

The Government avers that, in its view, the existing DHS TRIP process "adequately protects individuals from erroneous listings on the [watch list]" because "the private interests affected by alleged [watch list] placement are limited … while the Government's interest in prevention of catastrophic terrorist attacks is extraordinary." Dkt. 90 at 20 (Govt Motion for SJ). The Government

also notes that "[i]nclusion in the [watch list] is subject to multiple levels of review"—all of which are internal to the Government, without participation by the individual placed on the watch list—and that travelers may seek redress through the DHS TRIP process. *Id.* at 20-21. In describing the current contours of the redress process, however, the Government does not (and cannot) explain how it complies with Congress's mandate to provide affected travelers with a meaningful opportunity to correct erroneous information in the terrorist database. Where the Government is blatantly disobeying a clear statutory command, it is irrelevant that it believes that the DHS TRIP process effectively balances competing policy goals. *Cf. Latif*, 28 F. Supp. 3d at 1163.

In any case, the Government's policy argument casts DHS TRIP and the watch list in far too flattering a light. The FBI uses the watch list to recruit informants, not protect airplanes. *See Tanzin v. Tanvir*, 141 S. Ct. 486, 489 (2020). And the Government places people on the watch list and removes them, even outside of the DHS TRIP process, whenever the Government finds it beneficial to their litigation strategy. *See, e.g.*, *Fikre v. FBI*, 904 F.3d 1033 (9th Cir. 2018); *Long v. Pekoske*, 38 F.4th 417 (4th Cir. 2022).

Trying a different tack, the Government protests that "any additional procedural requirements would pose an enormous administrative and fiscal burden on the affected agencies," and estimates that "if the revised redress procedures for U.S. persons on the No Fly List were applied to U.S. persons who receive enhanced screening as a result of [watch list] status, DHS TRIP estimates that its workload for revised redress cases would increase by more than 1400 cases." Dkt. 90 at 21 (Govt Motion for SJ). The Government cites no authority for the proposition that, if complying with Congress's command is too inconvenient or labor-intensive, the Government may simply refuse to do so. Nor does the Government point to anything in the statute that contemplates treating U.S. citizens and lawful permanent residents on the No Fly List differently than any other individual placed on the watch list. And the Government does not even attempt to explain how the current redress

procedures provide all passengers who are "delayed or prohibited from boarding a flight because the advanced passenger prescreening system determined that they might pose a security threat" with a meaningful opportunity "to appeal such determination and correct information contained in the system." 49 U.S.C. § 44903(j)(2)(C)(iii)(I). The Government is welcome to attempt to convince Congress that "[n]one of the[] administrative and fiscal burdens" associated with fully complying with 49 U.S.C. § 44903(j)(2)(C)(iii)(I) "are warranted," but unless and until Congress amends the statute accordingly, the Government must comply with the law.

The Government also halfheartedly notes that "[a]dditional challenges are posed by the fact that status in certain [watch list] subsets constitutes SSI [Sensitive Security Information]." Dkt. 90 at 21 (Govt Motion for SJ). But the Government's approach to designating an individual's watch list status as SSI merely reflects the illegalities discussed above. In general, the Government deems an individual's watch list status to be SSI—but "No Fly List status is not SSI" when "a U.S. citizen or lawful permanent resident who is denied boarding" submits a redress request. PAR 393 n.33 (Froemling Decl. ¶ 52). The Government cannot justify distinguishing between subcategories of people placed on the watch list by pointing to SSI designations that deliberately track that arbitrary distinction.[1]

## **CONCLUSION**

This Court should deny Defendants' motion, grant Plaintiffs' motion, issue summary judgment in Plaintiffs' favor, and order additional briefing about the appropriate remedies for the Defendants' statutory violations.

---

[1] In any event, Plaintiffs' counsel have SSI clearance.

Dated: September 12, 2022

Respectfully submitted,

CAIR LEGAL DEFENSE FUND
BY: /s/ Lena Masri
Lena F. Masri (VA 93291)
lmasri@cair.com
Gadeir I. Abbas (VA 81161)*
gabbas@cair.com
Justin M. Sadowsky (VA 73382)
jsadowsky@cair.com

453 New Jersey Ave., S.E.
Washington, D.C. 20003
Phone: (202) 742-6420
Fax: (202) 488-0833

*Practice limited to federal matters.
Attorney for Plaintiffs