UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| ADIS KOVAC, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>CHRISTOPHER WRAY, *et al.*,<br><br>*Defendants*. | Case No. 3:18-cv-110-X |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................... 1

STANDARD OF REVIEW AND RESPONSE TO PLAINTIFFS' DISPUTED FACTS AND COUNTERSTATEMENT OF FACTS ....................................................................................... 2

ARGUMENT ............................................................................................................................. 2

I.   Plaintiffs May Not Re-Raise Statutory Ultra Vires Claims that this Court Has Already Rejected, and Which Form No Part of the APA Claim at Issue. ............................................. 2

II.  The Major Questions Doctrine Does Not Apply, and Regardless, the Government's Terrorist Watchlist Policies are Amply Authorized. ................................................................ 4

III. The Court Should Enter Summary Judgement for Defendants as to the Substantive – or Alleged "Placement" – Component of Plaintiffs' APA Claim. ................................................. 7

IV.  The Court Should Enter Summary Judgment for Defendants as to the Procedural Component of Plaintiffs' APA Claim. ..................................................................................... 7

CONCLUSION ........................................................................................................................ 13

## **TABLE OF AUTHORITIES**

**Supreme Court Opinions**

*Alabama Ass'n of Realtors v. HHS*,
    141 S. Ct. 2485 (2021) (per curiam) ............................................................................... 5

*Am. Bioscience, Inc. v. Thompson*,
    269 F.3d 1077 (D.C. Cir. 2001) ...................................................................................... 2

*Ardmore Consulting Grp., Inc. v. Contreras-Sweet*,
    118 F. Supp. 3d 388 (D.D.C. 2015) ............................................................................... 2

*Arizona v. California*,
    460 U.S. 605, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983) ................................................. 3

*Bassiouni v. CIA*,
    392 F.3d 244 (7th Cir. 2004) ........................................................................................ 11

*Blitz v. Napolitano*,
    700 F.3d 733 (4th Cir. 2012) ........................................................................................ 11

*Edokpayi v. Garland,*
    No. 3:19-CV-01242-X, 2021 WL 3144839 (N.D. Tex. July 26, 2021) ......................... 2

*El Ali v. Barr*,
    473 F. Supp. 3d 479 (D. Md. 2020) ........................................................................... 4, 7

*Elhady v. Kable*,
    993 F.3d 208 (4th Cir. 2021) ................................................................................. 11, 13

*Elhady v. Piehota*,
    303 F. Supp. 3d 453 (E.D. Va. 2017) ............................................................................ 7

*Ghedi v. Mayorkas*,
    16 F.4th 456 (5th Cir. 2021) ........................................................................................ 12

*Kalu v. IRS*,
    159 F. Supp. 3d 16 (D.D.C. 2016) ............................................................................... 11

*Kovac v. Wray,*
    No. 3:18-CV-00110-X, 2022 WL 717260 (N.D. Tex. Mar. 10, 2022) .............. 7, 10, 11

*Latif v. Lynch*,
    3:10-cv-00750 (BC), 2016 WL 1239925 (D. Or. Mar. 28, 2016) ................................. 8

*Long v. Pekoske*,
    38 F.4th 417 (4th Cir. 2022) ........................................................................................ 12

*Morrow v. Dillard*,
    580 F.2d 1284 (5th Cir. 1978) ....................................................................................... 3

*Myers v. United States*,
  272 U.S. 52, 47 S. Ct. 21, 71 L. Ed. 160 (1926) ......................................................... 6, 7

*Nat'l Federation of Independent Business ("NFIB") v. OSHA*,
  142 S. Ct. 661 (2022) (per curiam) ............................................................................ 4, 5

*Redeemed Christian Church of God v. United States Citizenship & Immigr. Servs.*,
  331 F. Supp. 3d 684 (S.D. Tex. 2018) ............................................................................ 2

*Salloum v. Kable,*
  No. 19-CV-13505, 2020 WL 7480549 (E.D. Mich. Dec. 18, 2020) ............................... 7

*Scherfen v. DHS,*
  No. 3:CV-08-1554, 2010 WL 456784 (M.D. Pa. Feb. 2, 2010) ............................. 11, 12

*Southeast Conf. v. Vilsack*,
  684 F. Supp. 2d 135 (D.D.C. 2010) ................................................................................ 2

*Tooley v. Bush*,
  No. 06-306, 2006 WL 3783142 (D.D.C. Dec. 21, 2006) .............................................. 11

*United States v. Castillo*,
  179 F.3d 321 (5th Cir. 1999) ....................................................................................... 2, 3

