UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| **ADIS KOVAC, et al.;** ) | |
| ) | |
| Plaintiffs, ) | Case No. 3:18-cv-110-X |
| ) | |
| v. ) | |
| ) | |
| **CHRISTOPHER WRAY, et al.;** ) | |
| ) | |
| Defendants. ) | |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT**

# **TABLE OF CONTENTS**

*INTRODUCTION*..................................................................................................................1

*ARGUMENT*........................................................................................................................2

    I.    The terrorist watch list has never been authorized by Congress and is in excess of the relevant agencies' statutory authority. ........................................................................2

        A.    The major questions doctrine applies because the watch list is an extraordinary assertion of federal power..............................................................................................2

        B.  The Government cannot identify any clear congressional authorization for federal agencies to create and maintain the watch list……………………………………………………….2

        C. The major questions doctrine issue is properly before this Court……………………….3

    II.   Plaintiffs' placement and continued retention on the watch list is arbitrary and capricious.....7

    III.  The DHS TRIP process entirely fails to consider an important aspect of Congress's instructions and is not in accordance with law........................................................................7

*CONCLUSION*....................................................................................................................10

# TABLE OF AUTHORITIES

**Cases**

*Alabama Ass'n of Relators v. Dept. of Health and Human Servs.*, 141 S. Ct. 2485, 2489 (2021)......................3

*Arizona v. California*, 460 U.S. 605, 618 (1983)) ..........................................................................................6

*Bassiouni v. CIA*, 392 F.3d 244, 245-46 (7th Cir. 2004)..............................................................................10

*Blitz v. Napolitano*, 700 F.3d 733, 737 n.5 (4th Cir. 2012) ..........................................................................10

*BST Holdings, LLC v. OSHA*, 17 F.4th 604, 611 (5th Cir. 2021) ..............................................................3, 4

*El Ali v. Barr*, 473 F. Supp. 3d 479, 529 (D. Md. 2020)) ...........................................................................5, 7

*Elhady v. Kable*, 993 F.3d 208, 215 (4th Cir. 2021)....................................................................................10

*Elhady v. Piehota*, 303 F. Supp. 3d 453, 467 (E.D. Va. 2017) ......................................................................5

*Kalu v. IRS*, 159 F. Supp. 3d 16, 22 (D.D.C. 2016)....................................................................................10

*Kovac v. Wray*, No. 3:18-CV-00110-X, 2022 WL 717260, at *2 (N.D. Tex. Mar. 10, 2022)...................10

*Latif v. Holder*, 28 F. Supp. 3d 1134, 1163 (D. Or. 2014)............................................................................8

*MCP No. 165*, 20 F.4th 264, 272 (6th Cir. 2021) .....................................................................................3, 4

*Misretta v. United States*, 488 U.S. 361, 372-73 (1989)) .............................................................................6

*NFIB v. OSHA*, 142 S. Ct. 661 (2022)............................................................................................................3

*Salloum v. Kable*, 19-cv-13505, ECF No. 61 (E.D. Mich. Sept. 29, 2021) ................................................10

*Salloum v. Kable*, 2020 WL 7480549, at *21 (E.D. Mich. Dec. 18, 2020) ..................................................5

*Scherfen v. DHS*, No. 3:CV-08-1554, 2010 WL 456784, at *8 n.5 (M.D. Pa. Feb. 2, 2010)...................10

*Tooley v. Bush*, No. 06-306, 2006 WL 3783142, at *20 (D.D.C. Dec. 21, 2006) .....................................10

*United States v. Castillo*, 179 F.3d 321, 326 (5th Cir. 1999) .......................................................................6

*Utility Air Reg. Grp. v. EPA*, 573 U.S. 302, 324 (2014)) ............................................................................2

*West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) ............................................................. passim

*Wooten v. McDonald Transit Associates, Inc.*, 788 F.3d 490, 494 (5th Cir. 2015) .........................6

