UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ADIS KOVAC, et al., | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | Civil Action No. 3:18-CV-0110-X |
| | § | |
| CHRISTOPHER WRAY, et al., | § | |
| | § | |
| *Defendants*. | § | |

## MEMORANDUM OPINION AND ORDER

Adis Kovac, Bashar Al-Jame, Suhai Allababidi, Abraham Sbyti, and Faduma Mohamed Warsame (collectively, "the Passengers") experienced rigorous screening at airports. Convinced that they are on the terrorist watchlist, the Passengers sued the leaders of several agencies[1] (collectively, "the Government"). The Government and the Passengers both move for summary judgment. [Doc. Nos. 90, 96]. For the reasons explained below, the Court **DENIES** the Passengers' motion for summary judgment and **GRANTS** the Government's motion for summary judgment.

### I.  Background, Issues, and Standard of Review

The Court describes (A) the watchlist, (B) redress procedures for those potentially on the watchlist, (C) the Passengers' factual allegations, (D) this case's procedural posture, and (E) the relevant standard of review.

---

[1] The Passengers sued, among others, Christopher Wray, the Director of the Federal Bureau of Investigation ("FBI"); Charles H. Kable, the Director of the Terrorist Screening Center ("TSC"); Deborah Moore, the Director of the Transportation Security Administration ("TSA") and the Department of Homeland Security ("DHS"); Nicholas J. Rasmussen, director of the National Counterterrorism Center ("NCTC").

## A.  The Watchlist

For years, the Government has sought to stymie terrorists' ambitions to harm the United States and its people.  An obvious initial step in thwarting terrorists is to ascertain their identities and to keep an eye on them.  Accordingly, before 2003, "nine [United States] agencies maintained twelve different terrorist watchlists" to keep track of suspected terrorists.[2]  But recognizing the drawbacks of such a diffused approach in the wake of 9/11, President George W. Bush issued an executive order calling for the creation of the Terrorist Screening Center ("TSC"), which he tasked with "consolidat[ing]" the Government's watchlists into a singular list of "terrorist identity information."[3]  The FBI administers the TSC "in coordination" with DHS.[4]

Several agencies collaborate to create, maintain, and enforce the watchlist. Initially, any United States agency with "a reasonable suspicion that [an] individual is a known or suspected terrorist" can send a nomination to the National Counterterrorism Center ("NCTC") for that individual's inclusion on the watchlist.[5] The NCTC maintains a terrorist database and "serves as the primary organization . . . for analyzing and integrating all intelligence . . . pertaining to terrorism."[6]  After the NCTC reviews a nomination, the TSC also reviews the nomination.  Once an individual is on the watchlist, the Transportation Security Administration ("TSA")—

---

[2] Doc. No. 91 at 17.

[3] *Id.* at 8, 16.  The Government calls that watchlist the Terrorist Screening Dataset or "TSDS." But given the deluge of acronyms in this case, the Court declines to pile on another one and instead refers to the TSDS simply as "the watchlist."

[4] *Id.* at 2.

[5] *Id.* at 21.

[6] *Id.*

an entity within DHS—takes the reins.  Specifically, the TSA sets up shop in airports and "compar[es] passenger information to the . . . terrorist watchlist."[7]  If a person is on the watchlist, TSA agents may subject him to enhanced screening or deny him admittance to the airport's "sterile area" altogether.[8]

The watchlist has several subset lists, and placement on them is contingent on "heightened substantive derogatory criteria."[9]  Two subsets are relevant here.  First, the Selectee List consists of individuals who may receive heightened screening at airports.  "[T]he criteria for inclusion on the Selectee List are not public."[10]  Second, the No-Fly List consists of individuals who may not board flights over United States airspace.  The criteria for inclusion on the No-Fly List are public.

## B. Redress Procedures

A person who suspects he's on the watchlist may file a "Traveler Inquiry Form" with the TSC, describing his "experience[]" and "provid[ing] any comments or additional information that [he] deem[s] relevant to the inquiry, including any exculpatory information."[11]  The TSC then reviews that information and "make[s] a new determination as to whether the individual continues to satisfy the standard for inclusion in the [watchlist]."[12]

---

[7] 49 U.S.C. § 44903(j)(2)(C)(ii).

[8] Doc. No. 91 at 74.  "Sterile" is only a term for security.  Medically, airports are anything but sterile.

[9] Doc. No. 90 at 12.

[10] Doc. No. 91 at 23.

[11] *Id.* at 63.

[12] *Id.* at 64–65.

But the TSC leaves the passenger in the dark.  Specifically, the TSC generally doesn't divulge whether a person is on the watchlist.   Consequently, the TSC concludes the redress process by providing the passenger with a cryptic statement that it "ha[s] made any corrections to records that [its] inquiries determined were necessary."[13]  And a passenger can't infer his placement on the watchlist from his enhanced screening by the TSA because passengers may experience enhanced screening for a variety of reasons, many of which have nothing to do with the watchlist.