*United States v. Matthews*,
  312 F.3d 652 (5th Cir. 2002) ........................................................................................... 3

*Util. Air Regul. Grp. v. E.P.A.*,
  573 U.S. 302 (2014) ......................................................................................................... 5

*West Virginia v. EPA*,
  142 S. Ct. 2587 (2022) ................................................................................................. 4, 5

*Wright v. FBI,*
  No. 3:20-CV-173-G-BN, 2020 WL 7345678 (N.D. Tex. Nov. 13, 2020), *report and recommendation adopted*, 2020 WL 7344707 (N.D. Tex. Dec. 14, 2020) ................. 11

**United States Code**

6 U.S.C. § 111 ....................................................................................................................... 5

6 U.S.C. § 202 ....................................................................................................................... 5

6 U.S.C. § 211 ....................................................................................................................... 6

19 U.S.C. §§ 482, 1455, 1459, 1461, 1467, 1499, 1581, 1582 ....................................... 6

28 U.S.C. § 533 .................................................................................................................... 6

49 U.S.C. § 114 ........................................................................................................... 3, 5, 6

49 U.S.C. § 44903 ............................................................................................................ 5, 8

49 U.S.C. §§ 44904, 44926, 44906 ................................................................................ 3, 4

**Regulations**

28 C.F.R. § 0.85(l) ........................................................................................................................ 6

49 C.F.R. § 1520.5 ..................................................................................................................... 11

73 Fed. Reg. 64,018 (Oct. 28, 2008) ......................................................................................... 12

**INTRODUCTION**

Plaintiffs have filed a cross-motion and opposition to Defendants' Motion for Summary Judgment on the sole remaining claim in this case, brought under the Administrative Procedure Act (APA). *See* Pls.' Opp. and X-Mot. for Summ. J. (Pls.' Mot.), ECF No. 96. For the reasons stated in Defendants' opening motion, summary judgment should be issued in Defendants' favor on both the substantive and procedural aspects of this claim. As set forth in in the classified supplemental memorandum submitted with that motion, to the extent any Plaintiff is or was ever placed in the Terrorist Screening Dataset (TSDS), any such action was supported by evidence that meets relevant inclusion criteria. Moreover, the Government is entitled to summary judgment on the procedural claim, because the challenged TSDS policies and procedures represent a reasonable, and non-arbitrary, balance of the Government's interests in preventing terrorist attacks and preserving civil liberties.

As discussed further below, the counterarguments raised in Plaintiffs' cross motion are all unavailing. First, although Plaintiffs now focus on a purported lack of statutory authority for the terrorist watchlist, those arguments appeared in their non-delegation claim, and do not appear in their APA claim. These arguments were already considered and rejected by this Court at the motion to dismiss stage as part of the non-delegation claim, and that ruling is now law of the case. Plaintiffs request that this Court reconsider this ruling under the "major questions" doctrine—but that doctrine does not apply here. Even if it did, however, the Government's terrorist screening policies are amply and sufficiently authorized. Second, in light of the Court's decision that information underlying any TSDS status is properly protected by—at minimum—the law enforcement privilege, it is proper for the Court to decide Plaintiffs' substantive APA challenge on the basis of the Government's supplemental classified submissions. Finally, it was neither arbitrary nor capricious, nor contrary to law, for the Government to implement the DHS TRIP redress procedures, including the non-disclosure of TSDS status or the reasons underlying that status except in the narrow context of U.S. Persons on the No Fly List. These procedures represent a careful, lawful, and reasonable balance of the relevant underlying policy interests, and do not violate the APA.

For these reasons, and as discussed further below and in Defendants' opening motion, Defendants are entitled to summary judgment.

1

## STANDARD OF REVIEW AND RESPONSE TO PLAINTIFFS' DISPUTED FACTS AND COUNTERSTATEMENT OF FACTS

Plaintiffs' motion attempts to dispute material facts in the administrative record, but this is improper in an APA challenge. When a district court reviews an agency action under the Administrative Procedure Act, the court "sits as an appellate tribunal." *Edokpayi v. Garland*, No. 3:19-CV-01242-X, 2021 WL 3144839, at *1 (Starr, J.) (N.D. Tex. July 26, 2021) (citing *Redeemed Christian Church of God v. United States Citizenship & Immigr. Servs.*, 331 F. Supp. 3d 684, 694 (S.D. Tex. 2018); *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)). In such cases, "it is the role of *the agency* to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas 'the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'" *Redeemed Christian Church*, 331 F. Supp. 3d at 694 (emphasis added). Thus, in APA cases, the typical "standard set forth in Rule 56(c) does not apply because of the limited role of a court in reviewing the administrative record," *Southeast Conf. v. Vilsack*, 684 F. Supp. 2d 135, 142 (D.D.C. 2010), and the district court does not review "the record for disputed facts that would preclude summary judgment." *Ardmore Consulting Grp., Inc. v. Contreras-Sweet*, 118 F. Supp. 3d 388, 393 (D.D.C. 2015). Plaintiffs' attempt to dispute material facts and provide their own counterstatement of facts is thus improper.