*Wright v. FBI*, No. 3:20-CV-173-G-BN, 2020 WL 7345678, at *6-8 (N.D. Tex. Nov. 13, 2020) ........10

**Statutes**

29 U.S.C. § 655(c)(1) .....................................................................................................................5

42 U.S.C. § 111(d) .........................................................................................................................5

49 U.S.C. § 114(f)(3) .....................................................................................................................4

49 U.S.C. § 44903(j)(2)(C)(iii)(I) ................................................................................................8, 9

6 U.S.C. § 111(b)(1)(B) ..................................................................................................................4

**INTRODUCTION**

Adis Kovac, Bashar Al-Jame, Suhai Allababidi, Abraham Sbyti, and Faduma Mohamed Warsame are U.S. citizens who have never been charged, indicted, or convicted of a terrorism-related offense. Yet their lives have been turned upside-down by their unexplained placement on the federal terror watch list.

The Government's treatment of Plaintiffs has left them shocked and confused. In a DHS TRIP redress request, Mr. Sbyti wrote that he is "a proud, law abiding citizen" who "works hard," "pays his taxes on time," and "takes the safety and security of this country very seriously." PAR 632 (Sbyti DHS TRIP File) (cleaned up). He simply finds "it unfair to be subjected" to humiliating additional screening and interrogations "every time he goes to visit his family or have a vacation," and hopes that "this matter could be resolved in a timely and positive fashion." *Id.* (cleaned up). Similarly, Mr. Allababidi wrote in his redress request: "I am all for securing my country and [ensuring] my safety and [the] safety of others as well" and "[i]f there is any way I can help I would be more than happy to do so." Like the other Plaintiffs, they received only uninformative boilerplate language in response. The Government will not even confirm that they are targets for mistreatment.

This violates the APA for three reasons. First, the Government's creation and maintenance of the watch list is in excess of the relevant agencies' statutory authority because it is not clearly authorized by any federal law. Second, the placements of these individual Plaintiffs on the watch list is arbitrary and capricious. Third, the Government's refusal to provide any explanation to most individuals placed on the terror watch list violates Congress's command to afford affected travelers with a meaningful opportunity to contest their placement on the watch list. The Government's responses to our arguments are unconvincing, as we now explain.

1

**ARGUMENT**

I. **The terrorist watch list has never been authorized by Congress and is in excess of the relevant agencies' statutory authority.**

   A. **The major questions doctrine applies because the watch list is an extraordinary assertion of federal power.**

In an attempt to avoid the requirements of the major questions doctrine, the Government minimizes the power of the watchlist and scope of the doctrine itself. According to the Government, because the watch list "has existed for decades" and applies to only a "small number" (that is, thousands) of United States citizens, *see* Dkt. 100 at 4 (Govt Reply and Response to MSJ), it cannot be the kind of "extraordinary case" for which courts demand "clear congressional authorization for the power" that the relevant federal agencies claim, *see West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) (citing *Utility Air Reg. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). And under the Government's understanding of the major questions doctrine, a federal agency action will not constitute an "extraordinary case" unless the federal agencies involved assert a "radical or fundamental change to a statutory scheme" that specifically pertains to "statutory power over the national economy." *See* Dkt. 100 at 4-5 (Govt Reply and Response to MSJ) (quoting *West Virginia*, 142 S. Ct. at 2607, 2609).

That is wrong. An "extraordinary case" does not only arise where a federal agency makes a novel claim of statutory authority to regulate major economic actors. Rather, the "extraordinary case" analysis turns—and only in part—on either the political or economic salience of an issue. As the Supreme Court recently explained, courts "expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *West Virginia*, 142 S. Ct. at 2605 (quoting *Utility Air Reg. Grp.*, 573 U.S. at 324). Those two criteria—economic significance and political significance—are each relevant to the major questions inquiry, but neither is required. That is, a case may be extraordinary by virtue of its economic significance, its political significance, or a combination of the two. There is no rigid requirement that there be a "novel assertion of 'extravagant statutory

2

power over the national economy'" in order for a case to qualify as extraordinary. *See* Dkt. 100 at 5 (Govt Reply and Response to MSJ) (quoting *West Virginia*, 142 S. Ct. at 2609).