That secrecy largely vanishes for passengers on the No-Fly List.  In 2014, a court held that the government has to provide individuals "with notice regarding their status on the No-Fly List and the reasons for placement on that List."[14]  Accordingly, when a passenger on the No-Fly List seeks redress, DHS now "inform[s] the applicant of his or her status on the [No-Fly] list" and, "where possible," provides "an unclassified summary of information supporting" that status.[15]

### C. The Passengers

The Passengers are United States citizens who, collectively, experienced four issues in their travels.  First, some had trouble obtaining boarding passes.  For instance, Allababidi and Warsame had trouble printing their boarding passes at self-

---

[13] Doc. No. 96 at 15.

[14] *Latif v. Holder*, 28 F. Supp. 3d 1134, 1162 (D. Or. 2014).

[15] Doc. No. 91 at 6.

serve kiosks.  Likewise, Allababidi and Al-Jame, after some delays, each received a boarding pass containing an SSSS designation.[16]

Second, some alleged that they experienced enhanced screening at TSA checkpoints.  For instance, TSA agents asked Al-Jame "to take off [his] shoes, [his] belt, and empty everything" in his pockets.[17]  Agents then conducted a "full body search" on Al-Jame and "swabbed [his] hands."[18]  Likewise, Allababidi asserts that TSA agents spent an hour "going through every single item" of his carry-on luggage.[19]

Third, federal agents interrogated some of the Passengers.  For instance, when Al-Jame returned from Jordan, two TSA officers "interrogated [him] about [his] trip [and] . . . [his] life."[20]  Similarly, when Allababidi returned from Mexico, "agents asked [him] [a] bunch of questions."[21]

Fourth, agents denied some of the Passengers boarding altogether.  For instance, on multiple occasions, agents "barred [Kovac] from boarding the plane" or did "not allow[] [him] to get a boarding pass."[22]  Although the Government later confirmed that Kovac was on the No-Fly List, it has since removed him from that list.

---

[16] The TSA instructs aircraft operators to put "SSSS" (short for Secondary Security Screening Selection) on a person's boarding pass to indicate that the individual must undergo enhanced screening.

[17] *Id.* at 99.

[18] *Id.*

[19] *Id.* at 104; *see also id.* at 99 (contending that Al-Jame's "carry-on bag was searched extensively and swabbed"); *id.* at 128, 136 (contending that Sbyti and Warsame similarly received "extra screening").

[20] *Id.* at 99.

[21] *Id.* at 104.

[22] Doc. No. 96 at 12 (cleaned up); *see also* Doc. No. 91 at 93 (contending that Al-Jame that he "was denied flight boarding").  The Government eventually allowed Al-Jame to fly.

### D. Procedural Posture

Initially, the Passengers brought claims under the Due Process Clause, the Equal Protection Clause, the Non-Delegation Doctrine, and the Administrative Procedure Act ("APA").  But the Court has whittled the case down.

First, the Court dismissed the Passengers' equal-protection and non-delegation claims.[23]  Further, the Court dismissed the Passengers' due-process claims but only to the extent the Passengers alleged a reputational liberty interest.[24]  Second, upon learning that the Government removed Kovac from the No-Fly List, the Court dismissed Kovac's due-process claims to the extent he alleged a liberty interest in the right to travel.[25]  Third, the Court dismissed the Passengers' due process claims to the extent the Passengers alleged a "liberty interest in nonattainder," thereby terminating the Passengers' sole remaining due-process theory.[26]  Fourth, to resolve the remaining APA claims, the Court allowed the Government to file portions of the administrative record "under seal and for *ex parte*, *in camera* review only."[27]

Consequently, only the APA claim remains.  The Passengers aver that the watchlist violates the APA in three ways.  First, under the major-questions doctrine, they contend that Congress never authorized the Government to create or maintain a watchlist.  Second, they argue that their supposed placement on the watchlist is

---

[23] *See* Doc. No. 12 at 55–56 (hereinafter *Kovac I*).

[24] *Id.* at 55.

[25] *See* Doc. No. 43 at 10 (hereinafter *Kovac II*).

[26] *See* Doc. No. 57 at 12 (hereinafter *Kovac III*).

[27] Doc. No. 81 at 12 (hereinafter *Kovac IV*).

arbitrary and capricious because the government had no reasonable basis for that placement.  Third, they contend that the redress process is arbitrary and capricious because it deprives passengers of a meaningful opportunity to correct erroneous information.