## ARGUMENT

### I. Plaintiffs May Not Re-Raise Statutory Ultra Vires Claims that this Court Has Already Rejected, and Which Form No Part of the APA Claim at Issue.

Plaintiffs' briefing is largely devoted to arguing that Congress has not authorized the creation of a terrorist watchlist. *See, e.g.*, Pls.' Mot. at 15-18. These arguments are meritless, but should also be rejected because they merely repackage the *ultra vires* aspect of the non-delegation claim that this Court already rejected at the motion to dismiss phase. *See* MTD Mem. Op. at 52-55. Plaintiffs' APA claim does not comprise any *ultra vires* element, and their belated attempt to re-raise those failed arguments in this context should be rejected.

"The law-of-the-case doctrine 'posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" *United States v. Castillo*,

2

179 F.3d 321, 326 (5th Cir. 1999) (quoting *Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983)).  The doctrine applies to "things [d]ecided by necessary implication as well as those decided explicitly." *Morrow v. Dillard*, 580 F.2d 1284, 1290 (5th Cir. 1978).  The policy rationale behind this doctrine is clear: without it, "cases would end only when obstinate litigants tire of re-asserting the same arguments over and over again." *United States v. Matthews*, 312 F.3d 652, 657 (5th Cir. 2002).

Here, the question of whether the terrorist watchlist is authorized by law was already posed in Plaintiffs' non-delegation claim, which the Court dismissed.  *See* Mem. Op. on Mot. to Dismiss, ECF No. 12, at 53-54 (recognizing that "Plaintiffs' arguments concerning the non-delegation doctrine overlap with their claims that the TSA exceeded its statutory authority").  Plaintiffs' non-delegation claim alleged that "Congress has not directed the Executive Branch to create either a No-Fly List or a Selectee List" and that "assignment of the watch listing function to TSC violates Congress' directive that TSA determine who belongs on federal terror watch lists." *See* Complaint ¶ 290.  Accordingly, Plaintiffs argued in their response to Defendants' motion to dismiss that:

> Section 114(h) does not direct any agency to create a watch list. Nor does it establish the TSC or direct the agency to administer the watch list; indeed, when this law passed, TSC did not even exist. Yet, the TSC is carrying out the lion's share of those functions under executive directives. And by directing TSC to disseminate its watch list to private parties and foreign governments for the purpose of constraining the movement and activities of innocent Americans, TSC is plainly acting without the authority of Congress.

Pls.' Opp. to Defs.' Mot. to Dismiss, ECF No. 9, at 23.  They reassert these arguments here, *see e.g.*, Pls.' Mot. at 18, even though the Court rejected these arguments in full when it dismissed the non-delegation claim.  *See* Mem. Op. on Mot. to Dismiss at 55.  Indeed, in so ruling, the Court recognized that numerous valid statutes authorize the Government's terrorist screening policies.  *See* Mem Op. on Mot. to Dismiss, ECF No. 12 at 53-54 (discussing 49 U.S.C. § 114(d), (h); 49 U.S.C. §§ 44904, 44926, 44906).  That decision is therefore law of the case, and Plaintiffs' attempt to reassert those arguments here should be rejected.

Plaintiffs also may not raise such arguments here because they form no part of the APA claim they pled.  Plaintiffs' surviving APA claim does not comprise any *ultra vires* challenge.  *See* Complaint ¶¶ 260-270 (no discussion of lack of statutory authority for terrorist watchlisting).   Instead, it focuses on a substantive challenge to Plaintiffs' purported placement, and a related challenge to the redress procedures.

3

*See id.*; *see also* Mem. Op., ECF No. 81 at 11-12 (recognizing that the APA claim comprises a substantive claim and a procedural claim only). Plaintiffs' briefing at the motion to dismiss stage similarly reflects this pleading choice. *See* Pls.' Opp. to Defs.' Mot. to Dismiss, ECF No. 9, at 31 (no discussion of *ultra vires* agency action in section discussing APA claim). Plaintiffs may not, at this late stage, "shoehorn their [*ultra vires*] theory . . . into [their APA claim]." *El Ali v. Barr*, 473 F. Supp. 3d 479, 529 n.24 (D. Md. 2020). As in *El Ali*, "[n]owhere in [the APA count] do Plaintiffs plausibly aver such a claim," which has already been assessed and rejected by this Court, in any event.