The Government's misinterpretation of *West Virginia* is plain enough on its own, but it is even more stark when viewed in light of the Supreme Court's other major questions doctrine of the past term, *NFIB v. OSHA*, 142 S. Ct. 661 (2022). *West Virginia* asked whether, in the context of the EPA's regulation of coal plants, "a 'system of emissions reduction' can consist of generation-shifting measures." 142 S. Ct. at 2605. That is a question of technical statutory interpretation far too reticulated to be considered politically salient, but nonetheless immensely economically salient, as it was "projected to have billions of dollars of impact" on the energy industry. *Id.* But in *NFIB v. OSHA*, the Court focused on political, not economic importance. The stricken employee vaccine mandate was "a significant encroachment into the lives—and health—of a vast number of employees" and, accordingly, was "no everyday exercise of federal power." 142 S. Ct. at 665. The Supreme Court did not even mention compliance costs or the anticipated economic effects of the vaccine mandate in explaining why the mandate triggered the major questions doctrine. *See id.* at 664-65; *see also Alabama Ass'n of Relators v. Dept. of Health and Human Servs.*, 141 S. Ct. 2485, 2489 (2021) (describing the "issues at stake" in the CDC eviction moratorium case as "not merely financial").

Courts of appeals have similarly emphasized intrusions on personal liberty as weighty considerations in the "extraordinary case" inquiry. In the dissenting opinion below quoted favorably by *NFIB* in reversing the Sixth Circuit, Judge Sutton described the major questions doctrine as requiring "broad assertions of policymaking authority to be premised on direct and specific congressional delegations of that power." *In re MCP No. 165*, 20 F.4th 264, 272 (6th Cir. 2021) (mem) (Sutton, J., dissenting); *see also id.* at 273 (noting that "the intrusion on individual liberty is serious"); *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 611 (5th Cir. 2021) (describing the mandate as "mak[ing]

3

sweeping pronouncements on matters of public health affecting every member of society in the profoundest of ways").

So too here. As discussed in Plaintiffs' Cross-Motion for Summary Judgment, the Government claims the power to collect a vast array of identifying information about an individual based only on the speculative and ill-defined determination that the individual may, in the future, "engage[]" or "intend[] to engage" in terrorism. Dkt. 96 at 15-16 (citing PAR 4 (Watchlist Overview)). The Government then uses that information to impose a variety of life-altering consequences on those individuals, denying some access to commercial flights that cross United States airspace altogether, subjecting others to extensive and humiliating security screening, distributing watch list information to thousands of other entities, and perhaps even imposing adverse immigration consequences on listees. *See id.* At the risk of understatement, "the intrusion on individual liberty is serious," *In re MCP No. 165*, 20 F.4th at 272 (Sutton, J., dissenting), and the watch list affects those placed on it "in the profoundest of ways," *BST Holdings,* 17 F.4th at 611. Both "separation of powers principles and a practical understanding of legislative intent" require the Government to point this Court to "clear congressional power" to create and maintain the federal terror watch list. *West Virginia*, 142 S. Ct. at 2609; *see also Midship Pipeline Co., LLC v. FERC*, 45 F.4th 867, 876 (5th Cir. 2022).

### B. The Government cannot identify any clear congressional authorization for federal agencies to create and maintain the watch list.