### E.  Standard of Review

A court may set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[28]  "A decision is arbitrary or capricious only when it is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[29]  "This narrow standard of review does not seek the court's independent judgment" but rather "asks only whether the agency engaged in reasoned decision making based on consideration of the relevant factors."[30]

APA claims may only seek equitable relief and get tried to judges—not juries. The Court's review is limited to the administrative record,[31] rendering the Court akin to an appellate tribunal over the agency.[32]  What courts would consider to be fact issues in a non-APA case they consider to be legal issues in an APA case, so summary

---

[28] 5 U.S.C. § 706(2)(A).

[29] *Yogi Metals Grp., Inc. v. Garland*, 38 F.4th 455, 458 (5th Cir. 2022) (cleaned up).

[30] *Id.*

[31] 5 U.S.C. § 706; *see also Luminant Generation Co. v. E.P.A.*, 714 F.3d 841, 850 (5th Cir. 2013) (recognizing that, in APA cases, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court" (cleaned up)).

[32] *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) ("[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal").

judgment is the appropriate mechanism for a district court to resolve an APA claim.[33] Because both sides moved for summary judgment, the Court can resolve the remaining claim here.

## II. Analysis

The Court considers the (A) major-questions doctrine arguments and (B) APA arguments.

### A. Major-Questions Doctrine

"Congress enacts laws that define and . . . circumscribe the power of [executive agencies] to control the lives of the citizens."[34]  Sometimes, however, agencies "defy Congressional limits" and aggrandize powers to themselves that Congress never granted.[35]  Thankfully, a judicial bulwark helps hobble administrative power grabs: The major-questions doctrine recognizes that there are "extraordinary cases . . . in which the history and the breadth of the authority that the agency has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority."[36]

In such cases, the current patchwork of applicable caselaw obligates courts to employ a two-pronged analysis.  First, a court must determine whether the agency

---

[33] *See James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996) (holding that issues that appellant argued were disputes of fact precluding summary judgment were issues of law in the context of agency review), *cert. denied*, 519 U.S. 1077 (1997).

[34] *Chamber of Com. of United States of Am. v. United States Dep't of Labor*, 885 F.3d 360, 387 (5th Cir. 2018).

[35] *Id.*

[36] *W. Virginia v. E.P.A.*, 142 S. Ct. 2587, 2608 (2022) (cleaned up).

asserted "the power to make decisions of vast economic and political significance."[37] Second, if the asserted power has significance, a court treats the power grab "with skepticism" and requires the agency to "point to clear congressional authorization permitting its action."[38]  A bevy of non-exhaustive factors helps determine clear authorization, including whether the agency (1) relies on a "cryptically delegated" power, (2) "lack[s] the requisite expertise," (3) "relies on an unheralded power," (4) receives a "transformative [power] expansion," (5) "fundamental[ly] revis[es]" the law, and (6) regulates subject matter "with a unique political history."[39]  The Court considers each prong in turn.

## 1. Vast Economic and Political Significance

"[T]he economic and political significance of [an] assertion" of authority can "provide a reason to hesitate before concluding that Congress . . . confer[red] such authority."[40]  It's not clear why the Supreme Court requires clear congressional authorization only for **major** questions or **significant** assertions of authority.  It seems like the separation of legislative power in Article I from executive power in

---

[37] *Brown v. U.S. Dep't of Educ.*, No. 4:22-CV-0908-P, 2022 WL 16858525, at *11 (N.D. Tex. Nov. 10, 2022) (Pittman, J.) (cleaned up), *cert. granted before judgment sub nom. Dep't of Educ. v. Brown*, 143 S. Ct. 541 (2022).

[38] *Brown*, 2022 WL 16858525, at *12 (cleaned up); *see also Alabama Ass'n of Realtors v. Dep't of Health & Human Servs.*, 141 S. Ct. 2485, 2489 (2021).  The Government contends that the law-of-the-case doctrine bars the Passengers' major-questions argument.  Doc. No. 100 at 7–8.  It doesn't.  In rejecting the Passengers' non-delegation argument, the Court held that Congress had provided the agencies with "a general policy" regarding the watchlist.  *Kovac I*, at 54.  But the Court didn't decide whether this is a major-questions case or whether Congress clearly authorized the agency action at issue.  Accordingly, there's no "rule of law enunciated by a federal court" that necessarily dictates the Court's major-questions analysis.  *Morrow v. Dillard*, 580 F.2d 1284, 1289 (5th Cir. 1978).

[39] Josh Blackman, *Gridlock*, 130 HARV. L. REV. 241, 266 (2016) (cleaned up).

[40] *W. Virginia*, 142 S. Ct. at 2608 (cleaned up).