## II. The Major Questions Doctrine Does Not Apply, and Regardless, the Government's Terrorist Watchlist Policies are Amply Authorized.

Plaintiffs' invocation of the major questions doctrine to revisit the statutory authority question is unavailing. That doctrine is a departure from standard principles of statutory interpretation reserved for "certain extraordinary cases." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022). There is no indication that this is such a case. Unlike *West Virginia*, which invalidated an EPA plan to require power plants to shift from coal to renewables, reducing gross domestic product by at least a trillion dollars within two decades, *id.* at 2604, or *Nat'l Federation of Independent Business ("NFIB") v. OSHA*, 142 S. Ct. 661 (2022) (per curiam), which struck down an OSHA order requiring "84 million Americans to either obtain a COVID-19 vaccine or undergo weekly medical testing," *id.* at 665, here Plaintiffs challenge no "radical or fundamental change to a statutory scheme" that would be subject to the major questions doctrine. *West Virginia*, 142 S. Ct. at 2607 (citation omitted). Instead, they bring an APA challenge to a government policy that has existed for decades, and which applies only to a small number of U.S. persons reasonably suspected of ties to terrorism. *See* Mem. Op. on Mot to Dismiss, ECF No. 12, at 3 (discussing history of TSC's role in terrorist watchlisting, since 2003); Kovac_PublicAR_00333 n.9 (fewer than 5000 individuals included in the TSDS were U.S. Persons as of 2017). Here, only five individual Plaintiffs challenge their purported TSDS placement and the procedures applied to them. This case thus challenges no "novel" or "unprecedented" policies, *West Virginia*, 142 S. Ct. at 2605, 2612, let alone of the vast scope that would render this a "major questions case." *West Virginia*, 142 S. Ct. at 2610.

Plaintiffs acknowledge that this case is distinguishable from other major questions cases. *See* Pls.' Br. at 17 ("Here, the government does not claim the authority to regulate economic actors like hotels, office buildings, tobacco companies, or coal plants."). But they nonetheless claim that the terrorist watchlist "goes even further" than such cases, because it purportedly involves the "power to intrude directly into the lives of hundreds of thousands of individuals." *Id.* at 17. Even if this assertion were true, *but cf.* Kovac_PublicAR_00333 n.9 (noting small number of U.S. persons on the TSDS), this would not be a major questions case, because it does not involve any novel assertion of "extravagant statutory power over the national economy." *West Virginia*, 142 S. Ct. at 2609 (quoting *Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 324 (2014)); *see also NFIB*, 142 S. Ct 661; *Alabama Ass'n of Realtors v. HHS*, 141 S. Ct. 2485 (2021) (per curiam), ("[a]t least 80% of the country, including between 6 and 17 million tenants at risk of eviction, falls within the [CDC's eviction] moratorium").

Moreover, even if this could be a major questions case, the challenge would fail, because there is clear authority for the terrorist watchlist, both in statute and in Executive Order. *See* Mem. Op. on MTD at 55. Numerous components of the federal Government work together—pursuant to their separately delegated authorities—to secure the U.S. and its borders and aviation system from terrorist threats. For example, DHS is charged with "prevent[ing] terrorist attacks within the United States," 6 U.S.C. § 111(b)(1)(A), and "reduc[ing] the vulnerability of the United States to terrorism," *id.* § 111(b)(1)(B); *see also id.* § 202(1) (charging DHS with the responsibility of "[p]reventing the entry of terrorists and the instruments of terrorism into the United States."). Within DHS, TSA is responsible for securing transportation, with a focus on preventing terrorist attacks against civil aviation and other methods of transportation. *See* 49 U.S.C. § 114(d). TSA is further responsible for federal security screening operations for passenger air transportation, 49 U.S.C. § 114(e)(1), and for developing "policies, strategies, and plans for dealing with threats to transportation security," *id.* § 114(f)(3), and for "coordinating countermeasures with appropriate departments, agencies, and instrumentalities of the United States Government," *id.* § 114(f)(4). TSA may "issue . . . such regulations as are necessary to carry out [its] functions," *id.* § 114(l)(1), as well as "prescribe regulations to protect passengers and property on an aircraft," *id.* § 44903(b). The TSA Administrator is also required to establish procedures for notifying