As anticipated in Plaintiffs' Cross-Motion, the Government tries to identify "'clear congressional authorization' for the power it claims." *West Virginia*, 142 S. Ct. at 2609; *see* Dkt. 96 at 17. It directs this Court to broad congressional grants of authority for agencies to, for example, "prevent terrorist attacks within the United States," 6 U.S.C. § 111(b)(1)(B), and develop "policies, strategies, and plans for dealing with threats to transportation security," 49 U.S.C. § 114(f)(3). *See* Dkt. 100 at 5-6 (Govt Reply and Response to MSJ). Like the statutes at issue in *West Virginia* and *NFIB*,

4

those vague pronouncements of agency power "ha[ve] a colorable textual basis" but fall far short of carrying the Government's burden to show clear congressional authorization to create and maintain the watch list. *West Virginia*, 142 S. Ct. at 2609; *see* 42 U.S.C. § 111(d) (authorizing regulation of certain pollutants from existing sources) (analyzed in *West Virginia*); 29 U.S.C. § 655(c)(1) (authorizing certain emergency occupational-health regulations) (analyzed in *NFIB*). And the Government concedes that HSPD-6 is not a federal statute and, as such, cannot authorize the watch list within the meaning of the major questions doctrine. Dkt. 100 at 6 (Govt Reply and Response to MSJ).

Grasping for any supporting authority, the Government turns to a trio of out-of-circuit district court cases that it characterizes as "reject[ing] arguments that the terrorist watchlist lacks proper statutory authorization." Dkt. 100 at 7 (Govt Reply and Response to MSJ) (citing *Salloum v. Kable*, 2020 WL 7480549, at *21 (E.D. Mich. Dec. 18, 2020); *Elhady v. Piehota*, 303 F. Supp. 3d 453, 467 (E.D. Va. 2017); and *El Ali v. Barr*, 473 F. Supp. 3d 479, 529 (D. Md. 2020)). The Government conveniently omits that those cases rejected challenges to the watch list brought under the non-delegation doctrine, not the major questions doctrine. As described immediately below in Section I.C, those two doctrines are distinct. For one, the non-delegation doctrine is a constitutional claim of separation of powers, while the major question doctrine is just a form of statutory interpretation. For another, the Government's burden under the major question doctrine is much higher. So a court's decision on non-delegation grounds says nothing about the viability of a major questions claim.

### C. The major questions doctrine issue is properly before this Court.

The Government offers two reasons why this Court should not conduct the major questions doctrine inquiry. Both are baseless.

First, the Government invokes the law-of-the-case doctrine, arguing that this Court's dismissal of Plaintiffs' non-delegation claim forecloses a major questions doctrine argument. *See* Dkt. 100 at 2-

5

3 (Govt Reply and Response to MSJ). Nonsense. The law-of-the-case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *United States v. Castillo*, 179 F.3d 321, 326 (5th Cir. 1999) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)). As noted in Section B above, the Court's prior determination as to whether the watchlist violates the non-delegation doctrine is fundamentally separate as to whether it violates the APA under the major questions doctrine. And as also noted in Section B above, the tests are distinct, with the Government's required showing under the major questions doctrine much stricter than under nondelegation doctrine. Here, the rule of law at issue is this Court's holding that Congress articulated a constitutionally permissible "intelligible principle" when delegating power to the federal agencies that administer the federal terror watch list—which is completely distinct from Plaintiffs' major questions doctrine argument. *See* Dkt. 12 at 52-53 (Opinion and Order). This Court's determination that Congress cleared the low bar of "clearly delineat[ing] the general policy, the public agency which is to apply it, and the boundaries of this delegated authority," *id.* (quoting *Misretta v. United States*, 488 U.S. 361, 372-73 (1989)), is a far cry from a holding that Congress clearly authorized the creation and maintenance of the watchlist. *See West Virginia*, 142 S. Ct. at 2609.