Article II (subject to checks and balances like the presidential veto) means that agencies should always have clear congressional authorization when they act to avoid "lord[ing] it over the people without proper authority."[41]  Although some questions are obviously major based on the number of people who may feel the impact of the government regulation,[42] in some cases, it's unclear why the Supreme Court considered an agency power grab to be particularly major or significant.[43]  For instance, when an agency asserted authority to regulate tariff rates, the Supreme Court stressed that that authority had "enormous importance."[44]  It seems like what should be significant is not how many Americans the regulation impacts but instead that the regulation was without authorization from the people's elected representatives.[45]

In any event, the Court concludes that the watchlist has vast political significance under the Supreme Court's current formulation of the major-questions doctrine.  The watchlist consists of over a million people, and the Government could

---

[41] *Chamber of Com.*, 885 F.3d at 387.

[42] *See, e.g.*, *N.F.I.B. v. O.S.H.A.*, 142 S. Ct. 661, 665, 662 (2022) (finding an agency's vaccine mandate was a politically "significant encroachment into the lives—and health—of a vast number of employees" where it impacted "roughly 84 million workers"); *see also id.* at 667 (Gorsuch, J., concurring) ("The agency claims the power to force 84 million Americans to receive a vaccine or undergo regular testing.  By any measure, that is a claim of power to resolve a question of vast national significance.").  The Passengers contend that a major-questions case need not have economic significance—it can have purely political significance.  Doc. No. 101 at 7.  The Court agrees.

[43] Blackman, *supra* note 39, at 283 ("Why were the tariff rates in *MCI* and refundable tax credits in *King* so significant?  Without any further explication, these seem like mundane attributes of well-worn regulatory schemes.").

[44] *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 231 (1994).

[45] *See generally* Randy E. Barnett, *Restoring the Lost Constitution: The Presumption of Liberty* (2004).

place an unlimited number of people on it.[46]  Further, the liberty intrusions that flow from the watchlist are significant.  To maintain the watchlist, the Government "collect[s] a vast array of identifying information about an individual."[47]  Further, in this case alone, TSA agents executed a "full body search" on one Passenger and swabbed his carry-on bag.[48]  Government agents likewise interrogated many of the Passengers.  The Government can also "distribut[e] watch list information to thousands of other entities, and perhaps even impos[e] adverse immigration consequences on listees."[49]  Thus, the watchlist has vast political significance.[50]

## 2.  Clear Congressional Authorization

Regardless, Congress clearly authorized the watchlist.  Each relevant consideration demonstrates that authorization.

*Cryptically Delegated*:  Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions."[51]  For instance, when the Food and Drug Administration ("FDA") asserted the "authority to regulate tobacco products" based on a statutory provision allowing the FDA to ensure the "safety" of certain products, the Court concluded that "Congress could not have intended to

---

[46] Doc. No. 91 at 41 n.9 (providing data from 2017).

[47] Doc. No. 101 at 8.  The Passengers also assert that the Government "den[ies] some access to commercial flights that cross United States airspace altogether."  *Id.*  But only Kovac previously claimed he was on the No-Fly List, and, since the Government removed him from that list, this Court has found that "Kovac's claims stemming from his presence on the No-Fly List are moot."  *Kovac II*, at 9.  Accordingly, the Court declines to consider Kovac's being barred from flights.

[48] Doc. No. 91 at 104.

[49] Doc. No. 101 at 8.

[50] Even supposing that the watchlist doesn't present a major question, the Court would reach the same result because Congress clearly authorized the watchlist.

[51] *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001).

11

delegate a decision of such . . . significance to an agency in so cryptic a fashion."[52]  In short, Congress doesn't "hide elephants in mouseholes."[53]

Here, Congress clearly authorized the Government to create and maintain the watchlist.  Specifically, Congress authorized "[t]he Administrator of the [TSA] and the Director of the [FBI] jointly [to] assess current and potential threats to the domestic air transportation system," including "individuals with the capability and intent to carry out terrorist . . . acts."[54]  And Congress authorized the TSA Administrator and FBI Director "jointly [to] decide on and carry out the most effective method for continuous analysis and monitoring of [those] security threats."[55]  In short, Congress authorized the TSA and the FBI to identify potential terrorists and pick a method for monitoring them.  There's nothing cryptic about that command: Congress gave clear statutory authorization for the creation and maintenance of a list enumerating suspected terrorists.[56]

Further, Congress clearly authorized the TSA's use of the watchlist during airport screening.  Specifically, Congress authorized the TSA "to use information from government agencies to identify individuals on passenger lists who may be a threat to civil aviation or national security" and to "prevent [such] individual[s] from

---

[52] *F.D.A. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000).

[53] *Whitman*, 531 U.S. at 468.

[54] 49 U.S.C. § 44904(a).

[55] *Id.*

[56] The list of Congressional commands authorizing a watchlist could go on.  For instance, Congress charged the TSA with "establish[ing] procedures for notifying . . . airline security officers of the identity of individuals known to pose, or suspected of posing, a risk of air piracy or terrorism."  49 U.S.C. § 114(h)(2).  Congress also tasked DHS with "[p]reventing the entry of terrorists and the instruments of terrorism into the United States."  6 U.S.C. § 202(1).

boarding an aircraft[] or take other appropriate action with respect to [those] individual[s]."[57]   That's clear authorization for the TSA's use of the watchlist to screen airline passengers.