5

appropriate officials "of the identity of individuals" who are "known to pose, or suspected of posing, a risk of air piracy or terrorism or a threat to airline or passenger safety," *id.* § 114(h)(2)—a mandate which expressly requires TSA "to use information from government agencies" to identify travelers who may pose a threat to national security, and to "prevent [those] individual[s] from boarding an aircraft, or take other appropriate action," *id.* § 114(h)(3)(A), (B); *see also* § 114(h)(1) (providing for "cross-check[ing] as necessary data on individuals identified on Federal agency databases who may pose a risk to transportation or national security"). Also within DHS, U.S. Customs and Border Protection exercises authority under numerous statutes to search persons and goods at the nation's border. *See, e.g.*, 19 U.S.C. §§ 482, 1455, 1459, 1461, 1467, 1499, 1581, 1582. These authorities include, but are not limited to, inspections for the purpose of preventing terrorist attacks. *See, e.g.*, 6 U.S.C. § 211(g)(3)(a). And the FBI investigates and analyzes intelligence relating to both domestic and international terrorist activities. *See* 28 U.S.C. § 533, 28 C.F.R. § 0.85(l). Thus, there is clear, sufficient, and ample statutory authority that supports terrorist watchlisting.

Equally unfounded is Plaintiffs' theory that HSPD-6 cannot authorize the watchlist because it is not a statute, but rather an Executive Order that "does not bestow on the Government the authority to create an extralegal watch list without congressional authorization." Pls.' Mot. at 17. But HSPD-6 does no such thing; rather it simply directs the exercise of existing statutory powers delegated pursuant to the authorities cited above to executive branch officials. HSPD-6 itself directs the Attorney General to "establish" the TSC in order "to consolidate the Government's approach to terrorism screening and provide for the appropriate and lawful use of Terrorist Information in screening processes." HSPD-6 ¶ 2, Kovac_PublicAR_00011. On its face, HSPD-6 is a statement of Executive Branch "policy" with respect to terrorist watchlisting, but it "does not alter existing authorities or responsibilities of department and agency heads to carry out operational activities or provide or receive information," and "is intended only to improve the internal management of the executive branch …." *Id.* Thus, HSPD-6 is simply a management directive that derives from the President's general constitutional powers to direct the exercise of statutorily delegated authority. *See Myers v. United States*, 272 U.S. 52, 135, 47 S. Ct. 21, 31, 71 L. Ed. 160 (1926) ("The ordinary duties of officers prescribed by statute come under the general

6

administrative control of the President by virtue of the general grant to him of the executive power, and he may properly supervise and guide their construction of the statutes under which they act.").

For these reasons, numerous other courts—like this one—have rejected arguments that the terrorist watchlist lacks proper statutory authorization. *See e.g.*, *Salloum v. Kable*, No. 19-CV-13505, 2020 WL 7480549, at *21 (E.D. Mich. Dec. 18, 2020) (rejecting claim "Congress has not authorized the Executive Branch to utilize the federal terror watch list"); *Elhady v. Piehota*, 303 F. Supp. 3d 453, 467 (E.D. Va. 2017) (rejecting the argument "that TSA and TSC exceeded their authority by creating the Watch List"); *El Ali*, 473 F. Supp. 3d at 529 (D. Md. 2020) (similar). To the extent the Court reaches the merits of these arguments at all—and it need not, for the reasons discussed *supra* Part I—it should again reject these arguments.

### III. The Court Should Enter Summary Judgement for Defendants as to the Substantive – or Alleged "Placement" – Component of Plaintiffs' APA Claim.

In its March 10, 2022 Memorandum Opinion and Order, this Court granted Defendants' motion for leave to file portions of the Administrative Record—specifically, those pertaining to Plaintiffs' past or current TSDS status, if any, as well as any underlying materials considered by Defendants (*arguendo*) in determining whether each or any of the Plaintiffs met the standard for inclusion in the TSDS and/or its component lists—under seal and for *ex parte, in camera* review only. *Kovac v. Wray*, No. 3:18-CV-00110-X, 2022 WL 717260, at *2–4 (N.D. Tex. Mar. 10, 2022). In comportment with this Order, Defendants filed the Administrative Record partially *in camera* and *ex parte*, and request the entry of summary judgment in their favor as to the substantive (or alleged "placement") component of Plaintiffs' APA claim. Defendants thus again respectfully refer this Court to their *ex parte* supplemental brief, filed concurrently with their opening public memorandum, in reference to this portion of Plaintiffs' APA claim.

### IV. The Court Should Enter Summary Judgment for Defendants as to the Procedural Component of Plaintiffs' APA Claim.

Finally, the Court should likewise enter summary judgment for Defendants as to the procedural component of Plaintiffs' APA claim. In their memorandum, *see* Pls.' Mot. at 20, Plaintiffs clarify that this component of their claim is limited to a challenge to the DHS TRIP procedures available to travelers

7

who believe they have been unfairly or incorrectly delayed or identified for additional screening at airports or U.S. ports of entry. This claim likewise fails on its merits.