Second, the Government argues that Plaintiffs are barred from raising a major questions doctrine challenge to the watch list under the APA because the Complaint does not spell it out so explicitly. *See* Dkt. 100 at 3-4 (Govt Reply and Response to MSJ). But the pleadings were more than adequate to preserve the issue for this Court's resolution. *See* Fed. R. Civ. P. 8(a); *see also Wooten v. McDonald Transit Associates, Inc.*, 788 F.3d 490, 494 (5th Cir. 2015) (describing Rule 8 as demanding a "low threshold of content" that provides the defendant with "fair notice" of the plaintiff's claims). Plaintiffs' Complaint sets out a short and plain description of their APA claim. In relevant part, paragraph 272 states that Defendants' actions in creating and maintaining the watch list "were and are

6

arbitrary, capricious, an abuse of discretion, [and] otherwise not in accordance with law." Dkt. 1 at ¶ 272. And, as the Government itself points out, in a different section, the Complaint discusses the lack of congressional authority for the watch list at length. *See id.* at ¶¶ 286-293. The Government points to no authority suggesting that elaborating on an argument under one heading instead of another at the pleading stage bars the Plaintiff from ever raising it in the later stages of litigation. Instead, it relies exclusively on *El Ali v. Barr*, 473 F. Supp. 3d 479, 529 (D. Md. 2020). There, Plaintiffs totally failed to develop their non-delegation claim, leading the court to conclude that the Plaintiffs "jettisoned the claim." *Id.* That is plainly different from the major questions doctrine issue here, which we have thoroughly briefed for this Court's consideration. And even if the Government's arguments were all true—especially given that Plaintiffs remain on the watchlist and so their claims cannot be time-barred—the Government has shown and cannot show any prejudice or reason why Plaintiffs could not solve the problem by simply adding the Government's demanded magic words to either an Amended Complaint, *See* Fed. R. Civ. P. 15(a), or new Complaint. Which would leave us right back here. The Government's failure-of-pleading argument would win it nothing other than further delay even if it were not contrary to Rule 8(a) in the first instance.

## II. Plaintiffs' placement and continued retention on the watch list is arbitrary and capricious.

In the interest of avoiding redundancy, Plaintiffs rest on our Cross-Motion for Summary Judgment as to unlawfulness of the Plaintiffs' placement and retention on the watch list. *See* Dkt. 96 at 19-20.

## III. The DHS TRIP process entirely fails to consider an important aspect of Congress's instructions and is not in accordance with law.

Congress instructed the Administrator of the TSA to "establish a procedure to enable airline passengers, who are delayed or prohibited from boarding a flight because the advanced passenger

7

prescreening system determined that they might pose a security threat, to appeal such determination and **correct information contained in the system**." 49 U.S.C. § 44903(j)(2)(C)(iii)(I) (emphasis added); *see also id.* §§ 44903(j)(2)(G)(i), 44926(a). Common sense tells us that, in order for a passenger to have that opportunity, they need to know what information is in the databases in the first place. After all, "[a] traveler who has not been given any indication of the information that may be in the record does not have a way to correct that information." *Latif v. Holder*, 28 F. Supp. 3d 1134, 1163 (D. Or. 2014).

Congress's instructions do not distinguish between travelers on the Selectee List and the No Fly List. Under the plain text of the statute, both are "airline passengers[] who are delayed or prohibited from boarding a flight because the advanced passenger prescreening system determined that they might pose a security threat." 49 U.S.C. § 44903(j)(2)(C)(iii)(I). But the Government provides only a small subset of people on the watchlist—U.S. citizens and lawful permanent residents on the No Fly List—with any information about their placement on the list. *See* PAR 9 (Watchlist Overview). As a result, the vast majority of people on the watchlist lack the meaningful opportunity to appeal and contest their placement on the list, in direct violation of 49 U.S.C. § 44903(j)(2)(C)(iii)(I) and related statutory provisions.

The Government offers a litany of excuses for its disobedience of Congress's commands. First, while admitting that "DHS TRIP does not permit applicants to learn their watchlist status (with the limited No Fly exception)," the Government nonetheless asserts that the process provides "persons who believe they may be incorrectly placed in the TSDS a meaningful opportunity to be heard." Dkt. 100 at 8-9 (Govt Reply and Response to MSJ). But the Government does not explain how someone who does not understand why they have been placed on the list—that is, someone without any notice of the supposedly derogatory information on which the Government relies—can

8

meaningfully refute the placement. How does an innocent person defend himself from false accusations that they're not even aware of?