The Passengers disagree.  First, they contend that the Government can't locate any specific language authorizing the watchlist.  But the Passengers only come to that conclusion by ignoring the specific statutory language authorizing the watchlist. For instance, the Passengers cite 49 U.S.C. § 44904(a), but they omit its requirement that the TSA and FBI identify "individuals with the capability and intent to carry out terrorist . . . acts."[58]

Second, the Passengers obliquely contend that Congress didn't "***expressly*** authorize[]" the TSC or the watchlist.[59]  Presumably, the Passengers are peeved that none of the statutes expressly says "watchlist" or "Terrorist Screening Center."  But the test isn't whether the Government adopted Congress's preferred nomenclature in labeling its terrorism apparatuses.  The test is whether Congress "authoriz[ed] an agency to exercise [the] powers" at issue.[60]  And Congress clearly—not cryptically— authorized the watchlist.

*Expertise*: "When an agency has no comparative expertise in making certain policy judgments, . . . Congress presumably would not task it with doing so."[61]  For

---

[57] 49 U.S.C. § 114(h)(3)(A)–(B).

[58] Doc. No. 96 at 21 (quoting 49 U.S.C. § 44904(a)).

[59] *Id.* at 22 (emphasis added).

[60] *Alabama Ass'n*, 141 S. Ct. at 2489 (cleaned up).

[61] *W. Virginia*, 142 S. Ct. at 2612–13 (cleaned up).

instance, when the Occupational Safety and Health Administration ("OSHA") "ordered 84 million Americans to [] obtain a COVID-19 vaccine," the Supreme Court concluded that OSHA's "sphere of expertise" involves "hazards that employees face at work"—not "public health more generally."[62]

Tellingly, the Passengers ignore this consideration. The TSA's sphere of expertise includes identifying "individuals known to pose . . . a risk of . . . terrorism."[63] DHS has expertise in "prevent[ing] terrorist attacks."[64] And the FBI has expertise in "detect[ing] . . . crimes against the United States."[65] Accordingly, the Government possesses the expertise necessary to create and maintain a terrorist watchlist.

*Unheralded Power*: "When an agency claims to discover in a long-extant statute an unheralded power . . . , [courts] typically greet its announcement with a measure of skepticism."[66] For instance, in striking down OSHA's vaccine mandate, several Justices found it "telling that OSHA, in its half century of existence, has never before adopted a broad public health regulation of this kind."[67] Similarly, when the

---

[62] *N.F.I.B.*, 142 S. Ct. at 665.

[63] 49 U.S.C. § 114(h)(2); *cf. Pellegrino v. United States of Am. Transp. Sec. Admin., Div. of Dep't of Homeland Sec.*, 937 F.3d 164, 170 (3d Cir. 2019) (recognizing that "TSOs . . . perform the screening of all passengers and property[] to protect travelers from hijackings, acts of terror, and other threats to public safety" (cleaned up)).

[64] 6 U.S.C. § 111(b)(1)(A).

[65] 28 U.S.C. § 533(1).

[66] *Util. Air Regulatory Grp. V. E.P.A.*, 573 U.S. 302, 324 (2014) (cleaned up). *But see Griswold v. Connecticut*, 381 U.S. 479, 484 (1965) (discovering a substantive right to privacy in the long-extant Due Process Clause because "specific guarantees in the Bill of Rights have penumbras, formed by emanations from those guarantees").

[67] *N.F.I.B.*, 142 S. Ct. at 666 (Gorsuch, J., concurring) ("Section 655(c)(1) was not adopted in response to the pandemic, but some 50 years ago at the time of OSHA's creation. Since then, OSHA has relied on it to issue only comparatively modest rules addressing dangers uniquely prevalent inside the workplace, like asbestos and rare chemicals."); *see also BST Holdings, L.L.C. v. Occupational Safety & Health Admin., United States Dep't of Labor*, 17 F.4th 604, 619 (5th Cir. 2021) (Duncan, J.,

Center for Disease Control and Prevention ("CDC") imposed an eviction moratorium, the Court noted that "no regulation premised on [the statutory provision at issue] has even begun to approach the size or scope of the eviction moratorium."[68]

Tellingly, the Passengers also ignore this consideration, likely because the TSC has maintained the watchlist for nearly two decades.[69]  Before that, "nine [] agencies maintained twelve different [] watchlists."[70]  Accordingly, the authority to create and maintain a watchlist is not premised on a novel reading of a long-extant statute.