As an initial manner, Plaintiffs' arguments respecting their procedural claim largely parrot their prior assertions—addressed *supra*—that, in implementing DHS TRIP, Defendants have acted in excess of their statutory authority. *See id.* (asserting that these procedures contravene the Congressional command that TSA "'establish a procedure to enable airline passengers, who are delayed or prohibited from boarding a flight because the advanced passenger prescreening system determined that they might pose a security threat, to appeal such determination and correct information contained in the system'" (quoting 49 U.S.C. § 44903(j)(2)(C)(iii)(I)); *id.* at 21 (arguing that Defendants' *Glomar* policy with respect to watchlist status "fails to consider Congress's command and is not in accordance" with this provision); *id.* at 22-23 (reiterating arguments that the extant DHS TRIP procedures "disregard … Congress's instructions," as set forth in § 44903(j)(2)(C)(iii)(I))). These arguments—which largely, if not entirely, underpin Plaintiffs' procedural claim—fail for all of the same reasons set forth above in Parts I and II.

Plaintiffs' remaining contentions in support of the procedural aspect of their APA claim likewise fail. The gravamen of these contentions is two-fold. First, Plaintiffs assert that the Government's *Glomar* policy with respect to watchlist status fails to consider an important aspect of the problem, in that "in order for an individual to correct erroneous information, they need to know what information is in the databases in the first place." Pls.' Mot. at 21. And second, Plaintiffs invoke the limited, enhanced redress procedures available to any U.S person denied boarding on a commercial aircraft due to No Fly status who files a redress inquiry,[1] asserting that these enhanced procedures "highlight[] the illegality of [the Government's] refusal to provide other affected passengers with any information at all." *Id.* at 22. Defendants address both of these arguments—neither of which withstand scrutiny—in turn.

First, while DHS TRIP does not permit applicants to learn their watchlist status (with the limited No Fly exception discussed *supra*), the DHS TRIP process is adequate to protect against erroneous placement, and to afford persons who believe that they may be incorrectly placed in the TSDS a

---

[1] *See generally Latif v. Lynch*, 3:10-cv-00750 (BC), 2016 WL 1239925, at *5 (D. Or. Mar. 28, 2016) (describing these enhanced procedures); PAR_7-10 (APP_3-6) (same).

meaningful opportunity to be heard.  When an individual is placed on the TSDS, that placement decision undergoes several layers of review: (1) a decision by the nominating agency to nominate an individual for placement on the TSDS, (2) a determination by TSC that placement in the TSDS is appropriate; (3) regular reviews and audits of placement, and—as relevant to Plaintiffs' arguments—(4) a redress process in which the traveler can draw the Government's attention to any possible errors by explaining the difficulties the traveler has encountered and submitting relevant, exculpatory information, which the Government is required to review and consider.  *See* Defendants' SOF ¶¶ 6-7, 9, 19-20, 22-24.  In particular, the applicant submitting a redress inquiry may provide information about their travel experience, and any comments or additional information that they deem relevant to the inquiry, including any exculpatory information.  *Id.* ¶ 19.  In submitting the inquiry, if the applicant believes that he or she is included in the TSDS, the applicant could reference the publicly available reasonable suspicion standard for TSDS inclusion in considering what information to provide.  *See id.* ¶ 7 ("To include a known or suspected terrorist identity in the TSDS, the nomination must rely upon articulable intelligence or information which, based on the totality of the circumstances and, taken together with rational inferences from those facts, creates a reasonable suspicion that the individual is engaged, has been engaged, or intends to engage, in conduct constituting, in preparation for, in aid or in furtherance of, or related to, terrorism and/or terrorist activities").  The government's consideration of the totality of available information, including the applicant's submissions, may result in removal from the TSDS.  *See id.* ¶¶ 19, 23-24.