Second, the Government describes its failure to comply with an express statutory mandate as "rational" and "necessary to the operation of the watchlisting system" because, in the Government's judgment, disclosure of watchlist status and the underlying derogatory information during the redress process (to people other than U.S. citizens and lawful permanent residents on the No Fly List) would "be detrimental to national security and law enforcement efforts as well as to transportation security." Dkt. 100 at 9 (Govt Reply and Response to MSJ); *see id.* at 9-10. Plaintiffs disagree, of course. But once Congress speaks, that's the end of it. The Government may not ignore Congress's instructions because it believes doing so would be "rational" or even "necessary." If the Government wants to argue that providing affected travelers with a meaningful opportunity to appeal and contest their placements in the terrorist databases would undermine national security, it must tell that to Congress.

The Government similarly turns to policy arguments to defend its atextual distinction between U.S. citizens and lawful permanent residents on the No Fly List and all other affected passengers on the watchlist. *See id.* at 12-13. But, again, the Government is not free to depart from Congress's instructions because it decides that full compliance would be difficult or inconvenient.

Finally, the Government points to caselaw that has "upheld Defendants' nondisclosure policy against a variety of claims and challenges." Dkt. 100 at 10 (Govt Reply and Response to MSJ); *see id.* at 10-11 (collecting cases). Okay, but none of them upheld the policy against the claim and challenge here: that its policy of not disclosing watchlist status and the underlying derogatory information to most affected travelers is contrary to the express language in 49 U.S.C. § 44903(j)(2)(C)(iii)(I) and the related provisions. One addresses a Government motion to file an Administrative record under seal and for *ex parte* review by the court. *See Kovac v. Wray*, No. 3:18-CV-00110-X, 2022 WL 717260, at *2

9

(N.D. Tex. Mar. 10, 2022). One deals with a discovery dispute. *See* Order on Motion to Compel, *Salloum v. Kable*, 19-cv-13505, ECF No. 61 (E.D. Mich. Sept. 29, 2021). Three others factually describe the existing DHS TRIP process and relevant regulations, without directly assessing an on-point challenge to their legality. *See Elhady v. Kable*, 993 F.3d 208, 215 (4th Cir. 2021); *Blitz v. Napolitano*, 700 F.3d 733, 737 n.5 (4th Cir. 2012); *Scherfen v. DHS*, No. 3:CV-08-1554, 2010 WL 456784, at *8 n.5 (M.D. Pa. Feb. 2, 2010). The rest are even further afield, addressing a variety of Government responses to individuals' FOIA requests. *See Bassiouni v. CIA*, 392 F.3d 244, 245-46 (7th Cir. 2004); *Tooley v. Bush*, No. 06-306, 2006 WL 3783142, at *20 (D.D.C. Dec. 21, 2006); *Wright v. FBI*, No. 3:20-CV-173-G-BN, 2020 WL 7345678, at *6-8 (N.D. Tex. Nov. 13, 2020); *Kalu v. IRS*, 159 F. Supp. 3d 16, 22 (D.D.C. 2016).

## CONCLUSION

This Court should deny Defendants' motion, grant Plaintiffs' motion, issue summary judgment in Plaintiffs' favor, and require Defendants to remedy the statutory violations identified herein.

Dated: November 21, 2022

Respectfully submitted,

CAIR LEGAL DEFENSE FUND
BY: /s/ Lena Masri
Lena F. Masri (VA 93291)
lmasri@cair.com
Gadeir I. Abbas (VA 81161)*
gabbas@cair.com
Justin M. Sadowsky (VA 73382)
jsadowsky@cair.com

453 New Jersey Ave., S.E.
Washington, D.C. 20003
Phone: (202) 742-6420
Fax: (202) 488-0833

*Practice limited to federal matters.*
*Attorney for Plaintiffs*

10