*Transformative Power Expansion*:  Courts distrust an agency's power grab if it "would bring about an enormous and transformative expansion in [the agency's] regulatory authority."[71]  Transformative expansions occur where an agency has "never before" exercised such a "sweeping authority."[72]  For instance, OSHA's vaccine mandate constituted a transformative expansion because it gave OSHA authority over the medical decisions of "84 million Americans," which was "simply not part of what the agency was built for."[73]

---

concurring) ("OSHA issued it under an emergency provision addressing workplace 'substances,' 'agents,' or 'hazards' that it has used only ten times in the last 50 years and never to mandate vaccines."); *Texas v. Becerra*, 575 F. Supp. 3d 701, 715–16 (N.D. Tex. 2021) (Kacsmaryk, J.) ("CMS itself admits that said statutory provisions have never been invoked or used to implement a vaccine mandate."), *appeal dismissed*, No. 22-10049, 2022 WL 2752370 (5th Cir. Jan. 24, 2022).

[68] *Alabama Ass'n*, 141 S. Ct. at 2489.

[69] *Kovac I*, at 3.

[70] Doc. No. 91 at 17.

[71] *Util. Air*, 573 U.S. at 324.

[72] *Florida v. Dep't of Health & Human Servs.*, 19 F.4th 1271, 1303 (11th Cir. 2021) (Lagoa, J., dissenting); *see also BST Holdings*, 17 F.4th at 619 (Duncan, J., concurring) (concluding that OSHA lacked authority to impose a vaccine mandate where "OSHA issued it under an emergency provision addressing workplace 'substances,' 'agents,' or 'hazards' that it has used only ten times in the last 50 years and never to mandate vaccines").

[73] *N.F.I.B.*, 142 S. Ct. at 665 (cleaned up).

The Passengers don't attempt to argue that the watchlist is a transformative power expansion, so they've forfeited any such argument.  On the arguments before it, the Court cannot conclude that the watchlist is a transformative power expansion. The watchlist existed for nearly two decades, and it drew from "twelve [existing] terrorist watchlists."[74]

*Fundamental Revision of the Law*:  Where a power grab would constitute "a fundamental revision of the statute" granting the agency power, courts conclude that the asserted power "was not the idea Congress enacted into law."[75]  For instance, when the Department of Education ("DOE") authorized "$400 billion in student loan forgiveness," the Northern District of Texas concluded that the DOE's asserted authority would effectively "rewrite title IV [] to provide for loan forgiveness."[76]

The Passengers ignore this consideration, and for good reason.  Congress required the TSA and FBI to identify individuals "with the capability and intent to carry out terrorist . . . acts" and to "carry out the most effective method for continuous analysis and monitoring of" those individuals.[77]  The watchlist implements that grant of authority—it doesn't revise it.

*Unique Political History*:  Sometimes the subject matter of an agency's asserted authority has a "unique political history" suggesting that Congress didn't grant the

---

[74] Doc. No. 91 at 17.

[75] *MCI Telecommunications*, 512 U.S. at 231–32.

[76] *Brown*, 2022 WL 16858525, at *13 (cleaned up).

[77] 49 U.S.C. § 44904(a).

agency authority to regulate the matter in question.[78]  For instance, when the FDA regulated tobacco products, the Court noted that Congress had "created a distinct regulatory scheme for tobacco products, squarely rejected proposals to give the FDA jurisdiction over tobacco, and repeatedly acted to preclude any agency from exercising significant policymaking authority in the area."[79]

Predictably, the Passengers ignore this consideration.  Congress didn't create a regulatory system for watchlists outside of the FBI, DHS, and TSA.  And instead of precluding those agencies' involvement in the watchlist, Congress has repeatedly ratified it.  For instance, Congress directed the TSA to "compar[e] passenger information . . . to the automatic selectee and no fly lists."[80]  Likewise, Congress directed DHS, "in consultation with the Terrorist Screening Center, [to] design and review . . . operating procedures for the collection . . . of data . . . in the no fly and automatic selectee lists."[81]  Accordingly, the political history confirms that Congress authorized the watchlist.

In sum, while the watchlist's political significance makes it a major question, Congress clearly authorized the list and TSA's use of it.  Accordingly, the Court rejects the Passengers' major-questions argument.

---

[78] *Brown & Williamson*, 529 U.S. at 159.

[79] *Id.* at 159–60.

[80] 49 U.S.C. § 44903(j)(2)(C)(i); *see also id.* § 44903(j)(2)(C)(v).

[81] 49 U.S.C. § 44903(j)(2)(E)(iii).

## B. Arbitrary and Capricious Review

The Court next analyzes the Passengers' arguments that (1) their alleged watchlist placement and (2) the watchlist redress procedures are arbitrary and capricious.