      Moreover, both the Administrative Record and an ever-growing consensus of caselaw, *see infra* at 10-11, explain why DHS TRIP's nondisclosure policy, in particular, is not only rational, but indeed necessary to the operation of the watchlisting system.  As Defendants explained in their opening memorandum, FBI, TSC, and TSA have each—separately, and expressly—considered this issue, and assessed that disclosure of TSDS status during the redress process (to individuals outside the narrow No Fly List exception for U.S. Persons denied boarding, *see supra*) would be detrimental to national security and law enforcement efforts as well as to transportation security, and that disclosure of any underlying

9

derogatory information would cause additional harm to national security.  To highlight but one of these considered explanations, for example, the FBI has described in detail that

> inclusion in the TSDB[2] is often based on highly sensitive national security and law enforcement information that is properly protected from disclosure under law, including: (i) information that could tend to reveal whether an individual has been the subject of an FBI counterterrorism investigation, including the basis, status, or results of the investigation, and the content of any relevant investigative files; and (ii) information that could tend to reveal whether particular sources and methods were used by the FBI in a counterterrorism investigation or intelligence activity related to the individual in the TSDB or his associates.  The notice and opportunity to contest TSDB status which Plaintiffs seek would risk or require disclosure of a great deal of this information.  As explained below, disclosure of this information would provide adversaries with valuable insight into the specific ways in which the Government goes about detecting and preventing terrorist attacks, with potentially grave consequences for the national security.  Moreover, the expanded process which Plaintiffs seek would discourage cooperation from sensitive sources, would discourage agencies from making otherwise appropriate nominations to the TSDB, and would divert significant intelligence and investigative resources which otherwise would be spent detecting and preventing terrorist attacks.

PAR_333 (Orlando Decl. ¶ 20) (APP_40); *see also id.* ¶¶ 20-36 (elaborating further on this explanation) (APP_39-48); PAR_321-22 (Groh Decl. ¶¶ 64-67) (APP_31-32) (similar); PAR_392-97 (Froemling Decl. ¶¶ 52-60) (APP_81-85) (similar).  Further, "individuals who are selected for enhanced screening, unlike individuals who are denied boarding, are able to access sterile areas of airports and fly via commercial aviation, which remains a prime target for terrorist groups."  PAR_394 (Froemling Decl. ¶ 55) (APP_82).  The Administrative Record for this case thus belies Plaintiffs' conclusory assertion that Defendants have "failed to consider" an important aspect of the problem, or offered an explanation for its decision that runs counter to the evidence before the agency, or is implausible.  *See* Pls.' Mot. at 14-15.

Moreover, an ever-growing body of caselaw—including this Court's own March 10, 2022 Memorandum and Order—have uniformly upheld Defendants' nondisclosure policy against a variety of claims and challenges.  *See Kovac*, 2022 WL 717260, at *2 (upholding Defendants' assertion of the law enforcement privilege as to the same categories of information that Plaintiffs contend cannot rationally be withheld by DHS TRIP from redress applicants, on the grounds that "(1) the Government cannot confirm or deny any plaintiff's status without revealing privileged information which, if released, would

---

[2] The Terrorist Screening Dataset (TSDS) was previously known as the Terrorist Screening Database (TSDB).

harm national security and (2) any underlying documents justifying the reasons for including any plaintiff on the [TSDS] would reflect the underlying investigative or intelligence-related interest in each plaintiff"); Order on Motion to Compel, *Salloum v. Kable,* 19-cv-13505, ECF No. 61 (E.D. Mich. Sept. 29, 2021) (upholding Government assertion of law enforcement privilege over any TSDS status and underlying reasons for any such status); *Elhady v. Kable*, 993 F.3d 208, 215 (4th Cir. 2021) (noting with approval that "the government has a general policy of not disclosing TSD[S] status, whether positive or negative, in response to inquiries," and further explaining that "[t]he reason for this is apparent. Disclosure would disrupt and potentially destroy counterterrorism investigations because terrorists could alter their behavior, avoid detection, and destroy evidence."); *Blitz v. Napolitano,* 700 F.3d 733, 737 n.5 (4th Cir. 2012) ("The pertinent regulations deem the following to be sensitive security information that may not be publicly released: … the identities of individuals on … selectee lists[.]"); *Bassiouni v. CIA*, 392 F.3d 244, 245-46 (7th Cir. 2004); *Tooley v. Bush*, No. 06-306, 2006 WL 3783142, at *20 (D.D.C. Dec. 21, 2006), *aff'd sub nom., Tooley v. Napolitano*, 586 F.3d 1006 (D.C. Cir. 2009) (upholding government's position that confirming or denying records indicating plaintiff's presence on watch lists would reveal [sensitive security information]); *Wright v. FBI,* No. 3:20-CV-173-G-BN, 2020 WL 7345678, at *6-8 (N.D. Tex. Nov. 13, 2020) (holding that "[t]he FBI also properly invoked a standard Glomar response as to Wright's request for watch list information," including TSDS status), *report and recommendation adopted*, 2020 WL 7344707 (N.D. Tex. Dec. 14, 2020); *Kalu v. IRS*, 159 F. Supp. 3d 16, 22 (D.D.C. 2016) (upholding FBI's "Glomar" response to "Plaintiff's presence or non-presence on any FBI watch list"); *Scherfen v. DHS*, No. 3:CV-08-1554, 2010 WL 456784, at *8 n.5 (M.D. Pa. Feb. 2, 2010) ("Because the TSD[S] status of Plaintiffs can neither be confirmed nor denied, this Court cannot discuss ... the contents of [documents revealing Plaintiffs' status] submitted for *in camera* review[.]"); *see also* 49 C.F.R. § 1520.5(b)(9)(ii) (SSI includes "[i]nformation and sources of information used by a passenger or property screening program or system, including an automated screening system").