### 1. Alleged Watchlist Placement

The Passengers maintain that there's no "reasonable basis for the Government to place them on the watch list."[82]  Under arbitrary and capricious review, agencies must "articulate a satisfactory explanation for [their] action[s] including a rational connection between the facts found and the choice made."[83]  The Government has filed a classified supplement to its briefing for the Court's *ex parte*, *in camera* review, purportedly showing that, "to the extent that one or more Plaintiffs was or is in the [watchlist] . . . , any such placements were supported by evidence."[84]

After carefully considering that classified information, the Court concludes that any challenged Government action was neither arbitrary nor capricious.[85]  And any agency making such a watchlist nomination did not do so "solely based on race, ethnicity, national origin, religious affiliation, or First Amendment protected activities," as the Passengers allege.[86]

---

[82] Doc. No. 96 at 24.

[83] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up).

[84] Doc. No. 90 at 21.  The classified information is securely kept in a sensitive compartmented information facility—not in the Court's garage.

[85] Nothing in this opinion should be construed as confirming or denying the Passengers' status on or off the watchlist.

[86] Doc. No. 1 at 46.

Accordingly, the Court **GRANTS** the Government's motion for summary judgment as to any placement on the watchlist and **DENIES** the Passengers' motion for summary judgment as to any placement on the watchlist.

## 2. Redress Process

The Passengers complain that the redress process for individuals who believe they are on the watchlist does not provide such individuals "with any information about their apparent inclusion on the [watchlist]."[87]   Here's why that could be relevant: Congress requires the redress process to allow passengers to "correct information contained in [a] system" referred to as "the advanced passenger prescreening system."[88]   Thus, the argument goes, an individual must know his watchlist status "in order for an individual to correct erroneous information" in that system.[89]  The Government's failure to provide the Passengers' watchlist status, they argue, is therefore "arbitrary and capricious" in that it "entirely fail[s] to consider an important aspect of the problem."[90]

But the Government has not failed to consider the Passengers' ability to correct information in the prescreening system.   For instance, Passengers sometimes experience enhanced screening when the Government "misidentifie[s]" them because their "name is . . . similar to the name of a different individual who is included in the"

---

[87] Doc. No. 96 at 25 (emphasis omitted).

[88]  49 U.S.C. § 44903(j)(2)(C)(iii)(I); *id.* § 44903(j)(2)(C)(i) (recognizing that the passenger prescreening system "allow[s] the [DHS] to assume the performance of comparing passenger information . . . to the automatic selectee and no fly lists, utilizing all appropriate records in the consolidated and integrated terrorist watchlist maintained by the Federal Government").

[89] Doc. No. 96 at 25.

[90] *Motor Vehicle*, 463 U.S. at 43.

watchlist.[91]   Accordingly, the Government directs individuals seeking redress to "produce. . . at least one piece of government-issued photo identification."[92]   In such cases, photo identification allows the Government to "prevent future misidentification by . . . ***correcting information*** in the traveler's record."[93]

Further, the Government directs Passengers seeking redress to provide any "exculpatory information."[94]   That too helps correct erroneous information, because the "TSC reviews th[at] . . . exculpatory information . . . to make a new determination as to whether the individual continues to satisfy the standard for inclusion in the [watchlist]."[95]

But regardless, the Government declines to disclose watchlist status for good reason.[96]   Inclusion on the watchlist hinges on "highly sensitive national security and law enforcement information."[97]   Disclosure of that information could provide terrorists "with valuable insight into the specific ways in which the Government goes about detecting and preventing terrorist attacks."[98]   Even "[c]onfirmation that an individual is not in the [watchlist] would be of considerable value to terrorist groups," as it would allow them "to confirm which individuals . . . are more likely to evade

---

[91] Doc. No. 91 at 64 (cleaned up).

[92] *Id.* at 63.

[93] *Id.* (emphasis added).

[94] *Id.*

[95] *Id.* at 64–65.

[96] *Shrimpers & Fishermen of the RGV v. United States Army Corps of Eng'rs*, 56 F.4th 992, 996 (5th Cir. 2023) (recognizing that an agency's action is not arbitrary and capricious when the agency "articulate[s] a satisfactory explanation for its action" (cleaned up)).

[97] Doc. No. 91 at 41.

[98] *Id.*

20

detection and escape scrutiny."[99]  Tellingly, courts have repeatedly recognized the logic of that rationale.[100]

In sum, the Government has implemented the congressional mandate that passengers be able to correct information in the prescreening system.  But, for good reason, it does so without divulging a passenger's watchlist status.  The Passengers lodge three main objections.

First, the Passengers attempt to shoot the moon, maintaining that Congress's information-correcting requirement entitles them to even more information—in particular, all "information [] in the [terrorist] databases" concerning the Passengers.[101]  But that argument improperly conflates the ***prescreening system*** with the Government's ***terrorism database***.  The prescreening system—the information of which the Passengers are entitled to correct—is a system that "compar[es] passenger information . . . to the automatic selectee and no fly lists, utilizing all appropriate records in the . . . terrorist watchlist."[102]  Because the

---

[99] *Id.* at 43.