Plaintiffs' second (and final) substantive contention with respect to this claim[3]—that the availability of enhanced DHS TRIP procedure to the discrete subset of U.S. Person redress applicants who have been denied boarding "highlights the illegality" of the standard procedures, Pls.' Mem. at 22—likewise falls flat. The enhanced procedures for those denied boarding are afforded to this very limited subset of U.S. persons due to the substantially greater imposition that placement on the No Fly List entails for affected persons. Further, unlike denial of boarding, a traveler may receive heightened screening for multiple reasons, including random selection—and thus, it is entirely rational for the Government to assess that disclosure of No Fly List status does not involve the same harms to crucial national security interests. *See* PAR_378-79, 384-85 (Froemling Decl. ¶¶ 12, 32) (APP_70-71, 73-74); *see also Scherfen v. DHS*, No. 3:CV-08-1554, 2010 WL 456784, at *7 (M.D. Pa. Feb. 2, 2010) ("Heightened screening at airports and border-crossing points does not necessarily signify inclusion" on a watchlist, as "[t]ravelers may be pulled out of line, searched, and questioned for a variety of reasons, unrelated to watch lists."); 73 Fed. Reg. 64,018, 64,026 (Oct. 28, 2008) ("[Passengers who are not on the Selectee List] will not always avoid enhanced screening.").

In sum, as the Fourth Circuit explained in *Elhady*:

> After the TSDB was created, Congress considered the proper balance between effective counterterrorism efforts and the desire of air travelers to fly without undue burdens. It accommodated those competing interests by mandating the creation of DHS TRIP, a system that ensures that TSDB determinations are checked and reviewed. Congress recognized that the government's assessments in this area may not be foolproof. It nonetheless did not require the DHS TRIP redress process to eliminate all possibility of error, but only to reasonably mitigate the risk of possible errors … Congress made a policy choice, balancing the burdens imposed on the victims of false positives with the

---

[3] Plaintiffs further assert—in passing—that "[t]he FBI uses the watch list to recruit informants, not protect airplanes," and that the Government "places people on the watch list and removes them …whenever the Government finds it beneficial to their litigation strategy." Pls.' Mem. at 23. These unfounded allegations are wholly unsubstantiated and the Court need not address them. *But see Long v. Pekoske*, 38 F.4th 417, 425 (4th Cir. 2022) ("Even without a specific explanation on why it removed Long from the No Fly List," and notwithstanding that "the government doesn't concede constitutional error, we assume [the government] removed Long from the list because, as he contends, he doesn't belong on it. To say otherwise would be to suggest the government risked national security simply to moot a lawsuit. This we decline to do."). *Ghedi v. Mayorkas*, 16 F.4th 456, 468 (5th Cir. 2021) (explaining that the plaintiff's "core factual allegation … that he was placed on the Selectee List for 'declining to serve as an FBI informant'" was "speculative," and did "not permit a reasonable inference that [the Government] violated typical [watchlisting] processes to retaliate against him.").

> costs imposed on the entire country when a terrorist attack occurs. When such competing interests are at stake, value judgments must be made. Striking the balance in this most sensitive of areas belongs principally with the people's representatives.

993 F.3d at 229 (internal citation omitted). For these reasons, and all of the additional ones set forth in the Administrative Record, Defendants' opening memorandum, and *supra*, this Court should grant summary judgment to the Government as to Plaintiffs' procedural claim.

## CONCLUSION

For the foregoing reasons, summary judgment should be issued in the Government's favor, and Plaintiff's cross-motion should be denied.

Dated: October 21, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

   /s/ *Christopher R. Healy*
CHRISTOPHER R. HEALY
ANTONIA KONKOLY
Trial Attorneys
Federal Programs Branch
United States Department of Justice
Civil Division
1100 L Street NW
Washington, DC 20005
Tel: (202) 514-2395
christopher.healy@usdoj.gov
antonia.konkoly@usdoj.gov

*Attorneys for Defendants*