[100] *See, e.g., Elhady v. Kable*, 993 F.3d 208, 215 (4th Cir. 2021) ("For example, if a terrorist group knew that some of its operatives were *not* in the [watchlist], it could craft a plan sending those operatives through an airport or border while helping other members avoid detection."); *Gordon v. F.B.I.*, 388 F. Supp. 2d 1028, 1037 (N.D. Cal. 2005) ("Requiring the government to reveal whether a particular person is on the watch lists would enable criminal organizations to circumvent the purpose of the watch lists by determining in advance which of their members may be questioned."); *Wright v. Fed. Bureau of Investigation*, No. 3:20-CV-173-G-BN, 2020 WL 7345678, at *6 (N.D. Tex. Nov. 13, 2020) (Horan, M.J.) (approving, in the context of a Freedom of Information Act request, the FBI's refusal to "confirm[] []or den[y] the existence of any watchlist information, because the mere acknowledgment of the existence or non-existence of responsive records would trigger harm"), *report and recommendation adopted*, No. 3:20-CV-0173-G-BN, 2020 WL 7344707 (N.D. Tex. Dec. 14, 2020) (Fish, J.).

[101] Doc. No. 96 at 25.

[102] 49 U.S.C. § 44903(j)(2)(C)(i).

Government doesn't import the entirety of the NCTC's terrorism database into the prescreening system, Congress didn't provide the Passengers free rein to snoop through the terrorist databases.

Second, the Passengers cite *Latif v. Holder*, which held that the Government's redress procedure was arbitrary and capricious as applied to individuals on the "Mo–Fly [*sic*] List."[103]  That case is inapposite.  To begin, *Latif* erroneously conflated the prescreening system—which passengers are entitled to correct—and the terrorism databases—which passengers have no statutory right to correct.[104]  Moreover, the court didn't mention any governmental explanation for its nondisclosure of an individual's No-Fly List status.  In contrast, the Government here provides swaths of declarations explaining its rationale.  Accordingly, the Court declines to follow *Latif*.

Third, the Passengers note that the Government informs passengers seeking redress of their No-Fly List status.  Because the congressional mandate for a redress procedure is the same for individuals on the No-Fly List and the Selectee List, the argument goes, the Government's disclosure to individuals on the No-Fly List "highlights the illegality of its refusal to provide other affected passengers with any information at all."[105]

But the implied proposition in the Passengers' argument is that an agency must afford every subset of individuals the same level of redress procedures.

---

[103] 28 F. Supp. 3d 1134, 1163 (D. Or. 2014).

[104] *Id.* (requiring that a passenger be able "to correct erroneous information in the government's **terrorism databases**" (emphasis added)).

[105] Doc. No. 96 at 26.

Tellingly, the Passengers provide no precedent demanding such strict homogeneity. That's probably because they can't. The APA only requires courts to confirm that an agency has "a satisfactory explanation for its action."[106] The Court declines to impose a one-way ratchet on the Government.

Moreover, the Government has provided multiple satisfactory explanations as to why it alerts individuals of their No-Fly List status. As courts have noted, "[t]he No Fly List is the most restrictive category" because individuals in that category may not board "flights through U.S. airspace."[107] Thus, the Government explains that the "enhanced procedures" for those on the No-Fly List are "due to the substantially greater imposition that placement on the No Fly List entails for affected persons."[108]

Additionally, the Government notes that "a traveler may receive heightened screening for multiple reasons," so heightened screening doesn't effectively alert the screened passenger that he is on a watchlist.[109] But when the Government bars a person from boarding an airplane altogether, the cat's out of the bag. The barred passenger all but knows he's on the No-Fly List, so there's little point in the Government keeping up a charade when the barred passenger seeks redress. In contrast, "[t]he majority of passengers designated for enhanced security screening are so designated for reasons other than [watchlist] status," so a person subject to

---

[106] *Shrimpers*, 56 F.4th at 996 (cleaned up).

[107] *Elhady*, 993 F.3d at 214.

[108] Doc. No. 100 at 17.

[109] Doc. No. 100 at 17.

23

enhanced screening wouldn't know whether the Government suspects his involvement with terrorist activities.[110]

Because the Government's redress procedure is not arbitrary and capricious, the Court **GRANTS** the Government's motion for summary judgment as to the Passengers' APA claim concerning redress procedures and **DENIES** the Passengers' motion for summary judgment as to the Passengers' APA claim concerning redress procedures.

### III. Conclusion

The Court **DENIES** the Passengers' motion for summary judgment and **GRANTS** the Government's motion for summary judgment.

**IT IS SO ORDERED** this 9th day of March, 2023.

_____
BRANTLEY STARR
UNITED STATES DISTRICT JUDGE

---

[110] Doc. No. 91 at 71.